**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **MOBILE BAYKEEPER, INC.,**<br>**Plaintiff,**<br><br>**v.**<br><br>**ALABAMA POWER COMPANY,**<br>**Defendant.** | **Case No.: 1:22-cv-00382-KD-B**<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT ALABAMA POWER COMPANY'S
CORRECTED
<u>MOTION TO DISMISS AND BRIEF IN SUPPORT</u>**

<u>OF COUNSEL</u>:

Jaime W. Betbeze
(jbetbeze@maynardcooper.com)
Raymond L. Bell, Jr.
(rbell@maynardcooper.com)
Evan N. Parrott
(eparrott@maynardcooper.com)
MAYNARD COOPER & GALE P.C.
RSA Battle House Tower
11 N. Water St., Ste. 24290
Mobile, Alabama 36602
Telephone: (251) 432-0001

Ed R. Haden
(ehaden@balch.com)
Charles Burkhart
(cburkhart@balch.com)
Steven A. Burns
(sburns@balch.com)
Sean W. Shirley
(sshirley@balch.com)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100

**January 10, 2023**

**Table of Contents**

STATEMENT OF THE CASE.................................................................................................2

BACKGROUND ..............................................................................................................3

I.      Plant Barry ............................................................................................................3

II.     The Applicable CCR Regulatory Programs.................................................................4

        A.      Federal Regulation of Hazardous and Solid Waste. ....................................4
        B.      The Federal CCR Rule.................................................................................4
        C.      The State CCR Rule.....................................................................................5
        D.      Written Closure Plans. ................................................................................6
        E.      Groundwater Monitoring and Corrective Action.........................................6

III.    The Plant Barry Closure Plan Under the Federal and State CCR Rules.............................7

        A.      Alabama Power's Closure Plan for Plant Barry Effectively Contains the Coal
                Ash Under ADEM's Supervision. ..............................................................7
        B.      Alabama Power Is Implementing Corrective Action for Groundwater Issues. ......8
        C.      Alabama Power Remains Subject to Post-Closure Obligations. .........................9

IV.     ADEM Approved Alabama Power's Plan for Closure in Place. ........................................9

V.      Plaintiff's Complaint....................................................................................................12

LEGAL STANDARDS ..................................................................................................12

ARGUMENT ................................................................................................................13

I.      Alabama Power's Closure Plan Approved by ADEM Complies with the CCR Rules. ....13

II.     Plaintiff's Interpretations of Performance Standard Terms Are Contrary to the
        Language and Structure of the CCR Rule, as well as Decades of Historical Practice. .....18

        A.      Post-Closure Infiltration Means Infiltration Through the Cover. ...........................19
        B.      Groundwater is Not a "Free Liquid" Under the Federal CCR Rule. ......................24
        C.      The Obligation to Preclude Future Impoundment is also Directed at the Final
                Cover System. ............................................................................................26
        D.      EPA's January 11 Statement and Related Actions. ..............................................26

III.    Plaintiff is Estopped from Bringing the Very Three Claims that ADEM has Already
        Rejected.....................................................................................................................28

        A.      The Issues Plaintiff Raises Now Are Identical to the Issues it Raised Before
                ADEM in the Plant Barry Impoundment Closure Permit Proceeding..................29
        B.      The Issues were Actually Litigated Before ADEM.............................................29

1.      Restatement § 83 Focuses on the Due Process Procedures Available at the Agency Proceeding to the Party to Be Bound by Collateral Estoppel..................................................................29

2.      The Alabama Supreme Court Looks to What Procedures Were Available, Even if the Party to Be Bound Did Not Use Them. .................31

C.    The Resolution of the Issue was Necessary to the Final Determination by ADEM..................................................................33

D.    The Same Party is Involved in the ADEM Proceeding and in this Cases ............34

CONCLUSION....................................................................................34

CERTIFICATE OF SERVICE ...............................................................36

## Table of Authorities

**CASES**

*Adams v. Morton*,
    581 F.2d 1314 (9th Cir. 1978) ............................................................................ 34

*Auer v. Robbins*,
    519 U.S. 452 (1997)........................................................................................... 27

*Bakos v. UNUM Life Ins. Co. of Am.*,
    No. 22-11131, 2022 WL 3696648 (11th Cir. Aug. 25, 2022)..................................... 12

*Cal. Cmtys. Against Toxics v. EPA*,
    928 F.3d 1041 (D.C. Cir. 2019) ........................................................................... 24

*Cash Inn of Dade, Inc. v. Metro. Dade County.*,
    938 F.2d 1239 (11th Cir. 1991) ........................................................................... 13

*Caton v. City of Pelham*,
    329 So. 3d 5 (Ala. 2020)........................................................................... 28, 29, 31

*Chappelle v. City of Leeds*,
    No. 2:12-CV-2058-SLB, 2015 WL 5693636 (N.D. Ala. Sept. 29, 2015) ............................. 29

*City of Chicago v. Envtl. Def. Fund*,
    511 U.S. 328 (1994)........................................................................................... 24

*City of Graysville v. Glenn*,
    46 So. 3d 925 (Ala. 2010)................................................................................... 31

*Cmty. State Bank v. Strong*,
    651 F.3d 1241 (11th Cir. 2011) ........................................................................... 28

*Douglas v. Bayview Loan Servicing, LLC*,
    No. CA 11-00495-KD-C, 2012 WL 345364 (S.D. Ala. Jan. 13, 2012).................................. 12

*Durfee v. Duke*,
    375 U.S. 106 (1963)........................................................................................... 34

*Families Concerned About Nerve Gas Incineration v. U.S. Dep't of the Army*,
    380 F. Supp. 2d 1233 (N.D. Ala. 2005)................................................................... 32

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)....................................................................................... 27

*Kremer v. Chem. Constr. Corp.*,
    456 U.S. 461 (1982)........................................................................................... 32

*Kroner v. Comm'r of Internal Revenue*,
    48 F.4th 1272 (11th Cir. 2022) ........................................................................... 20

*Landau v. RoundPoint Mortg. Servicing Corp.*,
    925 F.3d 1365 (11th Cir. 2019) ........................................................................... 20

*Long v. Slaton*,
    508 F.3d 576 (11th Cir. 2007) .................................................................. 13

*Marshall Cty. Bd. of Ed. v. Marshall Cty. Gas Dist.*,
    992 F.2d 1171 (11th Cir. 1993) ................................................................ 12

*Mass. Mut. Life Ins. Co. v. United States*,
    782 F.3d 1354 (Fed. Cir. 2015) ................................................................ 12

*Meghrig v. KFC W., Inc.*,
    516 U.S. 479 (1996) ................................................................................. 12

*Sierra Club v. Two Elk Generation Partners, LTD P'ship*,
    646 F.3d 1258 (10th Cir. 2011) ................................................................ 32

*Sw. Airlines Co. v. Saxon*,
    142 S. Ct. 1783 (2022) ............................................................................. 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................. 12

*United States v. Howard*,
    28 F.4th 180 (11th Cir.), *cert. denied sub nom. Bramwell v. United States*, 143 S. Ct. 165
    (2022); ..................................................................................................... 12

*Walker v. City of Huntsville*,
    62 So. 3d 474 (Ala. 2010) ........................................................................ 29

## **STATUTES**

42 U.S.C. § 6945(d)(4) .................................................................................... 5

42 U.S.C. § 6922(a) ........................................................................................ 4

42 U.S.C. § 6928 ............................................................................................ 5

42 U.S.C. § 6944(a) ........................................................................................ 4

42 U.S.C. §§ 6901–6987 ................................................................................. 4

Ala. Code § 12-2-2 ........................................................................................ 32

Ala. Code § 12-3-10 ...................................................................................... 32

Ala. Code § 22-22A-7 ......................................................................... 12, 31, 32

Pub. L. No. 114-322, § 2301, 130 Stat. 1628, 1736 (2016) ............................ 1

## **RULES**

40 C.F.R. § 257.100 ...................................................................................... 23

40 C.F.R. § 257.102 ................................................................................. passim

40 C.F.R. § 257.104(b) .............................................................................. 9, 22

40 C.F.R. § 257.104(c) .................................................................................... 9

40 C.F.R. § 257.105 ........................................................................................ 7

40 C.F.R. § 257.106 ....................................................................................... 7

40 C.F.R. § 257.202 ..................................................................................... 16

40 C.F.R. § 257.50, *et seq.* ............................................................................ 1

40 C.F.R. § 257.53 ....................................................................................... 25

40 C.F.R. § 257.90 .................................................................................... 9, 22

40 C.F.R. § 257.96 ........................................................................................ 7

40 C.F.R. § 257.97 ........................................................................................ 7

40 C.F.R. § 257.98 ..................................................................................... 7, 9

40 C.F.R. §§ 257.90–98 ......................................................................... 6, 13, 22

40 C.F.R. Part 258 ........................................................................................ 4

40 C.F.R. Part 264 ........................................................................................ 4

40 C.F.R. Part 265 ........................................................................................ 4

45 Fed. Reg. 33,150 (May 19, 1980) ................................................................. 4

46 Fed. Reg. 12,414 ..................................................................................... 26

46 Fed. Reg. 12,425 (Feb. 13, 1981) ............................................................... 26

56 Fed. Reg. 50,978 (Oct. 19, 1991) ................................................................. 4

75 Fed. Reg. 35,172 (June 21, 2010) ............................................................... 23

75 Fed. Reg. 35,252-33 (June 21, 2010) ........................................................... 23

80 Fed. Reg. 21,301 (April 17, 2015) ................................................................ 2

ADEM Admin. Code r. 335-13-05-.06 ........................................................... 6, 16

ADEM Admin. Code r. 335-2-1-.17 .................................................................. 12

ADEM Admin. Code r. 335-13-15-.07(5)(b) ......................................................... 9

ADEM Admin. Code r. 335-13-15-.07(5)(c) ......................................................... 9

ADEM Admin. Code r. 35-13-15-.07 ................................................................. 16

Rule 12(b)(6), Fed. R. Civ. P. ...................................................................... 1, 12

## **OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 6, at 73
(2012) ...................................................................................................... 20

EPA, *Final Decision on Denial of Alternative Closure Deadline for Gen. James M. Gavin Plant, Cheshire*, Ohio (Nov. 18, 2022) ............................................................. 27

