IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MOBILE BAYKEEPER, INC.,          *
                                 *
     Plaintiff,                  *
                                 *
vs.                              *  CIVIL ACTION NO. 22-00382-KD-B
                                 *
ALABAMA POWER COMPANY,           *
                                 *
     Defendant.                  *

## REPORT AND RECOMMENDATION

This action is before the Court on Defendant Alabama Power Company's Corrected Motion to Dismiss (Doc. 60). The motion, which has been fully briefed, has been referred to the undersigned Magistrate Judge for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(S). Oral argument was conducted on May 26, 2023. (Doc. 75). Thus, the motion is ripe for resolution. Upon consideration of all matters presented, the undersigned recommends that Defendant's Corrected Motion to Dismiss (Doc. 60) be **DENIED** for the reasons that follow.

I.   **BACKGROUND**

Plaintiff Mobile Baykeeper, Inc. ("Baykeeper") initiated this citizen enforcement action challenging the closure plan of Defendant Alabama Power Company ("Alabama Power") for the James M. Barry Electric Generating Plant ("Plant Barry") located in Mobile County, Alabama. (Doc. 1). Baykeeper's complaint alleges that

Alabama Power's plan violates the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and the Coal Combustion Residuals Rule (the "CCR Rule" or the "Rule"), 40 C.F.R. § 257.50 *et seq.* (Id. at 1).

Baykeeper is a § 501(c)(3) non-profit public interest organization with members in Alabama and the Mobile area who operate "in the watersheds of the Mobile River and the Mobile-Tensaw Delta." (Id. at 4). Baykeeper's members "recreate, fish, and own property in these watersheds, including in the vicinity of and downstream from Plant Barry." (Id.). "They fear contamination of drinking water, wildlife, and river water, by ground and surface water contamination and by discharges and pollution from coal ash in groundwater, wetlands, and a creek in Alabama Power's Plant Barry coal ash impoundment." (Id.). They also fear and are concerned by Alabama Power's plans to store millions of tons of coal ash on the banks of the Mobile River and the Mobile-Tensaw Delta. (Id.).

Alabama Power, which has its principal place of business in Alabama, is engaged in the generation, transmission, distribution, and sale of electricity. (Id. at 6). Alabama Power owns and operates Plant Barry and its coal ash impoundment. (Id.). Alabama Power has operated a coal-fired generating plant at the site of Plant Barry since 1954. (Doc. 60 at 10). The process of generating electricity at Plant Barry produces coal combustion residuals.

(Id.).  The unlined Plant Barry Ash Pond was built to receive wet-sluiced coal combustion residuals, or coal ash, from Plant Barry in 1965, with the construction of earthen dikes within a meander loop of the Mobile River.  (Doc. 1 at 12).  Alabama Power stores over 21 million tons of coal ash in the unlined impoundment at Plant Barry, which sits in groundwater.  (Id.).  Baykeeper asserts that the unlined Plant Barry coal ash impoundment has been contaminating state waters for decades.  (Id. at 13).

On April 17, 2015, the United States Environmental Protection Agency ("EPA") published the CCR Rule "to regulate the disposal of coal combustion residuals (CCR) as solid waste under subtitle D of [RCRA]."  80 Fed. Reg. 21,302 (Apr. 17, 2015).  The CCR Rule establishes "national minimum criteria for existing and new CCR landfills and existing and new CCR surface impoundments and all lateral expansions consisting of location restrictions, design and operating criteria, groundwater monitoring and corrective action, *closure requirements and post closure care*, and recordkeeping, notification, and internet posting requirements."  Id. (emphasis added).

Under the CCR Rule, "[t]he owner or operator of a CCR unit must prepare a written closure plan that describes the steps necessary to close the CCR unit at any point during the active life of the CCR unit consistent with recognized and generally accepted good engineering practices."  40 C.F.R. § 257.102(b)(1).

The written closure plan must, at minimum, include the information specified in 40 C.F.R. § 257.102(b)(1)(i)-(vi).  <u>Id.</u>  The Rule is self-implementing in that "facilities are directly responsible for ensuring that their operations comply with [the Rule's] requirements."  80 Fed. Reg. at 21,311.  The Rule's requirements are enforceable by States and through citizen suits.  <u>See</u> 42 U.S.C. § 6972; <u>see also</u> 80 Fed. Reg. at 21,427.  The preamble to the CCR Rule provides, in pertinent part, that because the Rule establishes "minimum requirements only . . . states may . . . impose more stringent requirements."  80 Fed. Reg. at 21,332.  Further, the preamble provides that the Rule's "criteria do not preempt other state and federal requirements."  <u>Id.</u>

Subsequent to EPA's promulgation of the CCR Rule, Congress enacted the Water Infrastructure Improvements for the Nation Act ("WIIN Act"), on December 16, 2016.  Pub. L. No. 114-322, 130 Stat. 1628 (codified in scattered sections of the U.S.C.).  The WIIN Act expressly authorizes states to create "a permit program or other system" of regulation for CCR disposal, *subject to EPA approval and oversight*, that would "operate in lieu of regulation of coal combustion residuals units" under the CCR Rule.  42 U.S.C. § 6945(d)(1)(A).

In June 2018, the Alabama Department of Environmental Management ("ADEM") finalized its own state CCR regulations that govern the closure of CCR impoundments in Alabama.  <u>See</u> Ala. Admin.

Code Ch. 335-13-15.  To date, however, ADEM's CCR program has not yet been approved by EPA.[1]  (Doc. 1 at 4; Doc. 60 at 13).

Alabama Power submitted to ADEM a written closure plan that proposed to cap the Plant Barry coal ash impoundment in place, a method sometimes called "cap in place."  (Doc. 1 at 7).  On July 1, 2021, ADEM issued to Alabama Power a state solid waste permit for its "cap in place" plan.  (Id. at 3, 7).  Alabama Power has begun implementing its closure plan.  (Doc. 1 at 15; Doc. 60 at 9).

