**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **MOBILE BAYKEEPER, INC.,**<br>**Plaintiff,**<br><br>**v.**<br><br>**ALABAMA POWER COMPANY,**<br>**Defendant.** | **Case No.: 1:22-cv-00382-KD-B**<br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANT ALABAMA POWER COMPANY'S OBJECTIONS TO
<u>REPORT AND RECOMMENDATION</u>**

<u>OF COUNSEL:</u>

Jaime W. Betbeze
(jbetbeze@maynardnexsen.com)
Raymond L. Bell, Jr.
(rbell@maynardnexsen.com)
Evan N. Parrott
(eparrott@maynardnexsen.com)
MAYNARD NEXSEN P.C.
RSA Battle House Tower
11 N. Water St., Ste. 24290
Mobile, Alabama 36602
Telephone: (251) 432-0001

Ed R. Haden
(ehaden@balch.com)
Charles A. Burkhart
(cburkhart@balch.com)
Steven A. Burns
(sburns@balch.com)
Sean W. Shirley
(sshirley@balch.com)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100

October 16, 2023

## <u>TABLE OF CONTENTS</u>

Table of Authorities ..................................................................................................... iii

Objections To Report And Recommendation ............................................................... 1

The Standard of Review is De Novo ............................................................................. 1

Rule 72 Requirements ................................................................................................... 1

Objections ..................................................................................................................... 2

I.      Issue Preclusion Requires Dismissal Because Baykeeper Cannot Show A Violation Of The CCR Rule. ..................................................................................... 2

      A.     The Issues Were Identical for Purposes of Issue Preclusion. ................... 3

      B.     The Parties—Baykeeper and Alabama Power—Are Identical. .............. 6

      C.     Baykeeper had an Adequate Opportunity to Litigate. ............................ 7

      D.     The Issues were Actually Litigated and Decided. ................................... 8

      E.     The Findings were Necessary to ADEM's Determination. .................... 9

II.     This Case Is Not Ripe Because Its Closure Plan May Be Modified Before Final Closure In 2031 ................................................................................................. 9

III.    Baykeeper Has Not Stated a Claim Under Rule 12(b)(6) Based On The Correct Meaning Of The 2015 CCR Rule. ..................................................................... 12

      A.     <u>History</u>: EPA Has Approved Closure of Numerous Waste Impoundments with Waste in Contact with Groundwater. ..................... 13

            1.     EPA Has Approved Closure in Place of Multiple Waste Sites with Hazardous Materials in Contact with Groundwater ..................... 13

            2.     EPA's Cost Projection Represented that All CCR Impoundments would Close in Place with Ash in Contact with Groundwater. ................. 17

      B.     <u>Text</u>: The Technical Meaning of the CCR Regulations Allows Closure in Place with a Cover and Corrective Action. .................................................. 17

            1.     The Closure Plan Describes How Alabama Power Will "Control" and "Minimize" Post-Closure "Infiltration" into the CCR Impoundment and Releases Out of the Impoundment. .................................. 19

2.      The Closure Plan Describes How Alabama Power Will Prevent Future "Impoundment."................................................................................23

3.      The Closure Plan Describes How Alabama Power Will Eliminate "Free Liquids."....................................................................................................25

C.     <u>Structure</u>: When a CCR Impoundment is Closed in Place, the 2015 CCR Rule Includes Corrective Action Provisions to Address Groundwater. ........................28

D.     <u>Purpose</u>: Alabama Power's Closure Plan Will "Protect Human Health and the Environment."........................................................................................................29

CONCLUSION................................................................................................................29

CERTIFICATE OF SERVICE .......................................................................................31

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Adams v. Morton*,
    581 F.2d 1314 (9th Cir. 1978) ............................................. 7

*Adams v. Atl. Richfield Co*.,
    No. 2:18-CV-375-JVB-JPK, 2021 WL 4819608 (N.D. Ind. Oct. 15, 2021) ........................ 16

*Alkhatib v. Steadman*,
    No. CV 10–00342–KD–C, 2011 WL 5553775 (S.D. Ala. Nov. 15, 2011) ......................... 16

*Arriaga v. Fla. Pac. Farms, L.L.C.*,
    305 F.3d 1228 (11th Cir. 2002) ............................................. 20

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
    575 U.S. 138 (2015) ............................................. 4

*Caton v. City of Pelham*,
    329 So. 3d 5 (Ala. 2020) ............................................. 8, 9

*Cooper v. R.J. Reynolds Tobacco Co.*,
    586 F. Supp. 2d 1312 (M.D. Fla. 2008)............................................. 16, 17

*Durfee v. Duke*,
    375 U.S. 106 (1963)............................................. 6

*Ex parte Shelby Med. Ctr., Inc.,*
    564 So. 2d 63 (Ala. 1990) ............................................. 3

*Ex parte Smith*,
    683 So. 2d 431 (Ala. 1996)............................................. 8, 9

*Ex parte Tutt Real Est., LLC*,
    334 So. 3d 1249 (Ala. 2021) ............................................. 4

*Grimes v. Vitalink Comunic'ns Corp*.,
    17 F. 3d 1553 (3d Cir. 1994)............................................. 4, 5, 6

*Hui v. Castaneda*,
    559 U.S. 799 (2010)............................................. 2

*Jeffrey S. v. State Bd. of Educ*.,
    896, F. 2d 507 (11th Cir. 1990) ............................................. 1

*Johns v. Wells Fargo Bank, N.A.*,
    No. CV 14-0254-KD-C, 2015 WL 9238957 (S.D. Ala. Dec. 17, 2015) .............................. 16

*Johnson v. Sikes*,
    730 F.2d 644 (11th Cir. 1984) ............................................. 12

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ........................................................................ 13, 15

*Kroner v. Comm'r of Internal Revenue*,
48 F.4th 1272 (11th Cir. 2022) .............................................................. 4, 21

*Lage v. Ocwen Loan Servicing LLC*,
839 F.3d 1003 (11th Cir. 2016) ........................................................... 19, 26

*Marrese v. Am. Acad. of Orthopaidic Surgeons*,
470 U.S. 373 (1985) ................................................................................ 5, 6

*McCone v. Thorpe*,
828 F. App'x 697 (11th Cir. 2020) ............................................................ 15

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) .................................................................................. 28

*Regions Bank v. Kearney*,
597 F. App'x 1012 (11th Cir. 2014) ........................................................... 16

*Roanoke River Basin Ass'n v. Duke Energy Progress, LLC*,
No. 1:17–cv–707, 2018 U.S. Dist. LEXIS 52991, 2018 WL 2417862
(M.D.N.C. May 29, 2018) .......................................................................... 11

*S.E.C. v. Miller*,
No. 1:04-CV-01655, 2010 WL 11508717 (N.D. Ga. Aug. 18, 2010) ................... 16

*S.E.C. v. Levin*,
849 F.3d 995 (11th Cir. 2017) .................................................................... 18

*Texas v. United States*,
523 U.S 296 (1998) .................................................................................... 11

*United States v. Saunders*,
318 F.3d 1257 (11th Cir.2003) .................................................................... 18

*Util. Solid Waste Activities Grp. v. EPA*,
901 F.3d 414 (D.C. Cir. 2018) .................................................................... 29

*Voracek v. Nicholson*,
421 F.3d 1299 (Fed. Cir. 2005) ............................................................ 20, 21

## STATUTES

42 U.S.C. § 6901 ..................................................................................... 29

42 U.S.C. § 6922 ..................................................................................... 29

42 U.S.C. § 6944 ..................................................................................... 29

42 U.S.C. § 6945 ............................................................................................................... 4

42 U.S.C. § 6972 ............................................................................................................... 5

ADEM Admin. Code r. 335-13-15-.07 ......................................................................... 4, 9

Ala. Code § 22-22A-7 ....................................................................................................... 7

**RULES**

Rule 12(b)(6), Fed. R. Civ. P. .................................................................................. 2, 12, 16

Rule 72, Fed. R. Civ. P. ..................................................................................................... 1

S.D. Ala. GenLR 72(c) ...................................................................................................... 1

**REGULATIONS**

30 C.F.R. § 77.216-5 ....................................................................................................... 25

40 C.F.R. § 257.91 ............................................................................................... 21, 22, 28

40 C.F.R. § 257.101 ......................................................................................................... 19

40 C.F.R. § 257.102 .................................................................................................. passim

40 C.F.R. § 257.104 ......................................................................................................... 28

40 C.F.R. § 257.53 .................................................................................................... passim

40 C.F.R. § 257.60 ..................................................................................................... 18, 19

40 C.F.R. § 257.90 ........................................................................................................... 28

40 C.F.R. § 257.93 ........................................................................................................... 28

40 C.F.R. § 257.94 ........................................................................................................... 28

40 C.F.R. § 257.95 ........................................................................................................... 28

40 C.F.R. § 257.96 ..................................................................................................... 21, 28

40 C.F.R. § 257.97 ........................................................................................................... 28

40 C.F.R. § 257.98 ........................................................................................................... 28

40 C.F.R. § 265.228 ......................................................................................................... 28

75 Fed. Reg. 35,208 .................................................................................................. 13, 25

80 Fed. Reg. 21,412 .................................................................................................. 15, 17

