**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| MOBILE BAYKEEPER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 1:22-cv-00382-KD-B |
| ALABAMA POWER COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S REPLY TO ALABAMA POWER'S**
**RESPONSE TO BRIEF ON STANDING**

Mobile Baykeeper ("Baykeeper") submits this reply to the arguments presented for the first time by Alabama Power in its response brief on standing, Doc. 101.

Baykeeper satisfies all three elements for standing as an association, as set out in Baykeeper's standing brief, Doc. 99.  Alabama Power challenges only the first of these elements: whether one or more of Baykeeper's members would have standing to sue in his or her own right.

Baykeeper's members satisfy the traditional, well-established requirements of Article III for standing to sue in their own right, as set out in the Complaint and in sworn declarations. These members have documented that their injuries are occurring now and will only continue if Alabama Power is allowed to cap its Plant Barry coal ash impoundment while leaving huge amounts of coal ash saturated in water and leaching out pollutants into the surrounding environment.

## I.      Members Have Documented Concrete Injuries

Alabama Power relies on *TransUnion, LLC v. Ramirez* to try to negate the injuries documented in sworn declarations by Baykeeper's members.  141 S.Ct. 2190 (2021); *see, e.g.*, Doc. 101 at 2.  But *TransUnion* merely confirmed that a statutory violation is not enough and an injury must be concrete; it addressed a suit for retrospective damages, not forward-looking injunctive relief to abate ongoing harm.  As one court explained,

> *TransUnion* . . . does not seem to have materially altered standing jurisprudence for parties seeking *injunctive* relief. Rather, the Supreme Court again "recognized[ ]" that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210. **The TransUnion decision therefore appears to recognize the fundamental differences between damages and injunctive or other deterrent relief.** *See id.* ("[A] plaintiff's standing to seek injunctive relief does not necessarily mean that the plaintiff has standing to seek retrospective damages.").

*Conservation L. Found., Inc. v. Shell Oil Co.*, 628 F.Supp.3d 416, 433 (D. Conn. 2022) (second emphasis added); *see also Conservation L. Found., Inc. v. ExxonMobil Corp.*, 578 F.Supp.3d 119, 122 (D. Mass. 2021) ("*TransUnion* did not alter the standard this court used in denying the motion to dismiss the claims for prospective injunctive relief in the Amended Complaint.").

In fact, *TransUnion* reaffirms that plaintiffs like Baykeeper have standing. Illustrating the concrete harm requirement, the Court gave an example of two people, a Maine citizen and a Hawaii citizen, each hoping to sue a Maine factory for violations of federal environmental law. *TransUnion*, 141 S.Ct. at 2205-06. The Court reasoned that the Maine citizen, but not the Hawaii citizen, "may of course proceed in federal court." *Id.* As in the Supreme Court's example, Baykeeper's members live, work, and recreate on the Mobile River and Mobile-Tensaw Delta, and personally experience the impacts of Plant Barry's illegal closure plan, which allows ash to remain in contact with groundwater and leach into nearby waterways.

The Eleventh Circuit recognizes the traditional standing requirements in environmental cases seeking injunctive relief remain under *TransUnion*. In a case cited by Alabama Power, Doc. 101 at 1, the Eleventh Circuit held that an environmental plaintiff organization "satisfied our [standing] requirement by identifying ***one specific member . . . who has suffered a cognizable injury because she has used the South River and Chattahoochee watersheds less due to pollution***." *S. River Watershed All. v. Dekalb Cnty., Ga.*, 69 F.4th 809, 820 (11th Cir. 2023) (emphasis added). Likewise, in another of Alabama Power's post-*TransUnion* cases, the Eleventh Circuit reaffirmed that "[a]n individual suffers an aesthetic injury when she 'use[s] the affected area' and is a person 'for whom the aesthetic ... value[ ] of the area will be lessened by the challenged activity.'" *Glynn Env't Coal. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1241 (11th Cir. 2022) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S.

167, 183 (2000)).  "An individual can meet her burden of establishing that injury at the pleading

stage 'by attesting that [s]he uses ... an area affected by the alleged violations and that h[er]

aesthetic ... interests in the area have been harmed.'"  *Id.* (quoting *Black Warrior Riverkeeper,*

*Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015); *Sierra Club v. Tenn.*

*Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005)).

 Baykeeper has multiple members who have set out these same injuries in their sworn

declarations.  Kendall Dexter states that he "will not fish or hunt around the Barry Steam Plant."

