**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MOBILE BAYKEEPER, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 1:22-00382-KD-B** |
| | ) | |
| **ALABAMA POWER COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter is before the Court on Defendant Alabama Power Company's ("Alabama

Power" or "Defendant") Corrected Motion to Dismiss, (Doc. 60), Plaintiff Mobile Baykeeper,

Inc.'s ("Baykeeper" or "Plaintiff") Response in Opposition, (Doc. 61), Alabama Power's Reply,

(Doc. 63), United States Magistrate Judge Sonja F. Bivins' Report and Recommendation

("R&R") recommending that Alabama Power's motion be denied, (Doc. 91), Alabama Power's

Objections to the R&R, (Doc. 94), Baykeeper's Response to Defendant's Objections, (Doc. 95),

and Alabama Power's Reply, (Doc. 97). For the reasons set forth below, it is **ORDERED** that

Alabama Power's Corrected Motion to Dismiss, (Doc. 60), is **GRANTED** and that Baykeeper's

Complaint, (Doc. 1), is **DISMISSED** without prejudice.

I.      **BACKGROUND**

   A.  **The Federal Law Governing Coal Combustion Residuals**

The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.,

governs the generation, transportation, treatment, storage, and disposal of solid waste and

hazardous waste. Waterkeeper All., Inc. v. Regan, 41 F.4th 654, 657 (D.C. Cir. 2022). Despite

passage of this statutory framework in 1976, the Environmental Protection Agency (the "EPA")

1

struggled for decades over how to regulate the disposal of coal ash produced by coal-fired power plants under the RCRA. Util. Solid Waste Activities Grp. v. EPA, 901 F.3d 414, 419-24 (D.C. Cir. 2018). This coal ash is known as coal combustion residuals ("CCR"). Id. at 420. CCR make up one of the largest industrial waste streams in the country. Id. (internal citation omitted). Finally, the EPA published a final rule (the "Federal CCR Regulations" or "Regulations") to regulate the disposal of CCR under the RCRA in 2015, which includes, among other things, national minimum criteria for existing and new CCR surface impoundments. See 40 C.F.R. § 257.50 et seq. The Federal CCR Regulations also establish closure and post-closure care requirements for CCR surface impoundments. Id. § 257.100-257.104. The Federal CCR Regulations do not themselves establish a federal permitting program or otherwise provide for EPA enforcement of its standards. Regan, 41 F.4th at 657 (internal citation omitted).

The Federal CCR Regulations required the owners or operators of existing CCR surface impoundments to prepare initial written closure plans consistent with the requirements specified in subsection (b)(1) no later than October 17, 2016. 40 C.F.R. § 257.102(b)(2)(i). In the Regulations, the EPA recognized two methods of closure for impoundments: (a) excavation and removal of the CCR; and (b) closure in place. (Doc. 60 at 11). Owners or operators hoping to leave or cap CCR in place in the existing impoundment face additional strictures in implementing their closure plan. First, prior to installing a "final cover system" as specified in subsection (d)(3), "free liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues." 40 C.F.R. § 257.102(d)(2)(i). Second, at a minimum, the unit must be closed in a manner that will "preclude the probability of future impoundment of water, sediment, or slurry." Id. § 257.102(d)(1)(ii). Third, at a minimum, the unit must be closed in a manner that will "control, minimize or eliminate, to the maximum extent feasible, post-

closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters." Id. § 257.102(d)(1)(i). Cap-in-place closure plans must describe how the final cover system will achieve the performance standards specified in subsection (d). Id. § 257.102(b)(1)(iii). Separately, practices failing to satisfy any of these criteria constitute open dumping, which is prohibited under Section 4005 of the RCRA. Id. § 257.1(a)(2) ("Practices failing to satisfy any of the criteria in . . . §§ 257.50 through 257.107 constitute open dumping, which is prohibited under section 4005 of the Act.").

One year after the EPA promulgated the Federal CCR Regulations, Congress amended the RCRA in the Water Infrastructure Improvements for the Nation Act ("WIIN"). See 42 U.S.C. § 6945(d). WIIN adds provisions to the RCRA that specifically address CCR disposal units and expressly build on and reference the Federal CCR Regulations. Regan, 41 F.4th at 657; Util. Solid Waste Activities, 901 F.3d at 426. Under WIIN, states can (a) develop their own permitting programs and conditions under state law for the regulation of in-state CCR disposal units; or (b) submit to an EPA-administered permitting program and regulation pursuant to the Federal CCR Regulations. 42 U.S.C. § 6945(d)(1-2); Regan, 41 F.4th at 658. Under the first option, if the state submits its CCR permitting program and the EPA Administrator approves it, state law will operate in lieu of any EPA-administered program or regulation under the Federal CCR Regulations. 42 U.S.C. § 6945(d)(1)(A). However, the EPA Administrator may only approve a state CCR permitting program that is subject only to state regulations upon finding, based on site-specific conditions, that the technical standards under the state program "are at least as protective" as those under the Federal CCR Regulations. Id. § 6945(d)(1)(C); see also § 6945(d)(1)(B) ("[T]he Administrator . . . shall approve, in whole or in part, a permit program . . . if the Administrator determines that the program or other system requires each coal combustion

residuals unit located in the State to achieve compliance with . . . such other State criteria that the Administrator, after consultation with the State, determines to be at least as protective as the criteria described in clause (i)."). The approval of a state CCR permitting program that meets these prerequisites is to take place no later than 180 days after the state submits evidence of its permitting program and after public notice and an opportunity for public comment. Id. Unless and until the EPA Administrator approves a state CCR permitting program, the Federal CCR Regulations' relevant criteria shall apply to each CCR unit in the state. Id. § 6945(d)(3)(A).

**B.  Plant Barry, the Alabama CCR Regulations, and Plant Barry's ADEM Permit**

Defendant Alabama Power is a corporation headquartered in Alabama engaged in the generation, transmission, distribution, and sale of electricity. (Doc. 1 at 6). Alabama Power owns and operates the James M. Barry Electric Generating Plant ("Plant Barry") in Mobile County. (Id. at 1). Alabama Power has operated a coal-fired generating plant at Plant Barry since 1954. (Doc. 60 at 10). Alabama Power built a CCR surface impoundment at Plant Barry (the "Plant Barry Ash Pond") to receive wet-sluiced coal ash in 1965. (Doc. 1 at 12).

Following the EPA's adoption of the Federal CCR Regulations, in June 2018 the Alabama Department of Environmental Management ("ADEM") finalized its own state CCR regulations (the "Alabama CCR Regulations"). (Doc. 60 at 9); see Ala. Admin. Code Ch. 335-13-15. The Alabama CCR Regulations, like the Federal CCR Regulations, enact minimum criteria for existing and new CCR surface impoundments and closure and post-closure care requirements for CCR surface impoundments. The Alabama CCR Regulations include provisions that are identical to the Federal CCR Regulations, including the "Criteria for conducting the closure or retrofit of CCR units." See Ala. Admin. Code. r. 335-13-15-.07(3). Like the Federal CCR Regulations, the Alabama CCR Regulations create two CCR surface impoundment closure options: (a) closure in

4

place; and (b) closure by removal. (Doc. 60 at 9). In December 2018, Alabama Power submitted to ADEM its initial "Permit Application for CCR Surface Impoundment" at Plant Barry. (Doc. 37-1); see Ala. Admin. Code. r. 335-13-15-.09(1)(c). The permit application explained Alabama Power's intention to close in place the Plant Barry Ash Pond in accordance with the Alabama CCR Regulations. (Doc. 37-1 at 11).

In accordance with the Federal CCR Regulations, Alabama Power placed its initial closure-in-place plan for the Plant Barry Ash Pond in the facility's operating record on October 17, 2016. (Doc. 60 at 14). Alabama Power amended the plan with more detail in July 2019. (See Doc. 40-1). Alabama Power amended the plan again in April 2020. (See Docs. 27-1–37-1). Alabama Power included its then-existing closure and post-closure plans for the Plant Barry Ash Pond as part of its 2018 permit application. (Doc. 60 at 9).

In February 2021, ADEM issued a notice of both Alabama Power's initial Permit Application for CCR Surface Impoundment at the Plant Barry Ash Pond and of a public hearing the following month to receive oral comments on the proposed initial issuance of the permit. (Doc. 22-1 at 35-37). The notice explained that ADEM would also receive written public comments for entry into the public hearing record. (Id.). Members of the public submitted thousands of comments in opposition to the proposed permit. (See id. at 39-739; Doc. 23-1; Doc. 51-1).

On March 30, 2021, ADEM held the public hearing, during which numerous individuals, including a representative of Plaintiff Baykeeper, urged ADEM to deny Alabama Power the proposed permit. (Doc. 51-1 at 421-548). Baykeeper is a § 501(c)(3) non-profit public interest organization with members in Alabama and the Mobile Area who "operate in the watersheds of the Mobile River and the Mobile-Tensaw Delta." (Doc. 1 at 4). Baykeeper's members "recreate, fish, and own property in these watersheds." (Id.).

