## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MOBILE BAYKEEPER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO.: 1:22-cv-00382-KD-B |
| ALABAMA POWER COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFF MOBILE BAYKEEPER'S
### MOTION TO RECONSIDER

**OF COUNSEL:**

Barry Brock (ASB-9137-B61B)
Christina Tidwell (ASB-9696-D10R)
Southern Environmental Law Center
2829 Second Avenue S., Suite 282
Birmingham, AL 35233
Telephone: (205) 745-3060
bbrock@selcal.org
ctidwell@selcal.org


Richard Moore (ASB-5730-M55R)
450C Government Street
Mobile, AL 36602
Telephone: (865) 300-1206
richardmooreig@hotmail.com

Nicholas Torrey *(admitted pro hac vice)*
Southern Environmental Law Center
601 W. Rosemary St, Suite 220
Chapel Hill, NC  27516
Telephone: (919) 967-1450
ntorrey@selcnc.org

Frank Holleman *(admitted pro hac vice)*
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
fholleman@selcsc.org

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiff Mobile Baykeeper ("Baykeeper") submits this motion respectfully requesting that the Court reconsider its Order dismissing this citizen suit on standing and ripeness grounds. Doc. 108 (the "Order"). This motion is filed within 28 days of the Order and thus is reviewed under Rule 59(e).

One of the grounds that justifies a motion for reconsideration is "the need to correct clear error or manifest injustice." *Sonnier v. Comput. Programs & Sys., Inc.*, 168 F.Supp.2d 1322, 1336 (S.D. Ala. 2001). Such a motion is appropriate where the "Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Z.K. Marine Inc. v. M/V Archigetis*, 808 F.Supp. 1561, 1563 (S.D. Fla. 1992).

The Order contains clear errors resulting in manifest injustice. The Order errs in concluding that: 1) Baykeeper's injuries are not causally linked to the approved and implemented closure plan; 2) the requested remedy, *i.e.*, compliant closure, would not redress Baykeeper's injuries; and 3) this case is not ripe due to possible future contingencies and because there will be no harm in delaying review.

These conclusions are based on unsupported assumptions, reached without discovery or development of a factual record. Reliance on incorrect factual premises to support key legal conclusions renders the Order defective and mandates reconsideration. Further, these material assumptions of fact were first raised in the Order. They were not argued by the parties in their extensive briefing on Alabama Power's Motion to Dismiss, so Baykeeper did not have an opportunity to respond to them previously. Accordingly, Baykeeper submits with this Motion the attached expert declaration (Exhibit 1), which it did not have an opportunity or need to submit previously. *See Mays v. U.S. Postal Serv.*, 122 F.3d 43, 46 (11th Cir. 1997) (stating that a party

1

may introduce previously unsubmitted evidence on a motion to reconsider where it did not have the opportunity to do so before).  Baykeeper respectfully requests the Court reconsider the Order in light of these key factual and legal clarifications.[1]

As written, the Order would defeat standing and make the CCR Rule unenforceable by citizens, simply because an unlined coal ash impoundment has been leaking pollution for decades, even though the closure requirements being violated here are designed to stop such pollution.  The Order would also allow utilities to ignore the closure requirements of the Rule until construction of their cap-in-place cover system was complete, even though the Rule's standards determine whether cap-in-place can be *selected* by a utility in the first place.  Doc. 61-1 at 26-27.  And the Order would contravene the separation of powers by interfering with the balance struck by Congress when it specified that only a diligent prosecution in court by EPA—not other Congressionally-authorized processes like EPA's review of a state permitting program or its investigation of a coal ash site—can block citizen enforcement.  *See* 42 U.S.C. § 6972(b).

---

[1] The Order discusses the distinction between facial and factual attacks on standing and ripeness (subject matter jurisdiction) but does not state which one was applied.  Order at 17. The Court should provide clarification on this point. As discussed in the Order, a facial attack challenges the sufficiency of the allegations in the complaint, while a factual attack may entail referring to extrinsic evidence.  In addition, when a factual attack implicates the merits of the claim, as may be the case here, the Court should apply a summary judgment standard.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990).  On appeal, a facial attack is reviewed *de novo*. *Pillow v. Bechtel Const., Inc.*, 201 F.3d 1348, 1351 (11th Cir. 2000). A factual attack, in which the Court has made determinations of jurisdictional facts, is reviewed under the clearly erroneous standard. *Lawrence*, 919 F.3d at 1530.  This is potentially significant here because the Order relies upon assumptions of fact that were not in evidence and were not provided by the parties.

**I. The Order Erroneously Rejects Baykeeper's Standing.**

    **A. Baykeeper's Injuries Are Fairly Traceable to the Challenged Conduct.**

       *1. Members' Injuries Are Directly Linked to the Defective Closure Plan.*

The Order recognizes that the injuries documented by Baykeeper include a present reduction in members' "use and enjoyment . . . of the Mobile River, the Mobile-Tensaw Delta, and their watersheds" due to, among other things, "the risks and dangers created by the location of this storage site, and *Alabama Power's plan to continue doing so in perpetuity*." Order at 21 (quoting Doc. 1 at 4-5) (emphasis added). The Order appropriately declines to discount these concerns at the pleading stage. *Id.* at 22-23. Instead, it holds that the harms set out in the Complaint and declarations satisfy the concrete injury requirement of Article III. *Id.* at 24. The Order's injury-in-fact analysis notes that "Plant Barry is . . . *causing or contributing to* the recreational and aesthetic injuries Baykeeper members currently suffer." *Id.* at 23 (emphasis added). That is because Plant Barry's "unlined, saturated coal ash impoundment" is releasing "arsenic and other substances" "into the Mobile River," which "diminishe[s]" "Baykeeper's members' uses of the Mobile River." *Id.* (quoting Doc. 104 at 3).

However, the Order erroneously holds that these members' concrete injuries are not "fairly traceable" to Alabama Power's implementation of its closure plan, *id.* at 26, even though the cap-in-place closure that Alabama Power is constructing leaves coal ash saturated in water within the unlined impoundment, allowing it to continue leaching pollution. As a result of the non-compliant closure that Alabama Power is implementing, that pollution is happening now, and that pollution is "certainly impending" in perpetuity as a direct result of Alabama Power's faulty closure plan. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

The Order fundamentally misapplies the causation requirement for standing, despite recognizing that this requirement "is less stringent than proximate cause" and encompasses harms that "flow indirectly from the action in question."  Order at 24-25 (quoting *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019); *Focus on the Fam. v. Pinellas Suncoast Transit Auth*., 344 F.3d 1263, 1273 (11th Cir. 2003)).  The standard applied in the Order is much more stringent and applying it was clear error.

