# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MOBILE BAYKEEPER, INC.,** | ) | |
| | ) | |
| **Plaintiff ,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.** |
| | ) | **1:22-00382-KD-B** |
| **ALABAMA POWER COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT ALABAMA POWER COMPANY'S
## OPPOSITION TO
## PLAINTIFF MOBILE BAYKEEPER, INC.'S MOTION TO RECONSIDER

**OF COUNSEL:**

Jaime W. Betbeze
(jbetbeze@maynardnexsen.com)
Raymond L. Bell, Jr.
(rbell@maynardnexsen.com)
Evan N. Parrott
(eparrott@maynardnexsen.com)
MAYNARD NEXSEN P.C.
RSA Battle House Tower
11 N. Water St., Ste. 24290
Mobile, Alabama 36602
Telephone: (251) 432-0001

Ed R. Haden
(ehaden@balch.com)
Charles A. Burkhart
(cburkhart@balch.com)
Steven A. Burns
(sburns@balch.com)
Sean W. Shirley
(sshirley@balch.com)
BALCH & BINGHAM LLP
Post Office Box 306
Birmingham, AL 35201-0306
Telephone: (205) 251-8100

February 20, 2024

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... iii

Standard of Review........................................................................................................ 3

Argument ........................................................................................................................ 4

I.   This Court Correctly Held That Baykeeper Lacks Standing. .................................. 4

    A.   Baykeeper Lacks Standing Because the Harm Baykeeper Claims to Have Sustained Has Allegedly Been Ongoing Since 1991 and is Not Fairly Traceable to the Alleged Statutory and Regulatory Violations of the 2020 Closure Plan. ...................4

        1.   This Court Was Correct That There is a "Mismatch" between the Alleged Harm and the Alleged Violation. ................................................................................ 5

        2.   Baykeeper Uses an Incomplete Quote from the Court's Order in an Attempt to Establish Traceability. ................................................................................. 5

        3.   Baykeeper Misinterprets the CCR Regulations in Its Attempt to Establish a Current Violation Fairly Traceable to Ongoing Harm. ........................................... 7

        4.   Alleged Ongoing Releases from the Impoundment since 1991 Were Not Caused by any Violation of the 2015 CCR Regulations by the 2020 Closure Plan. .................... 8

        5.   Baykeeper's Post-Judgment Attempt to Project Future Harm Rests on Speculation that the Supreme Court has Rejected. ....................................................... 10

        6.   Baykeeper's New Authority Is Not Persuasive. ......................................... 13

        7.   Whether Some Other Party Could File a Citizen Suit Is Not Relevant to Standing Analysis. .................................................................................................. 14

    B.   A New Closure Plan Will Not Redress Baykeeper's Members' Injuries. ........................14

        1.   A New Closure Plan Would Not Immediately Address Alleged Pollution. .............. 14

        2.   Baykeeper's Arguments Highlight the Speculative Nature of Redressability in this Case. .................................................................................................... 15

II.  This Court's Holding that Baykeeper's Claims Are Not Ripe Is Correct. ............................ 18

    A.   Delaying Judicial Review Will Not Cause Baykeeper Harm. ..........................................18

        1.   This Court Explained that Baykeeper's Claims Are Not Ripe Because Withholding Judicial Consideration Will Not Cause Incremental Harm. ................. 18

        2.   Article III of the Constitution Takes Precedence Over RCRA's Statutory Citizen Suit Provision. .................................................................................. 18

        3.   Baykeeper Cannot Use a Post-judgment Submission of Previously Available Evidence to Manufacture Factual Issues after Final Judgment. ............... 19

B.  The Record is Unfit for Judicial Decision.  ....................................................22

1.  Significant Contingencies Require Resolution Before the Record is
    Fit for Judicial Decision.  ............................................................. 22

2.  Baykeeper's Urging of this Court to Ignore the Contingencies Is Contradicted
    by U.S. Supreme Court Precedent.  ............................................ 22

Conclusion  ........................................................................................................... 25

Certificate of Service  .......................................................................................... 26

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Acciard v. Whitney*,
No. 2:07-cv-476-FtM-36DNF, 2011 WL 13294619 (M.D. Fla. July 20, 2011) ...................... 21

*American Home Assur. Co. v. Glenn Estess & Associates, Inc.*,
763 F.2d 1237 (11th Cir. 1985) ................................................................................ 4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 14

*Association of Irritated Residents v. EPA*,
10 F.4th 937 (9th Cir. 2021) ................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 14

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................ passim

*Cole v. U.S.*,
755 F.2d 873 (11th Cir. 1985) ................................................................................. 9

*Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*,
138 F.3d 351 (8th Cir. 1998) ................................................................................... 2

*Dept. of Educ. v. Brown*,
600 U.S. 551 (2023) ............................................................................................... 4

*Duke Power Co. v. Carolina Env't Study Grp.*,
438 U.S. 59 (1978) ........................................................................................... 14, 15

*Exxon Shipping Co. v. Baker*,
554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) ......................... 4, 13, 18, 25

*Fl. Panthers v. Collier Cnty.*,
No. 2:13-CV-612, 2016 WL 1394328 (M.D. Fla. Apr. 8, 2016) ............................. 19

*Focus on the Family v. Pinellas Suncoast Transit Authority*,
344 F.3d 1263 (11th Cir. 2003) ............................................................................. 11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ............................................................................................... 5

*Harris v. Mex. Specialty Foods*,
564 F.3d 1301 (11th Cir. 2009) ............................................................................. 22

*In re Kellogg*,
   197 F.3d 1116 (11th Cir. 1999) ............................................................. 21

*Johnson v. Sikes*,
   730 F.2d 644 (11th Cir. 1984) ............................................................... 24

*Lee v. Thomas*,
   2012 WL 3137901 (S.D. Ala. Aug. 1, 2012) ........................................... 4

*Longmire v. City of Mobile, Alabama*,
   No. CV-16-0025-WS-M, 2017 WL 2126824 (S.D. Ala. May 16, 2017) ............... 4, 13, 18, 25

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ..................................................... 4, 10, 14, 16

*Mays v. U.S. Postal Serv.*,
   122 F.3d 43 (11th Cir. 1997) ........................................................... 4, 21, 22

*Muransky v. Godiva Chocolatier, Inc.*,
   979 F.3d 917 (11th Cir. 2020) ............................................................ 14

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) ............................................................................ 18

*Ranger Env't  Servs. LLC v. Foehl*,
   No. 1:23-00297-KD-M, 2023 WL 6931336 (S.D. Ala. Oct 19, 2023) ................... 17

*Roanoke R. Basin Ass'n v. Duke Energy Progress, LLC*,
   No. 1:17-cv-561, 2018 WL 1605022 (M.D.N.C. Mar. 29, 2018) ...................... 7, 8

*Roanoke River Basin Association v. Duke Energy*,
   No. 1:17-cv-707, 2018 WL 2417862 (M.D.N.C. May 29, 2018) ................... 7, 8, 22

*South River Watershed Alliance v. Dekalb County*,
   69 F.4th 809 (11th Cir. 2023) ................................................................ 16

*Support Working Animals, Inc. v. Governor of Florida*,
   8 F.4th 1198 (11th Cir. 2021) .............................................................. 12

*Texas v. United States*,
   523 U.S. 296 (1998) ............................................................................ 22, 23

*Thomas v. Union Carbide Ag. Prods. Co.*,
   473 U.S. 568 (1985) ............................................................................ 23

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ...................................................................... 4

*United States v. Metro. St. Louis Sewer Dist.*,
   440 F.3d 930 (8th Cir. 2006) ............................................................... 21

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ................................................................................................ 14

*Walters v. Fast AC, LLC*,
60 F.4th 642 (11th Cir. 2023) .......................................................................... 9, 10

*Zen-Noh Grain Corp. v. Consol. Env't Mgmt., Inc.*,
No. 12-CV-1011, 2012 WL 6201871 (E.D. La. Dec. 12, 2012) .............................. 25


