# EXHIBIT 1

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 7, 2024        Decided June 28, 2024

No. 22-1056

ELECTRIC ENERGY, INC., ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S.
REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
RESPONDENTS

STATE OF TEXAS, ET AL.,
INTERVENORS

———

Consolidated with 22-1058

———

On Petitions for Review of Actions
of the Environmental Protection Agency

———

2

No. 23-1035

ELECTRIC ENERGY, INC., ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S.
REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
RESPONDENTS

SIERRA CLUB,
INTERVENOR

————

Consolidated with 23-1036, 23-1037, 23-1038

————

On Petitions for Review of Actions
of the Environmental Protection Agency

————

*P. Stephen Gidiere III* and *Stacey L. VanBelleghem* argued
the causes for petitioners.  With them on the joint briefs were
*Joshua R. More*, *Helgi C. Walker*, *David Fotouhi*, *Julia B.
Barber*, *Michael L. Raiff*, *David W. Mitchell*, *Douglas Green*,
*Margaret K. Fawal*, *Karl A. Karg*, *Matt Gregory*, and *Ann H.
MacDonald*.

*Ken Paxton*, Attorney General, Office of the Attorney
General for the State of Texas, *Kellie E. Billings-Ray*, Chief,
Environmental Protection Division, and *John Hulme* and *Jake*

3

*Marx*, Assistant Attorneys General, were on the brief for State Petitioner-Intervenors in case No. 22-1056.  *Priscilla M. Hubenak*, Assistant Attorney General, entered an appearance.

*Nash E. Long*, *Andrew R. Varcoe*, *Stephanie A. Maloney*, and *Elbert Lin* were on the brief for *amicus curiae* the Chamber of Commerce of the United States in support of petitioners in case No. 22-1056.

*David Mitchell*, Attorney, U.S. Department of Justice, argued the cause for respondents.  With him on the briefs were *Todd Kim*, Assistant Attorney General, Environmental & Natural Resources Division, *Perry M. Rosen*, Attorney, and *Laurel Celeste*, Senior Attorney, U.S. Environmental Protection Agency.

*Gavin Kearney* argued the cause for respondent-intervenors.  With him on the joint briefs were *Thomas Cmar*, *Jennifer Cassel*, *Gilbert Zelaya*, *Lisa Evans*, *Nicholas S. Torrey*, and *Frank S. Holleman, III*.

Before: MILLETT and PILLARD, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge:*   In these two related cases, the owners and operators of several coal-fired power plants challenge Environmental Protection Agency actions applying and enforcing regulations that govern the disposal of coal combustion residuals.  Petitioners argue that the challenged agency actions amend existing legislative rules governing such disposal and that EPA was therefore required to promulgate those amendments according to the notice-and-comment procedures of the Administrative Procedure Act.  Because the

4

challenged documents straightforwardly apply existing regulations, they do not amount to the kind of agency action "promulgating a[] regulation, or requirement" that we have jurisdiction to review under the Resource Conservation and Recovery Act. 42 U.S.C. § 6976(a)(1). We accordingly dismiss the related petitions for lack of jurisdiction.

## I.

### A.

When an electric utility or power plant burns coal to produce electricity, it generates ash, slag, and other coal "residuals." *See* Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals from Electric Utilities, 75 Fed. Reg. 35128, 35137 (June 21, 2010). EPA has determined that coal residuals contain myriad carcinogens and neurotoxins that contribute to increased rates of "cancer in the skin, liver, bladder, and lungs," "neurological and psychiatric effects," "damage to blood vessels," and "anemia" in people exposed to them. Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities ("2015 Rule"), 80 Fed. Reg. 21302, 21451 (Apr. 17, 2015). EPA has also found that the residuals pose risks to plant and animal wildlife, including "[e]levated selenium levels in migratory birds, wetland vegetative damage, fish kills, amphibian deformities, . . . [and] plant toxicity." 75 Fed. Reg. at 35172.

To address the health and environmental risks associated with coal residuals, EPA regulates their disposal under Subtitle D of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq*. *See Util. Solid Waste Activities Grp. v. EPA* (*USWAG*), 901 F.3d 414, 421-25 (D.C. Cir. 2018) (per curiam) (discussing the regulatory landscape governing

5

disposal of coal residuals).   With Subtitle D of RCRA, Congress seeks to "assist [states and regional authorities] in developing and encouraging methods" for solid waste disposal that are "environmentally sound" and promote resource conservation.  42 U.S.C. § 6941.  As relevant here, RCRA calls on EPA to "promulgate regulations containing criteria for determining which facilities shall be classified as sanitary landfills and which shall be classified as open dumps."  *Id.* § 6944(a).  The statute requires that the regulatory criteria for classification as a sanitary landfill be sufficiently stringent to ensure "no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility."  *Id.*  If the agency classifies a practice as "the open dumping of solid waste or hazardous waste," RCRA provides for citizen suits against those engaging in such dumping, *id.* §§ 6945(a), 6972, and requires states to prohibit the practice in their waste management plans, *id.* § 6944(b).