EPA, *Denial of Alternative Closure Deadline for Gen. James M. Gavin Plant* (Cheshire, Ohio), Response to Comments on Proposed Denial (Nov. 2022) ........................... 27

EPA, *Closure of Hazardous Waste Surface Impoundments* 26 (Sept. 1982) .............. 20

EPA, *Guide for Industrial Waste Management* 11-1 (Feb. 2003) ................................................. 20

Restatement (Second) of Judgments § 34 ...................................................................................... 34

Restatement (Second) of Judgments § 83 ................................................................... 28, 29, 30, 31

**DEFENDANT ALABAMA POWER COMPANY'S**
**CORRECTED**
<u>**MOTION TO DISMISS AND BRIEF IN SUPPORT**</u>

In its Complaint, Plaintiff challenges the adequacy of a written plan for closure of Alabama Power Company's Plant Barry coal combustion residuals ("CCR") impoundment (sometimes called a coal ash pond). The closure plan was approved by the Alabama Department of Environmental Management ("ADEM") in compliance with two sets of regulations: federal regulations adopted by the U.S. Environmental Protection Agency ("EPA") for the *Disposal of Coal Combustion Residuals from Electric Utilities*, 40 C.F.R. § 257.50, *et seq.* (2015), and state regulations adopted by ADEM, ADEM Admin. Code r. 335-13-15, that mirror the federal regulations (together, referred to as the "CCR rules").[1] Plaintiff asks this Court to substitute its judgment regarding the adequacy of the approved closure plan for the expert judgment of ADEM—the state agency that administers the permitting program governing the management and closure of CCR impoundments.

Alabama Power Company ("Alabama Power") moves to dismiss the Complaint, and its challenge to the closure plan as "unlawful," on three independent grounds. *See* Fed. R. Civ. P. 12(b)(6). *First*, Alabama Power's ADEM-approved closure plan includes all the information that is required under the federal and state CCR rules. *Second*, Plaintiff's interpretations of those rules are contrary to their language and structure, as well as decades of historical practice. *Third*, Plaintiff is estopped from challenging the final closure plan given its voluntary decision not to challenge the final closure permit during the administrative process.

---

[1] In 2016, Congress enacted the Water Infrastructure Improvements for the Nation Act to allow States to apply to EPA for approval of state CCR programs. *See* Pub. L. No. 114-322, § 2301, 130 Stat. 1628, 1736 (2016). At this time, Texas, Oklahoma and Georgia have approved state CCR programs, but Alabama's program is awaiting EPA approval.

## STATEMENT OF THE CASE

Following EPA's promulgation of the federal CCR rule in 2015, 80 Fed. Reg. 21,301 (April 17, 2015), ADEM, in June 2018, finalized its own state CCR regulations that govern the closure of CCR impoundments in Alabama. *See* ADEM Admin. Code Ch. 335-13-15. Those regulations include provisions that are identical to the federal CCR rule and expressly allow for two closure options: (1) closure in place; and (2) closure by removal. Pursuant to both sets of rules, Alabama Power prepared and submitted to ADEM a written closure plan for the Plant Barry CCR impoundment using one of the options made available by these rules—closure in place.

In July 2021, ADEM issued a final permit to Alabama Power approving its closure in place plan, finding it to be protective of public health and the environment pursuant to the CCR rules, and setting standards and procedures for closing the CCR impoundment at Plant Barry in place (the "Final Closure Permit"). In 2019, Alabama Power initiated closure activities as was required under federal and state regulations and has been working diligently to implement the closure plan since receiving the Final Closure Permit. At this stage in the process, Alabama Power has spent approximately $257 million in implementing the closure plan. When completed, the plan to close the CCR impoundment at Plant Barry is estimated to cost over $1 billion.

Now, four years after ADEM finalized its CCR rule, more than three years after Alabama Power initiated the closure process to remain in compliance with the federal rule, and more than a year after ADEM issued the Final Closure Permit, Plaintiff attempts through this Resource Conservation and Recovery Act ("RCRA") citizen suit to challenge the adequacy of the Plant Barry written closure plan and to derail the ongoing closure progress. According to Plaintiff, a utility can never demonstrate the adequacy of its closure plan based on one of the options explicitly authorized by the federal and state CCR rules—closure in place—where CCR is in contact with groundwater. Plaintiff bases this argument on its reading of several terms used in the closure

2

"performance standards" of the federal and state rules, *i.e.*, "post-closure infiltration," "free liquids," and precluding the "probability of future impoundment of water, sediment or slurry." (Doc. 1 ¶ 22, PageID.8). As explained below, Plaintiff's arguments are misplaced and need not be resolved to rule in Alabama Power's favor. Because Plaintiff's interpretations of the CCR rule's performance standards fail as a matter of law, they were properly rejected by ADEM at the rulemaking stage and during the permit proceedings for Plant Barry in which Plaintiff made precisely the same arguments it makes here in the Complaint.

This lawsuit should be seen for what it is—a programmatic challenge to the state and federal CCR programs to require "closure by removal" and prevent "closure in place," an environmentally protective closure method approved by EPA, ADEM, and other agencies for decades at other waste disposal facilities. At bottom, Plaintiff invites this Court to inject itself into the regulatory process, to bypass notice and comment procedures, to retrospectively re-write the CCR regulations, and to disrupt the ongoing closure of the Plant Barry CCR impoundment by eliminating the "close in place" option that EPA provided in 2015 and ADEM approved in 2021. The Court should decline Plaintiff's invitation and dismiss this lawsuit.

## BACKGROUND

### I.    Plant Barry.

Plant Barry is located near Bucks, Alabama on the banks of the Mobile River, approximately 18 miles upstream from Mobile. *See* ADEM, Coal Combustion Residual Facility Permit at 1 (July 1, 2021) ("Final Closure Permit") (Ex. A) (Doc.22-1, PageID.107). Alabama Power has operated a coal-fired generating plant at the site since 1954. *See* Amended Closure Plan for Ash Pond, Plant Barry, Alabama Power Company, Rev. 1, at Att. Stormwater & Contact Water Management Plan, Rev. A at 1 (Apr. 2020) ("2020 Revised Closure Plan") (Ex. L, App. 9, Att.) (Doc. 28-1, PageID.4891). The process of generating electricity at Plant Barry produces CCR,

which historically has been transported by water (sluicing) to a CCR impoundment. 80 Fed. Reg. at 21,303. Constructed in 1965, the Plant Barry CCR impoundment covers roughly 597 acres. *See* 2020 Revised Closure Plan, at 2 (Ex. L, App. 9) (Doc. 27-1, PageID.4852).

In the six decades that that the dikes have been in place at Plant Barry, there never has been a failure or spillage from the CCR impoundment, even though several Category 5 hurricanes have passed through the area during that time.[2] *Compare* (Doc. 1 ¶¶ 12-13, 41, PageID.4-5, 12-13).

## II.    The Applicable CCR Regulatory Programs.

### A.    Federal Regulation of Hazardous and Solid Waste.

RCRA governs solid waste disposal. 42 U.S.C. §§ 6901–6987. EPA has regulated the disposal of hazardous waste since 1980 and municipal solid waste since 1991. *See* 40 C.F.R. Parts 258, 264, 265; 45 Fed. Reg. 33,150 (May 19, 1980); 56 Fed. Reg. 50,978 (Oct. 19, 1991). All RCRA waste disposal regulations must protect human health and the environment. 42 U.S.C. §§ 6922(a), 6944(a).

### B.    The Federal CCR Rule.

In April 2015, EPA published the federal CCR rule to "establish[] nationally applicable minimum criteria for the safe disposal of [CCR] in landfills and surface impoundments [ponds]." 80 Fed. Reg. at 21,303. In its CCR regulations, EPA recognized two methods of closure—(1) excavation and removal of the CCR, and (2) closure in place. *Id.* at 21,412. EPA determined that "both methods of closure . . . can be equally protective." *Id.*; *see also id.* at 21,310 (noting RCRA's protectiveness standard). Under the federal rule, a CCR impoundment owner is permitted to determine which method of closure is appropriate for a particular unit. *Id.* at 21,412. In preparing

---

[2] NOAA, *Historical Hurricane Tracks,* https://coast.noaa.gov/hurricanes (search "36512"; select 50 miles under "Search Distance"; select Categories 1-5 and Tropical Storm under "Storm Categories"; select years 1965-2022 under "Year(s)").

to issue the final rule, EPA assessed CCR impoundments around the country and found that a some "come in direct contact with the water table for at least part of the year."[3] Nonetheless, "EPA did not propose to require" closure by removal under the federal CCR rule, and anticipated that "most facilities" would not close their CCR units by removal "given the expense and difficulty of such an operation." *Id. See id.* ("*most facilities will likely not clean close* [i.e., closure by removal] *their CCR units* given the expense and difficulty of such an operation.") (emphasis added).[4]

Plant owners and operators are directed to exercise their judgment to implement the federal CCR rule, with certification by professional engineers of key data and submittals. *See, e.g.*, 40 C.F.R. § 257.102(b)(4). While EPA retains oversight and enforcement responsibility, the agency has not yet adopted its own permitting program to implement the rule. *See* 42 U.S.C. §§ 6928, 6945(d)(4) (enforcement authority). Some States, like Alabama, have developed permitting programs to support timely implementation of the CCR program. *See* 82 Fed. Reg. 38,685 (Aug. 15, 2017).

### C.     The State CCR Rule.

Following up on the federal CCR rule, ADEM adopted state CCR regulations in 2018 under the Alabama Administrative Procedure Act. *See* ADEM Admin. Code r. 335-13-15. These regulations are substantively identical to the federal CCR rule as to obligations for closure and

---

[3] *See* EPA, Human and Ecological Risk Assessment of Coal Combustion Residuals, EPA-HQ-RCRA-2009-0640-11993, at 5-10 (Dec. 2014) ("2014 Risk Assessment") (Ex. R) (Doc. 47-1 through 49-1, PageID.8900).