Baykeeper contends that Alabama Power's written closure plan fails to comply with the CCR Rule because a coal ash impoundment cannot be capped in place with coal ash in contact with groundwater, much less with large quantities of coal ash sitting feet deep in groundwater, as at Plant Barry.  (Doc. 1 at 8).  According to Baykeeper, the coal ash in the unlined Plant Barry impoundment is saturated in water several feet deep, the groundwater is in hydraulic connection with the Mobile River and regional surface aquifer, and Alabama Power's own consultant has found that the materials under the impoundment are "leaky."  (Id. at 12, 14).  Baykeeper alleges that Alabama Power's closure plan consists of leaving the coal ash in the existing unlined impoundment within the Mobile River's floodplain, and attempting

---

[1] In fact, EPA has provided notice that it will decline to approve ADEM's CCR program.  (Doc. 84-1).

to remove the surface water in the ash pond, consolidate the ash, build new berms and a barrier wall around the newly consolidated ash, install an internal toe drain, grade the ash, and install a cap. (Id. at 14). Baykeeper contends that the unlined impoundment will continue to leach pollutants out into the surrounding waters and will remain at risk of increased saturation, spills, and catastrophic failure caused by hurricanes, storms, regular flooding, and water level rise. (Id. at 5).

On July 20, 2022, Baykeeper provided written notice to Alabama Power, EPA, and ADEM that the Plant Barry closure plan did not meet the CCR Rule requirements for a "cap in place" closure plan, and of its intent to file suit after sixty days should the violations continue. (Doc. 1 at 3; Doc. 1-2). To date, EPA has not initiated a civil or criminal action to address Baykeeper's assertions that Alabama Power's Plant Barry closure plan does not meet the CCR Rule requirements for a closure plan. (Doc. 1 at 3).

On September 26, 2022, Baykeeper filed the instant complaint. (Doc. 1). In the complaint, Baykeeper asserts that EPA has made clear that "under the CCR Rule, 'surface impoundments or landfills cannot be closed with coal ash in contact with groundwater.'" (Id. at 8 (citation omitted)). According to Baykeeper, Alabama Power's "cap in place" closure plan violates RCRA and the CCR Rule as follows:

Count 1: The plan fails to eliminate free liquids prior to

capping in place in that the coal ash in the Plant Barry unlined impoundment is in contact with groundwater and will be in contact with groundwater, saturated in water, and located in water when the final cover system is installed.  Alabama Power has not eliminated and will not eliminate free liquids before the final cover system is installed, in violation of 40 C.F.R. § 257.102(d)(2) and RCRA.  (Id. at 16).

Count Two: The plan will result in the continued impoundment of water, sediment, or slurry, and it fails to preclude the probability of future impoundment of water, sediment, or slurry, in violation of 40 C.F.R § 257.102(d)(1)(ii) and RCRA.  (Id.).

Count Three: The plan does not control, minimize, or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste or releases of CCR pollution to groundwater or surface waters, in violation of 40 C.F.R. § 257.102(d)(1)(i) and RCRA.  (Id.).

In its prayer for relief, Baykeeper seeks a declaratory judgment that Alabama Power is violating the CCR Rule and RCRA by failing to comply with the closure requirements of the Rule, and that Alabama Power is violating the open dumping prohibition of RCRA.  (Id. at 17).  Baykeeper also seeks an injunction preventing Alabama Power from implementing the allegedly illegal closure plan and requiring Alabama Power to file a proper closure plan for the Plant Barry coal ash impoundment.  (Id.).  Baykeeper further

requests that it be awarded the costs of this action, including reasonable attorney fees and expert fees. (Id.).

Currently pending before the Court is Alabama Power's Corrected Motion to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 60).[2] In the motion, Alabama Power asserts that Baykeeper's complaint should be dismissed because its closure plan complies with the CCR Rule. (Id. at 20-25). According to Alabama Power, its plan "contains the information specified in § 257.102(b)(i)-(vi), including a 'discuss[ion] [of] how the *final cover system* [not "closure plan"] will achieve the performance standards specified in [§ 257.102(d)],' and more generally, 'how the CCR unit will be closed in accordance with this section.'" (Id. at 22-23 (emphasis in original)). Alabama Power asserts that its plan discusses how the CCR impoundment will be closed in accordance with the 40 C.F.R. § 257.102(d), and that there is no requirement that an operator "demonstrate" compliance with performance standards. (Id. at 23). According to Alabama Power, its closure plan not only sets out the measures that it currently believes will be needed to meet the performance standards

---

[2] Because its original Motion to Dismiss (Doc. 54) contained "several non-substantive typographical errors and omissions," Alabama Power was granted leave to file a Corrected Motion to Dismiss to correct those errors. (Docs. 57, 59). In light of Alabama Power's subsequent filing of a Corrected Motion to Dismiss (Doc. 60), it is recommended that its original Motion to Dismiss (Doc. 54) be **DENIED as moot.**

set out in § 257.102(d), but also explains that as the plan is implemented and system monitoring takes place, additional technologies may be used as needed if the selected approach is not performing as intended or correction action goals are not met. (Id.). Alabama Power maintains that in accordance with federal and state CCR rules, the closure plan may be "amended or supplemented to include other protective measures." (Id.). Alabama Power further asserts that the CCR Rule does not require that there be no contact between the CCR impoundment and groundwater, and that Baykeeper's interpretation of performance standard terms are contrary to the language and structure of the CCR Rule and decades of historical practice. (Id. at 24-35). Alabama Power also argues that Baykeeper is estopped from raising the three claims set forth in its complaint because those very claims have already been considered and rejected by ADEM. (Id. at 35-41).