## <u>OTHER AUTHORITIES</u>

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (Thomson/West 2012) ................................................................................ 4, 22, 23

EPA, Closure of Hazardous Waste Surface Impoundments 26 (Sept. 1982) ........................ 24, 25

EPA, Final Decision on Denial of Alternative Closure Deadline for Gen. James M. Gavin Plant, Cheshire, Ohio (Nov. 18, 2022) ....................................................................... 23

EPA, Guide for Industrial Waste Management 11-1 (Feb. 2003) ................................. 24

EPA, *Superfund Record of Decision:  Raymark Indu., Inc., Operable Unit 1*, CT, at 38 (July 3, 1995) .......................................................................................... 29, 30

EPA, *Superfund Record of Decision: Todtz, Lawrence Farm, IA,* at abstract (Nov. 1988) ......... 15

EPA, *Lexington County Landfill, Cayce, SC* (2007) ................................................16

H. R. 1609, 94th Cong. § 2 (1976) ....................................................................... 1

Restatement (Second) of Judgments § 83 ................................................................. 5, 7

## DEFENDANT ALABAMA POWER COMPANY'S OBJECTIONS TO
## <u>REPORT AND RECOMMENDATION</u>

Defendant Alabama Power Company ("Alabama Power") respectfully objects to the Report and Recommendation ("Report") (Doc. 91) issued by the Honorable United States Magistrate Judge Sonja F. Bivins on September 30, 2023, recommending that Alabama Power's Motion to Dismiss (Doc. 60) be denied.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c).  For the reasons stated below, Alabama Power's Motion to Dismiss should be granted.

## <u>The Standard of Review is De Novo</u>

A district judge may accept, reject, or modify the Magistrate Judge's Report and Recommendation after conducting a careful and complete de novo review of the findings and recommendations.  *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").  Accordingly, this requires the district judge to "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ.*, 896, F. 2d 507, 512 (11th Cir. 1990) (quoting H. R. 1609, 94th Cong. § 2 (1976)).

## <u>Rule 72 Requirements</u>

Federal Rule of Civil Procedure 72 requires that all objections to the Report be both timely and specific. *See* Fed. R. Civ. P. 72(b)(2) ("Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."); (Doc. 91, PageID.18949) ("In order to be specific, an objection must identify the specific place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.").

<u>**Objections**</u>

Alabama Power objects to the Report and its conclusions that issue preclusion does not apply, that the claims are ripe for adjudication, and that the 2015 CCR regulations should be interpreted to bar ash in contact with groundwater at closure. (Doc. 91, PageID.18936-18937, 18945-18948.) This Court should not adopt the Report for the reasons stated below:

When distilled to its essence, this entire case centers on whether the CCR Rule prohibits coal ash in contact with groundwater upon closure, or not.[1] Baykeeper contends that the terms "infiltration," "impoundment," and "free liquids" appearing in the CCR Rule collectively prohibit ash in contact with groundwater at closure. Alabama Power contends, based on the public record, that for decades, EPA's interpretation and application of those terms has acknowledged that waste would be in contact with groundwater and allowed it. Further, the EPA recognizes that engineering controls can be used to meet the performance standards when ash is in contact with groundwater or below the water table at closure. The Report, however, does not address the definitions of the regulatory terms or the utility of Alabama Power's engineering controls in its closure plan.

These objections address the Report's conclusions on issue preclusion and ripeness and its determination that Baykeeper's complaint states a claim under Rule 12(b)(6), Fed. R. Civ. P.

## I.     Issue Preclusion Requires Dismissal Because Baykeeper Cannot Show A Violation Of The CCR Rule.

Alabama Power objects to the Report's conclusion that issue preclusion does not apply. (Doc. 91, PageID.18931-18937.) An administrative decision triggers collateral estoppel and precludes the re-litigation of issues when:

_____

[1] At the motion to dismiss stage, Baykeeper's allegations that ash is in contact with groundwater is assumed to be true. (Doc. 1, PageID.12.) *See Hui v. Castaneda*, 559 U.S. 799, 802 n.1 (2010) ("Because this case comes to us on petitioners' motion to dismiss, we assume the truth of respondents' factual allegations."). If this litigation reaches later stages, however, Alabama Power will show that the top layer of the ground under the ash, referenced as "Unit 1" by geologists, is the original surface of the earth. (Doc. 75, PageID.18498-18499.) Accordingly, Alabama Power's position is that water above Unit 1 cannot be "groundwater" because EPA defines groundwater as being located "below the land surface." 40 C.F.R. § 257.53.

> (1) there is **identity of the parties** or their privies; (2) there is **identity of issues;** (3) the parties had an **adequate opportunity to litigate** the issues in the administrative proceeding; (4) the issues to be estopped were **actually litigated and determined** in the administrative proceeding; and (5) the findings on the issues to be estopped were **necessary to the administrative decision.**

*Ex parte Shelby Med. Ctr., Inc.,* 564 So. 2d 63, 68 (Ala. 1990) (emphases added) (internal quotation marks and citation omitted).

### A.     The Issues Were Identical for Purposes of Issue Preclusion.

The Report states "that EPA has placed Alabama Power on notice regarding potential deficiencies in its plant closure plan, and ADEM on notice that it intends to deny its application under the WIIN Act …." (Doc. 91, PageID.18936.)  The Report then concludes that "a plausible argument can be made that notwithstanding the similarities between the ADEM and federal CCR rules, they are not the same, and a finding that Alabama Power's plant closure plan passed muster under ADEM's CCR rules does not necessitate a finding that the plan complies with the federal CCR Rule."  (*Id.*)  The Report further states that "ADEM's CCR regulations have not been approved by EPA and do not operate in lieu of the CCR Rule.  Accordingly, the undersigned finds that the issue of whether Alabama Power's closure plan complies with the federal CCR Rule has not been litigated and thus recommends that Alabama Power['s] motion to dismiss based on collateral estoppel be denied."  (Doc. 91, PageID.18937.)  Alabama Power objects to these conclusions.

 First, the issues are the same, even though ADEM's and EPA's answers may be different.  The ADEM and EPA CCR regulatory language for "infiltration," "impoundment," and "free liquids" are identical.  While ADEM and EPA have reached different answers, issue preclusion looks at the identity of the issues—what the words mean—not the similarity or difference of the answers—contact with groundwater is or is not prohibited.  *See Ex parte Shelby Med. Ctr., Inc*., 564 So. 2d 63, 68 (Ala. 1990) (requiring "identity of issues," not answers, to apply issue preclusion to an administrative decision).

Similarly, in *B & B Hardware, Inc. v. Hargis Indus., Inc*., 575 U.S. 138, 153 (2015), the Supreme Court held that the interpretation of language in two different statutes, one by an agency and one by a court, involved the same issues for purposes of issue preclusion. Even though the language of the statutes was not identical, but similar, and the interpretive factors used by the agency and the court were not the same, the issues—interpretation of trademark standards in the two statutes—were close enough to be the "same" for issue preclusion purposes.

Better than the words from the two statutes at issue in *B & B Hardware*, 575 U.S. at 153, the words from the two regulations in this case are not merely similar, they are identical. *Compare* ADEM Admin. Code r. 335-13-15-.07(3)(d)1(i) ("infiltration"), *with* 40 C.F.R. § 257.102(d)(1)(i) (same); *compare* ADEM Admin. Code r. 335-13-15-.07(3)(d)1(ii) ("impoundment"), *with* 40 C.F.R. § 257.102(d)(1)(ii) (same); *compare* ADEM Admin. Code r. 335-13-15-.07(3)(d)2(i) ("free liquids"), with 40 C.F.R. § 257.102(d)(2)(i) (same); *see* (Doc. 60, PageID.13930-13931, 13949); (Doc. 63, PageID.17804); (Doc. 81, PageID.18634). And the U.S. Supreme Court and the Alabama Supreme Court use similar methods to interpret legal language. *Compare Kroner v. Comm'r of Internal Revenue*, 48 F.4th 1272, 1277 (11th Cir. 2022) ("'Every field of serious endeavor develops its own nomenclature,' and a 'specialized meaning is to be expected' when a text addresses a 'technical subject.' Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 6, at 73 (2012)."), *with Ex parte Tutt Real Est., LLC*, 334 So. 3d 1249, 1255 n.6 (Ala. 2021) (Mitchell, J., concurring) (explaining difference between plain meaning and technical meaning) (citing Scalia & Garner, *supra*).[2]

Second, the fact that EPA is proposing to disapprove ADEM's CCR permit program and associated regulations means that ADEM's regulations will not operate in place of the federal CCR regulations under the WIIN Act. *See* 42 U.S.C. § 6945(d). Instead, ADEM's regulations are state law. Under *Marresse* and *Vitalink*, a determination of a state law issue can have issue

_____

[2] And ADEM said it was interpreting, "State and Federal CCR requirement." *See* (ADEM's response to comments.) (Ex. F) (Doc. 51-1, PageID.12108.)

4

preclusive effect on a federal claim.  While this precludes Baykeeper's case, the EPA (but not Baykeeper) may litigate these issues in various federal forums—such as the pending D.C. Circuit case, a future case about notice of violations, etc.  *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373 (1985); *Grimes v. Vitalink Comm'ns Corp.*, 17 F. 3d 1553 (3d Cir. 1994).