Doc. 1-3, PageID # 41.  He further states that he "will not use that area because of the pollutants

emanating from the site," and "will not take [his] children or grandchildren to that area to fish,

hunt, or swim."  *Id.* at PageID # 42.  Similarly, Marl Cummings used to fish and hunt around and

directly below the Plant; now, he will not use the Delta downstream of Plant Barry "because of

the pollutants coming from the site, including pollutants from unlined coal ash storage at the

site."  *Id.* at PageID # 45.  Vaughn Miller "will not kayak in the area with the coal ash disposal

site because of the known pollutants emanating from it.  [He] would kayak in this area if the coal

ash disposal site were not there, near the Mobile River and unlined."  *Id.* at PageID # 53.

 Baykeeper's members' uses of the Mobile River near the Plant Barry coal ash

impoundment are diminished by the ongoing pollution with arsenic and other substances

currently flowing from the unlined, saturated coal ash impoundment into the Mobile River today.

This is not an "imminent" injury; it is occurring now.  These present impacts on their use and

enjoyment of the affected waterways do not involve the contingent series of "ifs" that led this

Court to find no imminent future injury in *Ranger Environmental Services v. Foehl*, No. 1:23-

00297-KD-M, 2023 WL 6931336, at *14 (S.D. Ala. Oct. 19, 2023).  Doc. 101 at 4-5.  Instead,

just as in *Glynn Environmental*, Baykeeper's members derive less pleasure from the area near,

around, and downstream of Plant Barry—and use it less—because of their concerns about the pollution from the coal ash pond. *See also Sierra Club*, 430 F.3d at 1344 (holding an environmental plaintiff shows standing "by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed"). Accordingly, Baykeeper's members have suffered exactly the type of concrete injury that satisfies Article III's standing requirements.

Alabama Power argues that Baykeeper needed to allege visible pollution, Doc. 101 at 6, or numerical testing results, *id.* at 7-8, to prove its members' injuries to their recreational and aesthetic interests in the downstream waterways. And it makes a last-minute request for judicial notice of its preferred sampling data, attempting to create a factual dispute without the benefit of discovery, Doc. 103. But Alabama Power's arguments are not the standard, and no such proof is required. "[A] plaintiff need not prove that their injury can be traced to specific molecules of pollution emitted by the alleged polluter." *Black Warrior Riverkeeper, Inc.*, 781 F.3d at 1280. "It is enough that a plaintiff show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Id.* at 1271 (internal citation and quotations omitted); *see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) ("Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kind of injuries alleged in the specific geographic area of concern.") (internal citation and quotations omitted).

Here, the Complaint sets out that the Plant Barry coal ash impoundment is contaminating the groundwater with documented high levels of arsenic and other pollutants, Complaint, Doc. 1, at ¶¶ 42-43, and that the contaminated groundwater flows into the Mobile River and will

continue to do so after capping in place, *id.* ¶ 41.  That is more than enough to support the concerns of Baykeeper's members, as the Eleventh Circuit cases cited above have held.  Where "members' declarations signal diminished enjoyment, apprehension over close contact with the waterways, and . . . decisions driven by that concern," the concrete injury requirement is satisfied.  *Conservation L. Found., Inc. v. Shell Oil Prod. US*, No. CV 17-396, 2020 WL 5775874, at *2 (D.R.I. Sept. 28, 2020) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society[.]")); *see also Ex parte Fowl River Protective Ass'n*, 572 So.2d 446, 456 n.2 (Ala. 1990) (stating that "matters of environmental protection and regulation are of great significance to the citizens of Alabama.").

   In addition, members of Baykeeper are concerned about the ongoing risk of pollution flooding onto their downstream properties, and the risk of a catastrophic failure of the coal ash impoundment, which would severely harm the downstream waterways they depend on.  Alabama Power tries to question the location of members' properties by tracing out a route pollution supposedly would have to take from the impoundment, Doc. 101 at 7-8, but pollution carried by flood waters in the Mobile-Tensaw Delta is not confined to discrete channels or precise routes, as the members set out in their declarations.  For example, Kendall Dexter states, "The Delta is basically one large river system.  At high water levels, sheets of water flow through the Delta and cover high ground.  Anything upstream flows downstream through the Delta . . . ."  Doc 1-3 at PageID # 41.