In July 2021, after considering the public hearing record, the written comments, the Alabama Solid Wastes & Recyclable Materials Management Act, and the Alabama CCR Regulations, ADEM issued to Alabama Power a Coal Combustion Residual Facility Permit to Close for the Plant Barry Ash Pond (the "ADEM Permit for the Plant Barry Ash Pond"). (Doc. 22-1 at 2-33). The ADEM Permit for the Plant Barry Ash Pond is valid until May 2031. (Id. at 2). Alabama Power is obligated to manage CCR at the Plant Barry Ash Pond in accordance with the conditions of the Permit, the approved permit application, and the Alabama CCR Regulations. (Id. at 3). Alabama Power began closure-in-place activities in 2019 "and has been working diligently to implement the closure plan" since receiving the ADEM Permit for the Plant Barry Ash Pond. (Doc. 60 at 9). Indeed, Alabama Power has already spent about $257 million in implementing the closure plan and expects to spend over $1 billion upon its completion. (Id.).

### C. Baykeeper's Lawsuit Against Alabama Power and the EPA's Notice of Potential Violations at Plant Barry

In September 2022, Plaintiff Baykeeper brought this citizen enforcement action against Defendant Alabama Power. (Doc. 1). The Complaint challenges Alabama Power's closure plan[1] for the Plant Barry Ash Pond, classifying it as an unlawful plan to permanently store over 21 million tons of coal ash and toxic pollutants in the existing unlined impoundment. (Id. at 1-2). The Ash Pond is built on top of Sisters Creek, a tributary of the Mobile River, and is situated in wetlands adjacent to the Mobile River. (Id. at 2). Baykeeper alleges that the plan leaves large quantities of coal ash below sea level and in contact with water, including groundwater, where it is leaching into public waters of the United States. (Id. at 1-2). Baykeeper also asserts that future floods, storms, and hurricanes present a risk of catastrophic failure as any surrounding water

---

[1] Presumably, "closure plan" refers to Alabama Power's April 2020 Amended Closure Plan for [the Plant Barry] Ash Pond. (See Docs. 27-1–37-1).

level rise could elevate groundwater in the Plant Barry Ash Pond and cause the coal ash to spill into the Mobile River and Mobile-Tensaw Delta. (See id. at 4-5). Baykeeper alleges that Alabama Power's closure plan for the Plant Barry Ash Pond is in violation of the RCRA, 42 U.S.C. § 6901 et seq., and the Federal CCR Regulations, 40 C.F.R. § 257.50 et seq. Baykeeper initiated its enforcement action under the RCRA's citizens' suit provision, 42 U.S.C. § 6972(a)(1)(A).

Specifically, Baykeeper asserts three counts under the Federal CCR Regulations and the RCRA. In Count One, Baykeeper alleges that "Alabama Power's closure plan for the Plant Barry coal ash impoundment fails to satisfy the CCR Rule's standard to eliminate free liquids prior to capping in place." (Doc. 1 at 16); see 40 C.F.R. § 257.102(d)(2)(i). In Count Two, Baykeeper claims, "Alabama Power's closure plan for the Plant Barry coal ash will result in the continued impoundment of water, sediment, or slurry, and fails to preclude the probability of future impoundment of water, sediment, or slurry." (Doc. 1 at 16); see 40 C.F.R. § 257.102(d)(1)(ii). Per Count Three, "Alabama Power's cap-in-place closure plan does not control, minimize, or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste or releases of CCR pollution to ground or surface waters." (Doc. 1 at 16); 40 C.F.R. § 257.102(d)(1)(i). In its Prayer for Relief, Baykeeper requests that this Court:

    A. Issue a declaratory judgment that Alabama Power is violating the Coal Combustion Residuals Rule and the Resource Conservation and Recovery Act by failing to comply with the closure requirements of the Rule, and that Alabama Power is violating the open dumping[2] prohibition of the Act;

    B. Enter appropriate preliminary and permanent injunctive relief to prevent Alabama Power from implementing this illegal closure plan;

---

[2] Since the term "open dumping" is definitional, it is not on its own a vehicle for legal relief. See 40 C.F.R. § 257.1(a)(2) ("Practices failing to satisfy any of the criteria in . . . §§ 257.50 through 257.107 constitute open dumping, which is prohibited under section 4005 of the Act.").

C.  Enter appropriate preliminary and permanent injunctive relief to ensure that Alabama Power files a closure plan for its Plant Barry coal ash impoundment that satisfies the requirements of the Act and the Rule by eliminating free liquids from the Plant Barry coal ash; precluding the possibility of future impoundment of water, sediment, or slurry; and eliminating the infiltration of groundwater and other liquids into Alabama Power's coal ash, as required by the CCR Rule;

D.  Award Baykeeper the costs of this action, including reasonable attorney and expert fees, as authorized by 42 U.S.C. § 6972(e); and

E.  Grant Baykeeper such further and additional relief as the Court deems just and proper.

(Doc. 1 at 17).

It is undisputed that prior to filing the Complaint and pursuant to 42 U.S.C. § 6972(a)(1)(A) and (b) and 40 C.F.R. § 254.2(a), Baykeeper sent Alabama Power, the EPA, and ADEM notice of alleged RCRA violations and its intent to file suit. (Doc. 1-2; Doc. 74-1 at 5). Baykeeper also waited the requisite sixty days after giving notice before filing suit. (Doc. 1; Doc. 74-1 at 5).

On January 31, 2023, several months after Baykeeper filed the Complaint, the EPA sent Alabama Power a Notice of Potential Violations and Opportunity to Confer (the "Notice"). (Doc. 62-1). The EPA indicated that it reviewed documents that included Alabama Power's 2020 Revised Closure Permit Application for the Plant Barry Ash Pond, the ADEM Permit for the Plant Barry Ash Pond, and publicly accessible information. (Doc. 62-1 at 2, 5-7). Based on its review, the EPA determined that Alabama Power "has potentially violated and is potentially in violation" of the Federal CCR Regulations for reasons explained in the Notice. (Id. at 2-16). The EPA has not commenced any enforcement proceeding as to the Plant Barry Ash Pond. (Doc. 74-1 at 2).

Since the EPA sent Alabama Power the Notice, there have been communications and exchanges of information between the EPA and Alabama Power. (Doc. 102 at 2). On December 6, 2023, the EPA sent Alabama Power a letter "extending an invitation to begin settlement

discussions." (Doc. 102-1 at 2). While the EPA's position detailed in the Notice has not changed, it gave Alabama Power until December 20 to respond that it is interested in continuing discussions with the EPA "to try to reach an agreed resolution." (Id.). On December 18, Alabama Power responded that it agreed "to conduct good faith negotiations with EPA to begin discussions towards an agreed resolution of CCR issues at Plant Barry." (Doc. 106-1 at 2). EPA and Alabama Power intend to begin these discussions as soon as January 2024. (Id. at 3).

### D.  The Status of Alabama's CCR Permitting Program

Several months after granting Alabama Power the ADEM Permit for the Plant Barry Ash Pond, in December 2021 ADEM submitted its application for the EPA Administrator's approval of Alabama's CCR permitting program. (Doc. 65-3); see 42 U.S.C. § 6945(d)(1)(A) ("Each State may submit to the Administrator . . . evidence of a permit program . . . and conditions under State law for regulation by the State of coal combustion residual units that are located in the State that, after approval by the Administrator, will operate in lieu of regulation of coal combustion residual units in the State . . . ."). Until July 2022, ADEM and the EPA conducted telephone calls and meetings to discuss the process and timeline for the EPA to review Alabama's application. (Doc. 84-1 at 18). The EPA claims that it became concerned with facilities in Alabama that were closing or had already closed unlined CCR surface impoundments while leaving CCR below the water table. (Id. at 19). In July 2022, the EPA informed ADEM that it was putting on hold its completeness review of ADEM's CCR permitting program application until Alabama demonstrated to the EPA that it was implementing its program consistent with the Federal CCR Regulations. (Id. at 20). In December, ADEM gave the EPA notice of its intent to sue the EPA under Section 7002(a)(1)(A) and (1)(B) of the RCRA, alleging the EPA failed to perform a nondiscretionary duty to approve Alabama's CCR permitting program. (Id.). Among other things,

ADEM asserted that the EPA did not comply with the statutory requirement to approve Alabama's CCR permitting program application within 180 days of the application's submittal, see 42 U.S.C. § 6945(d)(1)(B). (Doc. 84-1 at 20).