The Order compounds applying the wrong standard by basing its faulty traceability analysis on the factually incorrect assertion that "Baykeeper's members 'would have been injured in precisely the same way' had Alabama Power never begun closing the Plant Barry Ash Pond."  Order at 27-28 (citation omitted).  This statement makes the Order internally and logically inconsistent.  Saturated coal ash in the unlined impoundment is the cause of the ongoing pollution harming members' use of the river, *and* it is the cause of the ongoing violations of the Rule's closure standards.  The question is not what would happen if the impoundment were not closed at all, but what would happen if the ash were not saturated in water—if Alabama Power were closing in a compliant manner, removing the water from the ash as the Rule requires.  In that case, the ongoing contamination would stop.

Moreover, the Order's statement cannot be reconciled with its acknowledgment (at p. 21) that these members' injuries include their reduced use and enjoyment of the Delta due to Alabama Power's plan to perpetuate forever the ongoing pollution and risk of a catastrophic coal ash spill by leaving millions of tons of coal ash sitting in water beside the river.  The declarants testify that Alabama Power's approved closure plan for the coal ash impoundment is a major concern for them, and non-compliant closure based on the plan is reducing their use and enjoyment of the Mobile River and the Delta.  Doc. 1-3, Decl. of Kendall Dexter, PageID # 42; Decl. of Marl

Cummings, PageID # 44-45; Decl. of Dr. Luke Adams, PageID # 48; Decl. of Vaughn Millner, PageID # 53. For this additional reason, these members would *not* have been injured "in precisely the same way" absent Alabama Power's non-compliant closure plan. Order at 25-26. The plan dictates the closure methods, which leaves ash in water, which is directly tied to Baykeeper's injuries. Non-compliant closure is directly linked to the injuries; by leaving saturated ash in the leaking impoundment, it exacerbates them and will perpetuate them permanently.

Yet, the Order finds a "mismatch" between the alleged misconduct and the injury. The Order reaches that conclusion by mischaracterizing Baykeeper's claims in a manner that conflicts with the Complaint and with the Order's description of Baykeeper's injuries. Specifically, the Order shifts from correctly characterizing the misconduct as closure leaving saturated coal ash within the unlined impoundment[2] (which causes the pollution) to calling the misconduct "deficiencies . . . in the closure plan for the Plant Barry Ash Pond." Order at 25-26. But Baykeeper's claims are not merely about paperwork deficiencies as to the plan; it is the ongoing closure process itself, and this is made clear throughout the Complaint.[3] That process is leaving saturated ash in an unlined pit, perpetuating the contamination and risks. Alabama Power leaving saturated ash in its leaking impoundment causes *both* Baykeeper's injuries *and* the violations of the closure requirements. When characterized correctly, there is no "mismatch."

---

[2] On page 26, the Order correctly describes the misconduct as "implementing the closure plan," not the mere preparation of a faulty closure plan.

[3] Baykeeper's Complaint alleges the non-compliant closure *process* will *continue* to impound groundwater and allow leaching of pollutants (Doc. 1 at 1); that the non-compliant closure "practices" fail to satisfy performance standards and constitute open dumping in violation of RCRA (Doc. 1 at 2); that Alabama Power is violating the Rule and RCRA by "proceeding with its plan" to cap the impoundment which has the effect of "continuing the ongoing pollution…" (Doc. 1 at 5); and that Alabama Power violates the Rule and RCRA by "carrying out its plan for capping in place and by implementing the plan…: (Doc. 1 at 17). Baykeeper seeks injunctive relief to "prevent Alabama Power from implementing this illegal closure plan." *Id., Prayer For Relief.*

As discussed further below, the Order incorrectly states that longstanding pollution negates causation here.  The decision in *Ass'n of Irritated Residents v. U.S. EPA* illustrates that suing on a plan intended to reduce preexisting pollution can satisfy the traceability requirement. Plaintiffs there sued over EPA's approval of California's plan for meeting the air quality standard for ozone in the San Joaquin Valley, which included a contingency measure should the plan not make reasonable progress. 10 F.4th 937, 941 (9th Cir. 2021). The group alleged that the plan did not sufficiently reduce emissions. *Id.* at 945. The state challenged the group's standing because the group's injuries, which included "credible" threats to their well-being, were "not caused by the EPA's approval of the contingency measure in the State's plan . . . because the contingency measure has not yet been activated, so its implementation is merely 'hypothetical.'"  *Id.* at 943. The Ninth Circuit correctly rejected this argument, reasoning that "[a]n injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical or tenuous and remain plausible."  *Id.* (internal citation and quotation omitted).  Because the Valley "has long been an area with some of the worst air quality in the United States," the court reasoned that "[t]he threat that the Valley will continue to fail to meet the ozone standard—and therefore that the contingency measure will be activated—is neither conjectural nor hypothetical, but a reasonable inference from the historical record." *Id.* at 944.

Likewise, the injuries alleged by Baykeeper are causally connected to the challenged closure plan, because its implementation leaves ash in water and perpetuates the pollution. The implementation of the non-compliant closure plan will unquestionably cause, contribute to, and perpetuate forever the recreational and aesthetic harm to Baykeeper's members rather than abating it as the Rule requires.  The threat that Alabama Power will perpetually leak coal ash into

surrounding waterways is not "conjectural nor hypothetical, but a reasonable inference from the historical record." *See id.*

Thus, the Order misconstrues the conduct complained of—non-compliant closure which is leaving ash in water in violation of the Rule's performance standards—and makes a clear error in concluding that there is a "mismatch" in the injuries established and the misconduct by Alabama Power, which will continue harming Baykeeper by leaving coal ash saturated and leaking in perpetuity.

*2. Members' Present Injuries Are Not Negated by Past Pollution.*

The Order states that because Plant Barry's coal ash impoundment has been leaking for decades, ongoing pollution now that closure is underway is somehow not fairly traceable to the implementation of the challenged closure plan that leaves ash saturated in water within the leaking impoundment.  Order at 26.  But the fact that Alabama Power has contaminated groundwater and surrounding surface waters for many years does not negate members' injuries from the pollution Alabama Power is releasing now, the pollution it will release while it continues to implement its closure plan, and the pollution it will release after this defective closure is complete.[4]  In fact, documented past pollution supports the reasonableness of members' concerns about Alabama Power's plan to perpetuate these harms forever by leaving coal ash sitting in water, where it will continue to leach out pollutants into the Delta, and continue the threat of a catastrophic failure.

The purpose of the Rule's closure performance standards is to stop the leaching of pollutants into the surrounding waters—which is the injury at the heart of Baykeeper's Complaint.