**STATUTES**

5 U.S.C. § 703 ................................................................................................................ 2

28 U.S.C. § 1391(e) ....................................................................................................... 1

42 U.S.C. § 6928(a) ................................................................................................ 2, 12

42 U.S.C. § 6945(d) ................................................................................................ 1, 12

42 U.S.C. § 6972(a) .................................................................................................... 19

42 U.S.C. § 6976 .................................................................................................. 2, 3, 7


**RULES AND REGULATIONS**

40 C.F.R. § 257.102 ............................................................................................. passim

Rule 59(e), Fed. R. Civ. P. ................................................................................. 1, 3, 4, 21


**CONSTITUTIONAL PROVISIONS**

U.S. Constitution, Article III, § 2 ................................................................................ 19


**OTHER AUTHORITIES**

13A Charles A. Wright, et al., Federal Practice and Procedure § 3532 (1984) ............................ 23

*Elec. Energy, Inc. v. EPA,* Nos. 22-1056 & 22-1058 (D.C. Cir. filed April 8, 2022) ................ 11

Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant (Jan. 11,
2022), *available at* https://www.regulations.gov/document/EPA-HQ-OLEM-2021-0590-0002
.......................................................................................................................... 12

U.S. EPA, EPA Takes Key Steps to Protect Groundwater from Coal Ash Contamination (Jan. 11,
2022), *available at* https://www.epa.gov/newsreleases/epa-takes-key-steps-protect-
groundwater-coal-ash-contamination) ...................................................................... 12

## DEFENDANT ALABAMA POWER COMPANY'S OPPOSITION TO
## PLAINTIFF MOBILE BAYKEEPER'S MOTION TO RECONSIDER

This Court should deny Baykeeper's Motion to Reconsider because this Court correctly held that Baykeeper lacks standing and its claims are not ripe. Baykeeper's Motion is an attempt to relitigate its old arguments that lost and to introduce previously available evidence, neither of which are appropriate for a Rule 59(e), Fed. R. Civ. P., motion. And Baykeeper's new (but not newly decided) case law does not affect the soundness of the Court's decision on standing and ripeness.

The Complaint asks this Court to compare Alabama Power's current closure plan with the CCR regulations (the "CCR Regulations"). Alabama Power's closure plan dates back to 2020, and closure is scheduled to be complete in 2031. (Doc. 108, PageID.19438-19439, 19463). As this Court recognized, judicial resolution at present is not appropriate because between today and ultimate closure in 2031, any number of contingencies could impact this case, including the following:

### 1. ADEM's CCR Permitting Program

In August 2023, EPA proposed to deny ADEM's permit program application. (Doc. 108, PageID.19444). EPA has yet to take final action. If EPA were to change course and approve ADEM's program, federal law would then dictate that the closure of the coal ash pond at Plant Barry is governed by the permit issued by an EPA-approved state program. *See* 42 U.S.C. § 6945(d)(3)(A). That would create a permit shield defense for Alabama Power that would preclude citizen suit enforcement. On the other hand, if EPA ultimately denies ADEM's permit program application, ADEM could implement its permit program differently and/or amend its state CCR regulations in an effort to secure federal approval. Either course would presumably require Alabama Power to seek a permit modification that could reflect changes to the closure plan and make an order from this Court requiring such a change in the closure plan unnecessary. Alternatively, ADEM could challenge EPA's denial as a final agency action in federal district court, potentially including in a federal district court in Alabama. *See* 28 U.S.C. § 1391(e)(1)(C)

(authorizing a lawsuit against the United States where "the plaintiff resides if no real property is involved in the action").  The outcome of any such proceeding is unknown but would likely have a significant impact on this case regardless.

### 2.  EPA Notice of Potential Violations and Settlement Discussions

EPA issued Alabama Power a notice of potential violation (NOPV) on January 31, 2023, concerning the closure plan and other CCR compliance matters.  (Doc. 102, PageID.19374).  EPA has yet to issue a formal notice of violation, but EPA and Alabama Power have agreed to enter into discussions of a potential settlement of the matter.  (Doc. 106-1, PageID.19423-19424).

The outcome of settlement discussions is uncertain at best.  Alabama Power and EPA could resolve the same issues of infiltration, impoundment, and free liquids that form the basis of Baykeeper's claims by adopting measures different from those in the current closure plan that satisfy EPA's concerns.  That could require Alabama Power to revise its closure plan and seek a permit modification at ADEM, which ADEM's regulations expressly authorize.  *See* ADEM Admin. Code r. 335-13-5-.06.  On the other hand, if Alabama Power and EPA do not settle, EPA could bring an enforcement action, that ultimately would be resolved with a federal court judgment in the Southern District of Alabama.  *See* 42 U.S.C. §§ 6928(a), 6976; 5 U.S.C. § 703.   Either avenue could result in a change to the closure plan and modification of the permit.  And a settlement approved by a court judgment or litigation resolved by a court judgment would bar Baykeeper's claims in the case.  *See, e.g.*, *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 356 (8th Cir. 1998) ("Even when an agency enforcement action is not commenced until after the citizen suit, final judgment in the agency's court action will be a res judicata or collateral estoppel bar to the earlier citizen suit.") (citation omitted).

### 3.  D.C. Circuit Litigation Over EPA's 2022 Interpretations

EPA's 2022 interpretations of the federal CCR Regulations that Baykeeper relies on in this case (Doc. 1, PageID.8) are in active litigation in the D.C. Circuit.  (Doc. 102, PageID.19374-19375).  As discussed in prior briefing, EPA's 2022 interpretations are inconsistent with the text, structure, history, and purpose of the CCR Regulations, (*see* Doc. 60, PageID.13947) (Doc. 63,

PageID.17796-17803), and EPA should have gone through the notice-and-comment rulemaking procedure before issuing the new interpretations.  (Doc. 63, PageID.17803-17803).  Since EPA did not provide such notice and comment, the new interpretations would be invalid.  (*Id.*)

If the D.C. Circuit were to hold that EPA's January 2022 interpretations were a new rule for which notice and comment was required, but not provided, that court could invalidate the rule nationwide under its exclusive jurisdiction over new rules.  *See* 42 U.S.C. § 6976(a).  Alternatively, the D.C. Circuit might hold that the EPA's January 2022 interpretations did not amount to a new rule and then proceed to determine whether EPA's interpretations were correct or not.  A D.C. Circuit opinion of that nature would not be binding on this Court, but could be instructive and influence EPA's further actions.  As another alternative, the D.C. Circuit could identify some jurisdictional basis to resolve the case.  For example, that court could find that EPA's statements are merely interpretive statements, and judicial review will lie only when EPA relies on them to take a final agency action, such as direct enforcement.  Any of these outcomes could lead to review and potential revisions of the Plant Barry closure plan as allowed by the applicable regulations.

\* \* \*

While these and other contingencies remain outstanding, Baykeeper alleges that its members suffer CCR pollution-related recreational harms.  But these harms are not fairly traceable to the CCR Regulations or Alabama Power's closure plan, as this Court held.  Instead, taking Baykeeper's Complaint at face value at the motion-to-dismiss stage, the recreational harms it alleges are traceable to events predating the CCR Regulations and the closure plan by decades.  Baykeeper lacks standing, and its claims are not ripe.

## STANDARD OF REVIEW

Baykeeper's Motion to Reconsider is governed by Rule 59(e), Fed. R. Civ. P.  Motions to reconsider are not appropriate to relitigate old arguments or to present evidence that could have been presented before judgment:

> [M]otions for reconsideration are a disfavored, extraordinary remedy that must be employed sparingly. … Authority is legion for the proposition that motions to

reconsider "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 128 S.Ct. 2605, 2617 n.5, 171 L.Ed.2d 570 (2008) (citation omitted). Rule 59(e) does not afford an unsuccessful litigant "two bites at the apple." *American Home Assur. Co. v. Glenn Estess & Associates, Inc.*, 763 F.2d 1237, 1239 (11th Cir. 1985). Nor are such motions properly filed "as a kneejerk reaction by a dissatisfied federal court loser." *Lee v. Thomas*, 2012 WL 3137901, *2 (S.D. Ala. Aug. 1, 2012).