In 2015, EPA promulgated a final rule governing the disposal of coal residuals produced by electric utilities and power plants.  The 2015 Rule applies to owners and operators of two types of coal residual disposal sites—surface impoundments and landfills—which we collectively refer to as coal residual units.  *See* 40 C.F.R. § 257.53.  As contemplated by the statute, the 2015 Rule set criteria "designed to ensure that human health and the environment face 'no reasonable probability' of harm from [c]oal [r]esiduals spilling, leaking, or seeping from their storage units and harming humans and the environment."  *USWAG*, 901 F.3d at 420 (quoting 42 U.S.C. § 6944(a)).

To that end, the Rule established, among other things, restrictions on the location of coal residual units; requirements pertaining to lining of coal residual units, their structural integrity and relation to groundwater; and criteria for recycling

6

coal residuals for beneficial uses, such as by substituting it for cement in road construction. *See* 40 C.F.R. §§ 257.60-74. And the Rule also indicates that a coal residual unit is considered an "open dump"—and therefore must be retrofitted or closed—when "groundwater sampling . . . reveals an excess of [c]oal [r]esidual constituents in the water table." *USWAG*, 901 F.3d at 447 (citing 40 C.F.R. § 257.101).

Closure is a defined concept under RCRA. *See* 42 U.S.C. § 6945(a). The 2015 Rule dictates how coal residual units must close when the site is deemed an open dump. A unit owner may close the site "either by leaving the [coal residuals] in place and installing a final cover system" designed to "minimize infiltration and erosion," or by "remov[ing]" the coal residuals and "decontaminat[ing]" the unit. 40 C.F.R. § 257.102(a), (d)(3). When the unit owner opts to close with coal residuals in place, the 2015 Rule imposes two requirements that are particularly relevant to these petitions. First, the Rule mandates that, at a minimum, the unit close in a manner that will (a) "[c]ontrol, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste"; (b) control, minimize, or eliminate "releases of [coal residuals], leachate, or contaminated run-off to the ground or surface waters or to the atmosphere"; and (c) "[p]reclude the probability of future impoundment of water, sediment, or slurry" in the unit. *Id.* § 257.102(d)(1)(i)-(ii). Second, the Rule dictates that, before installing the "final cover system" over the unit, "[f]ree liquids must be eliminated by removing liquid wastes or solidifying the remaining wastes and waste residues." *Id.* § 257.102(d)(2)(i).

In response to *USWAG v. EPA*, 901 F.3d 414 (D.C. Cir. 2018), in which we vacated portions of the 2015 Rule as arbitrary and capricious, EPA amended the Rule. It newly classified unlined coal residual units—those units without a

composite liner preventing leakage into the soil—as open dumps that must stop receiving coal residuals and initiate closure by April 11, 2021. *See* Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities; A Holistic Approach to Closure Part A: Deadline to Initiate Closure, 85 Fed. Reg. 53516, 53517 (Aug. 28, 2020). At the same time, EPA granted leeway via an "alternative closure" exemption. That exemption allowed the owner or operator of an unlined surface impoundment to extend the closure deadline beyond April 2021 and manage the coal residuals in place in the meantime. To qualify for the exemption, the rule required the owner or operator to establish, as relevant here, (1) that "[n]o alternative disposal capacity is available on or off-site" of the facility, and (2) that the owner or operator remains in compliance with all of the other requirements of the coal residuals regulations. 40 C.F.R. § 257.103(a)(1)(i), (iii). The rule set an outer time limit on extensions: "[N]o facility may be granted time to operate the [non-complying] impoundment beyond" October 15, 2024. *Id.* § 257.103(f)(1)(vi), (vii).

## B.

Dozens of companies with unlined units, including several of the petitioners in this case, sought extensions of the April 2021 closure deadline. An application from the General James M. Gavin Plant is illustrative: The plant operator requested an extension until May 4, 2023, by which date it would cease routing all coal residuals to its active, unlined surface impoundment (known as the Bottom Ash Pond) and close the pond with some coal residuals in place. The Clifty Creek

8

Power Station and the Ottumwa Generating Station filed similar requests.

On January 11, 2022, EPA published proposed denials of Gavin, Clifty Creek, and Ottumwa's extension applications.[1] *See* 40 C.F.R. § 257.103(f)(3)(iii) (requiring publication of proposed decisions for a 15-day comment period).  In each of the three proposed denials, EPA concluded that the facility's owner or operator failed to demonstrate that the facility remained in compliance with other requirements of the coal residuals regulations, and thus did not meet the preconditions to receive an extension.  *See id.* § 257.103(a)(1)(iii).  Three of EPA's proposed reasons for finding such non-compliance are relevant here.