[4] *See* EPA, Regulatory Impact Analysis: EPA's 2015 RCRA Final Rule Regulating Coal Combustion Residual (CCR) Landfills and Surface Impoundments at Coal-Fired Utility Power Plants, EPA-HQ-RCRA-2009-0640-12034, at 4-28 (Dec. 2014) (Ex. S) (Doc. 49-1, PageID.10205) (including costs for capping CCR impoundments when estimating cost of closure).

groundwater protection, as described further below. *Compare, e.g.,* ADEM Admin. Code rr. 335-13-15-.07(3)(d)(1)-(3), *with* 40 C.F.R. §§ 257.102(d)(1)-(3); *compare* ADEM Admin. Code rr. 335-13-15-.06(7)-(9), *with* 40 C.F.R. §§ 257.96-98.

ADEM's CCR regulations also provide for a closure permit program. *See* ADEM Admin. Code r. 335-13-15-.07(3)(b)1 (CCR permitting obligation); *see also id.* Ch. 335-13-5 (permitting procedures). In December 2021, ADEM submitted an application to EPA for approval of Alabama's CCR program.[5] ADEM is waiting on final approval of the Alabama CCR program.

### D.    Written Closure Plans.

The federal CCR rule required owners of facilities subject to the CCR rule to place an initial written closure plan in each facility's operating record by October 17, 2016. 40 C.F.R. § 257.102(b)(2). The plan must describe the method of closure the owner intends to use, including certain descriptions and estimates of waste in place and its condition. *Id*. § 257.102(b)(1).

### E.    Groundwater Monitoring and Corrective Action.

In addition, the CCR rules include a separate set of requirements for continued monitoring of groundwater around the CCR impoundment and the conduct of corrective action when contaminants are detected above certain defined levels. *See id*. §§ 257.90–98; ADEM Admin Code r. 335-13-15-.06. As the name implies, the purpose of corrective action is to "correct" or remediate impacts to groundwater. If groundwater is impacted, then the facility must identify and assess corrective measures, 40 C.F.R. § 257.96, select one or more remedies to remediate impacted

---

[5] Ala. Env't Mgmt. Comm'n, Minutes of Feb. 11, 2022 Ala. Env't Mgmt. Comm'n Meeting at 18:25-19:2 (certified Apr. 8, 2022) (Ex. O, Part A, Tr.) (Doc. 44-1, PageID.6409). The State of Alabama on behalf of ADEM has filed a notice of intent to sue EPA for failure to approve the CCR closure permit program. Letter from Steve Marshall, Atty. Gen. to Michael Regan, Adm'r, EPA (Dec. 9, 2022), *available at* https://www.epa.gov/system/files/documents/2022-12/2022%20EPA-049.pdf (last visited Dec. 18, 2022).

groundwater, *id*. § 257.97; and implement a plan for corrective action, *id*. § 257.98. Together, these requirements apply whenever corrective action is required, including "during the closure and post-closure care period." 80 Fed. Reg. at 21,399.

### III.    The Plant Barry Closure Plan Under the Federal and State CCR Rules.

### A.    Alabama Power's Closure Plan for Plant Barry Effectively Contains the Coal Ash Under ADEM's Supervision.

In accordance with the federal CCR rule, Alabama Power placed its initial "closure in place" plan for Plant Barry in the facility's operating record on October 17, 2016, and posted it to Alabama Power's publicly accessible website on November 16, 2016. Alabama Power amended the plan with greater detail in 2019.[6] That plan, which was over 500 pages, included a highly detailed and technical plan for closure, as well as a storm water and contact water management plan, a construction best management practices plan, a construction quality assurance plan, an organic material management plan, and technical specifications and design drawings. *See id*. In April 2020, Alabama Power posted another amendment to the plan in further support of its closure permit application. *See* 2020 Revised Closure Plan (Ex. L, App. 9) (Doc. 27-1 through 37-1, PageID.4848-5449). Per the plan, closure of the CCR impoundment will generally consist of the following activities:

- **Site Preparation**: Site preparation activities have been performed, including, contractor mobilization, vegetation management, implementation of erosion and sediment control measures, installation of auxiliary equipment with a temporary wastewater treatment system, pumps and corresponding pump pad, and piping.

- **Dewatering**: Free liquids contained within the ash pond must be removed as per a dewatering plan submitted to ADEM.

---

[6] *See* Amended Closure Plan for Ash Pond, Plant Barry, Alabama Power Company at 2 (July 2019) ("2019 Amended Closure Plan") (Ex. N) (Doc. 40-1, PageID.5897); 40 C.F.R. §§ 257.106(d), (i)(4); *id*. § 257.105(i)(4). As allowed by the federal CCR rule, in July 2019, Alabama Power posted an amended closure plan to support the closure permit application submitted to ADEM. *See* 2019 Amended Closure Plan (Ex. N) (Doc. 40-1, PageID.5889).

- **Treatment**: Interstitial (pore) water removed from CCR to support CCR excavation and placement activities must be treated as per the dewatering plan.

- **Consolidation**: Excavated and dewatered CCR must be placed and compacted within the consolidated footprint. A soil containment berm will be constructed to contain the CCR and provide separation between the consolidated footprint and areas where CCR will be excavated and relocated to the consolidated footprint.

- **Covering**: The final cover system and stormwater management systems must be installed once an area of the consolidated footprint is complete and final grades are achieved.

*See id.* at 4 (Ex. L, App. 9) (Doc. 27-1, PageID.4855).

To date, Alabama Power has completed initial dewatering of the CCR impoundment at Plant Barry and is now preparing areas where containment berms will be constructed. Alabama Power anticipates completing construction of new subsurface barrier walls and containment dikes, placement of CCR behind these dikes, and installation of the final cover system on top of the impoundment by 2031. *See id.* at Table 1 (Ex. L, App. 9) (Doc. 27-1, PageID.4878).

**B.     Alabama Power Is Implementing Corrective Action for Groundwater Impacts.**

As part of its ongoing program for groundwater monitoring, Alabama Power detected levels of arsenic and cobalt at some locations on the plant site and is implementing corrective action to address those impacts.[7] (Doc. 1 ¶ 43, PageID.13). Under the corrective action regulations, Alabama Power has identified measures to address groundwater issues; completed an assessment of corrective measures on June 12, 2019; held a public meeting regarding its remediation strategy

---

[7] Concurrently with its development of its CCR regulations, ADEM issued an administrative order that requires Alabama Power to address groundwater issues, which Alabama Power continues to follow in addition to its regulatory obligations. (Doc. 1 ¶ 43, PageID.13).

on June 30, 2020; and submitted its Groundwater Remedy Selection Report to ADEM on October

29, 2021, where it awaits ADEM approval.[8]

      **C.**      **Alabama Power Remains Subject to Post-Closure Obligations.**

The CCR rules contain extensive 30-year post-closure care obligations that apply to

Alabama Power. These post-closure care requirements include: (1) maintaining the integrity of the

final cover system, including making repairs to the final cover as necessary to correct the effects

of settlement, subsidence, erosion, or other events, and preventing run-on and run-off from eroding

or otherwise damaging the final cover system; and (2) maintaining the groundwater monitoring

system under §§ 257.90 through 257.98. *See* 40 C.F.R. § 257.104(b); ADEM Admin. Code r. 335-

13-15-.07(5)(b). If any releases occur, the CCR rules require Alabama Power to implement

corrective action until remediation is complete. *See* 40 C.F.R. § 257.104(c); ADEM Admin. Code

r. 335-13-15-.07(5)(c).

**IV.**      **ADEM Approved Alabama Power's Plan for Closure in Place.**

After Alabama Power submitted its closure plan and permit application, on February 19,

2021, ADEM issued an initial draft permit for closure in place and a notice for comment and a

public hearing on the proposed permit.[9] ADEM then received written comments and held the

---

[8] Alabama Power Company, 2021 Annual Groundwater Monitoring and Corrective Action Report, at i-iii, 2 (Jan. 31, 2022) (Ex. P) (Doc. 45-1, PageID.6565-6567, 6576) *available at* https://www.alabamapower.com/content/dam/alabama-power/pdfs-docs/company/how-we-operate/ccr/plant-barry/ash-pond/groundwater-monitoring-and-corrective-action/2021%20Annual%20Groundwater%20Monitoring%20and%20Corrective%20Action%20Report%20-%20Barry%20Ash%20Pond.pdf

[9] *See* ADEM, Preliminary Determination, Initial Permit and Variance (Feb. 19, 2021) (Ex. B) (Doc. 22-1, PageID.120-134); ADEM, Notice of a Proposed Coal Combustion Residuals Permit Under the Ala. Solid Wastes & Recyclable Materials Mgmt. Act & Request for Comments Public Hearing Notice – 422 (Feb. 19, 2021) ("Feb. 19, 2021 Public Notice") (Ex. C) (Doc. 22-1, PageID.136-138).

public hearing in March 2021. *See* Feb. 19, 2021 Public Notice (Ex. C) (Doc. 22-1, PageID.136-138). At the public hearing and in a letter submitted to ADEM, Plaintiff argued that Alabama Power's closure plan did not meet the state and federal CCR rules' requirements for "infiltration," "impoundment," and "free liquids" because CCR would be in contact with groundwater at the time of closure—the same exact arguments Plaintiff makes here:

### Plaintiff's Identical Arguments

| Plaintiff's Arguments<br>in the ADEM Permit Proceeding | Plaintiff's Arguments<br>in this Case |
|---|---|
| **Infiltration**<br><br>"Utilities must control, minimize, or eliminate to the maximum extent feasible post-closure **infiltration** of liquids." ADEM, Transcript of Public Hearing on Proposed Coal Combustion Residuals (CCR) Permit, Ala. Power Co., James M. Barry Elec. Generating Plant at 108:3-113:19, 110:5-8 (Mar. 30, 2021) ("Pub. Hr'g Tr.") (Ex. G.) (Doc. 51-1, PageID.12224) (Stmt. of Sam St. John, Plaintiff Bd. Member).<br><br>"Alabama Power's Closure Plans must demonstrate that groundwater will not continue to flow through coal ash in order to satisfy the requirement to 'control minimize or eliminate to the maximum extent feasible, post-closure infiltration of liquids into the waste . . ..'" Letter from Plaintiff's Counsel to Russell A. Kelly, ADEM, at 10 (Apr. 6, 2021) ("2021 Letter from Plaintiff's Counsel") (Ex. E) (Doc. 51-1, PageID.11887-12030). | **Infiltration**<br><br>"The plan must '[c]ontrol, minimize or eliminate, to the maximum extent feasible, post-closure **infiltration** of liquids into the waste . . . .'" (Doc. 1 ¶ 22b, PageID.8).<br><br>"[I]f coal ash is in contact with water, capping the [coal ash] in pace will not control, minimize, or eliminate, the maximum extent feasible, post-closure infiltration of liquids into the waste . . . ." (*Id.* at ¶ 36, PageID.11).<br><br>"[T]he closure plan must demonstrate that if the ash is left in place, it will achieve each and all of the . . . performance standard requirements," including the requirements to 'control, minimize, or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste' . . . ." (*Id.* at ¶ 22, PageID.8). |
| **Impoundment**<br><br>"The utility can cap in place only if the cap-in-place design precludes the possibility of future **impoundment** of water, sediment or slurry." Pub. Hr'g Tr. at 108:3-113:19 (Ex. G) (Doc. 51-1, PageID.12223) (Stmt. of Sam St. John, Plaintiff Bd. Member).<br><br>"The proposed cap-in-place for Barry retains the dam or part of the dam . . . The proposed Barry cap-in-place plan does not appear to satisfy any of the requirements . . . ." *Id.* at 109:11-110:17 (PageID.12223-12224). | **Impoundment**<br><br>"The plan must '[p]reclude the probability of future **impoundment** of water, sediment, or slurry.'" (Doc. 1 ¶ 22b, PageID.8).<br><br>"[D]ikes will remain around the capped [coal ash]. . . The [coal ash] contains natural and/or man-made depressions that impound water, coal ash, slurry, and sediment." (*Id.* at ¶ 48) "[The] closure plan . . . fails to meet the minimum requirements . . . by impounding slurry, sediment, and/or water . . . ." (*Id.* at ¶ 51, PageID.15). |

| Plaintiff's Arguments in the ADEM Permit Proceeding | Plaintiff's Arguments in this Case |
|---|---|
| **Free Liquids**<br><br>"**Free liquids** must be eliminated by removing liquid wastes or solidifying remaining wastes." Pub. Hr'g Tr. at 108:3-113:19, 109:21-24 (Ex. G) (Doc. 51-1, PageID.12223) (Stmt. of Sam St. John, Plaintiff Bd. Member).<br><br>"Well, of course, they're leaving 50 percent of the ash pond in place, not touching it below groundwater . . . ." *Id*. at 109:24-110:1 (PageID.12223-12224). | **Free Liquids**<br><br>"**Free liquids** must be eliminated by removing liquid wastes or solidifying the remaining wastes . . . ." (Doc. 1 ¶ 22a, PageID.8).<br><br>"This provision on its face prevents a coal ash impoundment from being capped and closed in place if coal ash is in groundwater . . . ." (*Id*. at ¶ 30, Page ID.10). |

*See also* Pub. Hr'g Tr. at 100:3-105:6 (Ex. G) (Doc. 51-1, PageID.12214-12219) (Stmt. of Ray Mayhall, Plaintiff Member).

In April 2021, Plaintiff's counsel filed evidence (including expert reports) in opposition to Alabama Power's permit on behalf of Plaintiff, repeating these arguments once again. *See* 2021 Ltr. from Plf's Counsel at 9-11 (Ex. E) (Doc. 51-1, PageID.11895-11897).

After considering Plaintiff's comments, ADEM rejected them and issued the final permit authorizing closure in place for the CCR impoundment at Plant Barry. ADEM's "Final Determination" states:

> The permit requires the Permittee [Alabama Power] to manage CCR in accordance with the conditions of the permit, ADEM Admin Code r. 335-13-15 [*i.e.*, closure requirements for infiltration, impoundment, and free liquids], "Standards for the Disposal of Coal Combustion Residuals in Landfills and Surface Impoundments" [i.e., the state and federal CCR rules], and the approved permit application.

> Groundwater monitoring and corrective action requirements in the permit establish a groundwater monitoring system of wells . . . . For units where CCR constituents exceed acceptable levels, the permit establishes corrective action requirements to remediate contamination caused by the units.

Final Closure Permit, Final Determination at 1 (Ex. A) (Doc. 22-1, PageID.104).

Despite having the right to do so, Plaintiff elected not to appeal the final closure permit to the Alabama Environmental Management Commission ("AEMC") or through the state court

system. The Commission's regulations provide for a hearing on an administrative appeal of the permit decision with trial-type procedures, including intervention by parties, a schedule for motions, a prehearing process, discovery, and submission of evidence. ADEM Admin. Code rr. 335-2-1-.06, 335-2-1-.07, 335-2-1-.10, 335-2-1-.11, 335-2-1-.14. If Plaintiff had pursued this option, the Commission ultimately would have issued an order on the administrative appeal, *id.* r. 335-2-1-.17, which itself is appealable to the Alabama courts. Ala. Code § 22-22A-7(c)(6).

## V.    Plaintiff's Complaint.

On September 26, 2022—more than one year after ADEM's final determination and permit issuance—Plaintiff filed its lawsuit in this Court. *See* Doc. 1. In its Complaint, Plaintiff raises the same exact arguments that it made during the ADEM CCR rule-making and that it made in the ADEM permit proceeding.

## <u>LEGAL STANDARDS</u>

A court should grant a motion to dismiss "'when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action.'" *Bakos v. UNUM Life Ins. Co. of Am.*, No. 22-11131, 2022 WL 3696648, at *2 (11th Cir. Aug. 25, 2022) (quoting *Marshall Cty. Bd. of Ed. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)). "The interpretation of a regulation is. . . a question of law." *Mass. Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1362 (Fed. Cir. 2015). A plaintiff's ability to maintain a RCRA claim for an alleged violation of an EPA regulation may be challenged on a motion to dismiss. *See, e.g.*, *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 482-83, 488 (1996) (reversing court of appeals and concluding that

the district court properly dismissed the plaintiff's complaint for failure to state a claim under RCRA).[10]

## ARGUMENT

Alabama Power understands and fully embraces its obligation to protect human health and the environment, which includes protecting groundwater. Throughout its Complaint, Plaintiff confines the obligation to protect groundwater to the CCR rule's *closure* provisions, but entirely omits any mention of the groundwater monitoring and *corrective action regulations* that address detecting and remediating contaminants in the groundwater. Alabama Power is in full compliance with EPA regulations for *both* closure (§ 257.102) and corrective action (§§ 257.96-98), which, in turn, protect human health and the environment.

## I.  Alabama Power's Closure Plan Approved by ADEM Complies with the CCR Rules.

This is a straightforward case. Plaintiff asserts that "[u]nder the [CCR] Rule . . . Alabama Power was required to 'prepare an initial written closure plan consistent with the requirements specified in paragraph (b)(1) of [40 C.F.R. § 257.102]'." (Doc. 1 ¶ 20, PageID.7). Plaintiff explains that paragraph (b)(1) requires the closure plan to "*describe* 'how the final cover system

---

[10]   In deciding a motion to dismiss under Rule 12(b)(6), the Court "may consider … documents whose contents are alleged in the complaint and whose authenticity is not questioned … without converting the motion to dismiss to a motion for summary judgment." *Douglas v. Bayview Loan Servicing, LLC*, No. CA 11-00495-KD-C, 2012 WL 345364, at *3 (S.D. Ala. Jan. 13, 2012) (internal quotations and citations omitted). Likewise, the court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). *See United States v. Howard*, 28 F.4th 180, 186 n.2 (11th Cir.) ("[S]he surrendered her medical license. That fact is not included in the record, but we can take judicial notice of it as a publicly available state agency record."), *cert. denied sub nom. Bramwell v. United States*, 143 S. Ct. 165 (2022) (taking judicial notice of an investigative report from the Alabama Bureau of Investigation); *Cash Inn of Dade, Inc. v. Metro. Dade County*, 938 F.2d 1239, 1242–43 (11th Cir. 1991) ("[N]umerous courts have held that an authenticated record of the proceedings before an administrative or legislative body are properly the subject of consideration by the district court.").

will achieve the performance standards specified in paragraph (d) of this section.'" (Doc. 1 ¶ 21, PageID.7) (quoting 40 C.F.R. § 257.102(b)(1)(iii)) (emphasis added). Plaintiff, however, then argues that Alabama Power's written closure plan violates the federal CCR rule because it does not "*demonstrate* that if the ash is left in place, [the closure plan] will achieve each and all of the…performance standard[s]" of subsection (d). (*Id*. ¶ 22, PageID.8) (emphasis added). Inasmuch as Plaintiff challenges the adequacy of Alabama Power's written closure plan,[11] if that plan meets the basic requirements of the federal and Alabama CCR rules, that challenge must be rejected and the Complaint dismissed. That is the case here as shown below:

| EPA's Information Requirement Under § 257.102(b)(1), and ADEM's Requirement under ADEM Admin Code r. 335-13-15-.07(3)(b). | Plant Barry Am. Closure Plan (April 2020)[12] |
|---|---|
| A narrative description of how the CCR unit will be closed in accordance with this section. | Sections 1, 2 and 4 (pp. 1-15) (PageID.4852-4866) |
| A description of the final cover system, designed in accordance with paragraph (d) of this section, and the methods and procedures to be used to install the final cover. | Sections 4.4.2, 4.5 (pp. 15-17) (PageID.4866-4868) |
| The closure plan must also discuss how the final cover system will achieve the performance standards specified in paragraph (d) of this section. | Section 4.6 (pp. 17-19) (PageID.4868-4870) |
| An estimate of the maximum inventory of CCR ever on-site over the active life of the CCR unit. | Section 5 (p. 19) (PageID.4870) |
| An estimate of the largest area of the CCR unit ever requiring a final cover as required by paragraph (d) of this section at any time during the CCR unit's active life. | Section 6 (p. 20) (PageID.4871) |
| A schedule for completing all activities necessary to satisfy the closure criteria in this section, including an estimate of the year in which all closure activities for the CCR unit will be completed. | Section 16 (p. 23) (PageID.4874) |

---

[11] *See, e.g.*, (Doc. 1 ¶ 1, PageID.1) ("This citizen enforcement action challenges the unlawful closure plan…"); (*id*. at Prayer for Relief, ¶ A, PageID.17) (alleging that the closure plan fails to "comply with the closure plan requirements" of the CCR rule).