In its response in opposition to Alabama Power's motion, Baykeeper asserts that in 2022, EPA issued a final decision that rejected the arguments that Alabama Power makes in its motion to dismiss. (Doc. 61 at 7 (citing U.S. EPA, Final Decision Denial of Alternative Closure Deadline for General James M. Gavin Plant, Docket ID No. EPA-HQ-OLEM-2021-0590 (Nov. 18, 2022) (Doc. 61-1)). According to Baykeeper, EPA explained in that decision that a utility may not close an unlined impoundment by capping it in place

when coal ash remains in contact with ground water. (Id.).
Baykeeper asserts that EPA further explained that a utility does
not comply with the CCR Rule by including a mere "discussion" in
its plan; rather, § 257.102(b) "requires facilities to develop a
written closure plan *documenting the steps that will be taken* to
complete closure and *to ensure the performance standards are met*."
(Id. (emphasis in original) (quoting Doc. 61-1 at 43)). Baykeeper
also asserts that the state permit issued by ADEM is of no
consequence because EPA has not approved ADEM's CCR system or
permitting program. (Id. at 9-10).

Baykeeper notes that Alabama Power does not dispute that
capping of the impoundment will leave water in the ash basin; will
impound water, slurry, or sediment; and will continue to release
pollutants and contaminated water from the basin into the
surrounding environment. (Id. at 13). Baykeeper further asserts
that Alabama Power has failed to discuss or describe how it will
satisfy the CCR Rule requirements, and that Alabama Power's
assertion that it will manage the consequences later if the
selected approach does not perform as intended is at odds with the
plain language of the Rule, which provides that the requirements
of § 257.102(d)(2) must be met "prior to installing the final cover
system." (Id. at 15). Baykeeper also reiterates that Alabama
Power is violating the three specific closure requirements as set
forth in its complaint. (Id. at 18-30).

With respect to Alabama Power's estoppel argument, Baykeeper contends that the argument is fatally flawed because, as a matter of federal law, ADEM has no authority to determine the adequacy of the closure plan at issue nor to reject the complaint's claims pursuant to the CCR Rules. (Id. at 30). Baykeeper further asserts that Alabama's Power's contention that mere participation in a public comment process constitutes "litigation" of federal claims is unprecedented in Alabama law; that the issue of whether Alabama Power's plan comports with the federal CCR Rule was not litigated before ADEM; and that since EPA has not approved ADEM's CCR program application, ADEM could not have determined the federal claims in this case. (Id. at 30-32). Additionally, Baykeeper argues that the ADEM process was in no sense an adjudication in an adversarial proceeding with discovery, motions, sworn testimony, cross examination, and determinations of fact and law made by a judicial official. (Id. at 35). Baykeeper further asserts that federal courts have exclusive jurisdiction over RCRA claims; thus, there was a jurisdictional bar to litigating the CCR Rule claims in state court, and the requirements for collateral estoppel were not met. (Id. at 35-36).

In its reply, Alabama Power regurgitates many of the arguments made in its motion to dismiss and argues for the first time that this matter is not yet ripe because Baykeeper is in essence seeking an advisory opinion on whether the future closure of the CCR

impoundment at Plant Barry in 2031 will ultimately meet the closure performance requirements under the CCR Rule.   (Doc. 63).

Subsequent to Alabama Power's reply, Baykeeper requested and was granted permission to file a "Notice of Potential Violations and Opportunity to Confer" ("NOPV") issued by EPA to Alabama Power on January 31, 2023, and to submit a surreply.   (Docs. 64, 64-1, 64-2).   In the NOPV, EPA notified Alabama Power that its closure plan for the Plant Barry Ash Pond "potentially failed" to adequately address the closure performance standards in 40 C.F.R. § 257.102(d), in "potential violation" of 40 C.F.R. § 257.102(b), and does not appear to adequately discuss how the performance standards will be met, which "raises serious concerns" about whether the closure will ultimately meet the performance standards.   (Doc. 64-2 at 8-9).   The NOPV also noted that the closure plan does not address the ongoing flow of groundwater into the Ash Pond and does not describe how free liquids (groundwater or any other liquids within the Ash Pond) will be eliminated, or how the remaining ash will be sufficiently stabilized to support the final cover system; thus, Alabama Power is in potential violation of 40 C.F.R. § 257.102(b)(1).   (Id. at 12).   The NOPV further noted that groundwater will continue to flow into and out of the unlined Ash Pond in perpetuity and will consequently continue releasing CCR contaminants indefinitely, and that the plan does not adequately describe how the closure work will meet

12

the requirement to "control, minimize or eliminate, to the maximum extent feasible" post-closure infiltration into the unit or post-closure releases of CCR or leachate to the groundwater, in potential violation of 40 C.F.R. § 257.102(b)(1).  (Id. at 10). In its surreply, Baykeeper asserts that EPA's NOPV supports its complaint, which alleges that Alabama Power's closure plan violates the mandatory performance standards set forth in the CCR Rule.  (Doc. 64-1).

Baykeeper also requested and was granted permission to file two new exhibits and a supplement in support of its response to Alabama Power's motion to dismiss.  (Docs. 65, 65-1, 65-2, 65-3). The exhibits are letters exchanged between EPA and ADEM relating to Alabama's CCR permitting program.  (Docs. 65-1, 65-2).  In a letter dated February 1, 2023, EPA officials advised the Director of ADEM that "EPA remains concerned that ADEM's approach would result in a notably less protective program, allowing ongoing contamination of groundwater from CCR impoundments that are closed with waste in place, and that the record as it stands now would not support a proposal to approve Alabama's State program."  (Doc. 65-2 at 4).  In a response dated February 17, 2023 (Doc. 65-3), the ADEM Director advised EPA officials that ADEM had "provided all of the information required by 42 U.S.C. §§6945(d)(1)(A) and the 'Coal Combusion Residuals State Permit Program Guidance Document; Interim Final' guidance document (published by EPA in

the August 15, 2017, Federal Register) for a complete application for program approval[.]". (Doc. 65-3 at 2).  Thus, the ADEM Director asserted that ADEM's application was complete and stated that no further information would be submitted.  (Id.).  In its supplement, Baykeeper asserts that this correspondence makes clear that ADEM has not demonstrated that its permit program is a valid substitute for the current requirements of the federal CCR Rule, and that ADEM lacks authority to adjudicate or preclude the instant citizen suit.  (Doc. 65-1 at 2).