Third, that fact that federal courts have exclusive jurisdiction over RCRA *claims* does not bar *issue* preclusion.  In this case, Baykeeper claims that Alabama Power's closure plan for the Plant Barry ash pond violates the CCR Regulations and RCRA.  (Doc. 1, PageID.16-17.)  That claim necessarily includes elements of whether the infiltration, impoundment, and free liquids provisions of the federal CCR Rule were violated, whether there was an ongoing violation, and whether a 60-day letter was filed.  *See* 42 U.S.C. § 6972(a)(1)(A) & § 6972(b)(1)(A).  Because federal courts have exclusive jurisdiction to decide RCRA claims, *see* 42 U.S.C. § 6972(a), ADEM could not have decided the RCRA claim.  And Alabama Power does not assert claim preclusion.

Instead, Alabama Power asserts issue preclusion – that ADEM decided the issues of what the words "infiltration," "impoundment," and "free liquids" mean.[3]  Those issues are in play in this case as they constitute an element of the RCRA claim, but not the entire claim.   The Supreme Court has held that issue preclusion can apply to a state court determination of an issue that impacts an element of a federal claim subject to exclusive federal jurisdiction.  *See Marrese*, 470 U.S. at 381 ("[S]tate law determines . . . the *issue preclusive effect* of a prior state judgment in a subsequent action involving a claim within the exclusive jurisdiction of the federal courts [e.g., a RCRA claim].") (emphasis added).

_____

[3]Issue preclusion applies to issues of fact and law. *See* Restatement (Second) of Judgments § 83 cmt. b ("Administrative proceedings having some primary object other than the determination of a claim can have issue preclusive effects. The essential question is whether, within the context of the larger purpose of an administrative proceeding, an issue is formulated as it would be in a court and decided according to procedures similar to those of a court. An issue of law is so formulated when there is assertion and controversion of the meaning of an existing rule as applied to specific circumstances – actual, or hypothetical as in the case of a declaratory proceeding . . . .").

In *Vitalink*, the Third Circuit concluded that issue preclusion applied to a prior state court decision on issues that were relevant to an exclusively federal securities claim.  17 F.3d at 1554-55.  One of the issues decided in the state court case was Vitalink's alleged non-disclosure of material facts relating to a merger, which was relevant to a state law breach of fiduciary duty claim. *Id.* at 1556. Shareholders filed a subsequent fraud claim under Section 10(b) of the Securities Act of 1934 in federal district court, which had exclusive jurisdiction over such a claim.  *Id.* The district court held that issue preclusion barred a critical element of the securities claim because while the Section 10(b) claim was not resolved in state court, the issue of non-disclosure to shareholders was.  *Id.*

Similarly, ADEM decided the issues in the state permit proceeding that form the heart of Baykeeper's subsequent citizen's suit in this Court.  Before ADEM, Baykeeper made the same arguments that it makes in this case on the merits—the meanings of "infiltration," "impoundment," and "free liquids."  Before it could issue the permit, ADEM had to determine the issues of what the words "infiltration," "impoundment," and "free liquids" meant and did so. *See* (Ex. A) (Doc. 22-1, PageID.104) (Final Closure Permit, Final Determination); (Ex. F) (Doc. 51-1, PageID.12101, 12108) (ADEM, Response to Comments).  ADEM's decision on those issues triggers *issue preclusion* in this subsequent federal case.  *See Marrese*, 470 U.S. at 380–81; *Vitalink*, 17 F.3d at 1554-55.

## B.    The Parties—Baykeeper and Alabama Power—Are Identical.

Participants in an administrative proceeding are parties to that proceeding for purposes of issue preclusion.[4]  Baykeeper participated in the ADEM permit proceeding by attending the hearing, making oral and written arguments, and submitting expert reports to rebut Alabama

---

[4] *See* Restatement (Second) of Judgments § 83 & cmt. c, § 34  & rpt.'s note to cmt. a (1982); *Durfee v. Duke*, 375 U.S. 106 ... (1963); *Adams v. Morton*, 581 F.2d 1314 (9th Cir. 1978) ...."  (Doc. 63, PageID.17805) (Doc. 81, PageID.18630.)

Power's evidence in support of its application for a permit to close the ash pond at Plant Barry.[5] Alabama Power participated and indeed initiated the permit proceeding by submitting its permit application, and later submitted its amended closure plan and evidence for ADEM's consideration.[6]   Alabama Power also had the right to appeal any rejection of the application as an aggrieved owner and operator of the Plant Barry ash pond that is being closed.[7]

### C.   Baykeeper had an Adequate Opportunity to Litigate.

Baykeeper had an adequate opportunity to litigate its interpretation of "infiltration," "impoundment," and "free liquids" before ADEM.  Baykeeper received notice of the permit hearing; had access to Alabama Power's entire closure plan for the Plant Barry ash pond that was filed with ADEM; appeared at the hearing with counsel; presented oral arguments; filed written legal arguments; filed over 100 pages of expert reports to rebut Alabama Power's closure plan; received a final decision;[8] had the opportunity to appeal and request a hearing, conduct discovery and cross-examination, obtain an ALJ decision, and, if still dissatisfied with the result, to appeal to the Alabama state courts.[9]

_____

[5] *See* ("Pub. Hr'g Tr.") (Ex. G) (Doc. 51-1, PageID.12129-12136) (Stmt. Of Cade Kistler, Baykeeper Program Director); ("2021 Ltr from Plt's Counsel") (Ex. E) (Doc. 51-1, PageID.11887-12030).  Baykeeper's counsel in this case, SELC, also represented Baykeeper in the ADEM permit proceeding.

[6] *See* (Doc. 37-1, 39-1 through 40-1, PageID.5455-5490, 5498-5886) (initial permit application); (Docs. 27-1 through 37-1, PageID.4848-5449) (amended closure plan).

[7] *See* ADEM Admin. Code r. 335-2-1-.04(1) (request for hearing-appeal); (Doc. 60, PageID.13954); (Doc. 63, PageID.17805); (Doc. 81, PageID.18630-18631).

[8] *See* ("Feb. 19, 2021 Public Notice") (Ex. C) (Doc. 22-1, PageID.136-138); ("Pub. Hr'g Tr.) (Ex. G) (Doc. 51-1, PageID.12129-12136); (Statement of Cade Kistler, Baykeeper Program Director); ("2021 Ltr from Plf's Counsel") (Ex. E) (Doc. 51-1, PageID.11887-12030); (Final Closure Permit") (Ex. A) (Doc. 22-1, PageID.104); ("ADEM's Response to Comments") (Ex. F) (Doc. 51-1, PageID.12101, 12108).

[9] *See* ADEM Admin. Code rr. 335-2-1-.05 ("notice"); -.03 ("hearing"); -.14 ("testimony . . . under oath," "[e]ach party shall be entitled to respond and present evidence and argument," "right to cross-examine a witness"); Ala. Code § 22-22A-7(c)(6) (appeal to circuit court).

Under *Caton v. City of Pelham*, 329 So. 3d 5, 27 (Ala. 2020), the Alabama Supreme Court looks to procedures in the hearing and to procedures available after the hearing: "Additionally, Caton had **the opportunity to appeal** the decision of the administrative-hearing officer to the Department's Board of Appeals and also to appeal the Board of Appeals' decision to the circuit court for de novo review in a bench trial." (emphasis added). In *Ex parte Smith*, 683 So. 2d 431 (Ala. 1996), a plaintiff waived his appeal to a court from a non-lawyer administrative panel's decision that implicitly denied his First Amendment claim. The Alabama Supreme Court held that waiver of appellate review barred the plaintiff's attempt to re-argue his First Amendment claim in a subsequent court case. *Id.* at 436. Here, Baykeeper's waiver of its right to appeal from ADEM's decision waived its right to re-argue the same issues in this case.[10]

### D.  The Issues were Actually Litigated and Decided.

After Baykeeper argued and submitted evidence in the permit proceeding, ADEM considered its arguments and issued the final permit. The permit is a final decision of ADEM from which Baykeeper had an "adequate opportunity to" appeal to the Alabama Environmental Management Commission and then to the Montgomery County Circuit Court. ADEM's own regulations require it to issue the permit if the application complies with those regulations (e.g., "infiltration," "impoundment," and "free liquids"). ADEM Admin. Code r. 335-13-5-.04(3)(b). ADEM issued Alabama Power a written permit that requires "the Permittee [Alabama Power] to manage CCR in accordance with the conditions of the permit, ADEM Admin Code r. 335-13-15 [i.e., closure requirements for 'infiltration,' 'impoundment,' and 'free liquids']." ("Final Closure Permit") (Ex. A) (Doc. 22-1, PageID.104). And ADEM was even more specific in its responses to comments on the draft permit from various persons, including Baykeeper. *See* ("ADEM's Response to Comments") (Ex. F) (Doc. 51-1, PageID.12101, 12108) ("The closure performance

---

[10] *See* (Doc. 60, PageID.13949-13953); (Doc. 63, PageID.17805); (Doc. 81, PageID.18635-18637); (Doc. 86, PageID.18896-18902.)