   These risks are imminent.  Allegations of "near-term harms from foreseeable weather events" satisfy the standing requirements.  *Conservation L. Found., Inc. v. Shell Oil Co.*, 628 F.Supp.3d 416, 433 (D. Conn. 2022).  As the court in *Conservation Law Foundation* explained,

"'a major weather event . . . could happen at virtually any time, resulting in the catastrophic release of pollutants . . . . While it might not occur for many years, the fact that it is certainly impending is enough to meet the standard." *Id.* at 434 (quoting *Cons. L. Found., Inc. v. Shell Oil Prod. US*, No. 17CV00396, 2020 WL 5775874, at *1 (D.R.I. Sept. 28, 2020)).

The risks from flooding or a spill are supported by the allegations in the Complaint, unlike in *Muransky v. Godiva Chocolatier*, 979 F.3d 917, 933 (11th Cir. 2020). The Complaint here sets out that capping the Plant Barry impoundment in place in the floodplain and on the banks of the Mobile River subjects Baykeeper and its members to the increased risk of flooding due to storms and hurricanes, which saturates the coal ash in the impoundment even more, allowing more pollutants to leach out, *e.g.*, Complaint, Doc. 1, at ¶ 41, as well as the separate risks of a catastrophic failure and coal ash spill. *E.g.*, *id.* ¶¶ 12-13. The support in the Complaint also makes this case unlike *Thole v. U.S. Bank* (cited at Doc. 101 at 5 n.3), where the plaintiffs did not claim that the mismanagement they challenged would make a pension plan more likely to fail. 140 S. Ct. 1615, 1621-22 (2020). Here, Baykeeper clearly alleged that the challenged closure plan makes the Plant Barry impoundment more likely to fail. Complaint, Doc. 1, at ¶¶ 12-14.

In addition, EPA's Notice of Potential Violation confirms the reasonableness of these concerns, identifying Alabama Power's Structural Stability Assessment as among the "Areas of Concern" for Plant Barry. Doc. 64-2 at 2 (PageID #: 147481223).

Moreover, unlike in *Muransky*, where "a violation of the statute does not directly result in the harm Congress was trying to prevent," 979 F.3d at 930, here Alabama Power's violations of the closure performance standards subject people near and downstream of Plant Barry to exactly the types of harms that Congress and EPA intended to prevent with the CCR Rule and RCRA:

ongoing pollution and the threat of a coal ash spill.  In promulgating the CCR Rule, EPA cited

numerous coal ash spills and leaks as "demonstrate[ing] a compelling need for a uniform system

of requirements to address these risks."  80 Fed. Reg. 21,301, 21,327 (Oct. 14, 2015).

Finally, unlike in *HEAL Utah v. PacifiCorp*, 375 F.Supp.3d 1231, 1243 (D. Utah 2019),

Doc. 101 at 6, where the member was concerned about injuries to an orchard that she had not yet

decided to operate, Baykeeper's members actively use the Mobile River and Mobile-Tensaw

Delta for recreational and aesthetic activities.  It is not a remote chance that they would be

impacted in the event of a spill.

## II.     These Injuries Are Fairly Traceable to Alabama Power

To establish standing, a plaintiff must show "that the injury was likely caused by the

defendant."  *TransUnion*, 141 S. Ct. at 2203.  Here, there is no question that Alabama Power is

causing the pollution and other risks that are affecting members' use and enjoyment of the waters

around and downstream of the leaking Plant Barry coal ash impoundment.

Alabama Power attempts to rely on the Supreme Court's *Clapper v. Amnesty*

*International, USA* decision to argue that these injuries are not fairly traceable to itself, but that

argument fails.  *Clapper* held that there was not a sufficiently concrete injury where plaintiffs

"relie[d] on a highly attenuated chain of possibilities" involving multiple layers of contingencies

by multiple actors.  568 U.S. 398, 410 (2013).  But as discussed above, Alabama Power's

ongoing coal ash pollution from its saturated impoundment is harming Baykeeper's members'

interests today, in addition to the imminent threat of a spill or catastrophic failure.  Those

members' injuries do not rely on an attenuated chain of possibilities involving multiple actors

and contingencies; they are directly traceable to Alabama Power's water-soaked, polluting coal

ash, which Alabama Power is in the process of capping in place forever.  The saturated Plant

Barry coal ash is presently leaching pollutants into the Mobile River and will continue to do so, as alleged in the Complaint, so members' reduced use and enjoyment of the waterway is directly attributable to Alabama Power and is in no way "self-inflicted," *id.* at 418—as the Eleventh Circuit's environmental standing cases cited above make clear.