In February 2023, the EPA's Acting Administrator drafted a letter to the ADEM Director in response to ADEM's Notice of Intent to Sue letter and regarding the status of Alabama's CCR permitting program. (Doc. 65-2). The letter addressed how the EPA construes the timeframe for its consideration of state applications for CCR permit programs; the criteria the EPA uses to assess whether to approve a state CCR permit program application; the status of ADEM's permit program application package; and whether the current record would support a proposal to approve the Alabama CCR permitting program. (Id.). First, the EPA explained that it views the statutory 180-day review period for a final determination of adequacy as beginning "when EPA determines that a state application is administratively complete." (Id. at 2). "[A]n application will be considered complete once the state submits sufficient evidence to allow EPA to determine whether the relevant standard in 42 U.S.C. § 6945(d)(1) has been met." (Id.) (internal citation omitted). Next, the EPA stated that to the extent ADEM interprets the Alabama CCR Regulations to impose different requirements than the Federal CCR Regulations, the appropriate criterion is found in 42 U.S.C. § 6945(d)(1)(B)(ii). (Id. at 3-4) ("Subsection (ii) provides that such different State requirements may be approved if 'the Administrator, after consultation with the State, determines [the State criteria] to be at least as protective as the criteria described in clause (i).'" (also citing § 6945(d)(1)(C))). Third, a large part of the evidence needed to evaluate a state permitting program is the factual and legal bases to determine whether the state criteria meet the minimum standards under the Federal CCR Regulations. (Id. at 4). Accordingly, the EPA requested that ADEM supplement its application to include the bases it believes support a

conclusion that the criteria under the Alabama CCR Regulations are at least as protective as those under the Federal CCR Regulations. (Id.). Finally, the EPA stated,

> Based on the existing record, EPA remains concerned that ADEM's approach would result in a notably less protective program, allowing ongoing contamination of groundwater from CCR impoundments that are closed with waste in place, and that the record as it stands now would not support a proposal to approve Alabama's State Program.

(Id.).

In ADEM's response, the ADEM Director rebuffed the EPA's request that ADEM supplement its CCR permitting program application. (Doc. 65-3). ADEM claimed that it has provided all the information required under 42 U.S.C. § 6945(d)(1)(A) and the EPA's relevant guidance document for a complete application for program approval, so it would not submit any supplemental information. (Doc. 65-3 at 2). According to ADEM, its application is due to be approved. (Id.).

In April 2023, Alabama, on behalf of ADEM, sued the EPA in the U.S. District Court for the District of Columbia to force it to act on ADEM's CCR permitting program application. (Doc. 99 at 7); see State of Ala. v. U.S. EPA, No. 1:23-CV-00903-JEB (D.D.C.). In August 2023, the EPA issued a proposed denial of Alabama's CCR permitting program. (Doc. 84-1). The EPA reviewed both proposed and final permits that ADEM issued and concluded that Alabama's CCR permitting program does not require each CCR unit in the state to achieve compliance with either the minimum requirements in the Federal CCR Regulations or with alternative requirements that the EPA has determined to be at least as protective as the Federal CCR Regulations. (See id. at 41-199). Specifically, the EPA is proposing to determine that ADEM-issued permits allow CCR units in Alabama to comply with alternative requirements that are less protective than the requirements in the Federal CCR Regulations with respect to groundwater monitoring, corrective action, and closure. (Id. at 23). Because the EPA's Notice concerning potential violations at the

Plant Barry Ash Pond prompted an ongoing enforcement process, the EPA's proposed denial did not address the ADEM Permit for the Plant Barry Ash Pond, even though the EPA found that it shared many of the same flaws as ADEM's other CCR permits for unlined surface impoundments. (Id. at 41 n.17). Moreover, since implementation of groundwater monitoring, corrective action, and closure regulations are "fundamental to an adequate CCR state permit program," the EPA does not see a path forward for a partial CCR permit program. (Id. at 23). Thus, the EPA is proposing to deny the entire Alabama CCR state permit program as inadequate under the RCRA and the Federal CCR Regulations. (Id.). The public comment period for the proposed denial ended on October 13, 2023. (Doc. 99 at 8).

In September 2023, the District Court for the District of Columbia stayed the Alabama-EPA suit until March 4, 2024, and is requiring status reports every 60 days. (Id. at 7-8). In a joint status report filed in early November 2023, the parties to that suit stated that the EPA expects to provide a date for its final decision on ADEM's CCR permitting application in early January 2024, if it has not finalized its decision by then. (Id. at 8).

### E.  Alabama Power's Motion to Dismiss and the Report and Recommendation

In January 2023, Defendant Alabama Power filed a Corrected Motion to Dismiss. (Doc. 60). Alabama Power moved to dismiss the Complaint and its challenge to the closure plan for the Plant Barry Ash Pond as unlawful for three reasons. (Id. at 1) (citing Fed. R. Civ. P. 12(b)(6)). Not among these reasons, however, are the arguments that Baykeeper lacks Article III standing or that the present litigation is not "ripe" for adjudication. (See Doc. 60). Indeed, the parties did not address standing at all until the Court ordered the parties to file separate briefs in November 2023, as chronicled below. (See Docs. 99, 101, 104).

In February 2023, Baykeeper filed its Response to Alabama Power's Motion to Dismiss. (Doc. 61). In Alabama Power's Reply in Support of its Motion to Dismiss, Alabama Power raised for the first time the argument that Baykeeper's citizen enforcement action is not ripe for the Court's resolution. (Doc. 63 at 5-6). Baykeeper subsequently moved to strike Alabama Power's ripeness argument because Alabama Power raised it for the first time in its Reply. (Doc. 66 at 2-3). Baykeeper repeated this argument in its post-hearing memorandum on the impact of the Notice on the present suit and contends that this matter is as ripe as possible. (Doc. 74-1). In Alabama Power's response to Baykeeper's post-hearing memorandum, it argued that ripeness is a fundamental jurisdictional principle rooted in Article III that may be raised at any time, that compliance with Federal CCR Regulations' performance standards cannot be determined until the closure plan for the Plant Barry Ash Pond is fully implemented, and that the only ripe issue is whether the closure plan discussed the items required under 40 C.F.R. § 257.102(b). (Doc. 77-1).

On September 30, 2023, Magistrate Judge Bivins issued a thorough R&R on Alabama Power's Corrected Motion to Dismiss. (Doc. 91). The R&R classifies Alabama Power's argument for dismissal on ripeness grounds as a challenge to the Court's subject matter jurisdiction properly brought under Rule 12(b)(1), and the balance of Alabama Power's Motion as brought under Rule 12(b)(6). (Doc. 91 at 16-19). The R&R recommends a denial of Alabama Power's Corrected Motion to Dismiss, (Doc. 60), wherein Alabama Power asserted collateral estoppel or issue preclusion, ripeness, and failure to state a claim upon which relief can be granted as bases for dismissal. (Doc. 91 at 19-37). On October 16, Alabama Power objected to the R&R. (Doc. 94).

Among Alabama Power's specific objections is to the R&R's conclusion that the present matter is ripe for the Court's adjudication. (Id. at 16-19). Alabama Power also cites a brief that

the EPA filed in ongoing litigation in the D.C. Circuit for the proposition that there is no blanket prohibition on closing an impoundment in place with CCR in contact with groundwater. (Doc. 94 at 17) (citing Respondent Brief Filed by EPA and Michael S. Regan at 35, Elec. Energy, Inc. v. EPA, No. 22-1056 (D.C. Cir. Sept. 29, 2023)). "To the contrary, EPA states that closure in place 'is still an option' for such impoundments, so long as the 'facility . . . implement[s] engineering measures to address the groundwater.'" (Doc. 94 at 17). Alabama Power also contends that closure plans may be amended "at any time" under the Federal CCR Regulations, and that Alabama Power may do so following discussions with the EPA and the outcome of the D.C. Circuit litigation. (Id.) (citing 40 C.F.R. § 257.102(b)(3)(i)). It would be premature, says Alabama Power, for the court to entangle itself in this matter when the engineering controls to address groundwater contamination may not be set until the closure plan is fully implemented in 2031, and, in any event, Alabama Power may modify its closure plan before then. (Doc. 94 at 18). These contingent future events confirm for Alabama Power that Baykeeper's suit is not currently ripe. (Id. at 19).

On October 27, Baykeeper filed its Response to Alabama Power's objections to the R&R. (Doc. 95). In the Response, Baykeeper disputes Alabama Power's characterization of what the EPA said to the D.C. Circuit in the cited brief. (Id. at 15). Baykeeper also argues that allowing the possibility that Alabama Power may modify its closure plan for the Plant Barry Ash Pond to render the case unripe would "neuter the Rule by preventing the performance standards from ever being enforced before a coal ash impoundment was fully closed." (Id. at 12). According to Baykeeper, it has set out ongoing violations of the Federal CCR Regulations and the Court is perfectly capable of remedying these violations by imposing the requested injunctive relief in accordance with the Federal CCR Regulations. (Id. at 16). To do otherwise would eliminate

citizen enforcement of the Federal CCR Regulations and deny the Court's "virtually unflagging obligation" to exercise jurisdiction over this enforcement action. (Id.) (citing Colo. River Water Conservation Dist. v. U.S., 424 U.S. 800, 817 (1976)).

### F. Briefs on Standing and Oral Arguments on Standing and Ripeness

On November 2, the Court ordered that both parties file briefs addressing the issue of standing. (See Doc. 99) (Baykeeper's standing brief); (see also Doc. 101) (Alabama Power's standing brief). On December 12, the Court heard oral arguments from both parties addressing the topics of standing and ripeness. The Court also considers Baykeeper's reply to Alabama Power's response brief on standing, which Baykeeper filed the same day as the parties' December 12 oral arguments. (See Doc. 104).