---

[4] Further, Baykeeper's allegations of ongoing pollution are critical to proving a continuing violation, as required under 42 U.S.C. § 6972(a)(1)(A).  *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1010 n.20 (11th Cir. 2004) ("[A] continuous or ongoing violation is required for liability to attach under the RCRA.").

As EPA stated in the Preamble to the Rule, "many existing CCR surface impoundments are *currently leaking . . . . These are the risks the disposal rule specifically seeks to address.*" 80 Fed. Reg. 21,301, 21,343 (Apr. 17, 2015) (emphasis added). The Rule was promulgated to achieve the standard in RCRA Section 4004(a) of "no reasonable probability of adverse effects on health or the environment from disposal of solid waste." 42 U.S.C. § 6944(a). As also stated in the Preamble, the Rule's performance standards play a crucial role in achieving this standard: a "significant component supporting EPA's determination that the technical requirements will achieve the level of protection required under section 4004(a) is the performance standards that the rules lay out." 80 Fed. Reg. at 21,335. Alabama Power's failure to comply with these remedial requirements is fairly traceable to the ongoing pollution harming Baykeeper's members.

As the Order recognizes, closure activities have already begun and have been underway since 2019. Order at 26. At this point it is the implementation of this defective, non-compliant closure plan that is leaving coal ash saturated in water and leaching pollutants, exacerbating the members' diminished use and enjoyment of the waterways. Alabama Power's closure challenged here is far beyond the filing of paperwork; Baykeeper's claims apply to the actual, ongoing closure.

In particular, the Order misapprehends the requirements Baykeeper seeks to enforce by assuming they do not apply until construction of a final cover system "conclude[s]." *Id.* at 27. But the Rule states that free liquids must be eliminated "prior to *installing*" the final cover system. 40 C.F.R. § 257.102(d)(2)(i) (emphasis added). "Installing" is a present participle, which is the verb form that "expresses present action"—not completed action.[5] The Order misreads this requirement as not applying until the completion of the final cover system, when the Rule says the opposite:

---

[5] *Present Participle*, Merriam Webster, https://www.merriam-webster.com/dictionary/present%20participle (last visited Jan. 23, 2024).

this elimination must be accomplished "*prior to* installing" the final cover system.  40 C.F.R. § 257.102(d)(2)(i) (emphasis added).  As the Order correctly notes, "installation . . . began in 2020," meaning that the requirement to eliminate free liquids has been enforceable at least since that time. Order at 27.  And Alabama Power's ongoing implementation of a closure method that fails to eliminate free liquids is a direct cause of the ongoing leaching of pollutants out of the impoundment and into the surrounding waterways.  Thus, the injuries set out in the Complaint are caused by Alabama Power's failure to comply with the closure requirements of the Rule.

Alabama Power's pre-closure pollution in past decades cannot vitiate Baykeeper's standing to bring this action.  If it did, the Rule would be rendered unenforceable by any citizen because it is well known that utility coal ash impoundments like Plant Barry have been leaking for decades. Indeed, that very ongoing, legacy pollution was the impetus for the CCR Rule closure requirements to begin with.  The traceability result reached in the Order based on pre-existing pollution turns standing doctrine and the Rule on their heads.

   *3. The Order Misapplies the Law of this Circuit on Traceability.*

The federal CCR Rule requires all active utility coal ash impoundments, including the Plant Barry impoundment, to close.  40 C.F.R. § 257.101.  There is no scenario in which the impoundment would sit open in perpetuity.  It will either close in compliance with the Rule, or it will close in violation of its requirements.

Thus, the Order compares the current situation to the wrong baseline in evaluating traceability in a way no party argued.  Order at 28 (citing *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023)).  *Walters* stated that traceability is lacking "if the plaintiff 'would have been injured in precisely the same way' *without the defendant's alleged misconduct*."  60 F.4th at 650 (internal citation omitted) (emphasis added).  Using that rubric, the "alleged misconduct" asserted

9

by Baykeeper is non-compliant closure with coal ash saturated in water. And the probative question is whether Baykeeper's members would be injured in precisely the same way if Alabama Power were closing the impoundment in compliance with the Rule, by removing the water from the ash. The answer to that question is plainly "No," based on the allegations in the Complaint. If the Plant Barry impoundment were being closed in compliance with the Rule's requirements, Alabama Power would currently be taking active steps to control and reduce the source of the pollution by implementing a plan that separated the coal ash entirely from the surrounding waters, as the Rule requires. The harm to Baykeeper's members, which the Order determined to be concrete, will continue unabated if the impoundment is closed in a non-compliant manner, leaving coal ash in water, whereas the harm will be redressed if the impoundment is closed in a compliant manner. The question is *not* what harm would result if Alabama Power "never beg[a]n closing the Plant Barry Ash Pond" at all. Order at 28. Indeed, that is not an option—a refusal to close would only constitute additional "misconduct" and violation of the Rule.

The Order's reliance on *Roanoke River Basin Association v. Duke Energy* is also misplaced. Order at 28 (citing 1:17-cv-707, 2018 WL 2417862 (M.D.N.C. May 29, 2018)). While the Order states that the lack of state approval and far-off commencement of closure in the *Roanoke* case "is a distinction without a difference with respect to the causation analysis quoted here," *id.* at 28 n.4, the passage quoted in the Order shows there is a very significant difference: the *Roanoke* court held it was Duke Energy's "*preparation* of an *initial* Closure Plan" that was disconnected from the members' injuries. *Id.* at *5 (emphasis added).

Unlike this case, in *Roanoke*, an *initial* published plan was the subject of the challenge. When the suit was filed, Duke Energy still had more than *twenty months* under North Carolina regulations to submit the proposed plan to state regulators for approval, and it could not begin

implementation of the plan until after the state granted approval. *Id.* at \*7. Based on those particular facts—including an intervening state process—the court ruled that the plaintiffs would not necessarily "experience any effects" of the initial plan and therefore deemed it too remote and speculative to make the case justiciable. *Id.*

The situation in this case is entirely different. Plaintiffs are currently experiencing the effects: as the Order recognizes, Alabama Power has been implementing its state-approved closure plan for years, and it is obligated to do so by the terms of its state permit. Pollution is happening *because* the plan fails to address the pollution source, the coal ash saturated in groundwater within the impoundment. Accordingly, the harms to Baykeeper's members are more than "fairly" traceable to this defective closure plan—they are directly connected to Alabama Power's ongoing closure of the impoundment leaving coal ash saturated in water.

**B. The Order Errs in Finding the Requested Remedy Will Not Redress Baykeeper's Injuries.**

The Order cites the correct standard for redressability—that the injury (here, recreational and aesthetic harm) will "likely" be redressed by a favorable decision in that such decision will prevent or redress the injury, in whole or in part. Order at 28-29. At the motion to dismiss stage, the burden to prove redressability is "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997).