*Longmire v. City of Mobile, Alabama*, No. CV-16-0025-WS-M, 2017 WL 2126824, at *1 (S.D. Ala. May 16, 2017) (citations omitted).

"This circuit has held that a motion to reconsider should not be used by the parties to set forth new theories of law." *Mays v. U.S. Postal Serv.*, 122 F.3d 43, 46 (11th Cir. 1997) (footnote omitted). "[W]here a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion." *Id*.

## ARGUMENT

**I.    This Court Correctly Held That Baykeeper Lacks Standing.**

**A.    Baykeeper Lacks Standing Because the Harm Baykeeper Claims to Have Sustained Has Allegedly Been Ongoing Since 1991 and is Not Fairly Traceable to the Alleged Statutory and Regulatory Violations of the 2020 Closure Plan.**

Article III standing requires a causal connection between an actual or imminent injury to the plaintiff and the alleged statutory or regulatory violations complained of:

> Our jurisprudence has "established that the irreducible constitutional minimum of standing contains three elements" that a plaintiff must plead and—ultimately— prove. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "First, the plaintiff must have suffered an 'injury in fact'" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Ibid. (some internal quotation marks omitted). Second, the **plaintiff's injury must be "fairly traceable to the challenged action of the defendant," meaning that "there must be a causal connection between the injury and the conduct complained of**." Ibid. (internal quotation marks and alterations omitted). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." Id., at 561, 112 S. Ct. 2130 (some internal quotation marks omitted).

*Dept. of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (emphasis added). *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("[U]nder Article III, ... [o]nly those plaintiffs who have been *concretely **harmed*** **by** a defendant's **statutory violation** may sue that private defendant over

that violation in federal court.") (bold emphases added).

"[I]t is the plaintiff's burden, in a lawsuit brought to force compliance, to establish standing …." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 170 (2000).

### 1.      This Court Was Correct That There is a "Mismatch" between the Alleged Harm and the Alleged Violation.

Following this binding precedent, this Court found a mismatch between the harm Baykeeper alleges—decades of alleged pollution in the river around the Plant Barry CCR impoundment and on their properties—and the alleged violation of the 2015 CCR Regulations and RCRA by Alabama Power's closure plan for the impoundment.   As this Court explained, "Baykeeper's members derive less pleasure from the area near, around, and downstream of Plant Barry—and use it less—because of their concerns about pollution from the coal ash pond." (Doc. 108, PageID.19456) (internal quotation marks and citation omitted).   But as this Court correctly recognized, "what dooms Baykeeper's Complaint on standing grounds is the mismatch between the injuries in fact just described and the conduct it challenges, namely the alleged deficiencies (pursuant to the Federal CCR Regulations and RCRA) in the closure plan for the Plant Barry Ash Pond." (*Id*. at PageID.19458-19459).   "Baykeeper's problem is that the coal ash pollution about which it complains pre-existed and therefore is not fairly traceable to the challenged action of Alabama Power, the implementation of the closure plan for the Plant Barry Ash Pond."  (*Id*. at PageID.19459).   The Court correctly held that Baykeeper's challenges to Alabama Power's "as-yet incomplete closure plan … did not 'factually cause,' and therefore is not 'fairly traceable to,' the complained-of regulatory violations."  (*Id*. at PageID.19461).

### 2.      Baykeeper Uses an Incomplete Quote from the Court's Order in an Attempt to Establish Traceability.

Baykeeper attempts to establish traceability by using an incomplete quote from the Court's Order.  (Doc. 111, PageID.19550).  The CCR Regulations provide that the elimination of free liquids must occur "prior to *installing* the final cover system."  *See* 40 C.F.R. § 257.102(d)(2)(i) (emphasis added).   When the installation of the final cover system will occur is governed by the

closure plan.   *See id.* at § 257.102(b)(1)(vi).   Alabama Power's closure plan provides that the final cover system is not scheduled to be completed until 2030, after numerous steps in the closure plan are completed (e.g., draining the pond water, consolidating the ash, construction of berms, construction of underground barrier walls, and constructing the final cover system before it is installed).  (Doc.  27-1, PageID.4878).   Thus, the requirement to eliminate free liquids applies before "installation" of the final cover system is completed in 2030, not when closure construction began in 2019.   Baykeeper, however, attempts to make the requirement to eliminate free liquids enforceable now, instead of years from now, and thus create a current violation of the CCR Regulations for standing purposes.   To do so, Baykeeper states: "As the Order correctly notes, **'installation . . . began in 2020,'** meaning that the requirement to eliminate free liquids has been enforceable at least since that time. Order at 27."   (Doc. 111, PageID.19550) (emphases added.) Baykeeper omits that the Order states that "**construction** of the final cover system began in April 2020," and "installation" of the final cover system will not be completed until 2030:

| Baykeeper's Representation of what the Order States | The Court's Order |
|---|---|
| "As the Order correctly notes, **'installation . . . began in 2020,'** meaning that the requirement to eliminate free liquids has been enforceable at least since that time. Order at 27."  (Doc. 111, PageID.19550) (emphases added). | With respect to Count One, while **construction** of the final cover system **began in April 2020**, it is not expected to conclude – and therefore be 'installed' – until August 2030.  (Doc. 27-1 at 191).  It contravenes basic principles of logic to conclude that installation that began in 2020 and likely will not be completed until 2030 is the factual or de facto cause of ground water contamination that allegedly goes back decades."  (Doc. 108, PageID.19460) (emphases added). |

The base must be constructed before the final cover system can be installed.  So even if installation is viewed as a process that began in 2020 and will be completed in 2030, the requirement to eliminate free liquids is not triggered in 2020 (i.e., when closure construction began), but when installation of the final cover is completed in 2030.  S*ee* 40 C.F.R. § 257.102(d)(2)(i).  As a result, there can be no current violation of the CCR Regulations causing

6

Baykeeper's members to avoid recreational use of the Mobile-Tensaw Delta.

        **3.**      **Baykeeper Misinterprets the CCR Regulations in Its Attempt to Establish a Current Violation Fairly Traceable to Ongoing Harm.**

Next, Baykeeper misinterprets the CCR Regulations. Baykeeper argues that adopting its preferred closure plan will result in earlier benefits to its members in the form of reduced recreational harm. According to Baykeeper, its claims "are not merely about paperwork deficiencies as to the plan; it is the ongoing closure process itself …." (Doc. 111, PageID.19546). Baykeeper says: "Pollution is happening *because* the plan fails to address the pollution source, the coal ash saturated in groundwater within the impoundment." (*Id.* at PageID.19552). But, as explained above, the CCR Regulations simply do not require free liquids to be eliminated in 2022 or 2024. Instead, the CCR Regulations require free liquids to be eliminated "prior to installing the final cover system," 40 C.F.R. § 257.102(d)(2)(i), and, as this Court emphasized, installation of the final cover system is scheduled to be completed in 2030. (Doc. 27-1, PageID.4878). This is a central point in the Court's analysis. Even assuming an alleged violation will occur years from now, that alleged violation is not *directly linked* to any alleged ongoing pollution today, as the Court correctly held.[1] *See Roanoke R. Basin Ass'n v. Duke Energy Progress, LLC,* No. 1:17-cv-561, 2018 WL 1605022, at *4 (M.D.N.C. Mar. 29, 2018) (holding that "diminished use and enjoyment" of local waters was "not *directly linked* to [the defendant]'s preparation of an initial closure plan that allegedly fail[ed] to comply with the CCR Rule's requirements regarding its contents") (emphasis added).