First, EPA proposed finding that each of the three facilities had a coal residual unit with its base sitting in and saturated with groundwater.  The extension applications did not discuss any "engineering measures taken to ensure that the groundwater had been removed from the unit prior to the start of installing the final cover system, as required by 40 C.F.R. § 257.102(d)(2)(i)."  Proposed Gavin Denial at 46 (Joint Appendix (J.A.) 75, No. 22-1056); Proposed Clifty Creek

---

[1] Petitioners also purport to challenge the Proposed Conditional Approval of an Alternative Closure Deadline for H.L. Spurlock Power Station in Maysville, Kentucky.  That conditional approval is distinct from the proposed denials petitioners challenge because it rests on a proposed finding that the facility had not yet adequately demonstrated compliance with the 2015 Rule's groundwater monitoring requirements—not on a proposed finding of failure to comply with the closure requirements in 40 C.F.R. § 257.102. Petitioners raised no argument regarding that conditional approval in their briefing or at oral argument, so they have abandoned that challenge.  *See Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 594 (D.C. Cir. 2023).

9

Denial at 40 (J.A. 158, No. 22-1056); Proposed Ottumwa
Denial at 41 (J.A. 238, No. 22-1056).  Given the potential for
groundwater to infiltrate the coal residual unit and for coal
residuals to dissolve in the water and migrate out of the unit,
the facilities had not established, as required by the 2015 Rule,
how those units had been closed in a manner that would
"[c]ontrol, minimize or eliminate, to the maximum extent
feasible, post-closure infiltration of liquids into the waste and
releases of [coal residuals], leachate, or contaminated run-off
to the ground or surface waters or to the atmosphere."  40
C.F.R. § 257.102(d)(1)(i).  Because the plants did not comply
with the closure requirements in sections 257.102(d)(1) and
(2), EPA proposed that it could not grant the requested
extensions.  *See id.* § 257.103(a)(1).

Second, EPA proposed that Clifty Creek's proposal to
construct concrete settling tanks for coal residual storage was,
in effect, a proposal to build a new coal residual surface
impoundment.  And, because Clifty Creek had not established
that the new surface impoundment complied with the 2015
Rule's liner design criteria in 40 C.F.R. § 257.72, EPA
proposed finding that it could not grant the extension.

Lastly, EPA proposed finding that Ottumwa Generating
Station's closure plan was not compliant with the closure
requirements because Ottumwa proposed, contrary to existing
regulations, placing additional coal residuals in a surface
impoundment during closure.  The 2015 Rule explicitly
requires that the owner or operator of an existing unlined
surface impoundment "cease placing" coal residuals into that
impoundment, 40 C.F.R. § 257.101(a)(1); EPA explained that

10

there is, contrary to Ottumwa's assertion, no exception for placement that might be considered a "beneficial use."

The same day EPA published the proposed decisions, the agency issued a press release announcing its intention to "protect communities and hold facilities accountable for controlling and cleaning up the contamination created by decades of coal ash disposal." Press Release at 1 (J.A. 1, No. 22-1056). The press release described EPA's "propos[ed] decisions on requests for [closure-deadline] extensions," which, in the agency's words, "re-state[d] EPA's consistently held position that surface impoundments or landfills cannot be closed with coal ash in contact with the groundwater." *Id.* at 1, 3 (J.A. 1, 3, No. 22-1056). It also announced that EPA was "putting several facilities on notice regarding their obligations to comply with [the existing coal residual] regulations" and "laying out plans for future regulatory actions." *Id.* at 1-2 (J.A. 1-2, No. 22-1056).

As forecasted in the press release, EPA directors sent letters that same day to Georgia's Environmental Protection Division and to four companies with power stations in Indiana, Ohio, Kansas, and Puerto Rico, describing how the 2015 Rule's closure standards applied to those companies' coal residual units that are saturated in groundwater. EPA's letter to Duke Energy, for example, informed it that two of its unlined surface impoundments in New Albany, Indiana—which it had removed from service and covered with soil and grass in 1989, but which continued to sit in 20 feet of groundwater—are "subject to the requirements of 40 C.F.R. Part 257." Duke Energy Letter at 1 (J.A. 9, No. 22-1056). If Duke Energy planned to close the two sites with waste in place, EPA explained, it would need to "implement engineering measures

11

to remove groundwater from the unit[s]" before installing the final cover system. *Id.* at 3 (J.A. 11, No. 22-1056).

Taken together, we call the issuance of the January 11, 2022 documents—the proposed decisions, the press release, and the letters—the January 2022 actions.

**C.**

On November 28, 2022, EPA published in the Federal Register notice of its final order on Gavin's extension request. *See* Final Decision on Request for Extension of Closure Date Submitted by Gavin Power, LLC, 87 Fed. Reg. 72989 (Nov. 28, 2022). As it had proposed to do, EPA rejected Gavin's extension request and ordered the facility to cease receipt of coal residuals into the Bottom Ash Pond no later than April 12, 2023. *Id.* at 72990. In support of its denial, EPA cited Gavin's failure to demonstrate its compliance with the 2015 Rule's closure performance standards for a separate unlined surface impoundment known as the Fly Ash Reservoir, which had ostensibly been closed while indefinitely saturated in 64 feet of groundwater.