[12] The 2020 Revised Closure Plan is available at Ex. L, App. 9, PageID.4848-5449.

Nowhere does Plaintiff allege that Alabama Power failed to address any of these requirements of § 257.102(b)(1) or to include any of the information above in its written closure plan. For example, Plaintiff does not allege that Alabama Power failed to "discuss how the final cover system will achieve the performance standards specified in paragraph (d) of this section." 40 C.F.R. § 257.102(b)(1)(iii). The closure plan complies with the federal CCR rule and Plaintiff's Complaint is due to be dismissed for this reason alone.

In an effort to create a federal claim, Plaintiff rewrites the plain language of § 257.102(b)(1) to impose requirements for written closure plans beyond those that appear on the face of the federal CCR rule. Plaintiff asserts that the closure plan must not only "describe" how the CCR Rule performance standards of § 257.102(d) will be met, but "must [also] *demonstrate*" that the closure plan "will achieve" these closure performance standards, including the requirements (i) to "[c]ontrol, minimize or eliminate, to the maximum extent feasible, post-closure *infiltration* of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters," (ii) to "[p]reclude the probability of future *impoundment* of water, sediment, or slurry," and (iii) to eliminate "*free liquids*" prior to installing the final cover system. (Doc. 1 ¶¶ 21-22, PageID.7-8) (emphases added). According to Plaintiff, these three provisions create a simple decisional rule for this "demonstrat[ion]": "Under each of these three requirements, a coal ash impoundment cannot be capped in place with coal ash in contact with groundwater." (*Id.* ¶ 23, PageID.8).

Plaintiff's challenge to Alabama Power's closure plan fails for three reasons. First, all that the federal CCR rule requires is that Alabama Power post a written closure plan that contains the information specified in § 257.102(b)(1)(i)-(vi), including a "discuss[ion] [of] how the *final cover system* [not "closure plan"] will achieve the performance standards specified in paragraph (d) of

this section," and more generally "how the CCR unit will be closed in accordance with this section." 40 C.F.R. § 257.102(b)(1)(i), (iii). By its terms, Alabama Power's closure plan discusses how the CCR impoundment will be closed in accordance with § 257.102(d), and Plaintiff does not allege otherwise.

Second, there is no requirement in § 257.102(b)(1) that an operator "demonstrate" compliance with the subsection (d) performance standards using the measures "discuss[ed]" in its plan. To the contrary, the word "demonstrate" appears nowhere in § 257.102(b)(1). Rather than requiring that a closure plan "demonstrate" compliance with the performance standards in § 257.102(d), § 257.102(b)(1) requires only that an operator "*discuss*" in a closure plan "how the final cover system will achieve" those standards. *See id*. § 257.102(b)(1)(iii) (emphases added). For this reason, rather than requiring an operator to "demonstrate" that the closure plan complies with performance standards that have not been fully implemented, the federal and state CCR rules contemplate and provide procedures for updates as may be necessary to maintain ongoing compliance, even "after closure activities have commenced." *Id*. § 257.102(b)(3)(ii)(II); ADEM Admin. Code r. 335-13-15-.07(3)(b)3.(ii)(II); *see also id*. r. 335-13-05-.06 (permit modification procedures). To that end, Alabama Power's closure plan not only sets out the measures that it currently believes will be needed to meet the subsection (d) performance standards, but explains that as the plan is implemented "system performance is monitored" and additional technologies may be used "as needed if the selected approach is not performing as intended or corrective action goals are not met." 2020 Revised Closure Plan at 19 (Ex. L, App. 9) (Doc. 27-1, PageID.4870). In that case, Alabama Power explains that, in accordance with the federal and state CCR rules, the closure plan may be "amended or supplemented to include other protective measures." *Id*.

16

Third, if "no closure with CCR in contact with groundwater" was the standard, somewhere in § 257.202(b) or (d) or in the hundreds of pages explanation of the 2015 CCR regulation, EPA would have said it. But EPA did not. Plaintiff asserts that its "no contact with groundwater" standard for CCR units is compelled by its reading of the terms "infiltration," removal of "free liquids," and future "impoundment of water" in subsection (d). (Doc. 1 ¶ 21, PageID.7). As Alabama Power explains below, subsection (d) cannot reasonably be read to eliminate one of the two closure options that EPA provided in the federal CCR rule for all CCR units (i.e., "closure in place"). Indeed, as EPA has explained, where an impoundment is closed in place, dewatering the impoundment prior to closure and installing a final cover system that minimizes infiltration of water (*e.g.*, rain) through the cover will in many cases relieve the pressure that creates groundwater contamination due to leaching from the sides and bottoms of the CCR unit. *See, e.g.*, Ltr. from J. Winston Porter, Acting Adm'r, EPA to Hon. Bob Wise, House of Reps., RO 12763 (Oct. 8, 1986) (Ex. Q) (Doc. 47-1, PageID.8802) ("EPA relies principally on the final cover to provide post-closure protection of groundwater.").

In all events, Alabama Power is not charged under subsection (b) of the federal CCR rule with demonstrating in its written closure plan that there is no contact between the CCR impoundment and groundwater. Rather, Alabama Power must discuss the final cover system and related steps that will be used to minimize or control any potential leaching of CCR constituents to "the ground or surface waters." 40 C.F.R. §§ 257.102(b)(1)(iii), (d)(1). Alabama Power's closure plan explains how "the final cover systems will control and minimize infiltration of liquids into the CCR" as well as releases and contaminated runoff. *See* 2020 Revised Closure Plan at 17 (Ex. L, App. 9) (Doc. 27-1, PageID.4868). The plan describes how "[t]he final cover systems are configured to preclude the probability of future impoundment of water, sediment, or CCR slurry

into the ash pond." *Id*. Specifically, the closure plan provides: "This closure approach will effectively control the source of CCR constituents to groundwater by removing free water and some interstitial water from the ash, reducing the footprint area of the ash and preventing further infiltration of surface water resulting from rainfall through the ash." *Id*. at 19 (Doc. 27-1, PageID.4870). The closure plan also specifically indicates that Alabama Power will "minimiz[e] the hydraulic head [pressure] driving water through the subsurface." *Id*. The plan explains, "[a] reduction in head that could lead to outward or downward migration will also allow the natural, low permeability clay that is directly below the Ash Pond to more effectively confine vertical seepage flows." *Id*. Accordingly, Alabama Power's closure plan complies with § 257.102(b)(1), and Alabama Power's motion should be granted for this reason alone.

## II.    Plaintiff's Interpretations of Performance Standard Terms Are Contrary to the Language and Structure of the CCR Rule, as well as Decades of Historical Practice.

Because Alabama Power's closure plan complies with the language of the federal and state CCR rules, this Court need not resolve the meaning of the technical terms "post-closure infiltration," "free liquids," or "impoundment," to decide this Motion. Even if the Court did, however, Plaintiff's interpretations of these terms are inconsistent with the language and structure of the CCR rule, as well as historical practice.

As discussed above, the federal CCR rule allows units to close "*either* by leaving the CCR in place and installing a final cover system *or* through removal of the CCR and decontamination of the CCR unit." *Id*. § 257.102(a) (emphases added). Plaintiff's Complaint seeks to eliminate the closure in place option by arguing that a facility may not use that option for impoundments that have CCR in contact with groundwater. Neither the federal nor state CCR rules contain any such categorical prohibition. Nor was that the intent of the rule. Indeed, EPA explained that the rule does not "require [closure by removal] nor [] establish restrictions on the situations in which

[closure by removal] would be appropriate," but instead "allows the owner or operator to determine whether [closure by removal] or closure with the waste in place is appropriate for their particular unit." 80 Fed. Reg. at 21,412.

### A.   Post-Closure Infiltration Means Infiltration Through the Cover.

In an attempt to establish a categorical prohibition against closure in place, Plaintiff argues the requirement to control, minimize, or eliminate post-closure infiltration and releases, to the maximum extent feasible, cannot be met when CCR is in contact with groundwater. (Doc. 1 ¶¶ 23-24, 35, PageID.8-9, 11). According to Plaintiff, closure in place "will violate this standard where the natural hydrology will cause groundwater to continue flowing into the ash basin and infiltrating into the waste following closure." (*Id.* ¶ 36, PageID.11). Plaintiff's interpretation is incorrect, for several reasons.

First, closure in place requires the utility to place a "final cover system" over the impoundment after it is dewatered to shed rainfall from above and prevent rain from making its way into the CCR (i.e., post-closure infiltration). *See* 40 C.F.R. §§ 257.102(d)(1)(i), (d)(3). The performance standard that addresses post-closure "infiltration of liquids" and "releases of leachate" is therefore directed at the *final cover system*, which must be "designed to minimize infiltration and erosion." *Id.* (emphasis added)*; see also id.* § 257.102(b)(1)(iii) ("The closure plan must also discuss how the *final cover system* will achieve the performance standards specified in paragraph (d) of this section.") (emphasis added); 80 Fed. Reg. at 21,413 ("*final cover system*" must "minimize" or "control" "infiltration" and "releases of leachate") (emphasis added); *id.* at 21,414 (linking performance standard in § 257.102(d)(1)(i) to final cover system "[a]s discussed in the previous section"). To this end, "[t]he *infiltration* of liquids through the closed CCR unit must be minimized *by the use of an infiltration layer* that contains a minimum of 18 inches of earthen material" and "erosion . . . must be minimized by the use of an erosion layer that contains

a minimum of six inches of earthen material that is capable of sustaining native plant growth." 40 C.F.R. §§ 257.102(d)(3)(i)(B) & (C) (emphases added).