Baykeeper also filed a motion to strike new arguments raised in Alabama Power's reply brief and twenty-six new exhibits (Docs. 62-1 – 62-26) introduced in Alabama Power's reply brief.  (Doc. 66).  To the extent Baykeeper seeks to strike Alabama Power's ripeness argument, the motion is **denied**.  The question of ripeness affects the Court's subject matter jurisdiction and can be raised by the parties or the Court at any time.  See, e.g., Johnson v. Sikes, 730 F.2d 644, 647 (11th Cir. 1984).  Furthermore, Baykeeper has had the opportunity to respond and has responded to Alabama Power's ripeness argument.  Thus, the motion to strike (Doc. 66) is denied with respect to the ripeness argument.  Because the other subject arguments introduced in the reply brief were not raised in Alabama Power's motion to dismiss, and the subject exhibits are not central to the complaint, the Court has disregarded them.

Also before the Court is Baykeeper's post-hearing memorandum

on the impact of EPA's NOPV. (Doc. 74-1). In the memorandum, Baykeeper argues that a citizen enforcement suit can only be stopped if proper notice has not been given to EPA, if the sixty-day waiting period following the notice has not been observed, or if EPA has diligently prosecuted a previously filed agency enforcement action. (Id. at 7). Baykeeper also asserts that EPA is well aware of this action and has expressed no objection to this citizen enforcement action going forward. (Id. at 6). Baykeeper further contends that using the concept of ripeness to block citizen enforcement would conflict with the plain language and intent of the statute and Rule. (Id. at 8). According to Baykeeper, if the mere existence of a post-filing agency investigation and NOPV could result in a finding of ripeness, this would essentially rewrite the statute, which clearly provides for citizen suits. (Id. at 9). Baykeeper further asserts that Alabama Power has obtained a state permit and is forging ahead with its closure plan; thus, this case is as ripe as it will ever be. (Id. at 9-10).

In Alabama Power's response to Baykeeper's post-hearing memorandum, it argues that this case is not ripe because some of the actions listed in the plan, such as installing its final cover system, are not scheduled to occur until 2030. (Doc. 77-1 at 1). Alabama Power further asserts that what happens after closure in 2030 cannot be adjudicated in 2023 because compliance with

performance standards cannot be determined until the closure plan is fully implemented. (Id.). According to Alabama Power, the Court should dismiss this action without prejudice because whether Alabama Power's closure will ultimately meet the performance standards cannot be determined at this time, particularly since Alabama Power is free to amend its closure plan at any time. (Id.). Alabama Power asserts that the only issue that is currently ripe for adjudication is whether Alabama Power's closure plan discusses the items that 40 C.F.R. § 257.102(b) says must be discussed in such plans. (Id. at 3).[3]

## II.  STANDARDS OF REVIEW

### A.  Rule 12(b)(6)

Alabama Power's motion to dismiss references Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 60 at 8). A defendant may move to dismiss a complaint pursuant to Rule 12(b)(6) if the plaintiff has failed to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

---

[3] Baykeeper has also filed notice of EPA's proposed denial of Alabama's Coal Combustion Residuals Permit Program. (Docs. 84, 84-1). Baykeeper again argues that the lack of EPA approval of the Alabama CCR permitting program further demonstrates that ADEM's permit program and findings in connection with issuing state CCR permits are not a valid substitute for the requirements of the federal CCR Rule. (Doc. 84 at 2). Of course, Alabama Power claims the notice supports its ripeness argument, and that RCRA only authorizes suits for ongoing violations of the CCR Rule, not potential future violations. (Doc. 87 at 1-2).

accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>  This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (internal citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." <u>Id.</u>

When evaluating a motion to dismiss under Rule 12(b)(6), a court "must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." <u>Almanza v. United Airlines, Inc.</u>, 851 F.3d 1060, 1066 (11th Cir. 2017). All "reasonable inferences" must be drawn in the plaintiff's favor. <u>St. George v. Pinellas County</u>, 285 F.3d 1334, 1337 (11th Cir. 2002). That said, "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." <u>Mamani v. Berzain</u>, 654 F.3d 1148, 1153 (11th Cir. 2011).

A court reviewing a motion to dismiss must typically limit its consideration to the complaint and exhibits attached thereto. <u>Grossman v. Nationsbank, N.A.</u>, 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam). However, a "court may consider an extrinsic document

if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." SFM Holdings, Ltd. v. Banc of Am. Secs., LLC, 600 F.3d 1334, 1337 (11th Cir. 2010); see also Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999) (stating that "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute"). Further, courts may consider properly judicially noticed documents in resolving a motion to dismiss. Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010) (per curiam) (holding that the district court "properly took judicial notice" of documents which were "public records that were 'not subject to reasonable dispute' because they were 'capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned'" (quoting Fed. R. Evid. 201(b)); see also Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding.").

### B.   Rule 12(b)(1)

Alabama Power has also made arguments for dismissal that implicate the Court's subject matter jurisdiction. See, e.g., Reahard v. Lee County, 30 F.3d 1412, 1415 (11th Cir. 1994) (stating that the issue of ripeness goes to whether a district court has subject matter jurisdiction). A challenge to a district court's subject matter jurisdiction is properly brought under Federal Rule of Civil Procedure 12(b)(1). See Fed. R. Civ. P. 12(b)(1); Newman

v. William L. Gunlicks Irrevocable Tr., 897 F. Supp. 2d 1270, 1273 (M.D. Fla. 2012).

Motions to dismiss under Rule 12(b)(1) come in two forms: "facial attacks" and "factual attacks." Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (per curiam). Facial attacks only require the court to determine whether the plaintiff's complaint has alleged a sufficient basis for subject matter jurisdiction. Id. at 1529. As such, the allegations within the complaint are assumed true for purposes of the motion. Id. On the other hand, factual attacks challenge the existence of subject matter jurisdiction irrespective of what the complaint alleges. Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A., 104 F.3d 1256, 1261 (11th Cir. 1997). Accordingly, in a factual attack, courts may consider information outside of the pleadings — including testimony, affidavits, and other evidence — and "may make factual findings necessary to resolve the motion." Hawthorne v. Baptist Hosp., Inc., 2008 U.S. Dist. LEXIS 95555, 2008 WL 5076991, at *2 (N.D. Fla. Nov. 24, 2008).