standards described in ADEM Admin. Code r. 335- 13-15-.07(3)(d) [i.e., "infiltration," "impoundment," and "free liquids"] will be achieved by dewatering the unit to remove free liquids . . . ."). In *Ex parte Smith*, 683 So. 2d at 433, the administrative decision "did not mention Smith's constitutional claims, apparently rejecting them." Nonetheless, the Alabama Supreme Court held the First Amendment issues were precluded by waiver/collateral estoppel. *Id.* at 436.[11]

       **E.**    **The Findings were Necessary to ADEM's Determination.**

Baykeeper opposed the Plant Barry closure permit based on its positions on "infiltration," "impoundment," and "free liquids" in the ADEM proceeding. ADEM's rejection of Baykeeper's arguments was "necessary" and critical to its decision to issue the final permit. *See Caton*, 329 So. 3d at 23 (for collateral estoppel to apply based on an administrative decision, the determination of the issue must have been "necessary to the administrative decision") (internal quotation marks and citation omitted). Again, ADEM Admin. Code r. 335-13-5-.04(3)(b) provides that ADEM can issue a permit only "if the application complies with this Division [i.e., Division 13 of the regulations] ...." That division of ADEM's regulations includes the "infiltration," "impoundment," and "free liquids" requirements. *See* ADEM Admin. Code r. 335-13-15- .07(3)(d)1(i) ("infiltration"); *id.* at (3)(d)1(ii) ("impoundment"); and *id.* at (3)(d)2(i) ("free liquids").

Baykeeper is precluded from re-arguing the issues in this Court that it lost before ADEM.

**II.**    **This Case Is Not Ripe Because Its Closure Plan May Be Modified Before Final Closure In 2031.**

The Report states: "the straightforward issue at the heart of this controversy is whether, under the CCR Rule, a CCR impoundment can be capped in place with CCR in contact with groundwater." (Doc. 91, PageID.18946.) Because Baykeeper alleges that Alabama Power's closure will not wholly eliminate CCR being in contact with groundwater, the Report reasons that applying this "straightforward" legal standard and accepting Baykeeper's allegations as true means

---

[11] *See* (Doc. 60, PageID.13953-13954); (Doc. 81, PageID.18638-18640); (Doc. 86, PageID.18896-18901).

the complaint is ripe and states a claim for relief.  (Doc. 91, PageID.18946-18947.)  Alabama Power objects to this conclusion.

The Report's "straightforward issue at the heart of this controversy" is not how EPA explains its rule.  In a brief just filed in the D.C. Circuit in which EPA addresses the meaning of the 2015 CCR Rule as set forth in its final *Gavin* decision, EPA explains that there is no blanket prohibition on closing an impoundment in place with CCR in contact with groundwater, as Baykeeper alleges in its complaint and argues in its briefing.  To the contrary, EPA states that closure in place "is still an option" for such impoundments, so long as the "facility … implement[s] engineering measures to address the groundwater."  (EPA Br. at 35, in *Electric Energy Inc. v. EPA*, No. 22-1056 (D.C. Cir. Sept. 29, 2023) (Doc. 93-2, PageID.19168) (citing 85 Fed. Reg. 12,456, 12,464 (Mar. 3, 2020)).  Once the performance standards are met, EPA explains that any "CCR remaining in the closed unit [will] not [be] continually inundated with groundwater."  *Id.* According to EPA, the problem in *Gavin* was that the "closed CCR unit" had "no engineered actions to address groundwater … saturating CCR" and thus did not comply with the CCR rule. *Id*.

As the Report observes, "Alabama Power's plan lays out the steps it will take to close the impoundment, and Alabama Power has already begun implementing its plan."  (Doc. 91, PageID.18945.)  In prior filings and proceedings before this Court, Alabama Power has addressed in detail the engineering controls in its closure plan that have been certified by a professional engineer and approved by ADEM, including a subsurface barrier to separate ash from the natural surroundings.  *See, e.g.*, (Doc. 75, PageID. 18501) (describing engineering controls); (Doc. 76-1, PageID.18522) (same); (Doc.63, PageID.17797-17798) (same).  Unlike *Gavin*, Alabama Power's plan is not a closure plan "with no engineered actions to address groundwater that [may be] saturating CCR."  (Doc. 91, PageID.18946.)

Importantly, the Report also recognizes that as a result of discussions with EPA and the pending D.C. Circuit litigation on the meaning of the 2015 CCR rule, "there is a reasonable possibility that Alabama Power's CCR [closure] plan will at some point undergo modifications.

10

Of course, the timing and the extent of any potential future modifications to the plan is currently unknown." (*Id.*)  Just so.  Closure plans may be amended "at any time" under the CCR rule (40 C.F.R. § 257.102(b)(3)(i)) and Alabama Power will continue to update its closure plan as circumstances require, whether those circumstances are discussions with EPA, the resolution of the D.C. Circuit litigation, or additional information that comes to light during implementation of the closure plan itself.

In light of these circumstances, it would be premature for Baykeeper to ask this Court to assess now whether Alabama Power's closure plan will ensure that the "CCR remaining in the closed unit is not continually inundated with groundwater"[12] when the closure plan is fully implemented in 2031.  In fact, because there is "a reasonable possibility" that Alabama Power's closure plan will undergo modifications and "any potential future modifications to the plan…[are] currently unknown," (Doc. 91, PageID.18946), how would the Court possibly make that determination now?  A claim is not ripe when further factual development would significantly advance the Court's ability to deal with the legal issues.  *See Texas v. United States*, 523 U.S 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). (internal quotation marks and citations omitted).  And as the court in *Roanoke River Basin Ass'n v. Duke Energy Progress, LLC*, No. 1:17–cv–707, 2018 U.S. Dist. LEXIS 52991, 2018 WL 2417862, *7 (M.D.N.C. May 29, 2018), explained in dismissing a similar CCR citizen suit in part on ripeness grounds, "whether the substance of … [an] initial [c]losure [p]lan ultimately meets the [closure] performance standards outlined in the [CCR] Rule goes beyond a purely legal question and *would require further factual development*."[13] (emphasis added).  For example, the Court cannot possibly determine now

___

[12] At the motion to dismiss stage, the parties must assume the truth of Baykeeper's allegation that ash is in contact with groundwater, but Alabama Power will show differently if the litigation progresses past this stage.  *See supra* note 1.

[13] Contrary to the conclusion in the Report, *Roanoke* directly applies here. As in this case, the court found in *Roanoke* that it was "likely" there would be "future amendments and revisions to the initial [c]losure [p]lan based on any number of circumstances."  *Roanoke*, 2018 WL

whether "free liquids" have been "eliminated" from the CCR impoundment "prior to installing the final cover system," when installation of the final cover is not scheduled to occur until 2030.  (Ex. L, App. 9) (Doc. 27-1, PageID.4878.)

Relatedly, the Report asserts that "[t]here is nothing before the Court that suggests that a remedy cannot be fashioned."  (Doc. 91, PageID.18946.)  But what additional engineering controls would the Court suggest be included in the closure plan to ensure that in 2031 the "CCR remaining in the closed unit is not continually inundated with groundwater"?  Those suggested by Baykeeper?  By a professional engineer retained by the Court?  By the results of EPA and Alabama Power discussions?  By the outcome of the D.C. Circuit litigation?  By some combination of the above?  And how would any such remedy account for subsequent legal developments, changed conditions at Plant Barry, or developing closure technologies between now and 2031 that could lead to modification of the closure plan?  Would Alabama Power be able to revise its plan as contemplated by the regulations, or must it apply to this Court for an amendment?  *See, e.g.*, *Johnson v. Sikes,* 730 F.2d 644, 648 (11th Cir. 1984) (ripeness protects courts from "entangling themselves in abstract disagreements") (citations and quotations omitted).  These uncertain contingent future events confirm that Baykeeper's complaint is not ripe for this Court's resolution at this time.

## III.   Baykeeper Has Not Stated a Claim Under Rule 12(b)(6) Based On The Correct Meaning Of The 2015 CCR Rule.

In its discussion of whether Baykeeper's complaint states a claim for which relief can be granted under Rule 12(b)(6), the Report does not include any analysis of the CCR regulatory terms or the utility of Alabama Power's engineering controls.  Instead, the Report defers to what it characterizes as EPA's position, stating, "Baykeeper's assertions appear to be supported by the

_____

2417862, at *7.  As the court explained, "[t]he uncertainty as to whether, and in what form, [the defendant's] initial [c]losure [p]lan will ultimately be implemented weighs against a finding that this matter is now ripe for a judicial decision."  *Id.*

NOPV that EPA recently issued to Alabama Power."  (Doc. 91, PageID.18947-18948.)   In *Kisor v. Wilkie*, 139 S. Ct. 2400, 2423-24 (2019), however, the Supreme Court mandated that "[b]efore" a court defers to an agency interpretation of a regulation, that court "must" examine the text, structure, history, and purpose of that regulation:

> Rather, the **court <u>must</u> make a conscientious effort to determine**, based on indicia like **text, structure, history, and purpose**, whether the **regulation** really has more than one reasonable meaning. . . . . **<u>Before</u> even considering deference**, the court must seriously think through those positions.

(Emphases added.)