Alabama Power's reliance on the *Roanoke River Basin Association* cases from North Carolina is also misplaced.  The court there held that the members' diminished use and enjoyment of waters was not directly linked to Duke Energy's preparation of an initial closure plan, where a state process that would determine how the coal ash impoundments would be closed had yet to occur and closure would not begin for years, so it was not clear that the initial closure plan challenged in those cases would ever be implemented: "[N]either the Association nor anyone else will experience any effects from the implementation of Duke Energy's Closure Plan ***unless and until NCDEQ grants final approval*** . . . ."  *Roanoke River Basin Ass'n v. Duke Energy Progress, LLC*, No. 1:17CV561, 2018 WL 1605022, at *8 (M.D.N.C. Mar. 29, 2018) (emphasis added).  Here, Alabama Power is currently implementing its cap-in-place plan at Plant Barry under the authorization of a state permit, as the Company admits in its motion to dismiss: "In 2019, Alabama Power initiated closure activities . . . and has been working diligently to implement the closure plan."  APC Motion to Dismiss, Doc. 60, PageID # 13922.   Thus, the contingencies that were dispositive in *Roanoke River Basin Association* are simply not present here.

### III.    A Favorable Decision Would Redress These Injuries

Finally, Alabama Power makes the frivolous argument that because there is a fish consumption advisory for mercury in the Mobile River, "no change in the ash pond closure method would redress any recreational injury Baykeeper's members may suffer."  Doc. 101 at

10.  Not true.  First, the Complaint sets out that a site inspection of Plant Barry found the coal ash contains mercury, Complaint, Doc. 1, at ¶ 42, and the pollutants that will continue to leach out of the impoundment after closure, *id.* ¶ 13, do not exclude mercury, as Alabama Power tries to suggest.  Second, Baykeeper's members do more than eat fish—they catch fish, boat, kayak, hunt, and swim in the Mobile-Tensaw Delta, and their concerns about Alabama Power's coal ash pollution prevent them from doing these activities near the Plant Barry coal ash impoundment. A favorable decision here would require Alabama Power to prevent liquids from saturating its coal ash and releasing pollution into the surrounding environment, directly addressing the concerns that affect members' use and enjoyment of the waterways.  And third, the relief sought in the Complaint need not eliminate all sources of pollution in the Mobile River; the Supreme Court has held that redressability requirement is satisfied where the "risk would be reduced to some extent if petitioners received the relief they seek." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007); *see also Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury").

In other words, there is no requirement that a plaintiff sue every polluter, and a polluter does not escape enforcement of the environmental laws because others have polluted also, as multiple Circuit Courts of Appeals have explained.  *See, e.g.*, *Sierra Club v. EPA*, 964 F.3d 882, 887-88 (10th Cir. 2020) ("the existence of other contributors [of pollution] wouldn't affect . . . standing.");  *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996) ("[T]he Constitution does not require Sierra Club to produce an affiant who claims that Cedar Point's discharge *in particular* injured him in some way. . . . [I]t is sufficient for Sierra

Club to show that Cedar Point's discharge of produced water *contributes* to the pollution that impairs Douglas's use of the bay." (emphases in original)).

## IV.     Conclusion

For the foregoing reasons and those stated in Baykeeper's initial brief on standing and at the hearing, Baykeeper satisfies the requirements of Article III and has standing to assert all claims stated in the Complaint.

Respectfully submitted, this 12th day of December, 2023.

s/ Barry A. Brock
Barry A. Brock
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**

Barry Brock (ASB-9137-B61B)
Christina Tidwell (ASB-9696-D10R)
Southern Environmental Law Center
2829 Second Avenue S., Suite 282
Birmingham, AL 35233
Telephone: (205) 745-3060
bbrock@selcal.org
ctidwell@selcal.org

Richard Moore (ASB-5730-M55R)
450C Government Street
Mobile, AL 36602
Telephone: (865) 300-1206
richardmooreig@hotmail.com

Nicholas Torrey *(admitted pro hac vice)*
Southern Environmental Law Center
601 W. Rosemary St, Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
ntorrey@selcnc.org

Frank Holleman *(admitted pro hac vice)*
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
fholleman@selcsc.org

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 12, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

s/ Barry A. Brock
Barry A. Brock
*One of the Attorneys for Plaintiffs*