## II.    LEGAL STANDARD

A district judge may designate a magistrate judge to submit to her proposed findings of fact and recommendations for the disposition of a motion to dismiss. 28 U.S.C. § 636(b)(1)(A-B). Within fourteen days after being served with a copy of the recommended disposition, any party may serve and file specific written objections to the proposed findings and recommendations. Id. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(2). "In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found." Burks v. Mobile Cnty. Pub. Sch. Sys., No. 18-CV-390-KD-C, 2019 WL 133223668, at *1 (S.D. Ala. Jan. 8, 2019). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). The district judge shall make a de novo determination of those portions of the report and recommendation to which proper objection is made. § 636(b)(1)(C); Fed. R. Civ. P.

72(b)(3). The district judge may accept, reject, or modify the magistrate judge's recommended disposition. Id.

Here, Alabama Power timely objected to the R&R, and Baykeeper timely filed its response to Alabama Power's objections. The Court finds that Alabama Power makes specific and proper objections to the R&R's conclusions that are relevant to the present order. Accordingly, the Court applies a de novo standard of review to the portions of the R&R discussed below. See § 636(b)(1)(C); Fed. R. Civ. P 72(b)(3).

The defendant may move to dismiss the complaint pursuant to Rule 12(b)(6) if the plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When evaluating a motion to dismiss under Rule 12(b)(6), a court "must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." Almanza v. United Airlines, Inc., 851 F.3d 1060, 1066 (11th Cir. 2017). A district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment. Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010) (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999)). The court may take judicial notice of facts that are not subject to reasonable dispute because they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(2). Courts may take judicial notice at any stage of the proceeding. Fed. R. Evid. 201(d).

The questions of both standing and ripeness go to whether the district court has subject matter jurisdiction. Kennedy v. Floridian Hotel, Inc., 998 F.3d 1221, 1231 (11th Cir. 2021) ("In contrast, Floridian's jurisdictional challenge involves standing, a doctrine that . . . affects our (and the district court's) subject matter jurisdiction."); Reahard v. Lee Cnty., 30 F.3d 1412, 1415 (11th Cir. 1994) ("The question of ripeness goes to whether the district court had subject matter jurisdiction.") (internal quotations and citations omitted). Courts must address jurisdictional objections before analyzing the sufficiency of the complaint. Llampallas v. Mini-Cirs., Lab, Inc., 163 F.3d 1236, 1242 (11th Cir. 1998). A challenge to the district court's subject matter jurisdiction is properly brought under Rule 12(b)(1). Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs, 709 F.3d 1055, 1058 (11th Cir. 2013); Fed. R. Civ. P. 12(b)(1). Motions to dismiss under Rule 12(b)(1) come in two forms: "facial attacks" and "factual attacks." Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990). Facial attacks only require the court to determine if the plaintiff has alleged a sufficient basis for subject matter jurisdiction. Id. at 1529. As such, the allegations within the complaint are assumed true for purposes of the motion. Id. Unlike facial attacks, factual attacks challenge the existence of subject matter jurisdiction irrespective of the pleadings. Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A., 104 F.3d 1256, 1261 (11th Cir. 1997). Accordingly, courts may consider information outside of the pleadings – including testimony, affidavits, and other evidence – and may make factual findings to resolve the motion. McElmurray v. Consol. Gov't of Augusta-Richmond Cnty., 501 F.3d 1244, 1251 (11th Cir. 2007). In a factual attack on subject matter jurisdiction, the district court is not constrained to view the facts in the light most favorable to the non-movant. Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1169 (11th Cir. 2011).

### III.    STANDING ANALYSIS

#### A.  The Standing Doctrine

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 141 S.Ct. 2190, 2203 (2021); see U.S. Const. art. III, § 2.  "Under Article III, a case or controversy can exist only if a plaintiff has standing to sue – a bedrock constitutional requirement that this Court has applied to all manner of important disputes." U.S. v. Tex., 599 U.S. 670, 675 (2023). The Supreme Court has explained that Article III is "every bit as important in its circumscription of the judicial power of the United States as in its granting of that power." Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 476 (1982). The law of Article III standing aims to prevent the judicial process from being used to usurp the powers of the political branches and confines the federal courts to their proper judicial function. Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). As such, standing is "not merely a troublesome hurdle to overcome if possible so as to reach the merits of a lawsuit," but part of the nation's basic constitutional charter. Valley Forge, 454 U.S. at 476.

Article III standing consists of three elements. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not conjectural or hypothetical." Id. (internal quotations and citations omitted). Second, there must be a causal connection between the injury and conduct complained of, such that the injury is "fairly traceable" to the challenged action of the defendant. Id. Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. at

561 (internal quotations and citations omitted). The party invoking federal jurisdiction bears the burden of establishing these elements. Id.

An organization has standing to redress an injury suffered by its members without showing an injury to the association itself. S. River Watershed All., Inc. v. Dekalb Cnty., Ga., 69 F.4th 809, 819 (11th Cir. 2023). Associational standing exists when (1) the organization's members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1342 (11th Cir. 2014). Baykeeper maintains, "As to the second and third elements, the interests Baykeeper seeks to protect are central to its mission to protect the water resources of the Mobile River watershed and the Mobile-Tensaw Delta . . . and the claims do not seek money damages or otherwise require the participation of individual members." (Doc. 99 at 2). Alabama Power does not dispute that the second and third elements of associational standing are met. (See Doc. 101). Instead, Alabama Power disputes whether one or more Baykeeper members "have standing to sue in their own right," (see Doc. 101 at 5) (quoting Doc. 99 at 3), meaning that the associational standing inquiry now collapses into a standard Article III standing analysis.

"The three elements of Article III standing – injury, causation, and redressability – must be supported 'with the manner and degree of evidence required at the successive stages of the litigation.'" Wilding v. DNC Servs. Corp., 941 F.3d 1116, 1124 (11th Cir. 2019) (quoting Lujan, 504 U.S. at 561). Because on a motion to dismiss the Court presumes that "general allegations embrace those specific facts that are necessary to support the claim," at the pleading stage, general factual allegations of the standing elements may suffice. See Wilding, 941 F.3d at 1124 (internal citation omitted).

As a preliminary matter, the Court recognizes that because of the conceptual overlap between the justiciability doctrines of standing and ripeness as it relates to this case, some of the Court's conclusions could have been classified under either heading. See Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale, 922 F.2d 756, 760 n.3 (11th Cir. 1991) ("Because both standing and ripeness analyses look to the existence of actual injury to the plaintiff caused by the alleged wrong, they overlap to some degree and often collapse into each other."); Wilderness Soc'y v. Alcock, 83 F.3d 386, 390 (11th Cir. 1996) (explaining that the distinction between standing and ripeness "is one of the most confused areas of the law.").

### B.  The Court has an Independent Obligation to Assure that Standing Exists

The parties did not address the issue of standing until after the Court's November 2, 2023, order. (See Doc. 96). But standing "cannot be waived or conceded by the parties, and it may be raised (even by the court sua sponte) at any stage of the case." A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co., 925 F.3d 1205, 1210 (11th Cir. 2019). "[I]t is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009). In any case, the Court has afforded the parties ample opportunity to brief the issue, (see Docs. 99, 101, 104), and argue it in a hearing before the Court.

### C.  Baykeeper Plausibly Alleges Injuries in Fact

"First and foremost" of the Article III elements is "injury in fact." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103 (1998). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (citing Lujan, 504 U.S. at 560). Injury in fact is a constitutional requirement that Congress cannot erase

by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.

<u>Spokeo</u>, 578 U.S. at 339. Therefore, alleging a "bare procedural violation, divorced from any concrete harm" cannot satisfy the injury-in-fact requirement of Article III. <u>Id.</u> at 341.

> Per the "Parties and Standing" section of the Complaint,
>
> Baykeeper and its members have been harmed by Alabama Power's violations of RCRA and the CCR Rule. They recreate, fish, and own property in these watersheds, including in the vicinity of and downstream from Plant Barry. They fear contamination of drinking water, wildlife, and river water, by ground and surface water contamination and by discharges and pollution from coal ash in groundwater, wetlands, and a creek in Alabama Power's coal ash impoundment. They also fear and are concerned by Alabama Power's plans to store millions of tons of coal ash on the banks of the Mobile River and the Mobile-Tensaw Delta, where the storage will be subject to the risks of flooding, storms, water level rise, and hurricanes, thus exposing Baykeeper and its members and these water resources to the risk of catastrophic failure and a spill of coal ash into the Mobile River and the Delta. Alabama Power's storage of coal ash in groundwater, wetlands, and a creek; its storage on the banks of the Mobile River and the Mobile-Tensaw Delta; and its contamination, discharges, and pollution from coal ash in groundwater, wetlands, and a creek; and the risks and dangers created by the location of this storage site, and Alabama Power's plan to continue doing so in perpetuity, are reducing the use and enjoyment by Baykeeper and its members of the Mobile River, the Mobile-Tensaw Delta, and their watersheds.

(Doc. 1 at 4-5). In six declarations attached to the Complaint, Mobile Baykeeper members state that they fish, camp, hunt, and boat in the Mobile-Tensaw Delta but will avoid doing so near Plant Barry over concerns of pollution from the Plant Barry Ash Pond. (<u>See</u> Doc. 1-3). For example, one member will not eat fish caught near Plant Barry because he believes that "they could contain heavy metals which escape from the steam plant and end up in the Mobile River." (<u>Id.</u> at 3). Another will not kayak near the Plant Barry Ash Pond because of the known pollutants emanating from it but would otherwise. (<u>Id.</u> at 15).