However, as discussed above, the Order mischaracterizes the claims and relief sought and applies nonexistent standards. The Order assumes that requiring a compliant closure plan would be merely procedural, Order at 29, and assumes that the real-world relief afforded by enforcement of the Rule's closure standards does not count for redressability because it supposedly "will not truly manifest" for many years. *Id.* at 30. These are clear errors of law and fact that require correction, as set out below.

11

Most fundamentally, the Order misapprehends that the very purpose of the CCR Rule's closure requirements is to cure the ongoing leaking of pollution from unlined coal ash impoundments and the long-term risk of a catastrophic failure, which are the concrete injuries that the Order acknowledges are present in this case. The Rule's Preamble references both TVA's 2008 Kingston coal ash spill and Duke Energy's 2014 Dan River spill, as well as the fact that "many existing CCR surface impoundments are currently leaking, and states, "*[t]hese are the risks the disposal rule specifically seeks to address*." 80 Fed. Reg. at 21,343 (emphasis added). In other words, the Rule itself confirms there is a direct connection between the relief requested in this case (compliant closure) and redress of the injuries set out in the Complaint (reducing the risks of ongoing pollution and catastrophic failure).

The Order first states that ordering compliant closure would only fix a "procedural injury," not the concrete injuries Baykeeper has established. Order at 29. The Order again appears to conflate the facts of this case with those in *Roanoke,* where the plan had not received state approval or permitting and was not being implemented. Baykeeper seeks relief not for procedural injuries but rather for its members' concrete injuries tied to ongoing pollution perpetuated by the implementation of the defective closure plan. The Order also ignores the fact that the posting of a compliant closure plan is required under the Rule to describe "how the CCR unit will be closed" and to set out the method of closure in order to proceed. The closure plan itself determines what will happen at the Plant Barry site and is not merely a procedural filing; instead, it is a necessary step in providing relief on the ground. 40 C.F.R. § 257.102(b). Ordering compliant closure pursuant to a compliant closure plan will not fix just a procedural injury—it will directly prevent and redress the members' actual, concrete injuries by abating the pollution that is the source of those injuries.

12

The Order goes on to make unsupported factual assumptions about the remedy sought in this case, without the benefit of discovery or expert testimony, which is improper. *See Bischoff v. Osceola*, 222 F.3d 874, 881 (11th Cir. 2000) ("*The court must resolve any genuine disputed factual issue concerning standing, either through a pretrial evidentiary proceeding or a trial itself.*") (internal citation and quotation omitted) (emphasis in original); *Klinedinst v. Swift Inv., Inc.*, 260 F.3d 1251, 1257 (11th Cir. 2001) (reversing lower court's order granting summary judgment based on erroneous factual assumption).

Specifically, the Order incorrectly states that "ordering [Alabama Power] to execute a closure plan that complies with 40 C.F.R. § 257.102(d)(1)(i-ii) and (d)(2)(i) would not make it 'substantially likely' that Plant Barry's coal ash leaching would cease any time soon." Order at 29. While Alabama Power never made such an argument, the Order relies on this assumption to deny redressability. This "any time soon" temporal element for redressability is not found in the case law dealing with environmental harm, as discussed below. In addition to that clear legal error, there are several fundamental errors associated with this statement and other factual assumptions underlying the Order's legal conclusions.

First, the assumption directly conflicts with Baykeeper's well-pleaded allegations. As set out in the Complaint, "under Alabama Power's current Closure Plans and the state permit issued by ADEM, contamination will continue indefinitely into the future," Doc. 1 at ¶ 49, "causing continued pollution and perpetuating the risks to Baykeeper and its members, as well as the water resources of the Mobile-Tensaw Delta that they depend on—unless the closure requirements of the federal CCR Rule are enforced at Plant Barry." *Id.* at ¶ 13; *see also* fn. 3 above. These allegations must be credited on a motion to dismiss, and they make clear that the requested relief will stop the injuries alleged.

Second, the Order's assumptions, which encompass complex scientific issues, have no factual basis.  The Order opines that ordering Alabama Power to "eliminate free liquids by removing liquid wastes prior to installing the final cover system would do nothing to address Plant Barry's ongoing groundwater contamination when the system will not be installed until August 2030."  Order at 29 (emphasis in original).  Alabama Power did not make such an argument, there is no factual basis in the record to support the statement, and this statement is simply incorrect.  There is ample evidence that implementing a coal ash closure that removes free liquids, precludes impoundment of water, and prevents infiltration of liquids into the ash has immediate benefits in reducing pollution levels and risk, long before closure is complete.

As the attached expert declaration explains, implementation of closure in compliance with the Rule "would reduce most of these environmental impacts and reduce the environmental risks (*i.e.*, injuries to Baykeeper will be reduced), and the ultimate removal of all coal ash will then permanently eliminate the environmental impacts and risks (*i.e.*, injuries to Baykeeper will be eliminated)."  Ex. 1, Brown Decl. at ¶ 55.  Where unlined coal ash impoundments have been closed and excavated in a coastal area like Plant Barry and in another arsenic-contaminated site below the fall line, reduction in pollution of the surrounding environment began soon after ash excavation *started*, years before closure was completed.  Closure activities at these sites reduced "the discharge of contaminated groundwater to surface waters, *with beneficial effects long before the completion of closure*."  *Id.* at ¶¶ 30, 50 (emphasis added).  Arsenic levels in nearby groundwater "have declined dramatically" after excavation of coal ash began.  *Id.* at ¶ 49.  Further, at the Grainger site, ongoing excavation prevented coal ash catastrophes in 2018 and 2019, before closure had been completed, when hurricane flood waters inundated the coal ash impoundments

for the first time.[6]  The benefits of proper closure do not start when the closure is completed, 10 or more years after the cleanup begins—water pollution declines during dewatering and cleanup, and the risk of coal ash catastrophe declines with each passing day of ash removal.  But the Order reaches the opposite conclusion based on mistaken factual assumptions made prior to discovery and without the benefit of a factual record.

The third error in the quoted statement is the implication that an order of this Court must cause all coal ash leaching to "cease" to satisfy the redressability standard.  Order at 29.  That is simply not the case, as the Order itself acknowledges elsewhere; even a substantial likelihood of "partial relief" suffices.  *Id.*  And as just described above, closing a coal ash impoundment in a way that controls the source of the pollution can begin providing relief early in the closure process by reducing high levels of arsenic pollution like those at Plant Barry.  Moreover, as set out in the preceding section, Baykeeper's injuries include reduced use and enjoyment of the waterways due to their concerns about Alabama Power's non-compliant closure plan and the ongoing pollution and long-term risks to which it subjects them; consequently, ordering a closure plan that complies with the CCR Rule would also begin providing relief for this injury immediately.