Baykeeper argues this Court's reliance on *Roanoke River Basin Association v. Duke Energy*, No. 1:17-cv-707, 2018 WL 2417862 (M.D.N.C. May 29, 2018), is "misplaced." (Doc. 111, PageID.19551.) Baykeeper contends that the initial status of the closure plan in *Roanoke* distinguishes that case from this case in which ADEM has issued a permit to Alabama Power for

---

[1] If Baykeeper wanted to re-write the regulations to require the elimination of free liquids today, it should have challenged the CCR Regulations in the D.C. Circuit in 2015, but it did not. *See* 42 U.S.C. § 6976(a)(1).

its closure plan that is being implemented.  (*Id*. at PageID.19551-19552).  As this Court recognized, however, it is a "distinction without a difference with respect to the *causation* analysis" for standing purposes.  (Doc. 108, PageID.19461) (emphasis added).

There were two parallel *Roanoke River Basin* cases that the district court dismissed for the same reasons.  *See Roanoke R. Basin*, No. 1:17-cv-707, 2018 WL 2417862; *Roanoke R. Basin Ass'n v. Duke Energy Progress, LLC,* No. 1:17-cv-561, 2018 WL 1605022, *4 (M.D.N.C. Mar. 29, 2018).  In both cases, the standing question was not whether the initial closure plan would become final and go into effect, but whether the environmental group's members' "diminished use and enjoyment" of local waters was "*directly linked* to [the defendant]'s preparation of an initial closure plan that allegedly fail[ed] to comply with the CCR Rule's requirements regarding its contents." *Roanoke River Basin*, 2018 WL 1605022, at *4 (emphasis added).  Because the alleged inadequacy of the contents of the CCR impoundment closure plan did not cause—was not fairly traceable to—the environmental group's members' recreational injuries, the court found no standing and dismissed the citizen suit.  Both that court and this Court were correct.

### 4. Alleged Ongoing Releases from the Impoundment since 1991 Were Not Caused by any Violation of the 2015 CCR Regulations by the 2020 Closure Plan.

Next, Baykeeper argues: "*As a result of the non-compliant closure* that Alabama Power is implementing, that *pollution is happening now*, and that pollution is 'certainly impending' in perpetuity as a direct result of Alabama Power's faulty closure plan." (Doc. 111, PageID.19544) (emphases added) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)).  This argument fails to establish a manifest error of law, or any error, for several reasons.

Baykeeper's position is that Alabama Power's closure plan violates the CCR rule "now"— from 2020 (when Alabama Power filed its revised closure plan) to 2021 (when ADEM issued the permit) to 2022 (when it filed its Complaint) to today (when Alabama Power is implementing that closure plan).  *See, e.g.*, (Doc. 99, PageID.19347) ("Violations of all three requirements are occurring *now* ….  The violations alleged in the Complaint are taking place *now*.") (emphases

added); (Doc. 95, PageID.19251) ("These [closure] standards apply *now* to Alabama Power's ongoing closure of the Plant Barry coal ash impoundment.") (emphasis added); (Doc. 61, PageID.13968) ("[T]o legally close its impoundment, a utility must comply with these standards *prior to closure* ….") (emphasis added).  This Court correctly concluded that the alleged violation of the CCR Regulations now simply *did not cause* the injury now.  Instead, Baykeeper alleges conditions occurring since at least 1991 and ongoing since then have prevented Baykeeper's members from fishing and kayaking in the Mobile-Tensaw Delta.[2]  As this Court correctly found, that's a mismatch.  *See TransUnion*, 141 S. Ct. at 2205 ("Only those plaintiffs who have been *concretely **harmed** by* a defendant's **statutory violation** may sue that private defendant over that violation in federal court.") (bold emphases added).  In short, accepting arguendo Baykeeper's contentions as true as this stage, any possibility of injury would have been precisely the same with the closure plan filed by Alabama Power or preferred by Baykeeper.  *See Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) ("[W]e have held traceability to be lacking if the plaintiff 'would have been injured in precisely the same way' without the defendant's alleged misconduct.").  Baykeeper's post-judgment attempt to re-argue this point fails.

Specifically, Count 1 of the Complaint alleges that the closure plan violates the CCR Regulations' requirement to eliminate free liquids.  (*See* Doc. 1, PageID.16) (Count 1); 40 C.F.R. § 257.102(d)(2)(i) ("prior to *installing the final cover system* … (i) Free liquids must be eliminated").  Again, the final cover system will be installed in 2030.  (Doc. 27-1, PageID.4878).  And construction on the entire site to be completed in 2031.  (*Id.*)

Count 2 alleges that the closure plan violates the CCR rule by not precluding the future impoundment of liquids.  (*See* Doc. 1, PageID.16) (Count 2); 40 C.F.R. § 257.102(d)(1)(ii) ("The

---

[2] While a "court must assume as true the 'factual' allegations in the complaint," *Cole v. U.S.*, 755 F.2d 873, 878 n.13 (11th Cir. 1985), Alabama Power, of course, disputes the allegation that pollution has been leaking into the Mobile River since 1991 and publicly available test results confirm that there have been no exceedances of EPA or ADEM safe limits in drinking water or in the Mobile River.  *See* (Doc. 72-1, PageID.17892-17893) (Doc. 103, PageID.19381-19393).

owner or operator of a CCR unit must ensure that, at a minimum, the CCR unit is *closed* in a manner that will: … (ii) Preclude the probability of future impoundment of water, sediment, or slurry") (emphasis added).  Again, based on the schedule contained in the 2020 closure plan, it could not have caused the alleged pollution and injury to Baykeeper's members' recreational interests beginning in 1991.  (Doc. 27-1, PageID.4878).

And Count 3 alleges that the 2020 version of the closure plan violates the CCR Rule by not controlling the infiltration of liquid into or the release of leachate out of the ash impoundment.  *See* (Doc. 1, PageID.16) (Count 3); 40 C.F.R. § 257.102(d)(1)(i) ("The owner or operator of a CCR unit must ensure that, at a minimum, the CCR unit is *closed* in a manner that will: … (i) Control, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of CCR, leachate, or contaminated run-off to the ground or surface waters or to the atmosphere") (emphasis added).  Once again, a 2020 plan that schedules closure completion over a decade later did not cause the alleged ash impoundment releases and injure the recreational interests of Baykeeper's members beginning in 1991.   Another mismatch.  *See TransUnion*, 141 S. Ct. at 2205; *Walters*, 60 F.4th at 649.

### 5.     Baykeeper's Post-Judgment Attempt to Project Future Harm Rests on Speculation that the Supreme Court has Rejected.

Baykeeper attempts to avoid the mismatch of ongoing injuries that began in 1991 with an alleged statutory/regulatory violation by the 2020 closure plan by projecting its members' injuries forward into the future.  In the future, Baykeeper argues, if its closure plan were adopted, "ongoing contamination would stop," but under the current plan, pollution would allegedly be ongoing and that differential in pollution will be a future injury.  (*See* Doc. 111, PageID.19545.)  In *Lujan*, 504 U.S. at 560, the Supreme Court explained that an "injury in fact" must be "actual" (i.e., present) or "imminent" (i.e., future).  (Internal quotation marks and citations omitted).  In *Clapper*, 568 U.S. at 409, the Supreme Court held that a future injury must be imminent (i.e., certainly impending)—not happening years from now and subject to contingencies that may make the injury not happen.

In *Clapper*, 568 U.S. at 406, reporters and lawyers, who communicated with likely targets of surveillance who were located overseas, including suspected foreign agents and terrorists, challenged a new act that expended the government's surveillance authority.  Under the new act, a court would have to approve procedures to be adopted to regulate such surveillance and a court would have to approve surveillance of specific foreign agents.  *Id*. at 413-14.  The Supreme Court explained that it would not speculate as to the decisions of third-party decision makers not before the Court: "**We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors**.  Section 1881a mandates that the **Government must obtain the Foreign Intelligence Surveillance <u>Court</u>'s approval of targeting procedures** [issued by the Executive Branch], minimization procedures, and a governmental certification regarding proposed surveillance."  *Id*. at 414 (emphases added).  "[R]espondents [i.e., the reporters and lawyers] can only speculate as to whether that court will authorize such surveillance."  *Id*. at 413.