That impoundment, EPA explained, did not meet two of the closure requirements set forth in the 2015 Rule. Specifically, Gavin's submission failed to show: (1) that the facility had eliminated "free liquids" from the Fly Ash Reservoir before closure, as required by 40 C.F.R. § 257.102(d)(2)(i); and (2) that the facility had taken engineering measures to "control, minimize, or eliminate to the maximum extent feasible" the "post-closure infiltration of liquids from either side or base of the units into the waste," or to "preclude the probability of future impoundment of water, sediment, or slurry," as required by 40 C.F.R. § 257.102(d)(1)(i) and (ii). EPA also denied the extension request because Gavin had not demonstrated compliance with

12

the 2015 Rule's groundwater monitoring and sampling standards.

## D.

Two groups of petitioners sought review in this court. First, in Case No. 22-1056 and the consolidated petition, entities that operate or represent coal-fueled power plants challenged EPA's January 2022 actions as unlawfully amending the existing closure regulations. Petitioners argue that EPA violated both the Administrative Procedure Act and RCRA by announcing in a series of informal documents what they claim is a legislative rule subject to notice-and-comment rulemaking. *See* 5 U.S.C. § 553. Second, in No. 23-1035 and consolidated petitions, another (partially overlapping) group of companies filed what they describe as a "protective" petition, in the event this court lacks jurisdiction to review the January 2022 actions. As in Case No. 22-1056, petitioners in Case No. 23-1035 assert that EPA promulgated, in its final denial of the Gavin plant's application, a legally binding amendment to the existing coal residuals regulations without the requisite notice-and-comment rulemaking.

## II.

Our consideration of the petitions begins and ends with jurisdiction. RCRA vests this court with original, exclusive jurisdiction over "petition[s] for review of action of the Administrator in promulgating any regulation, or requirement under this chapter or denying any petition for the promulgation, amendment or repeal of any regulation." 42 U.S.C. § 6976(a)(1). The statute governs venue, mandating that "challenges to final regulations be brought before us rather than in another court." *Molycorp., Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999). It also operates as "a limitation on our jurisdiction," cabining our review to final regulations,

13

requirements, and denials of petitions to promulgate, amend, or repeal a regulation. *Id.* Challenges to other final EPA actions under RCRA must be brought in the first instance in federal district court. *See* 42 U.S.C. § 6976(a).

Both sets of petitioners contend that the challenged EPA actions are reviewable as final "regulations" because they amend existing legislative rules and because an "amendment to a legislative rule must itself be legislative." *Sierra Club v. EPA*, 873 F.3d 946, 952 (D.C. Cir. 2017). EPA, for its part, asserts that we have jurisdiction to review only the final Gavin Denial, which it contends is a reviewable "requirement" within the meaning of 42 U.S.C. § 6976(a)(1). We consider our jurisdiction to review the January 2022 documents at issue in Case No. 22-1056 before turning to whether we have jurisdiction to review the final Gavin Denial at issue in Case No. 23-1035.

**A.**

Petitioners assert that, in the January 2022 actions, EPA promulgated a binding legislative rule subject to direct review in this court. Specifically, they argue that the January 2022 documents are legislative rules because they amended the existing coal residuals rule in two important ways: (1) by announcing a new prohibition on closing coal residual units with waste in contact with groundwater; and (2) by expanding the types of waste storage units and practices subject to the coal residuals regulations.

To ascertain whether regulatory action constitutes the promulgation of a reviewable regulation under 42 U.S.C. § 6976(a)(1), we look to whether the action "binds private parties or the agency itself with the 'force of law.'" *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 227 (D.C. Cir. 2007) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C.

14

Cir. 2002)).  In other words, we ask whether the agency action
constitutes a final legislative rule.  *See id.*; *Nat'l Mining Ass'n
v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (explaining
that a legislative rule has the "force and effect of law" (quoting
*INS v. Chadha*, 462 U.S. 919, 986 n.19 (1983))).  Because an
agency's amendment of an existing legislative rule must itself
be legislative, *see Sierra Club*, 873 F.3d at 952, we would have
jurisdiction to review amendments to the legislative rules
governing coal residual disposal.  But we are unpersuaded by
petitioners' assertion that the January 2022 documents amend
the 2015 Rule.

**1.**

Start with petitioners' claim that EPA announced, for the
first time in January 2022, a prohibition on closing unlined
surface impounds while coal residuals sat in contact with
groundwater.  Petitioners assert that EPA thereby "eliminate[d]
one of th[e closure] options" the existing regulations
contemplate for surface impoundments: the option to close
with waste in place.  Pet'r Br. 36, No. 22-1056; *see* 40 C.F.R.
§ 257.102(a) (providing that landfills and surface
impoundments can close either with waste in place or by
removing waste).