When it developed its CCR regulations, EPA looked to its own existing programs for waste disposal facilities and adapted the same terminology and concepts. *See* 80 Fed. Reg. at 21,409 & n.119, 21,413. Under those programs, EPA had already established its usage of the term "infiltration" in the context of closure as describing the performance of the final cover system and the "downward migration" of liquids "through the cover soil" of the closed impoundment. *See* EPA, *Closure of Hazardous Waste Surface Impoundments* 26 (Sept. 1982) ("1982 Guidance") (Ex. S) (Doc. 49-1, PageID.10411); *see also* EPA, *Guide for Industrial Waste Management* 11-1 (Feb. 2003), ("2003 Guidance") (Ex. U) (Doc. 49-1, PageID.10921) ("For post-closure care, the overall goal is to minimize the infiltration of water into a unit by providing maintenance of the final *cover*.") (emphasis added). The law requires words in regulations to be interpreted with context and history in mind, not in isolation.[13]

---

[13] Courts "evaluate whether the plain language of the regulation unambiguously answers the question at issue when [] consider[ing] the regulatory language itself, **the particular context in which that language appears**, and the broader context and purpose of the regulatory scheme as a whole." *Landau v. RoundPoint Mortg. Servicing Corp.*, 925 F.3d 1365, 1369 (11th Cir. 2019) (emphasis added); *see Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) ("To discern that ordinary meaning, those words 'must be read' and interpreted '**in their context,' not in isolation**.") (emphasis added) (internal citation omitted). "Sometimes context indicates that a **technical meaning** applies. Every field of serious endeavor develops its own nomenclature— sometimes referred to as *terms of art*. Where the text is addressing a scientific or technical subject, a specialized meaning is to be expected . . . ." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) (bold emphasis added). *Accord Kroner v. Comm'r of Internal Revenue*, 48 F.4th 1272, 1277 (11th Cir. 2022) ("'Every field of serious endeavor develops its own nomenclature,' and a 'specialized meaning is to be expected' when a text addresses a 'technical subject.' Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 6, at 73 (2012).").

To illustrate this point, EPA's 1982 Guidance shows a closed impoundment with waste in contact with groundwater (i.e., below the water table):

**1982 EPA Hazardous Waste Closure Guidance**



1982 Guidance at 25 (Ex. T) (Doc. 49-1, PageID.10410).

EPA's diagram shows that "infiltration" comes from the top of the impoundment vertically through the "[c]over material." That 1982 EPA guidance further explains that the requirement to remove "free liquids" prior to installing the cover seeks to "yield consolidated wastes of sufficient density to support the cover and associated construction vehicles," consistent with § 257.102(d)(2). *Id*. at 9 (Doc. 49-1, PageID.10394). In other words, a primary goal upon facility closure is to promote stability to support the cover, which in turn cuts off one source of water that, if left unchecked, could produce leachate.

Contrary to Plaintiff's contention, the text and structure of § 257.102 demonstrate that the requirement to "[c]ontrol, minimize or eliminate" "infiltration" and "releases" in § 257.102(d)(1)(i) is linked solely to the downward movement of water through the final cover system. *See* 40 C.F.R. § 257.102(b)(1)(iii) ("The closure plan must also discuss how the *final cover*

21

*system* will achieve the performance standards specified in paragraph (d) of this section.")
(emphasis added); 80 Fed. Reg. at 21,414 (equating performance standard in § 257.102(d)(1)(i) to
final cover system "[a]s discussed in the previous section"). When EPA issued the federal CCR
rule, it specifically explained that the performance standard in § 257.102(d)(1)(i) was directed to
the final cover system: "The final rule requires that any *final cover system* control, minimize or
eliminate, to the maximum extent practicable, post-closure infiltration of liquids into the waste and
releases of leachate (in addition to CCR or contaminated run-off) to the ground or surface waters."
80 Fed. Reg. at 21,413 (emphasis added).

Nothing in the text of § 257.102(d)(1)(i) prohibits all "contact" between CCR and
groundwater or even prohibits releases to groundwater. The language requires the operator only to
"[c]ontrol, minimize or eliminate, to the maximum extent feasible" post-closure infiltration and
releases "to the ground or surface waters." 40 C.F.R. § 257.102(d)(1)(i). Even if "the ground"
could be read as "groundwater" (which it cannot, as EPA knew how to say "groundwater" when
it wanted),[14] the regulatory language recognizes that the performance standard can be met by
measures to "[c]ontrol [or] . . . minimize" such releases.

Even if post-closure monitoring at a closed in place unit reveals concentrations of
contaminants above defined levels, the operator must take corrective action. *Id.* §§ 257.96-98,
257.104. Referring back to EPA's illustration on page 21, Alabama Power acknowledges that

---

[14] *E.g.,* 40 C.F.R. § 257.90(a) ("All CCR landfills, CCR surface impoundments, and lateral
expansions of CCR units are subject to the groundwater monitoring and corrective action
requirements. . . ."); *id.* § 257.90(c) ("Once a groundwater monitoring system and groundwater
monitoring program has been established at the CCR unit as required by this subpart, the owner or
operator must conduct groundwater monitoring and, if necessary, corrective action throughout the
active life and post-closure care period of the CCR unit."); *id.* § 257.104(b)(3) ("Maintaining the
groundwater monitoring system and monitoring the groundwater in accordance with the
requirements of §§ 257.90 through 257.98.").

cutting off one source of water (infiltration of rain) is not intended to address some other source of water (lateral entry of groundwater). But the potential for such a condition does not prohibit closure in place, and the CCR rules say nothing of the sort. Indeed, in assessing the risk of the closure in place option, EPA acknowledged that CCR impoundments "come in direct contact with the water table," yet found that "releases from surface impoundments drop dramatically after closure, even with waste in place" so much so that there is a "negligible effect on modeled risks" when closing in place. 2014 Risk Assessment at 5-10, 5-28 through 5-29 (Ex. R) (Doc. 47-1, PageID.8900, 8918-8919).

The history and purpose of § 257.102(d) further compel this reading. In 2015, EPA stated that it received no comments on the proposed performance standard for closure in place (as finalized at § 257.102(d)) and thus adopted it "without revision" from the proposed rule. *See* 80 Fed. Reg. at 21,414. Thus, EPA intended no substantive difference between the proposed and final rule. Plaintiff's "infiltration" argument relies exclusively on § 257.102(d)(1)(i). That is the part where EPA includes an obligation to "control, minimize, or eliminate . . . infiltration" without explicitly using the word "cover," in contrast to § 257.102(d)(3), which does. Because "cover" is not included in § 257.102(d)(1)(i), Plaintiff believes it is free to graft any meaning it likes into the term "infiltration." However, the 2010 proposal had a different structure that included no provision precisely parallel to § 257.102(d)(1)(i). *See* 75 Fed. Reg. 35,172, 35,252-33 (June 21, 2010) (proposed § 257.100). Rather, *every use of the word "infiltration" in the 2010 proposal was explicitly tied to the performance of the cover system. See id.* The word appears six times in the proposed provision, and all six relate to the performance of "the final cover system," similar to § 257.102(d)(3) as finalized. *Id.* (proposed §§ 257.100(d) (introductory material), 257.100(d)(2), 257.100(e)(1)). And according to EPA, "infiltration" in the 2015 final rule meant the same thing

as in the 2010 proposal. Neither the proposed performance standard nor the federal CCR rule speaks to any general requirement to prevent groundwater from entering the closed unit from the bottom or sides. In both, the standard was tied to the final cover.

The same is true for the other waste-management programs that EPA used as the "model" for § 257.102(d). In both the industrial waste and hazardous waste contexts, EPA regulates "infiltration" as the downward movement of water through the final cover. In those contexts, EPA has indicated that impoundments may be closed in place, even with waste in contact with groundwater and below the water table, *see* Risk Assessment at 5-10 (Dec. 2014), and in some such cases must be closed in place. *See* 2003 Guidance at 11-4 (Ex. U) (Doc. 49-1, PageID.10924) ("[I]f the waste volumes are large and underlying soil and ground water are contaminated, closure by total waste removal might not be possible."). Plaintiff's claims are a stark departure from this decades-long, consistent approach. And, because CCR is a solid waste that is regulated "much more loosely" than hazardous waste, it would be unlawful to amend § 257.102(d)(1) to be more restrictive than the requirements for hazardous waste impoundments. *See City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331 (1994); *see also Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1053 (D.C. Cir. 2019) ("In RCRA, Congress required EPA to regulate both hazardous and non-hazardous 'solid waste,' with more stringent requirements applying to hazardous waste."). Yet Plaintiff's argument would do just that.

### B.   Groundwater is Not a "Free Liquid" Under the Federal CCR Rule.

In further support of its effort to establish a categorical prohibition against closure in place, Plaintiff argues the requirement to eliminate "free liquids" prior to installing the final cover system includes an obligation to: (1) remove all groundwater from the impoundment prior to installation; and (2) forever preclude groundwater from re-entering the CCR impoundment after closure. (Doc.

1 ¶¶ 30-31, PageID.10). Based on this reading, Plaintiff contends that closure in place is never appropriate when CCR is in contact with groundwater. (*Id.* ¶ 32, PageID.10).

The federal CCR rule does not define "free liquids" to include "groundwater." The regulations define "free liquids" as "liquids that readily separate from the solid portion of a waste *under ambient temperature and pressure*." 40 C.F.R. § 257.53 (emphasis added). "Groundwater" is separately defined as "water *below* the land surface in a zone of saturation," *id.* (emphasis added), but is not mentioned in § 257.102(d)(2) or in § 257.53's definition of "free liquids." Thus, while it may be true in a simplistic sense that "groundwater" is a liquid, "groundwater" is not a "free liquid" under the definition in the regulations.

Plaintiff's interpretation of "free liquids" further conflicts with the language and intent of § 257.102(d)(2), which does not require the removal of *all* liquid or groundwater from a closed CCR impoundment (or preventing it from returning), but only "removing *liquid wastes* or solidifying the remaining *wastes* and waste residues" "prior to installing the final cover" "sufficient to support the final cover system." *Id.* § 257.102(d)(2) (emphasis added). "Groundwater" is not a "waste"—it is "water below the land surface in a zone of saturation." *Id.* § 257.53. EPA knew when it promulgated the federal CCR rule that many impoundments "come in direct contact with the water table," 2014 Risk Assessment at 5-10 (Ex. R) (Doc. 47-1, PageID.8900), yet nothing in the text of the existing regulations or EPA's contemporaneous explanation of them remotely suggests a requirement to remove all groundwater prior to (or after) "closure in place."