### III. **ANALYSIS**

Courts must address jurisdictional objections before analyzing the sufficiency of a complaint. See Llampallas v. Mini-Cirs., Lab, Inc., 163 F.3d 1236, 1242 (11th Cir. 1998). Accordingly, the Court will analyze Alabama Power's jurisdictional challenges before considering its arguments for dismissal pursuant

to Rule 12(b)(6).

**A.   Preclusion**

As noted *supra*, Alabama Power argues that Baykeeper is estopped from raising the three claims set forth in its complaint because those very claims have already been considered and rejected by ADEM.  (Doc. 60 at 35-41).  "Under the Full Faith and Credit Act, 28 U.S.C. § 1738, a federal court must give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered."  Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324, 1331 (11th Cir. 2010) (quotation omitted).  But while the Full Faith and Credit Act accords state judicial decisions with preclusive effect in federal courts, it "is not applicable to . . . unreviewed state administrative fact-finding . . . ."  Univ. of Tenn. v. Elliott, 478 U.S. 788, 794 (1986).  Instead, federal common-law rules of preclusion require federal courts to give a state agency's fact-finding the same preclusive effect to which it would be entitled in that state's courts when the "state agency act[s] in a judicial capacity [and] resolves disputed issues of fact properly before it in which the parties have had an adequate opportunity to litigate[.]"  Id. at 799.  However, if Congress manifests clear intent to abrogate the common law rule of preclusion, a court must conform to such congressional intent.  See id. at 797.

In Elliott, the Supreme Court rejected a preclusion rule for

Title VII claims because the statute requires the EEOC to give weight to state agency decisions but does not require the agency to accept those decisions wholesale.  Id. at 795-96.  The Court reasoned that "it would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect in Title VII actions in federal court."  Id. at 795.  Conversely, the Court noted that "[n]othing in the language of § 1983 remotely expresses any congressional intent to contravene the common-law rules of preclusion . . . ."  Id. at 797 (quoting Allen v. McCurry, 449 U.S. 90, 97-98 (1980)).  Therefore, because the policies undergirding the collateral estoppel doctrine – enforcing repose, efficiency, federalism, and comity - generally weigh in favor of preclusion as a first principle, the Court gave preclusive effect to the state agency's unreviewed fact finding on the plaintiff's § 1983 claim.  Id. at 798-99.

The clear teaching of Elliott is that unless a federal statute has language showing that Congress intended to override established preclusion law, federal courts should give a state agency's findings preclusive effect if the state's courts would do the same.  See id. at 799.  Put another way, Elliott effectively sets up a presumption in favor of applying the state's preclusion rules to unreviewed decisions made by state agencies.  The rule only applies, however, if the agency acted in a judicial capacity; that is, if it resolved the disputed claims after giving the

parties a full and fair opportunity to litigate.  <u>Kremer v. Chem.</u> <u>Const. Corp.</u>, 456 U.S. 461, 480 (1982).  As a necessary corollary, "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation."  <u>Montana v. United States</u>, 440 U.S. 147, 164 n.11 (1979).

Considered together, the relevant Supreme Court decisions set up a three-step inquiry for determining whether a state administrative agency's unreviewed fact finding deserves preclusive effect.  First, the court must determine if the statute under which the plaintiff asserts a claim overrides the federal common law's preference for barring relitigation of questions already litigated and decided.  If the applicable statute shows that Congress intended to push aside federal preclusion law, the inquiry stops there, and the unreviewed agency determination will have no effect.  See <u>Elliott</u>, 478 U.S. at 796-97 (finding no preclusion of Title VII claims); <u>Astoria Fed. Sav. & Loan v.</u> <u>Solimino</u>, 501 U.S. 104, 112-13 (1991) (finding unreviewed state agency decisions have no preclusive effect on Age Discrimination in Employment Act claims); <u>JSK v. Hendry Cty. Sch. Bd.</u>, 941 F. 2d 1563, 1569 (11th Cir. 1991) (finding unreviewed state agency decision did not preclude claim brought under Education for All Handicapped Children Act).  But if the applicable statute fails to show that Congress intended to displace the federal common law of

preclusion, the court must move on to the second step of determining whether the state's own courts would give the agency fact-finding preclusive effect. If they would, the third and final step requires the federal court to scrutinize the procedures used by the state agency to reach the result that it reached, measuring their "quality, extensiveness, [and] fairness[.]"  Montana, 440 U.S. at 164 n.11.  Only then can a federal court give preclusive effect to a state agency's unreviewed fact finding.

Here, Baykeeper brings this RCRA citizen suit pursuant to 42 U.S.C. § 6972(a) to enforce the CCR Rule that EPA promulgated to regulate the disposal of coal combustion residuals, or coal ash. The parties have not pointed to any language in RCRA which suggests a congressional intent to contravene the common-law rules of preclusion, but Baykeeper argues that because ADEM's permitting process has not been approved by EPA, and has instead been called into question by EPA, the fact that ADEM issued a plant closure permit to Alabama Power following a public comment period that lacked any judicial features should not foreclose Baykeeper's ability to attack the issuance of the permit through the citizen suit process established under RCRA.

In Alabama, a state administrative agency's decision has preclusive effect when "(1) there is identity of the parties or their privies; (2) there is identity of issues; (3) the parties had an adequate opportunity to litigate the issues in the

administrative proceeding; (4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision." Wal-Mart Stores, Inc. v. Smitherman, 743 So. 2d 442, 445 (Ala. 1999) (citations omitted), overruled on other grounds by Ex Parte Rogers, 68 So. 3d 773, 781 (Ala. 2010); see Caton v. City of Pelham, 329 So. 3d 5, 22-23 (Ala. 2020) (applying Smitherman to analyze whether collateral estoppel applied to a determination made in an unemployment compensation proceeding). "The burden is on the party asserting collateral estoppel to prove that the issue it is seeking to bar was determined in the prior adjudication." Lee L. Saad Const. Co. v. DPF Architects, P.C., 851 So. 2d 507, 520 (Ala. 2002).