By concluding that Baykeeper has stated a "claim upon which relief can be granted," the Report necessarily agreed with Baykeeper's interpretation that no CCR impoundment can ever be closed in place with ash below the water table.[14]  The interpretation ignores EPA's recent statements that engineering controls can be implemented to address groundwater and help a CCR impoundment meet the closure performance standards.  And Baykeeper's interpretation is contrary to the history, text, structure, and purpose of the CCR Rule.

### A.  <u>History</u>: EPA Has Approved Closure of Numerous Waste Impoundments with Waste in Contact with Groundwater.

#### 1.  EPA Has Approved Closure in Place of Multiple Waste Sites with Hazardous Materials in Contact with Groundwater.

The Supreme Court explained in *Kisor*, 139 S. Ct. at 2423-24, that the history of a regulation is critical to its interpretation.  The history of the 2015 CCR Rule begins with EPA's admission that it "modeled the proposed requirements on current regulations that apply to interim status hazardous waste surface impoundments, which are codified in part 265."  80 Fed. Reg. at 21,409.  *See* 75 Fed. Reg. at 35,208 ("For closure of surface impoundments with CCRs in place,

---

[14] At the motion to dismiss stage, the parties must assume the truth of Baykeeper's allegation that ash is in contact with groundwater, but Alabama Power will show differently if the litigation progresses past this stage.  *See supra* note 1.

EPA has developed substantive requirements modeled on a combination of the existing 40 CFR part 265 [hazardous waste] interim status requirements for surface impoundments, and the long-standing MSHA [Mine Safety and Health Administration] standards.").

Baykeeper's argument that EPA has historically "prohibit[ed] the capping of an unlined impoundment [i.e., a waste disposal facility regulated by RCRA] in place when coal ash [i.e., a solid waste under RCRA] mixed with groundwater will remain in a leaking impoundment," is contradicted by the regulatory history.  (Doc. 61, PageID.13972.)  For more than 35 years, EPA has approved the closure of hazardous waste sites with waste (and chemicals) in contact with groundwater or below the water table:

- Todtz Facility in Lawrence Farm, Iowa (1988): EPA approved closure in place of a Superfund site where "[i]mpoundment **wastes are periodically in direct contact with the ground water beneath the site**, which flows southeasterly toward the Mississippi River." EPA, *Superfund Record of Decision: Todtz, Lawrence Farm, IA,* at abstract (Nov. 1988) (Ex. DD) (Doc.62-5, PageID.14738) (emphasis added). **"[Twenty-five] to 50 percent of the waste would remain in periodic contact with the water table**. . . ." *Id.* at 14 (Doc. 62-5, PageID.14774) (emphasis added).  *See* 42 U.S.C. § 9621(d)(1) & (2).

- Raymark Facility in Connecticut (1995): EPA approved closure of a waste site in place with a cover, even though approximately 150,000 cubic yards of waste remained "**below the water table**." *See Raymark ROD*, at 9, 25 (Ex. CC) (Doc. 62-4, PageID.14453) (emphasis added) ("Under all alternatives, approximately **30 percent of the contaminated soil-waste materials resides below the mean low water table** [i.e., in contact with groundwater].") (emphasis added). After closure, EPA recognized "**contaminants below the water table** would continue to migrate with the groundwater off the Raymark property."  *Id.* at 25 (Doc. 62-4, PageID.14469) (emphasis added).

- Lexington County Landfill, Cayce, SC (2007): Reviewing a closure EPA originally approved in 1994: "On February 8, 1999 . . . [t]he remedy was changed from consolidation of the Old Cayce Dump with the 321 Landfill, to capping the Old Cayce Dump in place. The change in remedy was performed to avoid the cost and technical difficulty associated with excavating **waste beneath the water table**." EPA, *Second Five-Year Review Report for Lexington Cty. Landfill Superfund Site, Lexington Cty., West Columbia, SC,* at 15-16 (Sept. 2007) (Ex. EE) (Doc.62-6, PageID.14811-14812) (emphasis added).

- Raymark Final Remedy (2016):  Answering a complaint about EPA's closure of a site with a cover, or cap, but without a liner, stating: "**caps without liners are typically used** to respond to former municipal landfills that are contaminated with hazardous substances. This is because . . . **buried waste has already been in contact with the groundwater for many years**, and impacts to groundwater have already occurred." EPA, *Raymark Indus. Inc. ROD, Final*

*Remedy, Part 3, Resp. Summ.* at 13 (2016) (Ex. FF) (Doc.62-7, PageID.15123)(emphases added).

*See* ("EPA Approved Closures") (Ex. BB) (Doc.62-3, PageID.14430-14436) (chart showing twenty-two (22) hazardous waste sites for which EPA approved closure in place with waste below the water table).[15] Under the CCR rule, it was not EPA's intent to regulate non-hazardous CCR more strictly than hazardous waste.[16]  In these cases, as at Plant Barry, *corrective action* addressed any ongoing groundwater issues.

The Report did not consider the EPA's twenty-two (22) administrative records of decisions, stating: "[b]ecause the other subject arguments introduced in the reply brief were not raised in Alabama Power's motion to dismiss, and the subject exhibits are not central to the complaint, the Court has disregarded them."  (Doc. 91, PageID.18925.) Alabama Power objects to the disregard of EPA's administrative decisions.

The Supreme Court has mandated that this "court must make a conscientious effort to determine, based on indicia like . . . **history** . . . of [the CCR] regulation" *Kisor*, 139 S. Ct. at 2423-24 (emphasis added).   EPA explained the history of its 2015 CCR regulation—that it "**modeled the proposed [CCR] requirements** on current **regulations** that apply to interim status **hazardous waste surface impoundments** . . . ." 80 Fed. Reg. at 21,409 (emphases added).  In its corrected motion to dismiss, Alabama Power argued in the "hazardous waste context[], EPA . . . has indicated that **impoundments may be closed in place, even with <u>waste in contact with groundwater</u>**. . . . Plaintiff's claims are a stark departure from this **decades-long, consistent approach**." (Doc. 60, PageID.13944) (emphases added).    Baykeeper responded: "**Alabama**

_____

[15] The Court may consider public records posted on EPA's website. *See McCone v. Thorpe*, 828 F. App'x 697, 698 (11th Cir. 2020) ("A district court may take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment.").

[16] 80 Fed. Reg. 21,302, 21,412 (Apr. 17, 2015) (noting that EPA does not require decontamination, i.e., a cleanup, of soils to "background levels," even with "hazardous waste units," and that there was "no basis in the current record to impose provisions for the remediation of CCR units that are more stringent than those imposed on hazardous wastes," given that CCR is a non-hazardous solid waste).

**Power's version of RCRA history misstates EPA's consistent 40-year approach** to the closure of surface impoundments under RCRA . . . ." (Doc. 61, PageID.13982) (emphasis added) (internal quotation marks and citation omitted).  In support of its original argument in its corrected motion to dismiss and to rebut Baykeeper's counter-argument to the contrary in its response brief, Alabama Power re-asserted that "[f]or at least 40 years, however, EPA has approved the **closure of hazardous waste sites with waste (and chemicals) in contact with groundwater**" and gave specific examples—the EPA's administrative decisions. (Doc. 63, PageID.17801-17802) (emphases added).  Under settled precedent, Alabama Power could cite to new authorities or new evidence in its reply brief as long as those items supported an argument made in its original motion and rebutted an argument made in Baykeeper's opposition brief.[17]

The Report also disregarded the summary chart (Exhibit BB) of the 22 EPA administrative decisions.  (Doc. 91, PageID.18925.) Alabama Power objects to the disregard of the chart. The demonstrative chart simply lists relevant quotes from the EPA administrative decisions to aid the

---

[17] The EPA's administrative decisions are not "evidence" in the sense of being subject to discovery, examination, and cross-examination.  They are administrative law decisions concluding that waste sites were closed by EPA in accordance with applicable regulations and statutes. Movants can cite to additional authorities in their reply briefs that do not raise new arguments.  *See Sec. & Exch. Comm'n v. Miller*, No. 1:04-CV-01655, 2010 WL 11508717, at *3 (N.D. Ga. Aug. 18, 2010) (J. Carnes, C.J.) (stating, "[i]n his Reply [165], however, defendant cited additional, more apt authority" and addressing cases cited for the first time in reply in support of motion); *see generally Regions Bank v. Kearney*, 597 F. App'x 1012, 1013 (11th Cir. 2014) (addressing case "cite[d], for the first time in their reply brief").  On the other hand, if the administrative decisions are viewed as evidence, they are judicially noticeable, publicly available (on EPA's website) government documents over which there is no dispute and can be cited in a reply brief in support of an argument responsive to the non-movant's opposition brief and raised in the original motion. *See Johns v. Wells Fargo Bank, N.A.*, No. CV 14-0254-KD-C, 2015 WL 9238957, at *6 (S.D. Ala. Dec. 17, 2015) ("As a matter of course, the Court will accept and consider evidentiary materials submitted in support of a movant's reply arguments where, as here, those arguments and supporting materials are related and responsive to the non-movant's opposition brief and do not support new grounds for relief.") (quoting *Alkhatib v. Steadman*, No. CV 10–00342–KD–C, 2011 WL 5553775, *6 (S.D. Ala. Nov. 15, 2011)); *Adams v. Atl. Richfield Co.*, No. 2:18-CV-375-JVB-JPK, 2021 WL 4819608, at *2 (N.D. Ind. Oct. 15, 2021) (at the Rule 12(b)(6) stage, taking judicial notice of "a March 2020 USEPA East Chicago Superfund Site Record of Decision Amendment, Zone 1, which is available on the EPA website") (emphases added).