Alabama Power spends the bulk of its standing brief arguing that Baykeeper fails to establish injury in fact from "speculative future events or conclusory assertions." (Doc. 101 at 6-13). The Court agrees with Alabama Power that "the Supreme Court has held that to establish standing, an individual must show an '<u>injury in law</u>' (i.e., violation of the statute) <u>and</u> an 'injury in fact' (i.e.,

physical, financial, or other harm to the plaintiff similar to a traditional tort).” (Doc. 101 at 6)
(emphasis included). Also, threatened injury must be “certainly impending” to constitute injury
in fact – “allegations of possible future injury are not sufficient.” Clapper v. Amnesty Intern.
USA, 568 U.S. 398, 409 (2013) (internal quotations, citations, and emphasis omitted). But
Alabama Power fails to credit recent, post-TransUnion Eleventh Circuit precedent making
abundantly clear that analogous plaintiffs have adequately alleged injuries in fact.

The rule in the Eleventh Circuit is that “organizational plaintiffs need only establish that at
least one member faces a realistic danger of suffering an injury.” Arcia, 772 F.3d at 1342. Post-
TransUnion, an environmental non-profit satisfied this requirement by identifying one specific
member who has used the relevant watersheds less often due to pollution. S. River Watershed
All., Inc., 69 F.4th at 820. A plaintiff “suffers an aesthetic injury when she uses the affected area
and is a person for whom the aesthetic value of the area will be lessened by the challenged
activity.” Glynn Env’t Coal., Inc. v. Sea Island Acquisition, LLC, 26 F.4th 1235, 1241 (11th Cir.
2022) (internal quotations and citations omitted and alteration adopted); see also Sierra Club v.
Tenn. Valley Auth., 430 F.3d 1337, 1344 (11th Cir. 2005) (“In an environmental case, an
individual plaintiff may show . . . injury in fact by attesting that he uses, or would use more
frequently, an area affected by the alleged violations and that his aesthetic or recreational
interests in the area have been harmed.”). At the pleading stage, the plaintiff meets her burden by
attesting that she uses the affected area and that her aesthetic interests in the area have been
harmed. Glynn Env’t, 26 F.4th at 1241.

This Court will not go down a rabbit trail of discounting members’ fear of a catastrophic coal
ash spill or concerns over invisible pollution. (See Doc. 101). Nor will the Court use judicial
notice to play hydrologist, as urged by Alabama Power, and conclude that certain pollutants

cannot crisscross the Mobile-Tensaw Delta. (See Doc. 105). At the motion-to-dismiss stage, general factual allegations of injury can suffice, so long as the complaint plausibly and clearly alleges a concrete injury. Glynn Env't, 26 F.4th at 1240. Ultimately, Baykeeper's declarations showing diminished present enjoyment in the area around Plant Barry speak for themselves. (See Doc. 1-3). "Baykeeper's members' uses of the Mobile River near the Plant Barry coal ash impoundment are diminished by the ongoing pollution with arsenic and other substances currently flowing from the unlined, saturated coal impoundment into the Mobile River today. This is not an 'imminent' injury; it is occurring now." (Doc. 104 at 3). "Instead, just as in Glynn Environmental, Baykeeper's members derive less pleasure from the area near, around, and downstream of Plant Barry – and use it less – because of their concerns about the pollution from the coal ash pond." (Id. at 3-4).

In addition, so long as the plaintiff shows that the defendant "discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern," that is enough. Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1281 (11th Cir. 2015). Here, the Complaint plausibly alleges that Plant Barry is contaminating waters adjacent to Plant Barry in the Mobile-Tensaw Delta, which is causing or contributing to the recreational and aesthetic injuries Baykeeper members currently suffer. (See Docs. 1 at 13, 1-3). Certainly, courts may take judicial notice of maps, and even of the north-south flow of the Mobile River. U.S. v. Proch, 637 F.3d 1262, 1266 n.1 (11th Cir. 2011) (taking judicial notice of a map); Bruner v. Geneva Cnty. Forestry Dep't, 865 So. 2d 1167, 1176 (Ala. 2003) (taking judicial notice of the flow of the Pea and Choctawhatchee Rivers); see also State of Ariz. v. State of Cal., 283 U.S. 423, 452 (1931) ("But a court may take judicial notice that a river within its jurisdiction is navigable."). But as one member asserts, "The Delta is basically one large river system. At

high levels sheets of water flow through the Delta and cover high ground. Anything upstream

flows downstream through the Delta . . . ." (Doc. 1-3 at 3); (Doc. 104 at 6) ("[P]ollution carried

by flood waters in the Mobile-Tensaw Delta is not confined to discrete channels or precise

routes . . . ."); cf. Fed. R. Evid. 201(b)(2) (The court may judicially notice a fact that is not

subject to reasonable dispute because it can be accurately and readily determined from sources

whose accuracy cannot reasonably be questioned."). Anyway, Alabama Power's presentation,

(Doc. 105), is a red herring because Baykeeper members plausibly allege recreational and

aesthetic injuries not just at their personal properties but in the waters immediately surrounding

the Plant Barry Ash Pond.

Baykeeper does not have an injury-in-fact problem. See Walters v. Fast AC, LLC, 60 F.4th

642, 649 (11th Cir. 2023) ("[I]t would make little sense, and disrupt longstanding conceptions of

Article III, to conclude that a plaintiff who suffers a concrete harm but not because of the

defendant's statutory violation, has really suffered no concrete harm at all.") (emphasis

included). Rather, it has a causation and redressability problem.

**D.  Baykeeper's Current Injuries are not Fairly Traceable to the Challenged Conduct**

The second "irreducible constitutional" element of standing is a causal connection between

the injury and conduct complained of, such that the injury is "fairly traceable" to the challenged

action of the defendant. Lujan, 504 U.S. at 560. "To be sure, traceability is not an exacting

standard." Walters, 60 F.4th at 650. The requirement of traceability of the plaintiff's injury to the

defendant's conduct is something less than the requirements of proximate causation. Cordoba v.

DIRECTV, LLC, 942 F.3d 1259, 1271 (11th Cir. 2019) ("We've made it clear that the traceability

requirement is less stringent than proximate cause . . . ."); Wilding, 941 F.3d at 1126 ("A plaintiff

need not show (or, as here, allege) that the defendant's actions are the very last step in the chain

of causation.") (internal quotations and citations omitted). Nor is a plaintiff required to prove causation beyond a reasonable doubt or by clear and convincing evidence. Focus on the Fam. v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1273 (11th Cir. 2003). "Instead, even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." Id.

Still, "the requirement is not toothless." Walters, 60 F.4th at 650. "A plaintiff at least must demonstrate factual causation between his injuries and the defendant's misconduct." Id. (emphasis included) (citing Dep't of Com. v. N.Y., 139 S.Ct. 2551, 2556 (2019) ("Article III requires no more than de facto causality . . . .")). Crucially, alleging that defendant caused both the injury and the challenged conduct is not enough. "There must be a causal link between the two." Roanoke River Basin Ass'n v. Duke Energy Progress, LLC, No. 17-CV-707, 2018 WL 2417862, at *4 (M.D. N.C. May 29, 2018) (emphasis included) (internal citation omitted). Thus, the Eleventh Circuit has held traceability to be lacking when the plaintiff "would have been injured in precisely the same way without the defendant's alleged misconduct." Walters, 60 F.4th at 650 (citing Cordoba, 942 F.3d at 1272 ("There's no remotely plausible causal chain linking the failure to maintain an internal do-not-call list to the phone calls received by class members who never said to Telecel they didn't want to be called again.") (emphasis included); Swann v. Sec'y, Ga., 668 F.3d 1285, 1289 (11th Cir. 2012) (concluding that the plaintiff's failure to provide the address of the jail on his absentee-ballot application independently caused him his alleged injury, which would have happened regardless of the application of the challenged statute)).

In the Court's eyes, what dooms Baykeeper's Complaint on standing grounds is the mismatch between the injuries in fact just described and the conduct it challenges, namely the alleged deficiencies (pursuant to the Federal CCR Regulations and RCRA) in the closure plan for the

Plant Barry Ash Pond. Alabama Power began closure-in-place activities in 2019 "and has been working diligently to implement the closure plan" since receiving the ADEM Permit for the Plant Barry Ash Pond. (Doc. 60 at 9). Baykeeper's problem is that the coal ash pollution about which it complains pre-existed and therefore is not fairly traceable to <u>the challenged action</u> of Alabama Power, the implementation of the closure plan for the Plant Barry Ash Pond. <u>See Cordoba</u>, 942 F.3d at 1271-72 (emphasis included) (quoting <u>Lujan</u>, 504 U.S. at 560).