Fourth, the Order applies the wrong standard for redressability by stating that the relevant consideration is whether relief would be afforded "any time soon."  Order at 29.  Redressability is based on whether—not how soon—the requested relief would alleviate the plaintiff's injury: the test is that relief must be "likely" rather than merely "speculative."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Where relief from injury depends on the contingent actions of third parties, courts have found redressability lacking because they cannot bind the actors who could provide relief.  *E.g.*, *id.* at 570-71.  But here, no conjecture or third-party actions are required for

---

[6] *See infra* nn.7-9.

the requested relief to address the injuries from pollution and long-term risk set out in the Complaint, and the Order does not—and could not—question that implementing a compliant closure plan would in fact stop the ongoing pollution and alleviate the risk of a spill.  That should be the end of the matter.

Baykeeper is aware of no case that supports the notion that redress must come within some undefined time period described as "soon" in order to count.  Order at 29.  On the contrary, environmental cases can take decades to remediate pollution.  For example, in a case cited in the Order, *South River Watershed Alliance, Inc. v. Dekalb County,* EPA and the Georgia Department of Natural Resources filed a complaint against the County in 2010, and entered into a consent decree in 2011; South River Watershed Alliance filed a notice of intent to sue for violations of the consent decree in 2019, resulting in a modification of the consent decree to require additional remedial actions by the County that would not achieve compliance until 2027.  69 F.4th 809 (11th Cir. 2023); Modification to Consent Decree at 21, *United States v. Dekalb Cty., Ga*., Civ. No. 1:10-cv-04039-SDG (N.D. Ga. Sept. 22, 2021).  The Eleventh Circuit found that the plaintiff met the redressability element of standing, because "[t]he water quality of the Chattahoochee and South Rivers would likely be improved if the court implemented an injunction requiring DeKalb County to take additional steps . . . ."  69 F.4th at 820.  A particular time limit by which relief must be provided has no place in this analysis.

Thus, while the Order appears to fault Baykeeper's requested relief—which like any remedy will take time to implement—for not stopping members' "instant," "ongoing" harms, what matters is the fact that the performance standards required for closure under the Rule will stop these harms, just as they were designed to do.  No environmental remedy has instantaneous effect, and that is not the standard for redressability.  Generally, there is no test for standing that the

requested relief provide an instantaneous cure or immediately correct the harm complained of.  If that were the law, the plaintiffs in *Brown v. Board of Education*, and any other case that requires a long remediation period, would have lacked standing.

The Order compounds these errors by repeating the incorrect statement that free liquids need not be removed until installation of the final cover system is complete (and thus the cover is supposedly "installed," Order at 29), whereas in fact—as discussed in the preceding section—the requirement to remove free liquids applies "prior to" "installing" the cover, a process that has already begun.

Finally, the Order appears to fault or question Baykeeper for not bringing a different RCRA claim. *Id.* at 30.  But Congress set out two RCRA causes of action enforceable by citizen suit, one of which Baykeeper asserts here.  An open dumping claim for a violation of the CCR Rule's requirements triggers no additional standing burden and hardly undermines Baykeeper's standing. In fact, Baykeeper has pursued enforcement of the exact regulation adopted by EPA pursuant to RCRA that is designed to address the risks of leaking coal ash impoundments and thus is designed to cure the injuries the Complaint is brought to address.  The Rule's closure requirements are in effect now, and compliance with their terms is the most direct way to stop the ongoing pollution and risks caused by Alabama Power's non-compliant closure of the impoundment leaving tons of coal ash sitting in water on the banks of the Mobile River.

## II. The Order Erroneously Held this Case Is Not Ripe.

### A.  The Order Violates the Separation of Powers.

The Order correctly notes that ripeness is a doctrine designed in part to advance the separation of powers and to respect limitations on judicial power.  But the Order uses the concept of ripeness to overrule the decisions that Congress made when it wrote RCRA and passed the

WIIN Act.  Under the Order, citizens cannot enforce the CCR Rule if EPA has merely initiated settlement discussions with a proposed violator, when the statute plainly allows citizen enforcement absent actual diligent prosecution of a court action by EPA.  The Order finds that EPA's predicted denial of Alabama's CCR permitting program application justifies blocking citizen enforcement, when Congress did not so provide in the WIIN Act.

In these ways, the Order contravenes the separation of powers.  Congress itself authorized citizen enforcement of RCRA and RCRA regulations.  *Williams v. Ala. Dep't of Transp.*, 119 F.Supp.2d 1249, 1256 (M.D. Ala. 2000) ("RCRA's standing provisions allow 'any person' to bring suit.  In choosing this language and conferring standing to the fullest extent permitted by Article III, Congress sought to maximize the number of potential enforcers of environmental regulations.") (internal citation omitted).  The matters that the Order relies upon to find lack of ripeness are procedures that Congress itself created: EPA's RCRA enforcement activities and EPA's review of a state's CCR Rule permitting program application.  But when Congress wrote RCRA and the WIIN Act, it created these procedures while expressly providing that only EPA court enforcement would block a citizen enforcement action; it deliberately did not give such effect to other EPA enforcement activities or EPA review of a state's permitting program application— the "contingencies" cited by the Order.  The Order effectively writes into RCRA limitations on Congressionally-authorized citizen enforcement based on procedures *created by Congress*, when Congress itself chose not to give those Congressionally-created processes that effect.

## B. Baykeeper Is Harmed Now By Preventing Timely Enforcement of the Closure Performance Standards.

The Order makes the factual finding that "[t]he Court cannot impose any <u>incremental</u> harm by deferring review to a date closer to the project's estimated 2031 completion date when, even if granted, *Baykeeper's requested relief would not affect the polluting impoundment until that point*

18

*anyway.*"  *Id.* at 35 (emphasis added).  The Order makes the additional factual finding that "*granting Baykeeper's relief would not affect the ongoing leaching until much closer to August 2030.*" *Id.* (emphasis added).  These statements are factually and legally incorrect.

These statements are mistaken factual findings made on a motion to dismiss without discovery or the development of a factual record.  As the attached expert declaration demonstrates, when utilities have undertaken closure by removal—which complies with the performance standards of the CCR Rule—pollution abatement has begun early in the process, "long before the completion of closure," not only at the end of the process when closure is complete.  Ex. 1 ¶¶ 30, 50.  The declaration sets out that at other coal ash sites, including one in a similar setting on the banks of a coastal river (Grainger), the initiation and carrying out of the process of dewatering and ash removal, not just the final completion of closure, significantly reduced arsenic groundwater contamination: "[A]s a result of the dewatering and concomitant excavation and removal of coal ash waste at GGS [Grainger] and WGS [Wateree], *environmental impacts and risks declined during closure implementation* and these injuries were eliminated after closure was complete." *Id.* ¶ 55 (emphasis added).