Similarly, contingencies to be resolved by independent decision makers from the Executive and Judicial Branches (i.e., EPA and the D.C. Circuit) exist in this case.  At a minimum, they cast doubt on whether Baykeeper's members will suffer pollution-related injuries in the future.  Because decisions by these third parties may make the future harm not occur, the future harm is not imminent.  *See Clapper*, 568 U.S. at 413-14.

While the general rule is that developments that happen after the complaint is filed cannot be considered, *see Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263, 1275 (11th Cir. 2003), at the time Baykeeper filed its Complaint, on September 26, 2022, (*see* Doc. 1, PageID.1), the D.C. Circuit litigation had been filed,[3] EPA had not approved ADEM's

---

[3] *See Elec. Energy, Inc. v. EPA,* Nos. 22-1056 & 22-1058 (D.C. Cir. filed April 8, 2022).

CCR permit program,[4] EPA had announced its 2022 interpretations of the CCR Regulations,[5] and EPA had issued a proposed decision on the Gavin case based on those interpretations.[6]  These pre-Complaint events created contingencies of whether the D.C. Circuit would invalidate EPA's (and Baykeeper's) interpretations of the CCR Regulations and whether EPA would act upon its 2022 position by denying ADEM's permit program application and by issuing an NOPV to Alabama Power about the Plant Barry CCR  impoundment.  *See* 42 U.S.C. § 6945(d)(1) (approval of permit program or not); 42 U.S.C. § 6928(a)(1) & 40 C.F.R. Part 22 (NOPV authority).  Based on these pre-Complaint contingencies, Baykeeper's injuries are not imminent or certainly impending.  *See Clapper*, 568 U.S. at 413-14.

Since the filing of the Complaint, EPA has acted consistently with its January 11, 2022 announcement and the proposed Gavin decision, by proposing to deny approval of ADEM's CCR permit program and issuing a notice of potential violation to Alabama Power regarding its closure of the Plant Barry ash impoundment.  *See Support Working Animals, Inc. v. Governor of Florida*, 8 F.4th 1198, 1201, 1204-05 (11th Cir. 2021) (considering post-complaint developments in pre-existing contingencies regarding what penalties would be imposed by what state agency for gambling on dog racing).  In any event, these contingencies impact whether Alabama Power would amend its closure plan to address releases from the impoundment in a different manner.  Under these circumstances, Baykeeper's projected future injury is not imminent or certainly impending.  *See Clapper*, 568 U.S. at 413-14.

_____

[4] *See* Ala. Env't Mgmt. Comm'n, Minutes of Feb. 11, 2022 Ala. Env't Mgmt. Comm'n Meeting at 18:25-19:6 (certified Apr. 8, 2022) (Doc. 44-1, PageID.6409).

[5] (*See* Doc. 1, PageID.8) (citing U.S. EPA, EPA Takes Key Steps to Protect Groundwater from Coal Ash Contamination (Jan. 11, 2022), *available at* https://www.epa.gov/newsreleases/epa-takes-key-steps-protect-groundwater-coal-ash-contamination).

[6] *See* Proposed Denial of Alternative Closure Deadline for General James M. Gavin Plant (Jan. 11, 2022), *available at* https://www.regulations.gov/document/EPA-HQ-OLEM-2021-0590-0002.

### 6.    Baykeeper's New Authority Is Not Persuasive.

Baykeeper's new argument that *Association of Irritated Residents v. EPA*, 10 F.4th 937 (9th Cir. 2021) ("AIR"), supports its traceability argument also fails.  *See Longmire*, 2017 WL 2126824, at *1 ("[M]otions to reconsider 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'") (quoting *Exxon Shipping Co*., 554 U.S. at 485 n.5) (citation omitted).  In *AIR*, 10 F.4th at 941, the EPA approved a contingency measure for stricter air quality controls if other measures did not attain air quality standards.  AIR challenged the EPA's approval of the contingency measure as arbitrary and capricious.  *Id*.  The association argued an injury was caused by a violation of EPA regulations: "AIR's members allege[d] concrete injuries because, as residents of areas affected by the [air quality attainment] Plan, they are 'compelled to breathe' levels of ozone that exceed the standard EPA promulgated to protect public health." AIR's Opening Br., No. 19-71223, 2019 WL 4346427, at *47.  The Ninth Circuit pointed to violations of EPA regulations in 2001, 2004, and 2012.  *AIR*, 10 F.4th at 944.  The Ninth Circuit held that the State's arguments really "relate more to ripeness than to standing."  *Id*.  The history of regulatory violations supported a reasonable inference that the continued regulatory violations would occur and trigger the contingency measure and that the association's members suffered concrete harm.  *Id*.  "We conclude that the challenge is ripe for review." *Id*.

By contrast, Baykeeper does not argue that its members suffered an injury from the alleged pollution in excess of any EPA regulatory limit.  Instead, it argues that its members have suffered harm from pollution it alleges to have existed for decades before the EPA issued the 2015 CCR Rule.  The harm was and is the alleged pollution itself, not the 2020 closure plan's alleged variance from the 2015 CCR Rule.  As to ripeness, discussed below, there is no history of alleged regulatory violations that make some contingency to address those violations likely.  Instead, there are the pending contingencies (e.g., EPA's proposed disapproval of ADEM's CCR permit program and EPA's NOPV proceeding) the resolution of which could require changes to Alabama Power's

current closure plan, making judicial action at this time premature. [7]

### 7.   Whether Some Other Party Could File a Citizen Suit Is Not Relevant to Standing Analysis.

In its last argument against traceability, Baykeeper assumes: "As written, the Order would defeat standing and make the CCR Rule unenforceable by citizens …." (Doc. 111, PageID.19543.) But "[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Clapper*, 568 U.S. at 420 (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982)) (internal quotation marks omitted). In any event, Baykeeper's assumption is not true. Compliance with the closure performance standards under the CCR Regulations should likely be evaluated "much sooner to closure project completion" or sometime thereafter. (Doc. 108, PageID.19468.)

### B.   A New Closure Plan Will Not Redress Baykeeper's Members' Injuries.

### 1.   A New Closure Plan Would Not Immediately Address Alleged Pollution.

The Court explained: "Baykeeper must finally show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' Lujan, 504 U.S. at 560 (internal quotations omitted)." (Doc. 108, PageID.19461). "To satisfy Article III standing's redressability element, a plaintiff need only demonstrate a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury. Duke Power Co. v. Carolina Env't Study Grp., 438 U.S. 59, 79 (1978) …." (Doc. 108, PageID.19461-19462).

_____

[7] Baykeeper also attempts to bridge the gap between present harm and future implementation of the closure plan with semantics: "Pollution is happening *because* the plan fails to address the pollution source, the coal ash saturated in groundwater within the impoundment." (Doc. 111, PageID.19552) (underlining added). Assuming that the meaning of "is" is to stop harmful conditions thatt are alleged to be occurring now, a new closure plan that would require years to draft, obtain a permit for, and implement, could not plausibly accomplish immediate cessation of the allegedly ongoing harmful conditions. *See Muransky v. Godiva Cholatier, Inc.*, 979 F.3d 917, 924–25 (11th Cir. 2020) (en banc) ("[M]ere conclusory statements do not suffice." [*Ashcroft v.*] *Iqbal*, 556 U.S. [662,] 678 [(2009)] (punctuation omitted). Although *Iqbal* and [*Bell Atl. Corp. v.*] *Twombly*[, 550 U.S. 544, 555–56 (2007)] have put a finer point on it, this standard is not new—it's long been known that even at the pleading stage**,** the 'litigant must clearly and specifically set forth facts' to satisfy the requirements of Article III.") (citation omitted).