The 2022 documents announce no such novel requirement.
They do provide that, if operators wish to close their coal
residual units with waste in place, EPA may require them to
implement engineering measures designed to interrupt any
contact between the groundwater and coal residuals in the
relevant unit.  But that much was clear from the text of the 2015
Rule.  After all, it is the 2015 Rule, not the January 2022
documents, that requires unit operators closing surface
impoundments with waste in place to eliminate "free
liquids"—"liquids that readily separate from the solid portion

15

of a waste under ambient temperature and pressure," 40 C.F.R. § 257.53—from the impoundment before installing the final cover system. *Id.* § 257.102(d)(2)(i). And it is the 2015 Rule, not the January 2022 documents, that mandates closure in a manner that will "control, minimize or eliminate, to the maximum extent feasible, post-closure infiltration of liquids into the waste and releases of [coal residuals], leachate, or contaminated run-off to the ground or surface waters." *Id.* § 257.102(d)(1)(i). A unit operator closing a surface impoundment with waste saturated feet-deep in groundwater has neither eliminated "free liquids" from the impoundment nor controlled the "infiltration of liquids" into that unit. *See id.* § 257.102(d)(1)(i), (2)(i).

The 2015 Rule, standing on its own, makes clear that operators cannot close their surface impoundments with groundwater leaching in and out of the unit and mixing with the coal residuals. EPA's proposed action contemplates enforcing those closure standards by requiring the unit's operator to discuss "the engineering measures taken" before installation of the cover system "to ensure that the groundwater had been removed from the unit," and to describe the steps taken to control water and waste flow in and out of the surface impoundment. Proposed Gavin Denial at 46 (J.A. 75, No. 22-1056); *see id.* at 47 (J.A. 76, No. 22-1056). That is a straightforward application, not an amendment, of the 2015 Rule. Nothing in EPA's description of those requirements as a prohibition on closing coal residual units with "coal ash in contact with groundwater" amends the 2015 Rule. Press Release at 3 (J.A. 3, No. 22-1056).

Petitioners insist that, to "shoehorn the new prohibition into the text of the existing regulations," EPA changed the meaning of two key terms in 40 C.F.R. § 257.102(d), which sets out the requirements for closure with waste in place. Pet'r

16

Br. 38, No. 22-1056.  First, petitioners argue that the January 2022 documents newly define "free liquids"—which, per the 2015 Rule, must be "eliminated" before closure, 40 C.F.R. § 257.102(d)(2)(i)—to include groundwater.  They assert that "free liquids" in the 2015 Rule do not include groundwater.  Petitioners stress that the Rule defines "free liquids" as "liquids that readily separate from the solid portion of a waste under ambient temperature and pressure," and separately defines "groundwater" as "water below the land surface in a zone of saturation."  Pet'r Br. 42, No. 22-1056 (emphases omitted) (quoting 40 C.F.R. § 257.53).  But the fact that the Rule includes distinct definitions of "free liquids" and "groundwater" gives us no reason to doubt that, when groundwater makes its way into a coal residual unit, it "readily separate[s] from the solid portion of a waste under ambient temperature and pressure," becoming a free liquid.  40 C.F.R. § 257.53.  Indeed, petitioners offer no argument that groundwater would not, once in a coal residual unit, separate as described.  *See* O.A. Tr. 33:15-23.

Second, petitioners argue that the January 2022 documents newly require facilities closing with waste in place to control the post-closure infiltration of liquids not just "downward" through the final cover system, but also from "any direction, including the top, sides, and bottom of the unit."  Pet'r Br. 38, No. 22-1056 (emphases omitted) (quoting Proposed Gavin Denial at 47 (J.A. 76, No. 22-1056)); *see id.* at 38-39.  But EPA's description of "infiltration" works no change to the existing regulatory text.  Nothing in the 2015 Rule supports petitioners' assertion that unit operators must minimize infiltration from only one direction—in their words, "the downward movement of water through the final cover system."  *Id.* at 38.  To the contrary, the mandate in section 257.102(d)(1) that units "control, minimize or eliminate . . . post-closure infiltration of liquids into the waste" appears in a set of

17

requirements applicable to the closure of the coal residual "unit" as a whole.  40 C.F.R. § 257.102(d)(1)(i).

Section (d)(1) is distinct from a different subsection of the Rule—section 257.102(d)(3)—which requires that the final cover system itself be "designed to minimize infiltration and erosion," including through the installation of an "infiltration layer" of earthen material in the final cover system.  *Id.* § 257.102(d)(3), (d)(3)(i)(B).  Section 257.102(d)(3) appears to be limited to controlling infiltration from above through the final cover system.  But nothing in section 257.102(d)(1) suggests that it could be so limited.  As EPA confirmed in a 2020 summary of a proposed rulemaking, "the [coal residual] regulations currently include [both] detailed technical standards for final cover systems in § 257.102(d)(3)" and "a general performance standard" in section 257.102(d)(1).  Hazardous and Solid Waste Management System: Disposal of CCR; A Holistic Approach to Closure Part B: Alternate Demonstration for Unlined Surface Impoundments; Implementation of Closure, 85 Fed. Reg. 12456, 12464 (Mar. 3, 2020).  And "surface impoundment[s] that extend[] into the groundwater table will need to include measures to comply" with the general "performance standard[]."  *Id.*

In sum, the January 2022 documents did not amend petitioners' obligations to remove existing groundwater and to prevent future groundwater infiltration from coal residual units when closing with waste in place.