Moreover, the obligation to remove "free liquids" falls under the subheading, "Drainage and stabilization of CCR surface impoundments" and serves those purposes. *See* 40 C.F.R. § 257.102(d)(2). As with infiltration, "drainage" removes a source of water that could otherwise result in leachate, and "stabilization" serves to maintain the protective cover safely in place. EPA

said so explicitly when it promulgated the "free liquids" provisions in its hazardous waste regulations decades ago: "As a practical matter, free liquids must be minimized before a cover can successfully be placed on a surface impoundment." 46 Fed. Reg. 12,414, 12,425 (Feb. 13, 1981). As EPA explained in the context of the CCR rule, the obligation to "either drain the CCR unit or solidify the remaining wastes" will "stabilize the wastes to a bearing capacity to support the final cover." 80 Fed. Reg. at 21,413. These functions and the purposes they seek to achieve do not depend on or relate to groundwater.

### C. The Obligation to Preclude Future Impoundment is also Directed at the Final Cover System.

Next, Plaintiff references the performance standard in § 257.102(d)(1)(ii), which requires the operator to "[p]reclude the probability of future impoundment of water, sediment, or slurry[]." Again, this aspect of the CCR rule was included to address the downward movement of water (i.e., rain) through the final cover system, as EPA specifically stated in response to comments: The final rule "requires *the final cover system* to be designed in a manner that will preclude the probability for future impoundment of water, sediment, or slurry." EPA, *Comment Summary and Response Document, Vol. 10* at 38 (Dec. 2014) (Ex. V) (Doc. 50-1, PageID.11027) (emphasis added); *see also* 85 Fed. Reg. 12,456, 12,468 (Mar. 3, 2020) (explaining that the "final cover system" must "promote positive drainage of precipitation as required by the CCR regulations to preclude . . . future impoundment."). Thus, as with the other aspects of § 257.102(d)(1), the intent of this provision is directed at the final cover system, not the lateral movement of groundwater into the closed unit.

### D. EPA's January 11 Statement and Related Actions.

Plaintiff refers to a statement EPA released on January 11, 2022, announcing that it had issued proposed determinations to several utilities denying their requests for extensions to continue

sending CCR to their CCR units past the rule's regulatory deadline of April 11, 2021. (Doc. 1 ¶ 23, PageID.8). There, EPA stated that a CCR impoundment cannot close with CCR in contact with groundwater.[15] On April 8, 2022, several utilities challenged EPA's January 11 actions in the D.C. Circuit as a retrospective amendment to the 2015 CCR rule without notice and comment. *See Elec. Energy, Inc. v. EPA*, Nos. 22-1056 & 22-1058 (D.C. Cir. pending). In November 2022, EPA finalized one of its January 11 proposed determinations and formally denied an extension to a utility to close Plant Gavin in Ohio for the same reason.[16] None of EPA's statements is directed to Alabama Power or Plant Barry.[17]

EPA faulted Gavin's closure plan for simply repeating regulatory language and failing to include an adequate "discussion" of how the performance standards will be met. *See, e.g.,* Gavin Determination at 43 (Ex. W) (Doc. 50-1, PageID.11228) (written closure plans must do more than simply "reiterat[e] the regulatory text"). Plaintiff makes no such allegation here (nor could it, in light of Alabama Power's detailed closure plan). Instead, Plaintiff insists that Alabama Power must

---

[15] *See* EPA, *EPA Takes Key Steps to Protect Groundwater from Coal Ash Contamination* (Jan. 11, 2022), *available at* https://www.epa.gov/newsreleases/epa-takes-key-steps-protect-groundwater-coal-ash-contamination.

[16] *See* EPA, *Final Decision on Denial of Alternative Closure Deadline for Gen. James M. Gavin Plant, Cheshire, Ohio* (Nov. 18, 2022) ("Gavin Determination") (Ex. W) (Doc. 50-1, PageID.11186); *see also* EPA, *Denial of Alternative Closure Deadline for Gen. James M. Gavin Plant (Cheshire, Ohio), Response to Comments on Proposed Denial* (Nov. 2022) (Ex. X) (Doc. 50-1, PageID.11281).

[17] To the extent a new interpretation of a regulation is contrary to its unambiguous meaning, no deference is due. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("[A] court must carefully consider[ ] the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on. Doing so will resolve many seeming ambiguities out of the box, without resort to *Auer* [*v. Robbins*, 519 U.S. 452 (1997)] deference.") (internal quotations and citations omitted). Here, "exhaust[ing] all the 'traditional tools' of construction," *id.,* the intent of the closure regulations is clear. Plaintiff's interpretations of the closure performance standards are contrary to the language and structure of the federal CCR rule.

"demonstrate" compliance with those standards at the closure plan stage. As noted above, Plaintiff's interpretation is incorrect, as the word "demonstrate" appears nowhere in § 257.102(b)(1). Moreover, with respect to the performance standards in § 257.102(d), the CCR rule requires only that Alabama Power "discuss" in the closure plan how the "final cover system" will meet those standards. 40 C.F.R. § 257.102(b)(1)(iii). Alabama Power's closure plan complies with that requirement, and Plaintiff does not allege otherwise. *Supra* at Argument, Part I.

### III.    Plaintiff is Estopped from Bringing the Very Three Claims that ADEM has Already Rejected.

Putting aside the closure plan's compliance with the CCR rules, ADEM already rejected Plaintiff's interpretations on the adequacy of the Plant Barry closure plan before ADEM, and Plaintiff voluntarily gave up its right to re-litigate the issues before this Court. Relying on Plaintiff's decision not to challenge the final closure plan through state proceedings, Alabama Power then began implementation of its comprehensive closure plan at great cost. Because ADEM made a final determination of the issues in this Complaint when it issued the final closure permit, collateral estoppel applies.

As the Eleventh Circuit notes, "[i]n considering whether to give preclusive effect to state-court judgments under res judicata or collateral estoppel, the federal court must apply the rendering state's"—here Alabama's—"law of preclusion." *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011). Alabama follows the Restatement (Second) on Judgments ("Restatement") with regard to collateral estoppel. *See Caton v. City of Pelham*, 329 So. 3d 5, 25–26 (Ala. 2020) (citing Restatement § 83(2)). As Restatement § 83 provides, collateral estoppel applies to final determinations by administrative agencies (e.g., ADEM). In Alabama, the elements of collateral estoppel are well established: "'(1) that an issue in a prior action was identical to the issue litigated in the present action; (2) that the issue was actually litigated in the prior action; (3) that resolution

28

of the issue was necessary to the prior judgment; and (4) that the same parties [or their privies] are involved in the two actions.'" *Chappelle v. City of Leeds*, No. 2:12-CV-2058-SLB, 2015 WL 5693636, at *8 (N.D. Ala. Sept. 29, 2015) (quoting *Walker v. City of Huntsville*, 62 So. 3d 474, 487 (Ala. 2010)). All four elements are satisfied here.

### A.   The Issues Plaintiff Raises Now Are Identical to the Issues it Raised Before ADEM in the Plant Barry Impoundment Closure Permit Proceeding.

Plaintiff meets the key element of collateral estoppel since it raised the same issues in the ADEM permit proceedings that it raises now. At the permit proceedings before ADEM, Plaintiff argued that Alabama Power's closure plan did not meet the federal CCR regulation's requirements for "infiltration," "impoundment," and "free liquids" because the ash would be in contact with groundwater—the same arguments Plaintiff now makes in its Complaint. As the chart on pages 10-11 of this Motion shows, the issues are identical.

### B.   The Issues were Actually Litigated Before ADEM.

To determine whether an administrative determination constitutes "actual litigation," for purposes of collateral estoppel, the Alabama Supreme Court looks to two sources:

1) The Procedures Afforded: Restatement § 83, Adjudicative Determination by Administrative Tribunal. *See Caton*, 329 So. 3d at 25–26 (employing Restatement § 83); and

2) The Procedures Available: The procedures that were *available* to the party to be bound, **even if that party did not take advantage of them.** *See Caton*, 329 So. 3d at 27 (concluding that a party's failure to use available procedures was immaterial to the collateral estoppel analysis).

#### 1.   Restatement § 83 Focuses on the Due Process Procedures Available at the Agency Proceeding to the Party to Be Bound by Collateral Estoppel.

On the one hand, collateral estoppel does not generally apply to agency rulemaking. On the other hand, it generally does apply to agency contested cases. Because of the numerous types of agency proceedings in the States, Restatement § 83 focuses whether the proceeding had four particular due process procedures. First, the Restatement looks to whether there was "[a]dequate

notice to persons who are to be bound by the adjudication." Restatement § 83(2)(a). On February 19, 2021, ADEM gave public notice of the hearing to be held on Alabama Power's closure permit, specifying the date, time, place, and subject to be addressed at the hearing.[18]

Second, the Restatement looks to the "right on behalf of a party to present evidence and legal argument" and a "fair opportunity to rebut evidence and argument by opposing parties." Restatement § 83(2)(b). At the March 30, 2021 public hearing on the draft permit, the ADEM hearing officer heard Plaintiff and its counsel's legal arguments. *See* Public Hr'g Tr. 15:10-22:20 (Ex. G) (Doc. 51-1, PageID.12129-12136) (Test. of Bd. Member). After the hearing, ADEM allowed Plaintiff's counsel to submit a letter making the same legal arguments on infiltration, impoundment, and free liquids, and accepted into the record evidence in the form of three expert reports by a geologist, a hydrologist, and an engineer for the purpose of rebutting Alabama Power's expert evidentiary submissions. *See* 2021 Ltr. from Plf's Counsel (Ex. E) (Doc. 51-1, PageID.11887-12030).

Third, the Restatement looks for "formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction." Restatement § 83(2)(c). There can be no dispute the notice, the public hearing, the legal arguments, and the evidence submitted by Plaintiff to ADEM all focused on the application of the infiltration, impoundment, and free liquids requirements to a specified party, Alabama Power, concerning a

---

[18] *See* Feb. 19, 2021 Public Notice (Ex. C) (Doc. 22-1, PageID.136-138). *See* ADEM Admin. Code r. 335-13-5-.03(1)(a) ("The Department shall provide notice and an opportunity for a public hearing and comment on any solid waste landfill unit, composting facility or CCR facility permit initial issuance . . . ."); *id.* r. 335-13-5-.04(2)(c) ("The notice shall be given not less than 35 days prior to the time of the public hearing and shall include: 1. A summary of the proposed permitting action. 2. The place, time, and date of the hearing. 3. The name, address and telephone number of an office at which interested persons may receive further information.").

specific transaction, closure of the CCR impoundment, at a specified location, Plant Barry, in Bucks, Alabama.[19]

Fourth, the Restatement looks for a "rule of finality, specifying a point in the proceeding when presentations are terminated and a final decision is rendered." Restatement § 83(2)(d). After the public hearing and the submission of written arguments and evidence,[20] ADEM issued the final permit. Accordingly, the permit is a final decision of ADEM for which an interested party can seek review at the AEMC.[21]

### 2. The Alabama Supreme Court Looks to What Procedures Were Available, Even if the Party to Be Bound Did Not Use Them.