Alabama Power, as the party seeking to assert collateral estoppel, has failed to carry its burden. Contrary to Alabama Power's assertions, it is not clear that there is an identity of issues between the ADEM permit proceeding and the instant action, or that the federal issues were actually litigated. In its reply brief, Alabama Power acknowledges that the ADEM permit proceeding was an adjudication of a state claim of whether to issue the closure permit "consistent with ADEM's CCR regulations." (Doc. 63 at 18). While Alabama Power argues that ADEM regulations for CCR plant closure permits track those under the CCR Rule, ADEM is only authorized to determine whether Alabama Power's closure plan

complies with state rules and regulations, whereas in the instant action, the focus is on the federal CCR Rule and EPA's interpretation of it.  Per Alabama Power, EPA now interprets the federal CCR Rule to require that a plant closure plan cannot have CCR in contact with groundwater.  (Doc. 60 at 34).  Alabama Power does not contend that there has been an administrative finding that its plant closure plan is written such that CCR does not have contact with groundwater; instead, it essentially argues that EPA's interpretation of what is required under the federal CCR Rule, i.e., no CCR in contact with groundwater, is incorrect. Given that EPA has placed Alabama Power on notice regarding potential deficiencies in its plant closure plan, and ADEM on notice that it intends to deny its application under the WIIN Act, a plausible argument can be made that notwithstanding the similarities between the ADEM and federal CCR rules, they are not the same, and a finding that Alabama Power's plant closure plan passed muster under ADEM's CCR rules does not necessitate a finding that the plan complies with the federal CCR Rule.  In fact, the preamble to the federal CCR Rule provides, in pertinent part, that the Rule establishes "minimum requirements only" and "states may therefore impose more stringent requirements."  80 Fed. Reg. at 21,332.  Moreover, as noted *supra*, the WIIN Act authorizes states to create a permit program for regulation of CCR disposal, which if approved by EPA, would "operate in lieu of regulation of coal

combustion residuals units in the State" under the CCR Rule. 42 U.S.C. § 6945(d)(1)(A). ADEM's CCR regulations have not been approved by EPA and do not operate in lieu of the CCR Rule. Accordingly, the undersigned finds that the issue of whether Alabama Power's closure plan complies with the federal CCR Rule has not been litigated and thus recommends that Alabama Power motion to dismiss based on collateral estoppel be denied.

**B. Ripeness**

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" Gunn v. Minton, 568 U.S. 251, 256 (2013) (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)). "Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' which restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies." Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 71 (2013) (quotation omitted). Ripeness principles "originate[] from the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual cases and controversies." Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009) (quotation omitted).

To determine whether a claim is ripe for judicial review, courts "consider both 'the fitness of the issues for judicial

decision' and 'the hardship of withholding court consideration.'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). In the administrative context, courts consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

Generally, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S 296, 300 (1998) (quotation omitted). Ripeness is a "justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla.*, 727 F.3d 1349, 1356 (11th Cir. 2013) (quotation omitted). The ripeness of a claim is a legal question. *Id.*

As noted *supra*, Alabama Power has argued that this case is not ripe. (Doc. 63 at 6). According to Alabama Power, Plant Barry's Ash Pond is not slated to close until 2031, and Baykeeper is essentially seeking an advisory opinion on whether the future

closure of the CCR impoundment at Plant Barry in 2031 will
ultimately meet the closure performance standards under the CCR
Rule.  (Id.).  Baykeeper, on the other hand, argues that the
ripeness concept has no place in a RCRA citizen enforcement action
because Congress has authorized citizens to file such actions and
has established the only conditions that justify halting a citizen
enforcement action.[4]  (Doc. 74-1 at 8-9).  Baykeeper also asserts
that Alabama Power submitted a closure plan for the CCR impoundment
at Plant Barry, that the plan does not comply with CCR Rule, that
ADEM has approved the plan and issued Alabama Power a permit, and
that Alabama Power is actively working to close the CCR impoundment

---

[4] Baykeeper also asserts that Alabama Power's ripeness argument
should be stricken because it was raised for the first time in
Alabama Power's reply.  While Baykeeper is correct in its assertion
that arguments raised for the first time in a reply brief are
generally disregarded, it is also well settled that ripeness is a
component of a district court's subject matter jurisdiction which
"may (indeed must) be raised" at any time, and even by the Court
sua sponte.  Nat'l Parks Conservation Ass'n v. U.S. Dep't of
Interior, 46 F. Supp. 3d 1254, 1266 (M.D. Fla. 2014); see Utah v.
U.S. Dep't of the Interior, 210 F.3d 1193, 1196 n.1 (10th Cir.
2000) (because ripeness doctrine is drawn from constitutional
limitations on judicial power and prudential reasons for refusing
to exercise jurisdiction, "ripeness can be raised at any time,
even by the court sua sponte"); Sammons v. National Comm'n on
Certification of Physician Assistants, Inc., 104 F. Supp. 2d 1379,
1381 (N.D. Ga. 2000) ("As ripeness goes to this court's subject
matter jurisdiction, the court must consider the question sua
sponte.").

Baykeeper also asserts that it has not been afforded an
opportunity to address Alabama Power's ripeness argument; however,
a review of the record reflects that Baykeeper has in fact
addressed the ripeness argument in one of several surreplies, as
well as in a post-hearing brief. (Docs. 66, 74-1).

in accordance with the plan.  (Docs. 1, 74-1).  Baykeeper argues that Alabama Power is violating the CCR Rule and RCRA, and that harm is occurring as a result.  (Id.).