Court and Baykeeper in finding them. This is not a new practice. *See, e.g.*, *Cooper v. R.J. Reynolds Tobacco Co.*, 586 F. Supp. 2d 1312, 1315 (M.D. Fla. 2008) ("See Exhibit 5 to Defendants' Materials in Support of the Court's Subject Matter Jurisdiction (chart of verdicts in individual smoking cases . . . .")). Alternatively, Alabama Power could have simply cited the administrative decisions in a footnote without the quotes, but that would not have been as helpful to the Court or to Baykeeper. (Doc. 67, PageID.17864-17865.) Alabama Power adopts the same arguments and authorities for this Court's consideration of the underlying EPA administrative decisions for this Court's consideration of the chart.

> ## 2.    EPA's Cost Projection Represented that All CCR Impoundments would Close in Place with Ash in Contact with Groundwater.

In EPA's 2014 Risk Assessment that was prepared to support the 2015 CCR Rule, EPA acknowledged that "it is known from reported damage cases that **some CCR WMUs [Waste Management Units] come in direct contact with the water table** . . . ." *See* EPA, Human and Ecological Risk Assessment of Coal Combustion Residuals, EPA-HQ-RCRA-2009-0640-11993, at 5-10 (Dec. 2014) (Ex. R) (Doc. 47-1, PageID.8900) (emphasis added). With this knowledge, EPA based its legally required cost estimate for the regulation on the assumption that "**all** surface impoundments undergo closure as landfills, meaning that surface impoundments are **not excavated**, nor is their ash trucked off-site." ("2014 EPA, *Regulatory Impact Analysis*") (Ex. S) (Doc. 49-1, PageID.10201) (emphases added). In the explanation to the 2015 CCR Rule, EPA stated, "most facilities will likely not clean close their CCR units given the expense and difficulty of such an operation." 80 Fed. Reg. 21,412. Removing the ash from the Plant Barry CCR impoundment would cost approximately $1,000,000,000. (Doc. 60, PageID.13922.)

More history will be included in the relevant portions of the Text argument below.

**B.      Text: The Technical Meaning of the CCR Regulations Allows Closure in Place with a Cover and Corrective Action.**

With this history, it is not surprising that nowhere in the 358 printed pages of the 2015 CCR Rule and explanatory comments did EPA state in "plain" language that an existing CCR impoundment could not close in place with ash in contact with groundwater, but would have to conduct a substantially more costly closure by removal.   *See* 80 Fed. Reg. 21302-01 (2015).

Had EPA in 2015 intended to include language that would prohibit closure of a CCR impoundment with ash in contact with groundwater, it could easily have done so.  EPA included language barring a new or operating CCR impoundment from having ash in contact with groundwater in the location restrictions part of the rule in 2015. *See* 40 C.F.R. § 257.60(a) (Location Restriction) ("New CCR landfills, existing and new CCR surface impoundments, and all lateral expansions of CCR units must be constructed with a base that is located no less than 1.52 meters (five feet) above the upper limit of the uppermost aquifer [i.e., groundwater] . . . ."). But EPA did not include this language in the closure performance standards of the CCR Rule.  *See* 40 C.F.R. § 257.102(d).  The EPA's inclusion of the prohibition on groundwater contacting ash in one part of the CCR Rule and the exclusion of that language from the performance standards of § 257.102(d) means this Court should not read into that provision what the EPA did not write into that provision.   *See S.E.C. v. Levin*, 849 F.3d 995, 1003 (11th Cir. 2017) ("If the SEC had intended for Rule 508(b) to address non-compliance with Section 5 of the Act, it would have expressly stated so. This is true especially because Rule 508(a), part of the same rule, explicitly references Section 5 of the Securities Act."); *United States v. Saunders*, 318 F.3d 1257, 1264 (11th Cir.2003) (interpreting a sentencing guideline in light of the rule of statutory construction that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (quotation marks and alterations omitted).

Further, the 2015 CCR Rule included language that if an existing CCR impoundment was too close to the "uppermost aquifer" (i.e., groundwater), it could be closed "**either** by leaving the

CCR **in place** and installing a final cover system **or through removal** of the CCR . . . ."  40 C.F.R. § 257.102(a) (emphases added).[18] If proximity to groundwater requires automatic closure by removal, § 257.102(a)'s option of "closing in place" would be effectively meaningless.  *See Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1010 (11th Cir. 2016) ("We cannot adopt the Borrowers' interpretation because it would render this phrase in the regulation meaningless.").

> ### 1.    The Closure Plan Describes How Alabama Power Will "Control" and "Minimize" Post-Closure "Infiltration" into the CCR Impoundment and Releases Out of the Impoundment.

Based on decades of application, Alabama Power contends that "infiltration" must be controlled or minimized and consists of water from the surface (i.e., rain) that falls vertically onto the ash, works its way downward through the ash via gravity, and produces contaminated water (i.e., leachate) that could come in contact with the groundwater.   Baykeeper asserts that "infiltration" must be stopped and can come from groundwater flowing horizontally into the bottom of the CCR unit and then exiting the unit. The text of the regulation provides:

| Infiltration<br>(40 C.F.R. § 257.102(d)) |
|---|
| "(d) Closure performance standard when leaving CCR in place—<br><br>   (1) The owner or operator of a CCR unit must ensure that, at a minimum, the CCR unit is closed in a manner that will:<br><br>      (i) **Control, minimize <u>or eliminate</u>**, to the maximum extent feasible, post-closure <u>**infiltration of liquids**</u> into the waste and **releases** of CCR, leachate, or contaminated run-off to the ground or surface waters or to the atmosphere;"<br><br>40 C.F.R. § 257.102(d)(1)(i) (emphases added). |

---

[18] *See* 40 C.F.R. § 257.101(b)(1)(ii) ("within six months of determining that an existing CCR surface impoundment has not demonstrated compliance with any location standard specified in §§ 257.60(a) [i.e., five feet above the uppermost equifer] . . . , the owner or operator of the CCR surface impoundment must cease placing CCR and non-CCR waste streams into such CCR unit and close the CCR unit in accordance with the requirements of  § 257.102.").

First, Baykeeper's contention that § 257.102(d)(1) requires Alabama Power "stop" or "prevent" post-closure infiltration and releases, *see, e.g.*, (Doc. 61, PageID.13971) ("stop") (PageID.13959, 13970, 13973, 13982, 13983-5) ("prevent"), is contradicted by the text of that regulation. Section 257.102(d)(1)(i)'s text requires an owner of a CCR impoundment to "[**c**]**ontrol**, **minimize or** eliminate, to the maximum extent feasible, post-closure **infiltration of liquids into the waste** and **releases** of CCR, **leachate**, or contaminated run-off to the ground or surface waters or to the atmosphere . . . ." (emphases added).

Second, the technical meaning of "infiltration" shows that it does not apply to groundwater. While the CCR Rule does not define "infiltration," standard geology sources do. A standard geology/hydrogeology textbook provides that it is "surface water [e.g., rain, not groundwater] that **infiltrates** into the waste and produces leachate." C.W. Fetter, Applied Hydrogeology at 427 (4th ed. 2001) (emphasis added). The U.S. Geological Survey defines "infiltration" as "flow of water from the land surface [e.g., rain] into the subsurface." *See* Infiltration, USGS, Water Science Glossary, https://www.usgs.gov/special-topics/water-science-school/science/dictionary-water-terms#I (last visited Feb. 23, 2023).

Third, the technical definition of "infiltration" and EPA's use of the term within the hazardous waste context on which the CCR Rule was modeled are consistent with how the term "infiltration" is used throughout the CCR Rule. The function of "infiltration" in § 257.102(d)(1) is shown in § 257.102(d)(3) which provides that when a CCR unit is closed in place, "the owner or operator must install a *final cover system* that is designed to *minimize infiltration* . . . ." (emphases added). A cover goes on top—on the surface—to stop rain, not underground to stop groundwater flow. Reading § 257.102(d)(1) and (d)(3) in pari materia means that the infiltration has the same meaning throughout § 257.102. *See Voracek v. Nicholson*, 421 F.3d 1299, 1304 (Fed. Cir. 2005) ("We note that similar terms used in different parts of the same statute or regulation presumptively have the same meaning."); *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1242 (11th Cir. 2002) (interpreting Department of Labor regulations using the in pari materia canon of

construction).[19]  The explanation to the 2015 CCR Rule confirms that the final cover system of §
257.102(d)(3) is what will control, minimize, or eliminate infiltration under § 257.102(d)(1).  *See*
80 Fed. Reg. 21,413 ("The final rule requires that any **final cover system** control, minimize or
eliminate, to the maximum extent practicable, post-closure infiltration of liquids into the waste and
releases of leachate (in addition to CCR or contaminated run-off) to the ground or surface
waters.").