On the one hand, Baykeeper alleges that "it is undisputed that the unlined Plant Barry coal ash impoundment has been contaminating water for decades." (Doc. 1 at 13) (citing a 1991 site assessment for a possible Superfund listing at Plant Barry that found elevated levels of arsenic and other pollutants and a 2018 ADEM Order citing Alabama Power for contaminating state waters); <u>see In the Matter of Alabama Power Co. James M. Barry Elec. Generating Plant</u>, Order No. 18-094-GW, at 1-3, 8-10 (ADEM Aug. 15, 2018). "Alabama Power is proceeding with its plan to cap its Plant Barry coal ash within the existing impoundment, <u>continuing</u> the ongoing pollution of the water resources of the Mobile-Tensaw Delta and creating a <u>continuing</u> danger . . . for Baykeeper and its members . . . ." (Doc. 1 at 5) (emphasis added). Baykeeper's cognizable recreational and aesthetic injuries emanate from Plant Barry's alleged <u>ongoing</u> leaking. (<u>See</u> Doc. 104 at 4) (Baykeeper's members' uses of the Mobile River near the Plant Barry coal ash impoundment are diminished by the ongoing pollution . . . currently flowing from the unlined, saturated coal ash impoundment into the Mobile River today.").

On the other, in the Complaint Baykeeper challenges the <u>current</u> closure plan's failure to promulgate a "closure performance standard" that eliminates free liquids "<u>prior</u> to installing the <u>final</u> cover system" required under subsection (d)(3). (Doc. 1 at 16, Count One); 40 C.F.R. § 257.102(d)(2)(i) (emphasis added). Baykeeper also challenges the <u>current</u> closure plan's failure

26

to promulgate a "closure performance standard" that ensures that, at a minimum, the Ash Pond is closed in a way that will: (a) "preclude the probability of future impoundment of water, sediment, or slurry"; and (b) "control, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste" or releases of CCR pollution to ground or surface waters. (Doc. 1 at 16, Counts Two & Three); see 40 C.F.R. § 257.102(d)(1)(i-ii) (emphasis added). With respect to Count One, while construction of the final cover system began in April 2020, it is not expected to conclude – and therefore be "installed" – until August 2030. (Doc. 27-1 at 191). It contravenes basic principles of logic to conclude that installation that began in 2020 and likely will not be completed until 2030 is the factual or de facto cause of ground water contamination that allegedly goes back decades. See Walters, 60 F.4th at 650 ("A plaintiff must at least demonstrate factual causation between his injuries and the defendant's misconduct.") (emphasis included); Dep't of Com., 139 S.Ct. at 2556 ("Article III requires no more than de facto causality . . . .").

With respect to Counts Two and Three, even assuming that the "closure performance standard" is static – it is not[3] – Alabama Power did not initiate closure activities until 2019. "There's no remotely plausible causal chain linking the failure to" implement a non-final closure performance standard precluding future impoundment of water or the post-closure infiltration of liquids to Plant Barry's ongoing leaching of coal ash. See Cordoba, 942 F.3d at 1272 (finding "no remotely plausible causal chain" connecting the failure to maintain a do-not-call list with the plaintiffs' unwelcome calls). Baykeeper's members "would have been injured in precisely the

---

[3] "The owner or operator may amend the initial or any subsequent written closure plan developed pursuant to paragraph (b)(1) of this section at any time." 40 C.F.R. § 257.102(b)(3)(i). Alabama Power has already amended its closure plan for the Plant Barry Ash Pond twice: in July 2019, (see Doc. 40-1), and again in April 2020, (see Docs. 27-1–37-1). As will be explained, the Court finds that the likelihood of future closure plan amendments in response to several forthcoming contingencies also makes this case not ripe.

same way" had Alabama Power never begun closing the Plant Barry Ash Pond. See Walters, 60 F.4th at 650. In a case that the Court finds comparable and persuasive,[4] the Middle District of North Carolina, addressing causality, held, "[T]he purported injury here – the diminished use and enjoyment of the Roanoke River Basin . . . – is not directly linked to Duke Energy's preparation of an initial Closure Plan that allegedly fails to comply with the CCR Rule's requirements regarding its contents." Roanoke River Basin, 2018 WL 2417862, at *5.

In sum, the defendant's activity causing Baykeeper's injury (the ongoing leaching of coal ash from Plant Barry into the Mobile River) is curiously not what Baykeeper decided to contest. Instead, Baykeeper challenges Alabama Power's as-yet incomplete closure plan that did not "factually cause," and therefore is not "fairly traceable to," the complained-of regulatory violations. See Walters, 60 F.4th at 650. Baykeeper thus lacks Article III standing to sue. Cordoba, 942 F.3d at 1272.

### E.  Baykeeper's Instant Harms are not Redressable by a Favorable Decision

Baykeeper must finally show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560 (internal quotations omitted). Traceability and redressability "often travel together." Support Working Animals, Inc. v. Governor of Fla., 8 F.4th 1198, 1201 (11th Cir. 2021) (citing 13A Charles Alan Wright & Arthur R. Miller, Fed. Prac. and Proc. § 3531.5 (3d ed. 2021)). To satisfy Article III standing's redressability element, a plaintiff need only demonstrate a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury. Duke Power Co. v. Carolina Env't

---

[4] Baykeeper distinguishes Ronaoke River Basin because there Duke Energy was still nineteen months away from submitting its proposed closure plan to the North Carolina regulator for approval, whereas here "Alabama Power admits closure is 'ongoing' under the plan approved in obtaining the state permit." (Doc. 66 at 3) (internal citation omitted). This is a distinction without a difference with respect to the causation analysis quoted here.

Study Grp., 438 U.S. 59, 79 (1978); see also Made in the USA Found. v. U.S., 242 F.3d 1300, 1310-11 (11th Cir. 2001) (explaining that partial relief may suffice for redressability).

Ordering that Alabama Power file a closure plan for the Plant Barry Ash Pond that satisfies the Federal CCR Regulations and the RCRA could only possibly alleviate a procedural injury, not Baykeeper's concrete injuries in fact. (See Doc. 1 at 17, Prayer for Relief "C"). Baykeeper therefore has no standing to contest Alabama Power's allegedly inadequate closure plan for the Plant Barry Ash Pond. But Baykeeper's request that the Court enter injunctive relief "to prevent Alabama Power from implementing this illegal closure plan" is more subtle. (Doc. 1 at 17, Prayer for Relief "B"). Still, ordering Baykeeper to execute a closure plan that complies with 40 C.F.R. § 257.102(d)(1)(i-ii) and (d)(2)(i) would not make it "substantially likely" that Plant Barry's coal ash leaching would cease any time soon. See Duke Power Co., 438 U.S. at 79. Ordering that Alabama Power eliminate free liquids by removing liquid wastes prior to installing the final cover system would do nothing to address Plant Barry's ongoing groundwater contamination when the system will not be installed until August 2030. (Doc. 27-1 at 191); see 40 C.F.R. § 257.102(d)(2)(i).

So too with Counts Two and Three of the Complaint. Ordering Alabama Power to implement a closure plan today that both eliminates the post-closure infiltration of liquids and releases of CCR into groundwater and precludes the probability of future impoundment of water, sediment, or slurry cannot redress ongoing leaching when the law only regulates how a CCR unit is closed. See 40 C.F.R. § 257.102(d)(1)(i-ii) (emphasis added). Alabama Power has already amended its closure plan for the Plant Barry Ash Pond twice. (See Doc. 40-1 (July 2019 amended closure

plan) and Docs. 27-1–37-1 (April 2020 amended closure plan)).[5] Alabama Power also does not anticipate the Plant Barry Ash Pond closure-in-place project to be completed until May 2031. (Doc. 27-1 at 191). Thus, a hypothetical order to comply with subsection (d)(1)(i-ii) cannot remedy Baykeeper's instant harms when the closure performance standard will not truly manifest until much closer to the May 2031 estimated project completion date.

This Court will not speculate about why Baykeeper brought a citizen suit under Section 6972(a)(1)(A) and not (a)(1)(B). Subsection (a)(1)(A) permits suits "against any person . . . who is alleged to be in violation of any . . . standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." See 42 U.S.C. § 6972(a)(1)(A). Thus, subsection (a)(1)(A) incorporates the portions of the Federal CCR Regulations governing the closure performance standard for leaving CCR in place under which Baykeeper sues. Meanwhile, subsection (b)(1)(B) permits suits "against any person, including . . . [any] past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to the health or environment." See id. § 6972(a)(1)(B). It appears that Baykeeper could have avoided the traceability and redressability problems just discussed by suing under subsection (a)(1)(B), which bypasses the Federal CCR Regulations by not incorporating them. Then there would have been no incongruity between Baykeeper's immediate injuries and the avenue for statutory relief against an "owner or operator . . . who is contributing to the past or present handling, storage . . . or disposal of any solid or hazardous waste which may present an imminent

---

[5] Article III standing must be determined as of the time at which the complaint is filed. Focus on the Fam., 344 F.3d at 1275. Baykeeper filed the Complaint in September 2022. (Doc. 1). As such, the impact of several outstanding contingencies and the consequent likelihood of future amendment to the Plant Barry Ash Pond closure plan will be left for the Court's ripeness analysis.

and substantial endangerment to . . . the environment." Nor would Baykeeper have to challenge the implementation of a closure plan that is and will be in flux and is not the source of the alleged leaching about which Baykeeper complains. But, with the facts as they are, the Court concludes that the traceability and redressability elements are absent, so Baykeeper lacks Article III standing to sue.