Further, ongoing removal protects against catastrophe and failure in the face of floods and hurricanes.  At the Grainger site in South Carolina, the utility claimed—like Alabama Power— that its coal ash impoundments had never been flooded or failed and it was safe to leave ash in place in unlined pits.  After citizen enforcement, in 2013 the utility agreed to excavate the coal ash impoundments.  In 2018, flood waters from Hurricane Florence for the first time inundated one impoundment, but a historic environmental catastrophe was avoided because that impoundment

had been excavated,[7] even though the cleanup had not been completed and coal ash remained in a second impoundment.[8] The next year, another historic hurricane-related flood overcame both impoundments, but by then the coal ash had been removed from the second impoundment also, though the cleanup had not yet been completed.[9] As these factual examples show, the Order errs by making an essential factual finding and faulty assumptions on a motion to dismiss without allowing full discovery.

As a logical matter, it is also incorrect to find there is no harm to postponing enforcement of the CCR Rule until 2031 after Alabama Power has finished its closure. Every day that goes by without an effective and legal closure of the Plant Barry coal ash impoundment, the unlined coal ash pit discharges pollution into the surrounding environment. And every day, this industrial waste stored on the banks of the Mobile-Tensaw Delta is subject to hurricanes, flooding, storm events, and water level rise. As this litigation illustrates, even if the Baykeeper were allowed to initiate enforcement in 2031, compliance with the law and elimination of environmental harm could take years more to obtain. Delaying enforcement guarantees incremental harm to Baykeeper and the environment. The injuries to Baykeeper recognized in the Order (at pp. 22-23) arise directly from the ongoing, serious environmental harm from leaking and risky coal ash impoundments that the

---

[7] Michael Biesecker, *Dam Breach at N.C. Power Plant Causes Coal Ash Spill into Cape Fear River*, Insurance Journal (Sept. 24, 2018) ("South Carolina's state-owned utility said floodwaters had also entered a coal ash dump at its closed Grainger plant near Conway. . . . [N]o significant environmental impact is expected because nearly all the ash has been removed from the basin"), https://www.insurancejournal.com/news/southeast/2018/09/24/502096.htm.
[8] Thad Moore, *Flooded SC river within inches of spilling into coal ash pit with 200,000 tons of waste*, Charleston Post & Courier (Sept. 25, 2018), https://www.postandcourier.com/news/flooded-sc-river-within-inches-of-spilling-into-coal-ash-pit-with-200-000-tons/article_b32ab830-c0c0-11e8-9f36-c3a9518cf2dd.html.
[9] WLTX, *Former Grainger ash pond breached in Hurricane Dorian flooding* (Sept. 8, 2019), https://www.wltx.com/article/news/local/waccamaw-river-floods-santee-cooper-ash-pond-conway/101-f133a8f9-b9c4-45e9-9f68-b4690c2ff6ea.

20

CCR Rule was promulgated to abate, and prompt citizen enforcement is the intended mechanism to ensure timely compliance, which will in turn remediate the contamination. Logically, the sooner the remediation begins the better. Delaying enforcement until completion of a non-compliant closure process would defeat the purpose and objectives of the Rule. Certainly, a decision to delay this action and put off effective remediation should not be based on the faulty factual and scientific assumptions contained in the Order.

Under the Rule's express requirements, the steps to stop pollution and protect against a coal ash catastrophe start long before the completion of closure. "[P]rior to installing the final cover system," Alabama Power must eliminate free liquids—water—from the impoundment. 40 C.F.R. §257.102(d)(2)(i). Relevant to that requirement, the Order overlooks a very important fact established in the briefing—Alabama Power does not dispute that large amounts of water-saturated ash are contained in the impoundment, and that under its proposed cap in place, anywhere from 1 million (according to Alabama Power) to 5 million (according to the EPA) tons will remain in water. *See* Doc. 99 at 9-10. Alabama Power's primary argument in its motion to dismiss is that leaving coal ash saturated in water and leaking pollutants from an unlined impoundment complies with the Rule, not that the pollution is not ongoing or that Baykeeper's injuries are not tied to it.

This closure standard can be satisfied by excavating the ash and moving it to dry, lined storage—which Duke Energy, the largest utility in the region, has determined is the only effective and cost-effective method,[10] or by recycling it. That removal would occur not all at once on a day

---

[10] Duke Energy has warned that for coal ash units located in floodplains and wetlands, like Plant Barry, "closure by removal of all or the vast majority of the CCR is the only closure option that can reliably and cost-effectively meet the federal CCR closure performance standards"; and that "[e]ven when closure in place can be engineered to comply with the federal closure performance standards . . .closure by removal is often more prudent and cost-effective." Duke Energy Testimony before the S.C. Pub. Serv. Comm'n, Doc. 61-3 at 16-17.

in 2031, but rather over time through a period of years as soon as the process of cleanup begins. As ash is removed, the amount of ash at risk of catastrophic failure and the amount of ash acting as a source of continuing water pollution is reduced.  Ex. 1 ¶ 19.  Alabama Power has not set out any engineering alternative to removal, and Duke Energy has determined there is not a desirable alternative;[11] but if an engineering alternative were found that would remove free liquids permanently from the unlined impoundment and satisfy the closure performance standards, that solution would be put in place during the course of implementing closure—not all at once in 2031. Ex. 1 ¶ 17.  Thus, the benefits of compliance with the Rule begin immediately upon the initiation of compliant closure, not at the end of the process as the Order incorrectly presumes.

The same is true of the other requirements to preclude the probability of future impoundment of water and coal ash slurry and to address the flow of water and contaminants into and out of the impoundment.  40 C.F.R. § 257.102(d)(1)(i) and (ii).  Those requirements are not put in place on a date in 2031 but are installed over time during the years of closure and cleanup of the site.  As the process is carried out, the source of the pollution—the unlined coal ash storage— is reduced, as is the magnitude of the consequences of catastrophic failure.  Ex. 1 ¶¶ 18-19.

At the very least, whether there are benefits to compliant closure prior to 2031 and whether there is harm to postponing compliant closure until after 2031 are factual issues that should not be resolved until after discovery and the full factual development of the case. Granting a motion to dismiss based on inaccurate factual assumptions, with no factual record on these scientific subjects, represents a clear error that rises to the level of manifest injustice.