As this Court correctly observed, an order to file a different closure plan "could only possibly alleviate a procedural injury, not Baykeeper's concrete injuries in fact. (See Doc. 1 at 17, Prayer for Relief 'C')." (Doc. 108, PageID.19462).   In any event, it would not make it "substantially likely" that Plant Barry's closure plan would redress the conditions of which Baykeeper complains "any time soon. See Duke Power Co., 438 U.S. at 79."   (Doc. 108, PageID.19462).  The reason is that whatever may be the effect of eliminating "free liquids" or controlling "infiltration" or precluding "future impoundment," even under Baykeeper's interpretations of those terms, it would not be felt until years in the future based on the construction schedule.   (Id.)  "Thus, a hypothetical order to comply with subsection (d)(1)(i-ii) cannot remedy Baykeeper's instant harms when the closure performance standard will not truly manifest until much closer to the May 2031 estimated project completion date."  (Id. at PageID.19463).

### 2. Baykeeper's Arguments Highlight the Speculative Nature of Redressability in this Case.

According to Baykeeper, its requested remedy will redress its members' alleged recreational harms now.  (See Doc. 111, PageID.19555).  It is self-evident that if this Court were to order the submission of a new closure plan today, Alabama Power's engineers would have to design such a plan, the plan would have to be submitted to ADEM, and ADEM would have to approve the plan and issue a new permit, which would be subject to appeal under Alabama law.  Moreover, assuming EPA intends to continue settlement discussions, the new plan would have to satisfy EPA.   Eventually, for a new ADEM permit to be valid for purposes of the federal regulations, EPA and ADEM would have to resolve their dispute about the approval of ADEM's permit program.  And then Alabama Power would have to implement the plan for completion at some future point in time.  In short, there are many moving parts in this scenario.  Closing a 600-acre ash impoundment is a massive project, and, like an aircraft carrier, cannot be turned on a dime.  With such a prolonged process, uncertainties in that process, and the contingencies, there is not a "substantial likelihood" that this Court's grant of Baykeeper's requested injunction would redress Baykeeper's members' alleged recreational injuries.  See Duke Power, 438 U.S. at 79 (a

plaintiff must demonstrate "a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury to satisfy the 'case or controversy' requirement of Art. III").

Further, Baykeeper's argument that its requested injunction for a new closure plan, presumably requiring excavation, will reduce future alleged recreational injuries beyond what would happen without that order is speculative. Given the contingencies that existed at the time the Complaint was filed, *see supra* at pp. 11-12, and again accepting the allegations as true for now, it is speculative what, if anything, this Court's order would accomplish in the future. This is because other events could lead Alabama Power to take a different course of action or else change the ground rules governing ash pond closures. *See Lujan*, 504 U.S. at 561 (plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'") (citation omitted).

Next, Baykeeper argues that *South River Watershed Alliance v. Dekalb County*, 69 F.4th 809 (11th Cir. 2023), confirms that a remedy can take years to implement does not deprive the court's order of its ability to redress the underlying injury.[8] (Doc. 111, PageID.19557). (*See also id*. at PageID.19558.) But unlike *South River Watershed*, in this case, there are several contingencies that will determine if Alabama Power has to excavate the coal ash or undertake other measures not in the current closure plan, which could leave this Court with nothing to redress. A series of outstanding contingencies to be resolved over the next several years deprives an injury of imminence or traceability to an alleged statutory or regulatory violation. *See Clapper*, 568 U.S. at 414 (contingent future approval of surveillance procedures made injury speculative, not imminent); *id*. at 417 (cost of avoiding future surveillance not fairly traceable to new statute where

---

[8] In *South River Watershed Alliance*, 69 F.4th at 819-20, the injury to be redressed was that one member obtained "aesthetic enjoyment" from "us[ing] the South River and Chattahoochee watersheds less due to pollution." The pollution complained of was the "illicit discharge of sewage spills." *Id*. at 818. The district court explained that the pollution included defendant's "dumping millions of gallons of untreated sewage into the watersheds." *S. River Watershed All., Inc. v. DeKalb Cnty., Georgia*, 484 F. Supp. 3d 1353, 1369 (N.D. Ga. 2020), *aff'd*, 69 F.4th 809 (11th Cir. 2023). The amended consent decree would require the county to cease discharging the raw sewage. *See South R. Watershed*, 69 F. 4th at 818.

same costs would be incurred to avoid surveillance under old law).

Similarly, Baykeeper's members' fear of a "catastrophic failure" of the dikes due to a historic storm or flood is speculative. (Doc. 111, PageID.19553). Since 1965 through numerous floods and hurricanes, including Category 5 hurricanes,[9] the dikes have never failed, and the coal ash has never spilled into the Mobile River. Accordingly, the Complaint contains no plausible allegation that they will. Baykeeper's speculation is insufficient to create an imminent injury that would need to be redressed. *See TransUnion,* 141 S. Ct. at 2210; *Clapper,* 568 U.S. at 414 & n.5; *Ranger Env't Servs. LLC v. Foehl,* No. 1:23-00297-KD-M, 2023 WL 6931336, at \*13-\*14 (S.D. Ala. Oct 19, 2023).

Likewise, it is speculative to say that Baykeeper's sought-after remedy will address the alleged pollution that Baykeeper's members claim is on their properties or has settled in the Mobile-Tensaw Delta. *See* (Kendall Dexter Decl.) (Doc. 1-3, PageID.41-42) ("16. … Pollutants from upstream eventually settle into the Delta and Mobile Bay, and when flood waters flow over Runamuck Island, they can settle onto our island. ... 18. … I am also concerned about the pollution from the coal ash site at Plant Barry that flows beside, over, and onto our island."); (Luke Adams Decl.) (*id*. at PageID.48) ("14. …  I am concerned that this plan will allow the coal ash to continue to pollute the Mobile River and that the floodwaters that flow past Plant Barry will carry pollutants from the site beside and onto my property."); (Nicholas Williams Decl.) (*id*. at PageID.58) ("16 … Pollutants from upstream eventually settle into the Delta and Mobile Bay.")  It is not apparent how issuing an order that would result in implementation of a different closure plan in 2031, for example, would clean up alleged existing pollution that has settled on land or in the Mobile-Tensaw Delta.

As a matter of law, Baykeeper's requested relief is not substantially likely to redress its

---

[9] *See* NOAA, Historical Hurricane Tracks, https://coast.noaa.gov/hurricanes (search "36512"; select 50 miles under "Search Distance"; select Categories 1-5 and Tropical Storm under "Storm Categories"; select years 1965-2023 under "Year(s)").

members' injuries. And its Motion to Reconsider largely rehashes old standing arguments that it already lost. *See Longmire*, 2017 WL 2126824, at *1 ("Authority is legion for the proposition that motions to reconsider 'may not be used to relitigate old matters ....'") (quoting *Exxon Shipping*, 554 U.S. at 485 n.5) (citation omitted).

## II. This Court's Holding that Baykeeper's Claims Are Not Ripe Is Correct.

### A. Delaying Judicial Review Will Not Cause Baykeeper Harm.

#### 1. This Court Explained that Baykeeper's Claims Are Not Ripe Because Withholding Judicial Consideration Will Not Cause Incremental Harm.

As this Court explained: "A ripeness inquiry consists of two determinations: (a) the hardship to the parties of withholding court consideration; and (b) the fitness of the issues for judicial decision. Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003)." (Doc. 108, PageID.19465-19466.) "[T]he probability that either or both [EPA's proposed disapproval of ADEM's CCR permit program or NOPV proceeding] will cause Alabama Power to amend its closure plan before the project's May 2031 completion date means that the 'closure performance standard' will likely not crystallize for years." (Doc. 108, PageID.19469.) "So, the Court causes no additional hardship by delaying review to allow for further factual development when the plain language of the Federal CCR Regulations and the early stage of the project would already have the Court wait. See Roanoke River Basin, 2018 WL 2417862, at *7 ('[A]s to the hardship prong of the ripeness analysis, the cost to Plaintiff of denying review would be minimal, if any, given the preliminary nature of the initial closure plan.')." The Court is correct.