**2.**

Petitioners also claim that the January 2022 actions expanded the types of waste storage units and practices subject to the coal residuals regulations without using the requisite rulemaking procedures.  In particular, they argue that EPA amended existing coal residuals regulations by: (1) expanding

18

the definition of "inactive surface impoundment" to apply to facilities that stopped receiving coal residuals before EPA promulgated the 2015 Rule; (2) expanding the meaning of regulated "surface impoundment[s]" to include self-supporting concrete settling tanks; and (3) narrowing the regulatory exclusion for "beneficial use." Pet'r Br. 44, No. 22-1056. We are not persuaded.

First, regarding regulation of units that stopped receiving coal residuals before October 2015, the plain text of the 2015 Rule applies to "inactive service impoundments," 40 C.F.R. § 257.50(c), which the Rule defines as "surface impoundment[s] that no longer receive[] [coal residuals] on or after October 19, 2015 and still contain[] both [coal residuals] and liquids on or after October 19, 2015," *id.* § 257.53. Consistent with that regulatory text, EPA's letter to Duke Energy contemplated applying the 2015 Rule to surface impoundments that no longer receive coal residuals but still contain coal residuals and groundwater.

Second, we are unpersuaded that EPA amended the 2015 Rule when it asserted, in the proposed Clifty Creek Denial, that a self-supporting concrete settling tank system is a coal residual surface impoundment within the meaning of 40 C.F.R. § 257.53. Section 257.53 defines a surface impoundment as "a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of [coal residuals] and liquids." 40 C.F.R. § 257.53. Petitioners assert that the Rule does not specifically "define '[coal residual] surface impoundment' to include 'tanks.'" Pet'r Br. 46, No. 22-1056. But an EPA determination that a specific self-supporting tank system is a "man-made excavation" or "diked area" does not change the definition of "surface impoundment." At most, EPA advanced an application of the

19

rule's terms that, as we explain below, is not a reviewable
"regulation."

Finally, petitioners contend EPA functionally amended the
2015 Rule when it proposed applying to the Ottumwa facility
the Rule's prohibition on "placing [coal residuals] in a [surface
impoundment] that is required to close." Proposed Ottumwa
Denial at 35 (J.A. 232-33, No. 22-1056); *see id.* at 35-36.
Petitioners contend that the facility could add coal residuals as
"fill" to a closing unit because the added waste is a "beneficial
use" exempt from regulation. Pet'r Br. 33, 47, No. 22-1056.
True enough, the 2015 Rule "does not apply to [waste disposal]
practices that meet the definition of a beneficial use" of coal
residuals. 40 C.F.R. § 257.50(g). But it is not at all clear that
Ottumwa's use would meet the definition. A "beneficial use"
subject to the exception is limited to practices, like the use of
encapsulated coal residuals as a filler in concrete, plastics, and
brick, that "provide a functional benefit" and "substitute for the
use of a virgin material, conserving natural resources that
would otherwise need to be obtained through practices, such as
extraction." 40 C.F.R. § 257.53; *see* 80 Fed. Reg. at 21327-28.

More fundamentally, there was nothing new about how
EPA proposed to apply the prohibition to Ottumwa. Well
before the challenged January 2022 actions, EPA spelled out
its understanding that, once the provisions of section 257.101
are triggered, "[a]ll further placement of [coal residuals] into
the unit," whether it "might be considered beneficial
use . . . [or] disposal," is prohibited. Hazardous and Solid
Waste Management System: Disposal of Coal Combustion
Residuals from Electric Utilities; Amendments to the National
Minimum Criteria (Phase One); Proposed Rule, 83 Fed. Reg.
11584, 11605 (Mar. 15, 2018). EPA's reiteration in 2022 of its

20

preexisting view of the closure standard's interaction with the beneficial-use exception does not prescribe new law.

**3.**

None of the January 2022 documents, then, amends the 2015 Rule. Each simply explains, interprets, and applies the 2015 Rule's obligations. It is the 2015 Rule, not the challenged set of 2022 documents, that "binds private parties [and] the agency itself with the 'force of law.'" *Cement Kiln Recycling Coal.*, 493 F.3d at 227 (quoting *General Elec. Co.*, 290 F.3d at 382).

In a final effort to establish that the January 2022 documents are legislative rules, petitioners draw our attention to EPA's later communications encouraging state environmental commissions to read the January 2022 proposed decisions "to understand EPA's application of closure in place" to facilities with "waste below the water table," including in their own jurisdictions. J.A. 500, No. 22-1056. They also point to a meeting EPA convened in March 2022 with agencies from eight states for a discussion of coal residual disposal. That discussion was informed by EPA's January 2022 proposed decisions, which the agency described as "re-stat[ing] EPA's position that surface impoundments or landfills cannot be closed with coal ash in contact with groundwater." J.A. 456, No. 22-1056.

None of EPA's communications in the months after January 2022—about the meeting or otherwise—indicates that EPA treated the January 2022 documents "in the same manner as it treats a legislative rule." Pet'r Br. 55, No. 22-1056 (quoting *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000)). Rather than rendering the 2022 documents a legal requirement with independently binding force, the agency's communications highlight that the agency viewed its

21

2022 enforcement actions as examples informative for
regulated parties as to how the agency interprets and applies
the codified closure regulations.