In *Caton*, 329 So. 3d at 27, the Alabama Supreme Court held that a party's failure to take advantage of available procedures was immaterial – what mattered was the procedures that were **available** to the party to be bound by collateral estoppel:

> [Caton] was repeatedly informed that he had the right to be represented by counsel at that hearing, that he had the right to subpoena and to call witnesses on his behalf and to cross-examine witnesses of the opposing party, and that he had the right to introduce documentary evidence in support of his position. *The fact that Caton did*

---

[19] The draft permit (Ex. B) (Doc. 22-1, PageID.120-134); the notice (Ex. C) (Doc. 22-1, PageID.136-138); the public hearing (*see generally* Ex. G) (Doc. 51-1, PageID.12115-12477); the legal arguments (Ex. G at 108:3-113:19) (Doc. 51-1, PageID.12222-12227) (Stmt. of Sam St. John, Plaintiff Bd. Member), (2021 Letter from Plaintiff's Counsel (Ex. E) ((Doc. 51-1, PageID.11887-12030)); the evidence (Expert reports attached to 2021 Ltr. from Plf's Counsel (*id.*).

[20] *See* ADEM Admin. Code r. 335-13-5-.04(3) ("After the public hearing and close of the comment period, the Department shall review, consider, and respond to comments received by the close of the comment period and take one of the following actions: . . . (b) Issue the permitting action, if the application complies with this Division . . . .").

[21] *See* Ala. Code § 22-22A-7(c) ("[A]ny person aggrieved by an administrative action of the department shall be entitled to a hearing before the Environmental Management Commission or its designated hearing officer."); *City of Graysville v. Glenn*, 46 So. 3d 925, 931 (Ala. 2010) ("[I]f Graysville claimed to be aggrieved by the issuance of the landfill permit, it was required to invoke the appeal procedure available to it under § 22–22A–7(c), Ala. Code 1975. Pursuant to that subsection, 'any person aggrieved by an administrative action of [ADEM] shall be entitled to a hearing before the [EMC] or its designated hearing officer.'").

> *not exercise several of those rights is **immaterial** to whether the elements of adjudication were available in the telephonic hearing.*

(Emphases added.)

ADEM afforded Plaintiff the right to an administrative appeal (with trial-type procedures) to the AEMC followed by an appeal to an Alabama circuit court, the Alabama Court of Civil Appeals, and petition for certiorari to the Alabama Supreme Court.[22] Plaintiff enjoys the same rights of representation and due process in Alabama's courts afforded to any litigant. That Plaintiff, for whatever reason, opted not to exercise its appellate rights is of no consequence; collateral estoppel bars the re-litigation of these issues as a matter of law. *See Sierra Club v. Two Elk Generation Partners, LTD P'ship*, 646 F.3d 1258, 1271-72 (10th Cir. 2011) ("Sierra Club's failure to appeal the [administrative] Council's 2005 Order . . . support[s] preclusion under Wyoming law."); *see generally id.* at 1266 ("'The fact that [Sierra Club] failed to avail [itself] of the full procedures provided by state law does not constitute a sign of their inadequacy.'") (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 485 (1982)).

---

[22] An "aggrieved party" may appeal an "administrative action" of ADEM, including permit issuance, to the Commission. ADEM Admin. Code rr. 335-2-1-.01, 335-2-1-.02. The appeal is subject to trial-type procedures, including intervention by parties, a schedule for motions, a prehearing process, and discovery and submission of evidence. *See* ADEM Admin. Code rr. 335-2-1-.06, 335-2-1-.07, 335-2-1-.10, 335-2-1-.11, 335-2-1-.14. The Commission ultimately would issue an order on the administrative appeal, *id.* r. 335-2-1-.17, which itself is appealable to the Alabama courts. *See* Ala. Code § 22-22A-7(c)(6) ("[An] order of the Environmental Management Commission made pursuant to the above procedure, modifying, approving or disapproving the department's administrative action, constitutes a final action of the department and is appealable to the Montgomery County Circuit Court or the circuit court in which the applicant does business or resides for judicial review on the administrative record"); *City of Graysville*, 46 So. 3d at 931 (stating an order on review of an ADEM permit is an order of the EMC the "'constitutes a final action of [ADEM]' and is appealable to the circuit court. § 22–22A–7(c)(6).");  Ala. Code § 12-3-10 ("[t]he Court of Civil Appeals shall have exclusive appellate jurisdiction of . . . all appeals from administrative agencies."); Ala. Code § 12-2-2 ("[t]he justices of the Supreme Court shall have authority to issue writs of certiorari.").

In *Families Concerned About Nerve Gas Incineration v. U.S. Dep't of the Army*, 380 F. Supp. 2d 1233, 1259-63 (N.D. Ala. 2005), the court held, in the alternative, that res judicata barred a federal court action for violation of a RCRA hazardous waste permit where the same claims about the inadequacy of the permit were litigated before ADEM in a contested proceeding and affirmed on appeal to the state courts. The Court noted that before ADEM, the plaintiff group was afforded "the opportunity to present expert and fact witness testimony, to cross-examine witnesses, and to present written briefs, and oral argument." *Id*. at 1238. The prior administrative contest was sufficient to bar the federal court RCRA permit challenge. *Id*. at 1263.

Likewise, Plaintiff was afforded the opportunity to, and did, present expert reports, written briefs, and oral argument, and could have appealed administratively and through the state court system. That is sufficient to bar the current federal court RCRA permit challenge. Plaintiff cannot suggest it did not have a full opportunity to appeal ADEM's issuance of the final closure permit, which addressed the three exact same issues now before this Court in this lawsuit.

## C.   The Resolution of the Issue was Necessary to the Final Determination by ADEM.

Determination of whether the infiltration, impoundment, and free liquids requirements of the federal CCR rule preclude any contact with groundwater was necessary for ADEM to issue the permit. Plaintiff argued at the permit hearing that these three issues meant the closure plan was inadequate because Alabama Power had not demonstrated that the closure permit would prevent CCR contact with groundwater. Under state law, however, ADEM was prohibited from issuing a permit that violates these provisions. Specifically, ADEM's procedural regulations provide: "After the public hearing and close of the comment period, the Department shall review, consider, and respond to comments received by the close of the comment period and take one of the following actions: . . . (b) *Issue the permitting action, if the application complies with this Division* [*of the*

33

*regulations*].” ADEM Admin. Code r. 335-13-5-.04(3)(b) (emphasis added). By issuing the closure permit to Alabama Power, ADEM necessarily considered and rejected Plaintiff's arguments.

### D.     The Same Party is Involved in the ADEM Proceeding and in this Cases

Plaintiff, the formally named plaintiff in this federal court action, (Doc. 1 at first sentence, PageID.1), was an active participant in the ADEM permit proceeding. That is sufficient for purposes of estoppel. Section 83 of the Restatement references § 34 regarding collateral estoppel's requirement that the party to the bound by the first judgment be the same in the second judgment. The notes to Section 34 explain: “It is equally well established that appearing and participating makes a person a party, e.g., *Durfee v. Duke*, 375 U.S. 106, 84 S. Ct. 242, 11 L.Ed.2d 186 (1963); *Adams v. Morton*, 581 F.2d 1314 (9th Cir. 1978) . . . .”[23]

Plaintiff voluntarily appeared at the ADEM permit proceeding, presented its case with law and evidence, and was fully heard. These issues are now precluded.

## <u>CONCLUSION</u>

As ADEM concluded after careful consideration, Alabama Power's closure plan complies with the requirements of the CCR rules, setting forth the measures and schedule for achieving each of the rules' performance standards. That comprehensive plan is just one step in a lengthy closure and post-closure process that will extend for nearly four decades—a fact that Plaintiff simply ignores. Based on the ADEM-approved closure permit, the Plant Barry closure is well under way,

---

[23] Restatement (Second) of Judgments § 34 Rep.'s Note to Comment (a) (1982). *Durfee*, 375 U.S. at 111–12, in turn, states: “We see no reason why this doctrine [preclusion] should not apply in every case where *one voluntarily appears, presents his case and is fully heard*, and why he should not, in the absence of fraud, be thereafter concluded by the judgment of the tribunal to which he has submitted his cause.” (Emphasis added.) *See Adams*, 581 F.2d at 1318 (treating appellant as a party to previous action where “the appellant never presented the court with a formal motion to intervene, but instead filed objections”).

and it will be closely monitored by ADEM at each step to ensure that human health and the environment remain protected. Although Plaintiff may disagree with that plan, that is no basis for an attempt to stop closure of this impoundment through a collateral attack on the permit. Plaintiff's Complaint, which attempts to rewrite the regulations that apply to closure plans, should be dismissed.

Respectfully submitted this the 10th day of January, 2023.


*/s/ Ed R. Haden*
One of the Attorneys for the Defendant
Alabama Power Company


**OF COUNSEL:**
Ed R. Haden (ehaden@balch.com)
Charles Burkhart (cburkhart@balch.com)
Steven A. Burns (sburns@balch.com)
Sean W. Shirley (sshirley@balch.com)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100

Jaime W. Betbeze (jbetbeze@maynardcooper.com)
Raymond L. Bell, Jr. (rbell@maynardcooper.com)
Evan N. Parrott (eparrot@naynardcooper.com)
MAYNARD COOPER & GALE P.C.
RSA Battle House Tower
11 N. Water St., Ste. 24290
Mobile, Alabama 36602
Telephone: (251) 432-0001

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of January 2023, a copy of the foregoing was filed using the Court's CM/ECF system, which send an electronic notice to all counsel of record.


*/s/ Ed R. Haden*
Of Counsel