While the parties have not identified any cases directly on point, there are instructive cases that shed light on this issue. For instance, in Wilderness Soc. v. Alcock, 83 F.3d 386 (11th Cir. 1996), an environmental group sought a declaration that the 1986 Final Land and Resource Management Plan and accompanying final environmental impact statement for Cherokee National Forest violated the National Forest Management Act, 16 U.S.C. § 1600, *et seq.* (1994).  Id. at 387-88.  The environmental group appealed the trial court's order granting summary judgment in favor of the government agencies and a group of timber companies on the ground that the plaintiffs did not represent a ripe controversy.  Id. at 389.  On appeal, the court held:

> We are persuaded by appellees' contention that no site-specific action will be taken pursuant to the Plan without a second stage of decisionmaking; "subsequent discretionary actions require separate and independent decisionmaking" before any site-specific action will occur.  Appellees concede that appellants can challenge both the site-specific action as well as the Plan-level decision(s) underlying the specific action at the second stage.  Our opinion is dependent on that concession. Until such actions have been proposed, however, there is no controversy for us to resolve.  We have no doubt that some decisions in the Plan make an injury to the appellants more likely.  "More likely," however, does not make the injury imminent enough for purposes of judicial decisionmaking.  We do not yet know when or how an injury to the appellants will occur, and this factual underpinning is vital to a full-fledged judicial review

> of the Plan.    Thus, until a site-specific action has
> been proposed, appellant's claimed injury is not ripe
> for judicial review.

Id. at 390-391 (internal citation and footnote omitted).

In another case, Fla. Panthers v. Collier County, Fla., 2016 U.S. Dist. LEXIS 47782, 2016 WL 1394328 (M.D. Fla. Apr. 8, 2016), a wildlife group brought a citizen enforcement suit pursuant to the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-44.  Id., 2016 U.S. Dist. LEXIS 47782, at *1-2, 2016 WL 1394328, at *1.  The plaintiff wildlife group alleged that the county's written policies and regulations relating to the clearing of agricultural land, issuance of building permits for single family residences, and planned future extension of a road were pre-empted by the Endangered Species Act because they were less stringent than the prohibitions in the Act.  Id., 2016 U.S. Dist. LEXIS 47782, at *2, 2016 WL 1394328, at *1.  The plaintiff group also asserted that since Congress has authorized citizen enforcement actions alleging wholly future violations of the Endangered Species Act, the ripeness doctrine is not applicable to citizen suits under the Act.  Id., 2016 U.S. Dist. LEXIS 47782, at *28, 2016 WL 1394328, at *10.  The district court disagreed and stated that:

> [R]ipeness is an Article III requirement, and as such it
> cannot be entirely swept aside by Congress.  The Court
> concludes, however, that Congress has not attempted to
> do so with the ESA citizen suit provisions.  While some
> claims for future violations are allowable under the
> ESA, the threat of future harm must still satisfy Article
> III. . . . Plaintiffs' position that "potential wholly-

future violations of the ESA" are always ripe results in federal courts being in the advisory opinion business which, as noted in Clinton v. Jones, 520 U.S. 681, 700 n.33, 117 S. Ct. 1636, 137 L. Ed. 2d 945 (1997), has been rejected for centuries. Rather, for future injuries to be ripe, they must satisfy the standard for an injury sufficient to invoke Article III standing:

> [A]n injury must be concrete particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling. Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending. Thus, we have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.

Id., 2016 U.S. Dist. LEXIS 47782, at *28-29, 2016 WL 1394328, at *10-11 (emphasis in original) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013)).

In Florida Panthers, the court determined that the plaintiffs' challenges to the county's agricultural land clearing Exemption and single-family residence exemption were ripe as pled. Id., 2016 U.S. Dist. LEXIS 47782, at *30-31, 2016 WL 1394328, at *11. The court found that no further factual development was necessary, and that delayed review would cause undue hardship to the plaintiffs. Id. The court also found that the plaintiffs' challenge to the county's "foreseeable future authorizations of agricultural land clearing" applications was ripe for judicial

review.  Id., 2016 U.S. Dist. LEXIS 47782, at *32-33, 2016 WL 1394328, at *12.  The court noted that twenty-four such applications had been processed, and the fact that none had ever been denied was sufficient to satisfy the injury requirement for Article III purposes.  Id.  According to the court, the fact that the county continued to implement the policy showed that the plaintiffs' assertions did not rest on contingent, hypothetical future events and thus were fit for adjudication.  Id., 2016 U.S. Dist. LEXIS 47782, at *33, 2016 WL 1394328, at *12.

Roanoke River Basin Ass'n v. Duke Energy Progress, LLC, 2018 U.S. Dist. LEXIS 52991, 2018 WL 2417862 (M.D.N.C. May 29, 2018), is another instructive case.  In Roanoke, the defendant utility company published an initial written CCR closure plan pursuant to CCR rule.  Id., 2018 U.S. Dist. LEXIS 52991, at *4, 2018 WL 2417862, at *2.  After publication of the utility's initial closure plan, an environmental group filed suit alleging that the utility was violating the CCR Rule and RCRA by failing to comply with the closure plan requirements and was also violating the open dumping prohibition in RCRA.  Id.  The court found that there was no causal nexus between the harms alleged and the challenged conduct of the utility.  Id., 2018 U.S. Dist. LEXIS 52991, at *9, 2018 WL 2417862, at *4.  The court also concluded that the matter was not ripe because the question of whether the initial plan would ultimately meet the performance standards outlined in the CCR Rule went beyond

a purely legal question and required further factual development. Id., 2018 U.S. Dist. LEXIS 52991, at *18, 2018 WL 2417862, at *7. According to the court, judicial review of the initial closure plan would involve extensive, time-consuming judicial consideration of the specifics of an elaborate, technical plan to determine whether, and to what extent, if any, the plan achieved the Rule's performance standards.  Id.

The court also found that the action giving rise to the controversy - the publishing of the initial closure plan - was not final and was wholly "dependent on future uncertainties," as the utility still had 20 months in which to submit a proposed closure plan that would be subject to public participation and review by the state regulatory agency.  Id., 2018 U.S. Dist. LEXIS 52991, at *18-20, 2018 WL 2417862, at *7.  The court also found that the hardship to the Plaintiff would be minimal at most, given the preliminary nature of the initial closure plan.  Id., 2018 U.S. Dist. LEXIS 52991, at *19, 2018 WL 2417862, at *7.