Baykeeper seeks to apply an abstract, supposedly plain meaning of "infiltration" in §
257.102(d)(1) to say it can describe water coming from underground, not just from the surface.
(Doc. 61, PageID.13981-13982.)  The CCR Rule, however, deals with highly technical subject
matter—the geology of an impoundment site, the hydrology of the impoundment (e.g., rain
draining through the impoundment), the engineering design of the CCR unit, and the
environmental science of whether a contaminant has reached a level that requires corrective
action.[20]   And when the subject matter is highly technical, courts use a "technical meaning,"
rather than a plain one.[21]

---

[19] Baykeeper's argument that § 257.102(d)(1) is a general performance standard and (d)(3)
a specific performance standard is unavailing.  *See* (Doc. 61, PageID.13963.)  Whether labeled
general or specific, the meaning of the same term used in both subsections is what counts.  *See*
*Voracek*, 421 F.3d at 1304.

[20] *See* 40 C.F.R. § 257.102(f)(2)(i)(C) (closure criteria) ("The geology and terrain
surrounding the CCR unit"); § 257.91(d)(1)(ii) ("Hydrogeologic setting"); *id.* at (iv) ("Engineering
design of the CCR unit"); § 257.96 (requiring corrective action if "any constituent listed in
appendix IV [i.e., a contaminant] has been detected at a statistically significant level exceeding the
groundwater protection standard").

[21] *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts
73 (2012) ("Sometimes context indicates that a **technical meaning** applies. Every field of serious
endeavor develops its own nomenclature—sometimes referred to as *terms of art*. Where the text
is addressing a **scientific or technical subject, a specialized meaning is to be expected** . . . .")
(bold emphases added).  *Accord Kroner v. Comm'r of Internal Revenue*, 48 F.4th 1272, 1277 (11th
Cir. 2022) ("[A] 'specialized meaning is to be expected' when a text addresses a 'technical
subject.' (citing Scalia & Garner, *supra*.).

Fourth, engineering controls can be used to keep groundwater from flowing into and leachate from flowing out of the CCR.  Even if the term "post-closure infiltration" is re-defined to include water coming from the sides and bottom of the CCR unit, the closure plan still discusses how such "post-closure infiltration" will be "control[led]."  EPA has recognized that "engineering controls" can prevent the subsurface flow of ground water into impounded waste.  (Doc. 61, PageID.13985); ("Gavin Determination") (Ex. W) (Doc. 50-1, PageID.11215); (EPA Br. at 35, in *Electric Energy Inc. v. EPA*, No. 22-1056 p. 35 (D.C. Cir. Sept. 29, 2023) (Doc. 93-2, PageID.19168.)[22]  Unlike Plant Gavin's closure plan, however, Plant Barry's closure plan includes engineering controls (i.e., subsurface barrier walls) to divert water above the uppermost geological feature[23] from the ash.  (*See Am. Closure Plan (Rev. 1)* (Ex. I) (Doc. 27-1, PageID.4866); Diagram of Plant Barry Closed CCR Unit (Ex. AA) (Doc. 62-2, PageID.14428.)  These walls separate the base of the CCR from the surrounding area and, therefore, "minimize" and "control" post-closure infiltration of water into and out of the CCR impoundment.  (*Am. Closure Plan (Rev. 1)* at 15) (Doc. 27-1, PageID.4866.)

_____

[22] EPA's brief states: "To meet existing requirements for such closure, the facility must implement engineering measures to address the groundwater.  JA__ (*Id.* at 28-30); 85 Fed. Reg. at 12,464.  Once met, the performance standards ensure that CCR remaining in the closed unit is not continually inundated with groundwater.  JA__ (Gavin Determination at 28-30).  In regulatory language, free liquids have been eliminated and infiltration and releases from the unit have been controlled to the maximum extent feasible.  40 C.F.R. §§257.102(d)(1)(i), (d)(2)(i).  A closed CCR unit with no engineered actions to address groundwater that is saturating CCR has not complied with these existing regulatory requirements: free liquids have not been eliminated and infiltration of liquids and releases of CCR or leachate have not been controlled, minimized, or eliminated to the maximum extent feasible.  40 C.F.R. §§257.102(d)(1)(i), 257.102(d)(2)(i)."

[23] While Alabama Power, at the motion to dismiss stage, assumes ash is contact with groundwater, *see supra* note 1, as shown in Exhibit AA, the shallow groundwater in contact with ash at Plant Barry is not an "aquifer" because it does not contain a "usable" amount of water that could be extracted for drinking water wells. *See* 40 C.F.R. § 257.53 (defining "aquifer"); *see* ("2021 Groundwater Report") (Ex. P) (Doc. 45-1, PageID.6578) (describing "Unit 1" and "Unit 2").  The "uppermost aquifer" is "Unit 3" and is farther down. (*Id.*) (Doc. 45-1, PageID.6578-6579.)  Ash is not in contact with the uppermost aquifer, where groundwater quality is measured. *See* 40 C.F.R. § 257.91(a).

Fifth, the history of the regulatory use of "infiltration" also supports controlling rain water, not groundwater. "Infiltration," EPA explained, described the performance of the final cover system and the "downward migration" of liquids "through the cover soil" of the closed impoundment.  *See* EPA, Closure of Hazardous Waste Surface Impoundments 26 (Sept. 1982) ("1982 Guidance") (Ex. S) (Doc. 49-1, PageID.10411); *see also* EPA, Guide for Industrial Waste Management 11-1 (Feb. 2003) ("2003 Guidance") (Ex. U) (Doc. 49-1, PageID.10921) ("For post-closure care, the overall goal is to **minimize the infiltration** of water into a unit by providing maintenance of the **final cover**.") (emphases added).  EPA's 1982 Guidance for hazardous waste impoundments illustrated a closed impoundment with waste in contact with groundwater and "infiltration" being water moving vertically through the unit from top to bottom without suggesting an obligation of excavation or special engineering measures as part of the closure process:



*See* ("1982 Guidance") (Ex. S) (Doc. 49-1, PageID.10411.)

> **2.     The Closure Plan Describes How Alabama Power Will Prevent Future "Impoundment."**

Alabama Power contends that an "impoundment" is an undesired feature that happens if the final cover system on top of the closed CCR unit settles to such an extent as to form a bowl or

depression in which water can collect and leak into the ash. Baykeeper argues that an impoundment can be underground where groundwater is in contact with ash. The text of the regulation provides:

| Impoundment<br>(40 C.F.R. § 257.102(d)) |
| --- |
| "(d) Closure performance standard when leaving CCR in place—<br><br>   (1) The owner or operator of a CCR unit must ensure that, at a minimum, the CCR unit is closed in a manner that will:<br>. . . .<br><br>     "(ii) Preclude the probability of future **impoundment** of water, sediment, or slurry;"<br><br>40 C.F.R. § 257.102(d)(1)(ii) (emphasis added). |

First, the text of the CCR Rule supports Alabama Power's reading. Baykeeper claims that an "impoundment" is not just the pond but also the groundwater beneath it, based on the definition of "CCR unit" including a "CCR surface impoundment." (Doc. 61, PageID.13978-13979.) However, the CCR rule does not say "no contact with groundwater," but that the probability of "future impoundment" must be "preclude[d]." 40 C.F.R. § 257.102(d)(1)(ii). In any event, the dictionary defines "impound" as "to collect and confine (water) in or as if in a reservoir." And it further clarifies that a "reservoir" is a "lake," not groundwater.[24]

Second, the history of the CCR Rule confirms that an impoundment deals with precluding a pool on the cover of the waste after closure. EPA took this language from regulations of the Mine Safety and Health Administration ("MSHA"). 75 Fed. Reg. at 35,208; *see also* 30 C.F.R. § 77.216-5(a) (including the "future impoundment" language). According to MSHA: "Tailings [i.e., waste] dams are typically abandoned by modifying the site to ensure **it is not capable of**

_____

[24] *Impound*, Merriam Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/impound; *Reservoir*, Merriam Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/reservoir (last visited Feb. 23, 2023).

**impounding water** *above* **the tailings [i.e., waste]** in place at the time of mine closure." MSHA, *Dam Inspection and Plan Review Handbook*, No. PH21-V-6, at 6-1 (Jan. 2021) (Ex. Y) (Doc. 50-1, PageID.11589 (emphases added). *See also* (Doc. 60, PageID.13946) ("**cover** system . . . will **preclude** the probability of future **impoundment**") (quoting EPA, *Comment Summary & Resp., Vol. 10*, at 38 (Dec. 2014) (emphases added)). Preventing the impoundment of waters "above" the waste means using a cover with a steep enough slope that surface water and other materials (including any slurry and sediment) will drain naturally, not preventing groundwater below the surface.