## IV.    RIPENESS ANALYSIS

### A. The Ripeness Doctrine

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The ripeness doctrine reflects this constitutional restriction on federal jurisdiction.[6] Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 242-45 (1952); Elend v. Basham, 471 F.3d 1199, 1205 (11th Cir. 2006). However, depending on the ripeness aspects at issue in a particular case, it may be more properly considered a prudential consideration. E.g., Buckley v. Valeo, 424 U.S. 1, 114 ("We have recently recognized the distinction between jurisdictional limitations imposed by Art. III and 'problems of prematurity and abstractness' that may prevent adjudication in all but the exceptional case.") (internal citation omitted); see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 670 n.2 ("Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction.") (internal quotations and citation omitted).

---

[6] According to Baykeeper, "using the concept of ripeness here to block citizen enforcement would conflict with the plain language and intent of the statute and the Rule." (Doc. 74-1 at 8). To the extent that the ripeness problem in a particular case is of a constitutional character, Congress is powerless to override it. See Fla. Panthers v. Collier Cnty., No. 2:13-CV-612, 2016 WL 1394328, at *10 (M.D. Fla. Apr. 8, 2016) ("[R]ipeness is an Article III requirement, and as such it cannot be entirely swept aside by Congress."); cf. TransUnion, 141 S.Ct. at 2205 ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III any more than, for example, Congress's enactment of a law regulating speech relieves courts of their responsibility to independently decide whether the law violates the First Amendment.").

Overall, the doctrine aims to separate matters that are premature for review because of speculative injuries that may never occur from those that are appropriate for federal court action. Ala. Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300, 1310 n.9 (11th Cir. 2002) (internal citation omitted). Doing so may advance the separation of powers, Allen v. Wright, 468 U.S. 737, 750 (1984), abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014), prevent courts from "entangling themselves in abstract disagreements over administrative policies," Abbott Lab'ys v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977), and protect administrative agencies from judicial interference "until an administrative decision has been formalized," Abbott Lab'ys, 387 U.S. at 148.

The Court notes at the outset that deeming claims nonjusticiable on grounds that are prudential, rather than constitutional, "is in some tension with [the Supreme Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." Lexmark, 572 U.S. at 126 (internal quotations omitted); see also Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014) (citing Lexmark). Nonetheless, the Supreme Court has declined to reassess the continuing vitality of the prudential ripeness doctrine and has employed the standard ripeness framework in subsequent cases. Susan B. Anthony, 573 U.S. at 167-68; see also Club Madonna, Inc. v. City of Miami Beach, 924 F.3d 1370, 1379-80 (11th Cir. 2019) (recognizing prudential limitations on justiciability even after Lexmark and Susan B. Anthony and applying the familiar ripeness test). This Court will follow suit.

A ripeness inquiry consists of two determinations: (a) the hardship to the parties of withholding court consideration; and (b) the fitness of the issues for judicial decision. Nat'l Park

Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003). Supreme Court decisions implicitly

require both elements to classify a case as "ripe" for judicial decision-making. Compare Poe v.

Ullman, 367 U.S. 497 (1961) (denying that the case was ripe despite an extensive factual

background with no future contingencies affecting justiciability), with Socialist Labor Party v.

Gilligan, 406 U.S. 583, 588 (1972) (acknowledging hardship but finding the case unripe for want

of an adequate record).

"[R]ipeness can be affected by events occurring after the case is filed." Yacht Club on the

Intracoastal Condo. Ass'n v. Lexington Ins. Co., 509 F. App'x 919, 922 (11th Cir. 2013). Courts

may therefore consider events that occurred after the filing of the complaint for ripeness

purposes. Eternal World Television Network, Inc. v. Sebelius, 935 F. Supp. 2d 1196, 1220 (N.D.

Ala. 2013) (citing Buckley, 424 U.S. at 114-17).

**B.  No Matter When Raised, Ripeness Must be Considered**

Baykeeper moved to strike Alabama Power's ripeness argument because Alabama Power

raised it for the first time in its Reply in Support of its Prior Motion to Dismiss. (Doc. 66 at 2-3;

see also Doc. 74-1). Generally, arguments raised for the first time in a reply brief are not properly

before a reviewing court. Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005).

But as Judge Bivins correctly notes in the R&R, like standing, ripeness implicates a district

court's subject matter jurisdiction and therefore must be raised by the parties or the Court at any

time during the litigation. (Doc. 91 at 28 n.4) (citing Nat'l Parks Conservation Ass'n v. U.S.

Dep't of Interior, 46 F. Supp. 3d 1254, 1266 (M.D. Fla. 2014); Utah v. U.S. Dep't of Interior, 210

F.3d 1193, 1196 n.1 (10th Cir. 2000); Sammons v. Nat'l Comm'n on Certification of Physicians

Assistants, Inc., 104 F. Supp. 2d 1379, 1381 (N.D. Ga. 2000)). The Court also agrees with Judge

Bivins that Baykeeper has been adequately afforded an opportunity to address Alabama Power's

ripeness argument in written filings, (see Doc. 66 at 2-3; Doc. 74-1 at 8-10; Doc. 95 at 10-15), as well during the December 12 oral arguments. Accordingly, the Court proceeds with its analysis.

### C. There is no Incremental Harm to Delaying Review

The first step of the ripeness inquiry is to determine whether delayed review would cause hardship to the plaintiffs. Nat'l Park Hosp. Ass'n, 538 U.S. at 808. The typical scenario in which the plaintiff can show "hardship" is when she is "forced to choose between foregoing lawful activity and risking substantial legal sanctions." Club Madonna, 924 F.3d at 1375 (citing Cheffer v. Reno, 55 F.3d 1517, 1524 (11th Cir. 1995)); see, e.g., Susan B. Anthony, 573 U.S. at 167-68 (holding that "denying prompt judicial review would impose a substantial hardship on petitioners, forcing them to choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other"), and Steffel v. Thompson, 415 U.S. 452, 462 (1974) ("[A] refusal on the part of federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity . . . ."). Here, since Baykeeper does not allege any risk of legal sanctions to itself, the bulk of higher court precedent regarding the first step of ripeness review is not helpful. However, the Eleventh Circuit has explained that the hardship prong "asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." Harrell v. The Fla. Bar, 608 F.3d 1241, 1258 (11th Cir. 2010).

Withholding court consideration cannot be said to cause Baykeeper substantial hardship, if any, due to the kind of relief Baykeeper seeks and the likelihood of future amendments to the challenged closure plan in response to several impending contingencies. As discussed above, the

Federal CCR Regulations cited in Counts One-Three of the Complaint regulate how the Plant Barry Ash Pond is "closed" and the condition of the Ash Pond "prior to installing the final cover system." (Doc. 1 at 16); 40 C.F.R. § 257.102(d)(1)(i-ii), (d)(2)(i). The Court cannot impose any incremental harm by deferring review to a date closer to the project's estimated 2031 completion date when, even if granted, Baykeeper's requested relief would not affect the polluting impoundment until that point anyway. Cf. Zen-Noh Grain Corp. v. Consol. Env't Mgmt., Inc., No. 12-CV-1011, 2012 WL 6201871, at *9 (E.D. La. Dec. 12, 2012) (holding that plaintiffs challenging the construction of a manufacturing unit "fail[ed] to demonstrate that any hardship would result from withholding adjudication" when operation of the plant was still months away). In that sense, Wilderness Soc'y is not directly on point. See 83 F.3d 386. There, the Eleventh Circuit found dispositive that no site-specific action pursuant to a challenged forest management plan would take place without further administrative decision making. Id. at 390. Here, by contrast, Alabama initiated closure activities in 2019 and received the ADEM Permit for the Plant Barry Ash Pond in 2021. (Doc. 60 at 9). Thus, while Baykeeper's injuries in fact persist and the Ash Pond's closure has begun, granting Baykeeper's relief would not affect the ongoing leaching until much closer to August 2030.[7]

It is far from clear what the Ash Pond's closure performance standard will look like in 2031. The owner or operator of a CCR impoundment may amend their written closure plan at any time. 40 C.F.R. § 257.102(b)(3)(i) (emphasis added). Alabama Power has already amended its closure plan for the Plant Barry Ash Pond twice: in July 2019, (see Doc. 40-1), and again in April 2020,

---

[7] Construction of the final cover system for the Ash Pond is not slated for completion until August 2030, with total project completion estimated for May 2031. (Doc. 27-1). As this Order tries to make clear, it only makes sense that the "closure performance standard" referenced in § 257.102(d) be determinable at a date much sooner to closure project completion. Of course, the Court is not equipped to theorize as to when that date might be. It is sufficient for present purposes to hold that Baykeeper's suit is not ripe at this time.