---

[11] *Id.*

**C.  This Case Is Fit for Adjudication Now.**

Throughout the ripeness discussion the Order finds "contingencies" that supposedly make the case unripe for decision.  *E.g.*, Order at 36.  As explained below, the Order is incorrect in its interpretation of these issues and their significance.  But as a threshold matter, the Order's speculation about "contingencies" that *might* change the current closure plan or the CCR Rule requirements to which it is subject does not provide a valid reason to rule this case unripe.

In other cases, this Court has correctly concluded that the *present* circumstances are what matters for the ripeness analysis: "[T]his Court declines to speculate on whether the default judgment will be vacated.  At present, the existence of the default judgment makes Wesco's duty to indemnify claim ripe."  *Wesco Ins. Co. v. M.O.S. Express, Inc.*, No. CV 2:21-00374-KD-N, 2021 WL 6206354, at *7 n.13 (S.D. Ala. Dec. 13, 2021), *report and recommendation adopted*, No. CV 2:21-00374-KD-N, 2022 WL 19352 (S.D. Ala. Jan. 3, 2022).  Multiple Courts of Appeals have confirmed this is the correct approach.  As one explained, "when determining whether a case is ripe, 'we must be careful not to ... speculate about "hypothetical" or "imaginary" cases[.]'"  *Warshak v. United States*, 532 F.3d 521, 529 (6th Cir. 2008) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).  Likewise, another Court of Appeals concluded that the possibility of a future change in position—like the potential changes contemplated in the Order—was insufficient to render the case unripe: "The suggestion that the Secretary may reverse his position at a subsequent date is far too speculative to cause us to refrain from deciding a case that is now ripe for decision."  *Am. Air Liquide, Inc. v. Comm'r*, 45 F.App'x 721, 722-23 (9th Cir. 2002)).

Here, Alabama Power has made its position abundantly clear that it does not believe it is required to separate its coal ash from water, and the company shows no sign of changing its mind

on that point.  Instead, Alabama Power is continuing to construct its defective closure plan in violation of the Rule's performance standards.

Alabama Power did announce recently that it has entered into an agreement to recycle an unspecified amount of coal ash at Plant Barry, but the company also made clear that this announcement is not a new closure method and that the project does not change its plan to cap the coal ash in its unlined impoundment in place.  An Alabama Power spokesperson stated,  "Our plans for all ash ponds remain the same—to close in place—as offered by the EPA rule and approved by ADEM."[12]  Consistent with Alabama Power's publicly stated intention to stick with its defective closure plan, Alabama Power has not changed the CCR Rule closure plan document on its CCR Rule disclosure website,[13] and to Baykeeper's knowledge has not sought to modify its state permit, which authorizes and requires this defective closure plan.  Without a new approved closure plan that excavates or otherwise stops the coal ash in the lower portions of the impoundment from being saturated and leaching out pollutants, this announcement does not change Alabama Power's violations of the Rule's closure standards and does not alleviate Baykeeper's injuries.  In terms of the Rule's requirements, Alabama Power has consciously not changed its closure plan, nor has it sought to change its binding state permit.

As the Order notes, ripeness is a doctrine that bars a plaintiff's claim where judicial review is premature "because of speculative injuries that may never occur . . . ."  Order at 32 (citing *Ala.*

---

[12] Dennis Pillion, *Alabama Power announces plan to remove, recycle coal ash in Mobile*, AL.com (Jan. 26, 2024), https://www.al.com/news/2024/01/after-push-from-epa-alabama-power-announces-plan-to-remove-recycle-coal-ash-in-mobile.html.
[13] Alabama Power, Amended Closure Plan for Ash Pond – Plant Barry (Apr. 1, 2020), https://www.alabamapower.com/content/dam/alabama-power/pdfs-docs/company/how-we-operate/ccr/plant-barry/ash-pond/closure-and-post-closure/Barry%20Ash%20Pond%20Amended%20Closure%20Plan%20Rev%201%20April%202020%20-%20Updated.pdf.

*Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300, 1310 n.9 (11th Cir. 2002)).  But there is no such speculation in Baykeeper's injuries.  Their present and ongoing injuries were clearly noted in the injury-in-fact section of the Order.  And their claims for relief are based on the CCR Rule's requirements that are in effect now and on the approved and permitted closure plan of Alabama Power that is actively in the process of being implemented; indeed, Alabama Power is bound to do so by the terms of its state permit, and its closure plan has been clearly set out on its CCR Rule-required website for years, without any change.  Claims based on these facts and standards are ripe.

The Order mistakenly relies on speculation that either EPA's proposed denial of Alabama's CCR permitting program or EPA's investigation and Notice of Potential Violation *might* cause Alabama Power to amend its closure plan and procedures.  The Court need not and should not rely on such speculation.  Alabama Power has shown no inclination whatsoever to change its closure method set out on its CCR Rule website and its binding state permit.  Alabama Power's recent public statements confirm it is sticking with this closure plan and that it disclaims any intent to change.  EPA has stated that Alabama Power failed to present information that would alleviate the violations of the closure standards that EPA set out in its Notice.  *See* Doc. 102-1 at 2.  Alabama Power is proceeding forward with the closure plan that will leave ash in water forever, and it does not contend otherwise.  When confronted with this enforcement action, Alabama Power didn't alter anything—it doubled down and argued that the Rule permits it to leave coal ash in water.  Thus, the Order's speculation is improper and without basis.

The Order notes that Alabama Power has amended its closure plan twice, with the latest amendment in April 2020.  It is important to note that almost four years have passed with no subsequent changes.  Order at 27 n.3.  Further, those changes made years ago are irrelevant because

since April 2020, ADEM has issued a binding state CCR permit which sets out how Alabama Power *must* close the Plant Barry impoundment, and the closure plan has not been amended since. As the Order states, Alabama Power is carrying out that closure according to the permit and has spent over a quarter billion dollars doing so. *Id.* at 6. The method of closure of the Plant Barry impoundment is now definite and underway. Alabama Power's recent announcement that it will stick with its cap-in-place plan even though it plans to recycle some ash at Plant Barry confirms that Alabama Power is fully committed to its current plan.

The prior amendments and other developments, discussed below, lead the Order to state that the closure performance standard under the CCR Rule "will likely not crystallize for years." *Id.* at 36. But the 2015 CCR Rule performance standards set out at 40 C.F.R. § 257.102(d), which form the basis of the Complaint, have been in place for eight years and cannot be changed by Alabama Power, settlement negotiations, or any of the cited developments. Industry litigants, including Alabama Power, may be contesting the meaning of the plain language of the Rule's standards, but the federal courts are charged with the jurisdiction to resolve those legal issues and enforce the Rule. To the extent the Order means to refer to Alabama Power's implemented closure approach, that closure is set out in a permit that is binding under Alabama law. Thus, both the Rule's performance standards and the permitted closure approach that violates those standards are fully "crystallized" and fixed today.