#### 2. Article III of the Constitution Takes Precedence Over RCRA's Statutory Citizen Suit Provision.

Baykeeper contends that this Court erred in holding Baykeeper's claims were unripe because RCRA establishes the only ripeness criteria for a citizen suit—no diligent prosecution by an agency before the complaint is filed. (Doc. 111, PageID.19559). This argument fails because the ripeness requirement for exercising the judicial power to decide a case or controversy comes

from the Constitution, Article III, § 2, and takes precedence over the citizen suit provision that was created by a statute—42 U.S.C. § 6972(a)(1)(A).

As this Court recognized, "[t]o the extent that the ripeness problem in a particular case is of a constitutional character, Congress is powerless to override it.  See Fl. Panthers v. Collier Cnty., No. 2:13-CV-612, 2016 WL 1394328, at *10 (M.D. Fla. Apr. 8, 2016) ('[R]ipeness is an Article III requirement, and as such it cannot be entirely swept aside by Congress.')."  (Doc. 108, PageID.19464) (citing *TransUnion*, 141 S. Ct. at 2205 ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III any more than, for example, Congress's enactment of a law regulating speech relieves courts of their responsibility to independently decide whether the law violates the First Amendment.")).

> ### 3.     Baykeeper Cannot Use a Post-judgment Submission of Previously Available Evidence to Manufacture Factual Issues after Final Judgment.

Baykeeper relies on a post-judgment expert declaration to argue that delaying judicial review will harm Baykeeper's members because its members are suffering alleged pollution harm that would be abated if the Court ordered Alabama Power to file an excavation closure plan with ADEM.  (Doc. 111, PageID.19560-19563).  Baykeeper makes two arguments why the Anthony Brown Declaration should be considered: (1) Alabama Power did not argue that eliminating free liquids before installing the cover system would not address the current groundwater contamination until after the final cover system was installed in 2030 (*see id.* at PageID.19555); and (2) the Court reached an erroneous factual conclusion because two electric generating facilities in South Carolina experienced reduction in pollution soon after excavation activities began (*see id*. at PageID.19560-19561).

First, Alabama Power did argue in its standing brief that actions were being taken during the closure process to reduce groundwater contamination:

> And under its closure plan, Alabama Power will: (1) remove the pond water and decrease the hydraulic head, or downward pressure, that historically has pushed

> contaminants through the coal ash downward into the groundwater (Doc. 27-1, Page ID.4870); and (2) conduct corrective action to address any impacts under the coal ash pond (Doc. 45-1, PageID.6565-6567).

(Doc. No. 101, PageID.19364).  On December 8, 2023, prior to the Court's December 12, 2023 Hearing, Alabama Power also filed a Request for Judicial Notice of upstream and downstream water quality testing from the Mobile River for 41 consecutive months from June 2020 through October 2023. (Doc. 103, PageID.19381-19382). Alabama Power presented argument regarding this testing at the Hearing, (Doc. 110, PageID.19530).

Baykeeper suffered no "surprise."  The Brown Declaration is repackaging of the same argument that Baykeeper made at the December 12, 2023 hearing about the two South Carolina sites:

> MR. HOLLEMAN: …We had a site in South Carolina on the coast, arsenic contamination like this one.  Soon after the excavation began, within a year or two, the arsenic contamination levels in the groundwater declined precipitously.
>
> . . . .
>
> Well, in 2018 in the course of remediation, not at the end, a major hurricane hit the state of North Carolina, and tremendous flood waters came down through South Carolina and inundated entirely one of the coal ash lagoons and the entire town of -- a significant portion of the town of Conway, which could have been one of the worst environmental disasters in the state's history.

(Doc. 110, PageID.19521-19522). For these reasons, the Brown Declaration does not impact the Court's findings and should be ignored.

Second, even if the expert declaration had explained how the South Carolina sites compared to the Plant Barry ash pond in terms of size and volume of CCR, velocity and flow of groundwater, and a myriad of other site-specific characteristics (it does not), it is still procedurally improper.  Baykeeper cannot submit previously unsubmitted evidence with its Motion to Reconsider because the years-old factual material was available during the pendency of the Motion to Dismiss.  "Evidence that was previously available, but which a party failed to present to the court, is not considered 'newly discovered evidence' for purposes of a motion for reconsideration. The rationale for this requirement is to prevent a party from profiting from its own inadvertence at the expense of judicial economy and equity. The rule also promotes the important interest in

preserving the finality of judgments." *Acciard v. Whitney*, No. 2:07-cv-476-FtM-36DNF, 2011 WL 13294619, at *2 (M.D. Fla. July 20, 2011) (rejecting deposition testimony submitted by the plaintiff with his Rule 59 motion because it was duplicative of evidence and arguments previously made by the plaintiff and considered by the Court prior to entering its judgment). *See Mays*, 122 F.3d at 46 ("[W]here a party attempts to introduce previously unsubmitted evidence on a motion to reconsider, the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion.").[10]

The evidence relied on by the expert—prior experience with two other coal ash impoundments in South Carolina—was available before the final January 4, 2024 judgment. (*See* Doc. 111-1, PageID.19580) (Grainger—"Arsenic concentrations in groundwater samples from monitoring well GGSMW-3 decreased from 941.9 ug/L (October 1, **2013**) to 304 ug/L (October 17, **2017**)") (emphases added); (*id.* at PageID.19582) (Wateree—"Between April 17, **2001** and

---

[10] Baykeeper contends that Alabama Power did not argue that "ordering [Alabama Power] to execute a closure plan that complies with 40 C.F.R. § 257.102(d)(1)(i-ii) and (d)(2)(i) would not make it 'substantially likely' that Plant Barry's coal ash leaching would cease any time soon." (Doc. 111, PageID.19554) (internal quotation marks and citation omitted). But Alabama Power argued at the December 12, 2023 hearing: "[W]hatever plan they get, whatever remedy is provided, excavation or modified closure in place or closure in place, if the level of individual harm to them would be the exact same throughout 2024, whatever the plan is because the plan won't get implemented until years later." (Doc. 110, PageID.19511). And Baykeeper contends that Alabama Power never argued that "ordering Alabama Power to 'eliminate free liquids by removing liquid wastes prior to installing the final cover system would do nothing to address Plant Barry's ongoing groundwater contamination when the system will not be installed until August 2030." (Doc. 111, PageID.19555) (citation omitted). But Alabama Power argued at the December 12, 2023 hearing: "[N]othing is going to change for the whole of 2024 because these plans are not going to be implemented. And their harm of no reduction in pollution in 2031 won't happen for 5 or 6 years from now." (Doc. 110, PageID.19518.) In any event, Alabama Power has acknowledged groundwater exceedances, "identified measures to address groundwater issues," and "is implementing corrective action to address those impacts." (Doc. 60, PageID.13928). Baykeeper, not a stranger to sur-replies and additional filings, did not file its expert's declaration at the hearing or before the judgment, and cannot use surprise as a basis to file that expert's declration with its post-judgment motion. *See In re Kellogg*, 197 F.3d 1116, 1120 (11th Cir. 1999) (noting that a party "may not use a Rule 59(e) motion to raise arguments available but not advanced at the hearing"); *see also United States v. Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 935 (8th Cir. 2006) (affirming district court's denial of motion for reconsideration where the expert report submitted in support of the motion was "merely a newly created opinion based on facts known to or accessible by [the movant] at the time of the . . . hearing …." ).

October 22, **2018**, 39 samples from monitoring well MW-3 were analyzed for arsenic.") (emphases added).  For this reason alone, this Court should ignore Baykeeper's post-judgment expert's declaration that relies on pre-judgment evidentiary material that was readily available. *See Mays*, 122 F.3d at 46.