Petitioners assert in passing that the 2022 documents are
reviewable directly in this court even if they are not legislative
rules but simply announce the agency's "interpretations of the
existing regulations." Pet'r Br. 61 n.6, No. 22-1056. Not so.
An interpretive rule construing an existing regulation "can
constitute final [agency] action" that courts may, under certain
circumstances, review under the Clean Air Act or other statutes
providing for judicial review of agency action. *POET
Biorefining, LLC v. EPA*, 970 F.3d 392, 406 (D.C. Cir. 2020).
But RCRA cabins our original jurisdiction to review of rules that
"bind[] private parties [and] . . . agenc[ies] with the 'force
of law.'" *Cement Kiln Recycling Coal.*, 493 F.3d at 227
(quoting *General Elec. Co.*, 290 F.3d at 382). Mere
interpretive rules lack "the force and effect of law" carried by
an underlying legislative rule or statute. *Cal. Cmtys. Against
Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019); *see Perez
v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015)
("Interpretive rules 'do not have the force and effect of
law . . . .'" (quoting *Shalala v. Guernsey Mem. Hosp.*, 514 U.S.
87, 99 (1995))). Even assuming that the January 2022
documents operated as a final interpretive rule, we would lack
power to review them under RCRA.

We accordingly dismiss the petitions in Case No. 22-1056
(and related petitions) for lack of jurisdiction.

**B.**

We turn next to Case No. 23-1035 and related petitions, in
which Gavin and operators of other coal-fueled power plants
raise a similar challenge to what they frame as a legislative rule
announced in the final Gavin Denial. Like the petitioners in

22

Case No. 22-1056, petitioners here argue that the final Gavin Denial announced a prohibition on waste-in-place closures for coal residual units saturated in groundwater.  That prohibition, they contend, amounts to a legislative rule promulgated without the requisite notice-and-comment rulemaking.

As above, we begin and end with our jurisdiction over these petitions, an issue on which the parties take conflicting and somewhat counterintuitive stances.

Petitioners argue that we have jurisdiction to review only the legislative rule that, in their view, EPA announced in the final Gavin Denial—but not the denial itself.  In other words, petitioners here, as in Case No. 22-1056, seek to challenge a generally applicable prohibition on closing coal residual units with waste in contact with groundwater, not EPA's determinations in the final Gavin Denial that Gavin itself failed to comply with the closure regulations.  In fact, petitioners argue that, apart from the generally applicable legislative rule announced therein, the final Gavin Denial is not a reviewable "regulation" or "requirement" under 42 U.S.C. § 6976(a)(1). Pet'r Br. 52, No. 23-1035.  Gavin has instead sought to challenge the Gavin-specific compliance findings in federal district court in the Southern District of Ohio.  *See Gavin Power, LLC v. EPA*, No. 2:24-cv-41 (S.D. Ohio filed Jan. 4, 2024).

EPA, by contrast, argues that the entire Gavin Denial must be challenged in the first instance in this court because it imposed a binding "requirement" for Gavin to initiate closure of its Bottom Ash Pond.  EPA contends that any challenges to the Gavin Denial raised only in the Ohio case and not in petitioners' opening brief here are forfeited.  But because the Gavin Denial does not announce a legislative rule—or any other kind of rule—but rather is a classic site-specific, fact-

23

intensive adjudication of Gavin's extension request, EPA asserts that it is not a "regulation" under RCRA subject to the requirements of notice-and-comment rulemaking.

We consider first whether the final Gavin Denial announces a reviewable legislative rule (*i.e.*, a "regulation") before ascertaining whether the Denial, as a whole, is reviewable as the "promulgation" of a "requirement."  42 U.S.C. § 6976(a)(1).

## 1.

Petitioners' assertion that the final Gavin Denial announces a legislative rule boils down to the same argument addressed in our discussion of Case No. 22-1056: that, in the Gavin Denial, EPA amended the 2015 coal residuals regulation by announcing therein that the agency is "unaware of a circumstance where [the closure] standards could be, or have been, met when the waste in a closed, unlined impoundment remains in contact with groundwater that freely migrates in and out of the [coal residuals] remaining in the closed unit."  Final Gavin Denial at 33 (J.A. 33, No. 23-1035).  But, as we explained above, EPA regulations adopted long before 2022 independently established that unit operators could not close surface impoundments with coal residuals saturated in groundwater.  *See supra* 14-17.  EPA did not amend the existing regulations when it spelled that out in the final Gavin Denial.  Nor are we persuaded by petitioners' assertion that EPA announced, in the final Gavin Denial, an interpretation of the term "infiltration" in 40 C.F.R. § 257.102(d)(1)(i) that conflicts with its prior description of the term "infiltration" as "applying 'only' to 'percolation' through the cap."  Pet'r Br. 43, No. 23-1035 (quoting EPA, Human and Ecological Risk Assessment of Coal Combustion Residuals, K-1 (Dec. 2014)). The source of that description pre-dates the 2015 Rule, and

24

nothing in the 2015 Rule itself suggests that EPA incorporated that understanding or expressly limited "infiltration" in that manner.