In the case at hand, all agree that Alabama Power's CCR "cap in place" closure plan has been through the state public comment phase, ADEM has issued Alabama Power a permit, and Alabama Power is actively moving forward with its plan to cap in place its coal ash impoundment at Plant Barry.  Baykeeper asserts:

> Alabama Power has received a permit from ADEM to cap in place its coal ash at Plant Barry, leaving the coal ash impounded and saturated in groundwater and on the banks

of the Mobile River and the Mobile-Tensaw Delta, where
it will continue to leach out pollutants into
surrounding waters, as well as remaining subject to
increased saturation and catastrophic failure and spills
from regular flooding, storms, water level rise, and
hurricanes. Because Alabama Power has received state
approval for its cap-in-place plan, there is no question
that this dangerous and defective plan will be
implemented-causing continued pollution and
perpetuating the risks to Baykeeper and its members, as
well as the water resources of the Mobile-Tensaw Delta
that they depend on-unless the closure requirements of
the federal CCR Rule are enforced at Plant Barry. Upon
information and belief, Alabama Power is moving forward
at Plant Barry with preliminary work to implement this
plan.

Alabama Power is proceeding with its plan to cap its
Plant Barry coal ash within the existing impoundment,
continuing the ongoing pollution of the water resources
of the Mobile-Tensaw Delta and creating a continuing
danger and threat of catastrophic failure for Baykeeper
and its members who own property and/or use and enjoy
the waterways downstream.

(Doc. 1 at 5).

Taking Baykeeper's allegations as true, the Court rejects
Alabama Power's ripeness argument. There is no dispute that
Alabama Power has received a permit from ADEM and is moving ahead
with its closure plan for the CCR impoundment at Plant Barry.
Alabama Power's plan lays out the steps it will take to close the
impoundment, and Alabama Power has already begun implementing its
plan. Baykeeper has alleged that Alabama Power's activities in
connection therewith are continuing and will continue to leach out
pollutants into the surrounding waters and perpetuate risks to
Baykeeper and its members unless the closure requirements of the

federal CCR Rule are enforced at Plant Barry.  See id.  As pled, Baykeeper has alleged harm that is not contingent on hypothetical future events.  Thus, unlike the situation in Roanoke, where the court had before it an initial closure plan, the plan in this case has received ADEM approval, and Alabama Power is actively working to put it in place.

The undersigned is fully cognizant that because ADEM is not authorized to issue a federal permit, and EPA, which is authorized to do so, has placed Alabama Power on notice of numerous potential deficiencies in its CCR closure plan, there is a reasonable possibility that Alabama Power's CCR plan will at some point undergo modifications.  Of course, the timing and the extent of any potential future modifications to the plan is currently unknown.  Even so, Baykeeper has alleged concrete, ongoing harm and specific and ongoing violations of the CCR Rule and RCRA by Alabama Power.  There is nothing before the Court that suggests that a remedy cannot be fashioned, or that judicial involvement will somehow torpedo administrative efforts.  Indeed, the straightforward issue at the heart of this controversy is whether, under the CCR Rule, a CCR impoundment can be capped in place with CCR in contact with groundwater.  (See Doc. 1 at 8; Doc. 60 at 33-34).  It is also noteworthy that under RCRA, Congress has already recognized and addressed the clash of interests at issue and has determined "the situations in which a state or federal agency's

enforcement efforts will foreclose review of a citizen suit in federal court." Adkins v. VIM Recycling, Inc., 644 F. 3d 483, 497 (7th Cir. 2011) (quotation omitted). Accordingly, the undersigned recommends that Alabama Power's motion to dismiss the complaint on ripeness grounds be denied.

### C.  Failure to State a Claim

Finally, Alabama Power asserts that Baykeeper's complaint should be dismissed because Baykeeper has failed to state a claim against it. The Court finds that Baykeeper's complaint states a claim upon which relief can be granted. Though Alabama Power protests to the contrary, Baykeeper has adequately explained why it believes that Alabama Power's CCR closure plan does not comply with the federal CCR Rule and RCRA. (Doc. 61 at 12-39). And Baykeeper's assertions appear to be supported by the NOPV that EPA recently issued to Alabama Power.(Doc. 64-2)[5] Taking Baykeeper's

---

[5] In the EPA Notice of Potential Violations, EPA advised, in part, that:

**(1)  Alabama Power has potentially failed to meet the criteria for conducting closure of the Plant Barry Ash Pond as required by 40 C.F.R. § 257.102.** Specifically, Alabama Power has potentially failed to prepare a closure plan that adequately addresses the closure performance standards in 40 C.F.R. § 257.102 (d), in potential violation of 40 C.R.R. §257.102(b). . .

As noted above, the unlined Ash Pond is closing with an EPA-estimated 23% of the CCR ash remaining in contact with groundwater after consolidation. As also noted above, the presence of significant volumes of saturated CCR will persist during closure and post closure as groundwater will continue to flow into and out

allegations as true, which the Court is required to do in resolving a motion under Rule 12(b)(6), the undersigned finds that Baykeeper has asserted plausible claims for relief against Alabama Power. Accordingly, the undersigned recommends that Alabama Power's motion to dismiss for failure to state a claim be denied.

## IV.   CONCLUSION

For the reasons set forth above, the undersigned **RECOMMENDS** that Alabama Power's Corrected Motion to Dismiss (Doc. 60) be **DENIED**.

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations

---

of the unit in perpetuity from the sides and bottom of the unit. The Amended Closure Plan does not address this ongoing flow of groundwater into the Ash Pond and does not describe how free liquids (groundwater or any other liquids within the Ash Pond) will be eliminated or how the remaining ash will be sufficiently stabilized to support the final cover system. Therefore, Alabama Power Company has potentially violated 40 C.F.R. § 257.102(b)(1).

(Doc. 64-2 at 8-12).

contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **29th** day of **September, 2023.**

/s/ SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**