### 3. The Closure Plan Describes How Alabama Power Will Eliminate "Free Liquids."

Alabama Power contends that "free liquids" are liquids that have drained free of the ash and can then be removed from the impoundment.  Baykeeper argues that free liquids include groundwater under the ash.  The text of the regulation provides:

| Free Liquids (40 C.F.R. § 257.102(d)) |
|---|
| "(d) Closure performance standard when leaving CCR in place— |
| . . . . |
| "(2) Drainage and stabilization of CCR surface impoundments. The owner or operator of a CCR surface impoundment or any lateral expansion of a CCR surface impoundment must meet the requirements of paragraphs (d)(2)(i) and (ii) of this section prior to installing the final cover system required under paragraph (d)(3) of this section. |
| "(i) **Free liquids** must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues". |
| 40 C.F.R. § 257.102(d)(2)(i) (emphasis added). |
| "**Free liquids** means **liquids that readily separate from the solid portion of a waste under ambient temperature and pressure**." |
| 40 C.F.R. § 257.53 (Definitions) (emphases added). |

First, both sides agree that the liquid that has drained from the ash and collected in a pool (and that Alabama Power has removed from the pool and treated) is a free liquid.  It is free of the ash.  Baykeeper goes further, however, to argue that the groundwater that touches the ash underground is a free liquid.

The text of the CCR Rule provides that "[f]ree liquids must be eliminated *by removing liquid wastes or solidifying the remaining wastes and waste residues*." 40 C.F.R. § 257.102(d)(2)(i) (emphasis added).  The purpose of this provision is to support the final cover system.  Section 257.102(d)(2) does not require the removal of *all* liquid or groundwater from a closed CCR impoundment (or preventing it from returning), but only "removing *liquid wastes* or solidifying the remaining *wastes* and waste residues" "prior to installing the final cover" "sufficient to support the final cover system." § 257.102(d)(2)(i) & (ii) (emphases added).  The last part of the sentence in (d)(2)(i) cannot be read to render "solidifying the remaining" wastes meaningless. *See Lage*, 839 F.3d at 1010 (cannot interpret regulatory language to render it "meaningless").

Moreover, the obligation to remove "free liquids" falls under the subheading, "Drainage and stabilization of CCR surface impoundments" and serves those purposes. *See* 40 C.F.R. § 257.102(d)(2). As with infiltration, "drainage" removes a source of water that could otherwise result in leachate, and "stabilization" serves to maintain the protective cover safely in place. EPA said so explicitly when it promulgated the "free liquids" provisions in its hazardous waste regulations decades ago: "As a practical matter, free liquids must be minimized before a cover can successfully be placed on a surface impoundment."  46 Fed. Reg. 12,414, 12,425 (Feb. 13, 1981). *See Duke Energy*, 2021 OEA 25, 2021 WL 2301805, at *12 ¶¶30, 32-35 (Ind. Dep't of Envtl. Mgmt. May 4, 2021) ("Consequently, for present purposes, 'free liquids' in the Federal CCR rule consists of the water that separates from sluiced ash and forms the surface water in an ash pond."). EPA explained, in the context of the CCR rule, the obligation to "either drain the CCR unit or solidify the remaining wastes" will "stabilize the wastes to a bearing capacity to support the final cover." 80 Fed. Reg. at 21,413. These functions and the purposes they seek to achieve do not depend on or relate to groundwater.

26

Second, groundwater found at the base of the ash pond is not a "free liquid" because it would take a change of pressure to separate it from the ash.  (Doc. 75, PageID.18452-18453.) Water that is embedded in solid material below the visible surface can be a source of free liquids in the sense that if you pump water out of the ground, it will then be "free," i.e., free flowing, afterwards. However, free liquids are limited to those that "readily separate from the solid portion of a waste under ambient temperature and pressure."  The entire purpose of a pump is to move material by inducing negative pressure, which changes ambient conditions.  If it is necessary to use a pump to forcibly extract the liquid from its surroundings, then the liquid in that state (before pumping) is not "readily" separating from that material "under ambient … pressure" and thus cannot be a "free liquid" in that state and location as EPA defines it in § 257.53.  And Alabama Power's barrier walls would limit horizontal flow in any event.

Third, the history of the CCR Rule supports the conclusion that "free liquids" does not include groundwater.  EPA modeled the CCR Rule on the hazardous waste regulations.  Under the hazardous waste regulations, EPA concluded that a closed impoundment with hazardous waste in contact with groundwater met "the RCRA closure requirements specified in 40 C.F.R. § 265.228." Section 265.228 includes a requirement to "eliminate free liquids," *see* (*Raymark ROD*) (Ex. CC) (Doc.62-4, PageID.14482.)  That requirement is nearly identical to § 257.102(d)(2)(i) for CCR, as shown below:

| Hazardous Waste Regulations | CCR Regulations |
|---|---|
| "Eliminate free liquids by removing liquid wastes or solidifying the remaining wastes and waste residues;" 40 C.F.R. § 265.228(a)(2)(i). | "Free liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues;" 40 C.F.R. § 257.102(d)(2)(i). |

C.    **Structure: When a CCR Impoundment is Closed in Place, the 2015 CCR Rule Includes Corrective Action Provisions to Address Groundwater.**

The structure of the 2015 CCR Rule reinforces the conclusion that a CCR impoundment may close with ash in contact with groundwater and still be protective of human health and the environment. The structure provides for (1) closure in compliance with performance standards

27

(infiltration, impoundment, and free liquids); and (2) groundwater monitoring and corrective action. *See* 40 C.F.R. § 257.102(d) (performance standards); § 257.104(b)(1), (3) (groundwater monitoring and corrective action). Groundwater monitoring includes installing wells around the CCR impoundment and taking periodic samples to see if a regulated substance is detected at a level that exceeds the EPA limits. *See id.* §§ 257.91, .93, .94, .95. If the substance is detected above a certain level, the utility must engage in the "corrective action" process (*id.* §§ 257.90(d), 257.96-.98) (e.g., assessment of substance, selection of remedy, and execution of remedy). The CCR rule contemplates that post-closure releases of CCR substances may occur and would be addressed through corrective action. The correct interpretation of the regulation does not imply a disregard of groundwater impacts.

The structure of the CCR Rule assigns tasks and goals naturally associated with *closure* to the *closure regulations*, such as installation of a cap, and assigns the functions of investigations and remediation of water "below the land surface" to the *groundwater regulations*. *See id.* § 257.53 (defining "groundwater"). Baykeeper's reading would take the groundwater monitoring and corrective action obligations that EPA, by *express text*, placed in the groundwater monitoring and corrective action regulations, *id.* §§ 257.90 to .98, and infuse a re-vamped version of such obligations by *implication* into the closure in place regulations, *id.* § 257.102(d). This would render the corrective action regulations largely superfluous. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 668 (2007) (rejecting interpretation of EPA regulation that "would render the regulation entirely superfluous").

### D. <u>Purpose</u>: Alabama Power's Closure Plan Will "Protect Human Health and the Environment."

The purpose of RCRA is to prevent "adverse effects on health or the environment." 42 U.S.C. § 6944(a) (solid waste). *See id.* § 6922(a) ("to protect human health and the environment") (hazardous waste). EPA's long-held position has been that the closure of a waste impoundment with a cover can be "protective of human health and the environment"—even with waste in contact

with groundwater.  *See* (*Raymark ROD*) (Ex. CC) (Doc.62-4, PageID.14453.)  An important purpose of the CCR Rule's provisions for addressing groundwater is to keep drinking water clean.  *See* 42 U.S.C. § 6901(b)(4) (RCRA is designed to prevent solid waste from "contaminat[ing] drinking water from underground and surface supplies"); *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 421-22  (D.C. Cir. 2018) ("*USWAG*")[25] (expressing concern about the potential risk of contamination from CCR impoundments getting into "groundwater" and "threatening sources of drinking water").  The municipalities that test and report the drinking water surrounding Plant Barry  show no contaminants exceeding EPA's safety levels.  (Doc. 72-1, PageID.17892-17893.)  Baykeeper admits this.  (Doc. 75, PageID.18435.)  Through continued closure and corrective action, the drinking water will remain in compliance with applicable standards and fulfill the purpose of RCRA.

## **CONCLUSION**

For the foregoing reasons, Defendant Alabama Power Company respectfully objects to the Report and Recommendation.  Alabama Power's Motion to Dismiss should be granted.

Respectfully submitted on this the 16th day of October, 2023

*/s/ Ed R. Haden*
One of the Attorneys for the Defendant
Alabama Power Company

---

[25] In *USWAG*, 901 F.3d at 422-23, the D.C. Circuit addressed, among other things, when closure is required for unmonitored CCR impoundments.  By contrast, this case concerns how closure will be accomplished at the Plant Barry ash pond that is no longer operating, has a system of ground monitoring wells, and is currently engaged in the corrective action process.

**OF COUNSEL:**
Ed R. Haden (ehaden@balch.com)
Charles Burkhart (cburkhart@balch.com)
Steven A. Burns (sburns@balch.com)
Sean W. Shirley (sshirley@balch.com)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100

Jaime W. Betbeze (jbetbeze@maynardnexssen.com)
Raymond L. Bell, Jr. (rbell@maynardnexsen.com)
Evan N. Parrott (eparrot@maynardnexsen.com)
MAYNARD NEXSEN P.C.
RSA Battle House Tower
11 N. Water St., Ste. 24290
Mobile, Alabama 36602
Telephone: (251) 432-0001

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of October 2023, a copy of the foregoing was filed using the Court's CM/ECF system, which send an electronic notice to all counsel of record.


*/s/ Ed R. Haden*
Of Counsel