(see Docs. 27-1–37-1). As will be discussed in more detail, several lurking contingencies increase the likelihood of future closure plan amendment(s). First, the EPA is proposing to deny Alabama's CCR permitting program application. (Doc. 84-1). Next, the EPA's Notice concerning Plant Barry's compliance with the Federal CCR Regulations, (Doc. 62-1), has taken shape such that the EPA and Alabama Power have agreed to settlement discussions, (Docs. 102-1, 106-1). While these contingencies alone do not make this case unripe, the probability that either or both will cause Alabama Power to amend its closure plan before the project's May 2031 completion date means that the "closure performance standard" will likely not crystallize for years. And the Complaint rises and falls with the closure performance standard's ability to provide for certain closure and post-closure conditions. So, the Court causes no additional hardship by delaying review to allow for further factual development when the plain language of the Federal CCR Regulations and the early stage of the project would already have the Court wait. See Roanoke River Basin, 2018 WL 2417862, at *7 ("[A]s to the hardship prong of the ripeness analysis, the cost to Plaintiff of denying review would be minimal, if any, given the preliminary nature of the initial closure plan.").

### D.  The Record is Presently Unfit for Judicial Decision

The second step of the ripeness inquiry is to evaluate "the fitness of the issues for judicial decision." Nat'l Park Hosp. Ass'n, 538 U.S. at 808. The fitness prong is typically concerned with questions of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." Harrell, 608 F.3d at 1258. "For a court to have jurisdiction, the claim must be sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision making by the court." Harris v. Mex. Specialty Foods, 564 F.3d 1301, 1308 (11th Cir. 2009) (internal quotations and citation omitted). A claim is not ripe for

adjudication if it rests upon contingent future events that may not occur as anticipated or at all. Tex. v. U.S., 523 U.S. 296, 300 (1998). If the plaintiff files before the facts underpinning the claim have been sufficiently developed, a court must dismiss the claim as not ripe for the court's review. Club Madonna, 924 F.3d at 1375. On the other hand, the more a question is purely a legal issue, the more likely it is that a court will find ripeness because that type of argument does not rely on a developed factual record. Harris, 564 F.3d at 1308. The Eleventh Circuit has explained, "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through review of potential or abstract disputes." Digit. Props., Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997).

The final form that the closure plan for the Plant Barry Ash Pond will take is not sufficiently defined and concrete to permit effective decision making by the Court. See Harris, 564 F.3d at 1308. Instead, it rests upon several contingent future events that may not occur as anticipated. See Tex., 523 U.S. at 300. First, the EPA is proposing to deny Alabama's entire CCR permitting program. (Doc. 84-1). Parties to the Alabama-EPA litigation expect the EPA to provide a date for its final decision on ADEM's CCR permitting application in early January 2024, if it has not finalized its decision by then. (Doc. 99 at 8); see State of Ala. v. U.S. EPA, No. 1:23-CV-00903-JEB (D.D.C.). Should the EPA stay the course and deny ADEM's application, that would leave Alabama in unchartered waters as the only state with EPA denial of its state CCR permitting program.[8] Per WIIN, the Federal CCR Regulations' relevant criteria govern the Plant Barry Ash Pond unless and until the EPA Administrator approves ADEM's application. See 42 U.S.C. § 6945(d)(3)(A). This means that if all goes as expected, the Federal CCR Regulations will continue to apply to the Plant Barry Ash Pond after the EPA announces its final decision. But it

---

[8] The three other states that have submitted applications – Georgia, Texas, and Oklahoma – have all received CCR permitting program approval from the EPA. (Doc. 84-1 at 16).

also makes it more likely that Alabama Power will be forced to amend its closure plan to some extent. EPA obviously interprets the Federal CCR Regulations' "Criteria for conducting the closure or retrofit of CCR units," <u>see</u> 40 C.F.R. § 257.102, more strictly than ADEM interprets the identically worded portions of the Alabama CCR Regulations, <u>see</u> Ala. Admin. Code. r. 335-13-15-.07(3). And while the EPA's interpretation is currently disputed, Plant Barry will have to comply with at least the Federal CCR Regulations by the time of closure. In other words, currently Alabama Power's closure plan, which Baykeeper challenges, is not final.

Moreover, now that Alabama Power has accepted EPA's overture to begin settlement discussions over Plant Barry, the closure plan will be subject to change to address at least some of the numerous violations detailed in the Notice. (<u>See</u> Doc. 102-1 at 2) ("The EPA appreciates APV's responses and cooperation over the last several months; however, the EPA's position detailed in the NOPV has not changed."); (Doc. 106-1 at 3) ("As soon as we can finalize a date and a time, technical teams from EPA and Alabama Power can meet, analyze EPA's engineering and geological concerns, and discuss potential methods and approaches to resolve any remaining CCR matters at Plant Barry."). Significantly, the relevant substantive law's yardstick[9] that the Court would use to adjudicate these claims is not ascertainable until these contingencies are resolved and the closure plan becomes more definite. <u>See Roanoke River Basin</u>, 2018 WL 2417862, at *7 ("The uncertainty as to whether, and in what form, Duke Energy's closure plan will ultimately be implemented weighs against a finding that this matter is now ripe for a judicial

---

[9] That is, whether the Plant Barry Ash Pond is closed in a manner that will provide for certain post-closure conditions and whether free liquids are eliminated prior to installation of the final cover system. <u>See</u> 40 C.F.R. § 257.102(d)(1)(i-ii), (d)(2)(i). Baykeeper's use of these Regulations also distinguishes it from prior cases like <u>Williams v. Ala. Dep't of Transp.</u>, 119 F. Supp. 2d 1249 (M.D. Ala. 2000), and <u>PMC, Inc. v. Sherwin-Williams Co.</u>, 151 F.3d 610 (7th Cir. 1998). These cases declined to dismiss RCRA citizen suits under the abstention doctrines but pre-dated the Federal CCR Regulations, which the EPA issued in 2015. As explained, it is the unique interplay between the early stage of the Ash Pond's closure plan, contingencies affecting the challenged closure plan, and the Regulations under which Baykeeper now sues that makes this case unripe.

decision."); (see also Doc. 63 at 6) ("[W]hat [Plaintiff] actually seeks is an advisory opinion from this Court on whether the future closure of the CCR impoundment at Plant Barry in 2031 will ultimately meet the closure performance standards under the CCR Rule.") (emphasis included).

Finally, delaying review would protect the Court from engaging in speculation and wasting its resources by reviewing Alabama Power's provisional closure plan. City of Plantation, 121 F.3d at 589. As Alabama Power points out,

> Relatedly, the Report asserts that "[t]here is nothing before the Court that suggests that a remedy cannot be fashioned." . . . But what additional engineering controls would the Court suggest be included in the closure plan to ensure that in 2031 the "CCR remaining in the closed unit is not continually inundated with groundwater"? Those suggested by Baykeeper? By a professional engineer retained by the Court? By the results of EPA and Alabama Power discussions? By the outcome of the D.C. Circuit litigation? By some combination of the above? And how would any such remedy account for subsequent legal developments, changed conditions at Plant Barry, or developing closure technologies between now and 2031 that could lead to modification of the closure plan? Would Alabama Power be able to revise its plan as contemplated by the regulations, or must it apply to this Court for an amendment? See, e.g., Johnson v. Sikes, 730 F.2d 644, 648 (11th Cir. 1984) (ripeness protects courts "entangling themselves in abstract disagreements") (citations and quotations omitted). These uncertain contingent future events confirm that Baykeeper's complaint is not ripe for this Court's resolution at this time.

(Doc. 94 at 19). The Court agrees with Alabama Power. This cannot be called a "purely legal claim." Harris, 564 F.3d at 1308. Because Baykeeper sued before the facts underpinning its claims have been sufficiently developed, the Court must dismiss them as not ripe for the court's review. See Club Madonna, 924 F.3d at 1375.

## V.    CONCLUSION

Since Baykeeper lacks Article III standing to bring suit and this matter is not ripe for judicial review, the Court lacks subject matter jurisdiction. Kennedy, 998 F.3d at 1231 ("In contrast, Floridian's jurisdictional challenge involves standing, a doctrine that . . . affects our (and the district court's) subject matter jurisdiction."); Reahard, 30 F.3d at 1415 ("The question of ripeness goes to whether the district court had subject matter jurisdiction."). If a court

determines that it has no subject matter jurisdiction, its only remaining function is to dismiss the case. <u>Steel Co.</u>, 523 U.S. at 94. The appropriate order for claims asserted by plaintiffs that lack Article III standing and unripe claims is dismissal without prejudice. <u>Gardner v. Mutz</u>, 962 F.3d 1329, 1344 (11th Cir. 2020) (ordering dismissal without prejudice for lack of jurisdiction when the plaintiffs did not establish Article III standing); <u>Peterson v. Overstreet</u>, 819 F. App'x 778, 780 (11th Cir. 2020) ("If a claim is not ripe, the district court lacks subject-matter jurisdiction, and the claim should be dismissed without prejudice."). Consequently, for the reasons set forth above, it is **ORDERED** that Alabama Power's Corrected Motion to Dismiss, (Doc. 60), is **GRANTED** and Baykeeper's Complaint, (Doc. 1), is **DISMISSED** without prejudice. Judgment shall be entered by a separate document as provided in Federal Rule of Civil Procedure 58(a).

      **DONE** this 4th day of January 2024.

<u>s / Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**