The Order predicts that EPA will deny Alabama's application to operate a CCR permitting program in lieu of the federal CCR Rule, and states that if EPA issues a final denial, "that would leave Alabama in unchartered waters as the only state with EPA denial of its state CCR permitting program." Order at 37. But that denial would not create uncertainty or put Alabama in a unique category. Alabama would be in exactly the same position as 46 other states that lack an approved

CCR Rule permitting program, and Alabama would be in exactly the same position it has been in since the CCR Rule was adopted in 2015: Alabama would not be operating an EPA-approved CCR permitting program but rather only its state permitting program, just like 46 other states. Enforcement of the federal CCR Rule in Alabama would thus continue to be, as it has been since 2015, only through federal court enforcement actions such as this one.

The Order supposes that a final EPA denial of Alabama's permitting program application "makes it more likely that Alabama Power will be forced to amend its closure plan to some extent." *Id.* at 38. There is no legal or factual basis for this entirely speculative statement. EPA's predicted denial will not change the state of coal ash regulation in Alabama. Before Alabama applied for approval of its permitting program, since it applied, and after the predicted EPA final denial decision, ADEM administers Alabama's state regulations, and the federal CCR Rule is enforceable by federal court enforcement suits. EPA's predicted denial has no impact whatsoever on Alabama Power's obligation under Alabama law to obey the permit that ADEM has issued. Alabama Power will be, as it is now, subject to both federal and less-stringent state requirements. The federal CCR Rule performance standards will be the same before and after the predicted denial, enforceable only by federal court enforcement actions like this one.

There is no reason or basis in the record to think that a denial of ADEM's federal CCR permit program application would cause Alabama Power to modify its permit to require it to do more than ADEM has required. EPA has proposed the denial, and at the hearing on the motion to dismiss, counsel for Alabama Power conceded that EPA would be expected to issue a final denial. Yet, Alabama Power over these months has taken no action to change its ongoing closure procedures or seek to make its permit stricter, and there is no evidence-based reason to speculate that Alabama Power would ask that it be required to do something that Alabama Power has fought

27

vigorously in this Court to avoid. Indeed, most recently after announcing some recycling of ash, Alabama Power has confirmed again that it will not change.

The Order asserts that "Plant Barry will have to comply with at least the Federal CCR Regulations by the time of closure." *Id.* But as to the closure performance standards in the CCR Rule, that statement is incorrect because Alabama Power must comply with those closure performance standards *now*, by selecting and implementing a plan that satisfies their requirements. The CCR Rule sets out performance standards that must be complied with now and prior to the completion of closure. 40 C.F.R. § 257.102(d) (stating the owner and operator of a CCR unit has an obligation to ensure that the unit is closed "in a manner *that will*" comply with performance standards); *id.* at § 257.102(d)(2) (stating the owner and operator must meet the requirements "*prior to* installing the final cover system") (emphasis added). But Alabama Power refuses to do so, as its filings in this case have made clear; the closure plan it is in the process of implementing does not comply with these standards, as set out in the Complaint. The statement in the Order assumes that Alabama Power always obeys the law and will obey the law at some point in the future, thereby assuming away the need for citizens to enforce the law and the possibility that Alabama Power will violate the Rule, when the Complaint sets out well-pleaded violations of the Rule today.

Next, the Order relies upon the fact that EPA and Alabama Power have initiated settlement discussions to find that the citizen enforcement action is not ripe. There is no legal basis for finding that the initiation of settlement discussions justifies the dismissal of litigation for lack of ripeness. In all litigation, there is the possibility that a settlement may change the litigation landscape, but initiation of settlement discussions does not divest courts of jurisdiction or cause them prudentially to dismiss pending litigation. In this instance, initiation of settlement discussions provides no basis

for a conclusion that Alabama Power is going to agree to undertake obligations that ADEM has not required and that Alabama Power has resisted for months in this litigation and in extensive discussions with EPA.

The Order states that the Court cannot address Alabama Power's violation of the CCR Rule until "the closure plan becomes more definite." Order at 38. Yet, as the Order sets out, Alabama Power is bound by an ADEM permit to carry out the closure plan that is the subject of the litigation, has set out that plan on its regulatorily-required CCR Rule Compliance website unchanged for almost four years, and has already spent over a quarter billion dollars carrying out that plan— approximately one quarter of the company's estimated total cost. Alabama Power is litigating vigorously to stick by that plan and has stated publicly that it will do so.

Finally, the Order states that the Court would have to engage in speculation to review how Alabama Power is going to close its Plant Barry impoundment. *Id.* at 39. But that statement disregards the fact that Alabama Power has obtained a binding permit from ADEM, that Alabama Power must close pursuant to that permit, and that Alabama Power is actively carrying out exactly that closure plan. There is no need for speculation: Alabama Power is bound by Alabama law to carry out the closure as alleged in the Complaint, is doing so now, and has shown a firm determination to proceed forward.

This case is ripe. The Order usurps the legislative function and rewrites RCRA, makes assumptions without factual or legal underpinnings without discovery and the development of a factual record, and does not acknowledge the controlling import of the fact that Alabama Power is required to close the Plant Barry impoundment by a legally-binding permit, which Alabama Power is in the course of carrying out and is vigorously defending. Baykeeper is not trying to enforce the law against what might happen, but rather against what is happening today.

## <u>CONCLUSION</u>

For the foregoing reasons, Baykeeper respectfully requests that the Court reconsider its dismissal of this action and allow citizen enforcement to proceed in order to address the serious harms of Alabama Power's ongoing efforts to close the Plant Barry impoundment while leaving coal ash saturated in water and leaking pollutants into the surrounding waterways in perpetuity.

Respectfully submitted, this 1st day of February 2024.

s/ Barry A. Brock
Barry A. Brock
*One of the Attorneys for Plaintiffs*

**OF COUNSEL:**

Barry Brock (ASB-9137-B61B)
Christina Tidwell (ASB-9696-D10R)
Southern Environmental Law Center
2829 Second Avenue S., Suite 282
Birmingham, AL 35233
Telephone: (205) 745-3060
bbrock@selcal.org
ctidwell@selcal.org

Richard Moore (ASB-5730-M55R)
450C Government Street
Mobile, AL 36602
Telephone: (865) 300-1206
richardmooreig@hotmail.com

Nicholas Torrey *(admitted pro hac vice)*
Southern Environmental Law Center
601 W. Rosemary St, Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
ntorrey@selcnc.org

Frank Holleman *(admitted pro hac vice)*
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: (843) 720-5270
fholleman@selcsc.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 1, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

s/ Barry A. Brock
Barry A. Brock
*One of the Attorneys for Plaintiffs*