### B.    The Record is Unfit for Judicial Decision.

#### 1.    Significant Contingencies Require Resolution Before the Record is Fit for Judicial Decision.

This Court correctly identified contingencies with a significant potential to affect this case, which should be resolved before the expenditure of judicial resources. "[Under] [t]he fitness prong…, 'the claim must be sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision making by the court.' Harris v. Mex. Specialty Foods, 564 F.3d 1301, 1308 (11th Cir. 2009) (internal quotations and citation omitted)."  (Doc. 108, PageID.19469).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated or at all. Tex. v. U.S., 523 U.S. 296, 300 (1998)."  (Doc. 108, PageID.19469-19470).

"The final form that the closure plan will take ... rests upon several contingent future events that may not occur as anticipated. See Tex., 523 U.S. at 300."  (Doc. 108, Page.ID.19470). "Significantly, the relevant substantive law's yardstick that the Court would use to adjudicate these claims is not ascertainable until these contingencies are resolved and the closure plan becomes more definite.  See Roanoke River Basin, 2018 WL 2417862, at *7 ('The uncertainty as to whether, and in what form, Duke Energy's closure plan will ultimately be implemented weighs against a finding that this matter is now ripe for a judicial decision.')."  (Doc. 108, PageID.19471-19472) (footnote omitted).

#### 2.    Baykeeper's Urging of this Court to Ignore the Contingencies Is Contradicted by U.S. Supreme Court Precedent.

Baykeeper also argues that possible future contingencies (e.g., EPA's denial of ADEM's permit program application, the NOPV proceeding, and the D.C. Circuit litigation) do not deprive this case of ripeness.  (Doc. 111, PageID.19564).  But these contingencies could be resolved in

ways that leave nothing for this Court to do or that make Baykeeper's interpretations of the CCR Regulations invalid.

The U.S. Supreme Court has held that a claim is not ripe for adjudication if it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Thomas v. Union Carbide Ag. Prods. Co*., 473 U.S. 568, 580–81 (1985) (quoting 13A Charles A. Wright, et al., Federal Practice and Procedure § 3532 (1984)). In *Texas v. United States*, 523 U.S. 296, 298-300 (1998), the State of Texas sought a declaration that Section 5 of the Voting Rights Act, requiring preclearance, did not apply to a new Texas statute that provided for various remedies for failing schools, including replacing locally elected school officials. The Supreme Court reasoned that the fact that the new statute "has yet to be interpreted by the Texas courts" increased the uncertainty and unfitness for judicial resolution: "[p]ostponing consideration of the questions presented, until a more concrete controversy arises, also has the advantage of permitting the state courts further opportunity to construe the provisions." *Id*. at 301 (internal quotation marks and citations omitted).

Likewise, current litigation before the D.C. Circuit, *see supra* at pp. 2-3, could lead EPA to take a different stance. Moreover, EPA and Alabama Power are in settlement discussions, *see supra* at p. 2, that could result in changes to the plan (e.g., engineering controls) or site corrective action measures that are not currently contemplated in the record before this Court. EPA could also change course and approve ADEM's permit program, or, alternatively, ADEM could challenge a final denial in court. *See supra* at pp. -21. Either course on the ADEM permit program could affect Alabama Power's final closure plan. Not knowing what the ultimate closure plan will be or EPA's or the D.C Circuit's final interpretations of the CCR Regulations makes the current claims for comparing the existing closure plan with the CCR Regulations unfit for judicial review. *See Texas*, 523 U.S. at 300-301.

Baykeeper takes issue with the Court's statement that the EPA's proposed denial of ADEM's permit program "makes it more likely that Alabama Power will be forced to amend its closure plan to some extent" and notes that the ADEM permit is "binding." (Doc. 111,

23

PageID.19568, 19566) (internal quotation marks and citation omitted).  But the CCR Regulations provide that an owner or operator of a CCR impoundment can amend its closure plan "at any time," *see* 40 C.F.R. § 257.102(b)(3)(i), and Alabama Power's permit expressly allows for amendments as circumstances require, (*see* Doc. 22-1, PageID.108, 110).  For example, if one or more of the ongoing contingencies result in a different understanding of Alabama Power's regulatory obligations, such that an amendment to the closure plan is required, Alabama Power will amend the plan to remain in compliance.

Moreover, both in the permit program proceeding and in the NOPV proceeding, highly technical factual issues remain to be resolved by EPA, ADEM, and Alabama Power.  (*See* Doc. 84-1, PageID.18679, 18704, 18778) ("engineering measures to control the groundwater," "slope stability," "no wells appear to have been screened in either the sand or silt layers"); (Doc. 62-1, PageID.14420-14421) (questioning "engineering controls," impact of "clay layer of varying thicknesses along with other depositional layers of various types of silty or clayey sands" on future stability of cover, "boring log and groundwater monitoring well construction data from groundwater wells").  As this Court stated:

> [D]elaying review would protect the Court from engaging in speculation and wasting its resources by reviewing Alabama Power's provisional closure plan. City of Plantation, 121 F.3d at 589.  As Alabama Power points out,
>
> > Relatedly, the Report asserts that "[t]here is nothing before the Court that suggests that a remedy cannot be fashioned." . . . But what additional engineering controls would the Court suggest be included in the closure plan to ensure that in 2031 the "CCR remaining in the closed unit is not continually inundated with groundwater"? Those suggested by Baykeeper? By a professional engineer retained by the Court? By the results of EPA and Alabama Power discussions? By the outcome of the D.C. Circuit litigation? By some combination of the above? And how would any such remedy account for subsequent legal developments, changed conditions at Plant Barry, or developing closure technologies between now and 2031 that could lead to modification of the closure plan? Would Alabama Power be able to revise its plan as contemplated by the regulations, or must it apply to this Court for an amendment? See, e.g., Johnson v. Sikes, 730 F.2d 644, 648 (11th Cir. 1984) (ripeness protects courts "entangling themselves in abstract disagreements") (citations and quotations omitted). These uncertain contingent future events confirm that Baykeeper's complaint is not ripe for this Court's resolution at this time.

(Doc. 108, PageID.19472).  And, as Baykeeper points out, Alabama Power's recently announced program to recycle a portion of the ash could also impact the final closure process.  (Doc. 111, PageID.19565).

This Court should not decide whether closure complies with the CCR Regulation's closure performance standards until Alabama Power is "closer to the project's estimated 2031 completion date."  (Doc. 108, PageID.19468) (citing *Zen-Noh Grain Corp. v. Consol. Env't Mgmt., Inc.*, No. 12-CV-1011, 2012 WL 6201871, at *9 (E.D. La. Dec. 12, 2012)).  And Baykeeper's Motion to Reconsider simply rehashes old arguments that lost.  *See Longmire*, 2017 WL 2126824, at *1 ("Authority is legion for the proposition that motions to reconsider 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'") (quoting *Exxon Shipping*, 554 U.S. at 485 n.5) (citation omitted).

## CONCLUSION

This Court should deny Baykeeper's Motion to Reconsider.


Respectfully submitted on this the 20th day of February, 2024


*/s/ Ed R. Haden*
One of the Attorneys for the Defendant
Alabama Power Company


**OF COUNSEL:**

Jaime W. Betbeze
(jbetbeze@maynardnexsen.com)
Raymond L. Bell, Jr.
(rbell@maynardnexsen.com)
Evan N. Parrott
(eparrott@maynardnexsen.com)
MAYNARD NEXSEN P.C.
RSA Battle House Tower
11 N. Water St., Ste. 24290
Mobile, Alabama 36602
Telephone: (251) 432-0001

Ed R. Haden (ehaden@balch.com)
Charles A. Burkhart (cburkhart@balch.com)
Steven A. Burns (sburns@balch.com)
Sean W. Shirley (sshirley@balch.com)
BALCH & BINGHAM LLP
1901 6th Avenue North
Suite 1500
Birmingham, AL 35203
Telephone: (205) 251-8100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of February 2024, a copy of the foregoing was filed using the Court's CM/ECF system, which sends an electronic notice to all counsel of record.


<u>/s/ Ed R. Haden</u>
Of Counsel