To the extent the Gavin Denial contains any "rule," that rule could at most be interpretive, not legislative, because it clarified and explained preexisting regulatory requirements. *See Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). And, as we explained above, an interpretive rule—which lacks the force and effect of law—is not a "regulation" directly reviewable in this court under RCRA.   *See Cement Kiln Recycling Coal.*, 493 F.3d at 226-27.

We are also unpersuaded that EPA announced a rule of any sort in the final Gavin Denial.   It engaged in classic fact-specific adjudication.   Unlike rulemaking, which typically announces "generally applicable legal principles" and "governs only the future," adjudication involves "case-specific determinations" that "immediately bind parties by retroactively applying law to their past actions."   *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023) (formatting modified).   EPA issued the final Gavin Denial in response to an individual facility's claim of entitlement to an alternative closure deadline under 40 C.F.R. § 257.103.   In it, EPA interpreted the existing 2015 Rule's closure standards for coal residual units and applied them to deny the extension request.   The denial immediately bound the Gavin plant to conform its pending closure proposals to the closure standards. In other words, the Gavin Denial "reads and functions like a judicial decision interpreting an agency regulation and then applying it to resolve a case or controversy."   *Id.*

The role of EPA's final Gavin Denial in elucidating principles that could inform future agency decision-making does not make it a legislative rule.   Nor does the fact that EPA

25

cited the final Gavin Denial in its later proposed disapproval of Alabama's Coal Residual program. EPA's denial of Alabama's program noted that the agency "ha[d] previously explained" in the final Gavin Denial that it "considers groundwater to be a liquid under the existing regulation" and that "a closed, unlined impoundment, where the [coal residual] remains in groundwater several feet deep" did not meet the requirements of § 257.102(d). Alabama: Denial of State Coal Combustion Residuals Permit Program, 88 Fed. Reg. 55220, 55236-37 (Aug. 14, 2023).

"The fact that an order rendered in an adjudication may affect agency policy and have general prospective application" does not make it a legislative rule. *Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017) (quotation marks omitted). To the contrary, "[a]djudicating a specific controversy requires identifying the governing law, which may involve resolving disputes about what that law means." *ITServe All., Inc.*, 71 F.4th at 1035. "Neither does [a] tangential impact on other entities necessarily transform an informal adjudication into a rulemaking since 'the nature of adjudication is that similarly situated non-parties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal.'" *Neustar, Inc.*, 857 F.3d at 895 (quoting *Goodman v. FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999)). We accordingly conclude that the final Gavin Denial did not announce a legislative rule.

**2.**

Having determined that EPA's final Gavin Denial does not include a legislative rule, we consider EPA's assertion that the Denial is nevertheless reviewable in this court under 42 U.S.C. § 6976(a)(1) as a "requirement," and that petitioners therefore forfeited any future challenges to the final Gavin Denial not

26

raised in their opening brief. EPA argues that, because the regulatory closure deadline of April 10, 2021, is, upon submission of a complete extension application, "toll[ed] . . . until issuance of a decision," 40 C.F.R. § 257.103(f)(3)(ii), the order's April 12, 2023, closure deadline imposes a "new obligation that carries legal consequence" and that accordingly constitutes a legal requirement: "Gavin must cease receiving waste . . . by April 12, 2023 (a date not supplied by any statute or regulation)." EPA Br. 22, No. 23-1035.

We need not delineate the exact contours of the word "requirement" in section 6976(a)(1) to decide that the April 12, 2023, deadline set forth in the Gavin Denial is not one. That is because the Gavin Denial imposes no new legal obligations on Gavin. The regulatory scheme always required the Gavin Plant to cease placing coal-combustion residuals in the Bottom Ash Pond by the compliance deadline. *See* 40 C.F.R. § 257.101(a)(1).

EPA highlights that, under section 257.103(f)(3)(ii), "[s]ubmission of a complete demonstration will toll the facility's deadline to cease receipt of waste until issuance of a decision" on the extension, and that an extension decision "will contain" a new deadline "to cease receipt of waste." EPA Br. 20, No. 23-1035. But EPA is wrong to suggest that, absent a decision on Gavin's extension request, the Gavin Plant is under no obligation to close. The fact that the deadline was tolled and then reinstated after the tolling condition expired does not transform the reinstatement of that deadline into a new legal requirement. Moreover, the 2015 Rule mandates that even surface impoundments eligible for an extension must close "no later than October 15, 2023," or, under specified eligibility requirements, "no later than October 15, 2024." *Id.* § 257.103(f)(1)(vi). In light of the nature of tolling as pausing rather than eliminating the deadline, reinforced by the

27

regulatory backstop deadline, we reject EPA's contention that its identification of the closure deadline "impose[d] a new obligation that carries legal consequence" for the Gavin Plant. EPA Br. 22, No. 23-1035. We accordingly lack jurisdiction to review the final Gavin Denial.

\*   \*   \*

For the foregoing reasons, we dismiss the petitions for lack of jurisdiction.

*So ordered.*